*Kyle Jeffery Schwark vs.*

*Sheriff Fred Wegener, et al.*

*Deposition of Katherine Margaret Fitting, MD, FACP*

*January 05, 2017*



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Exhibit E

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 2 of 12

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 17

1   Q.   And do you remember what year?
2   A.   2013, I think.
3   Q.   Okay.
4   A.   And I was called by the nurse who gave me
5   the list of medications and asked if we should -- what
6   his medications should be while being at the Park County
7   jail.
8   Q.   Okay. And what -- I mean, was that an
9   unusual circumstance, where the nurse is calling you and
10  giving you a list of medications and asking you these
11  kinds of questions?
12  A.   No.
13  Q.   Okay. So that's pretty routine?
14  A.   It's routine to check -- for patients who
15  have prescription medications, to call and talk about
16  what will be provided while the inmate is under our
17  custody.
18  Q.   Okay. Now, let me ask you this: A
19  prescription, obviously, is a doctor's order that
20  somebody should be taking whatever the med is, right?
21  A.   That's what a prescription is.
22  Q.   Right. So we have Mr. Schwark going into
23  the jail with doctors saying, You need this medication,
24  Mr. Schwark, right? That's what you understand?
25       MR. MICHALEK: Objection.

Page 18

1   Q.   (By Mr. Lane) He was coming to the jail
2   with other doctors out in the world saying, You need to
3   take this med or that med, or whatever, right?
4        MR. MICHALEK: Object to the form of the
5   question.
6        You can answer.
7   A.   He came to the jail taking medications
8   that were prescribed by other physicians.
9   Q.   (By Mr. Lane) Okay. So my question is:
10  Why is the nurse calling you asking about what he should
11  be taking when he has outside physicians that have
12  already told him what he should be taking?
13  A.   The situation in the jail when someone is
14  incarcerated is a different situation than when that
15  person is out in the community. We have a formulary of
16  medications that we use when someone is in the jail. We
17  don't have --
18  Q.   When you say "a formulary," what does that
19  mean?
20  A.   That's a list of medications that we
21  provide. We may frequently have to substitute
22  medications or change medications.
23  Q.   Why is that?
24  A.   Because we have policies regarding what
25  medications are appropriate and safe to use in the

Page 19

1   setting of an incarceration.
2   Q.   Give me an example of when somebody comes
3   in with a prescription for something and you decide to
4   change it.
5   A.   The patient comes in with a prescription
6   for a blood pressure medication that we don't have on the
7   formulary, and we will substitute a similar medication
8   that will handle the blood pressure issue.
9   Q.   When you say "formulary," it sounds to me
10  like -- obviously, jails are concerned about costs every
11  day. Is formulary another word for a generic substitute
12  for perhaps a higher-priced medicine?
13  A.   Not always.
14       MR. MICHALEK: Object to form.
15  Q.   (By Mr. Lane) Did you get informed that
16  Mr. Schwark had brought all his own meds into the jail?
17  A.   Yes.
18  Q.   Okay. And so he had all his meds.
19       Did you change any of his meds?
20  A.   After the first phone call, no.
21  Q.   Okay. So the nurse read you a list of all
22  the meds that Mr. Schwark was on, and you said, Fine,
23  that's all okay?
24  A.   I said for them to continue that
25  medication.

Page 20

1   Q.   Okay. Is there any fear that somebody
2   brings in narcotics, for example, in a bottle that says
3   it's blood pressure medication or something like that?
4   A.   That's always a possibility. And we don't
5   provide narcotics in the jail setting.
6   Q.   Right. So is there any process for
7   screening, you know, the meds? Somebody claims, Oh, this
8   is blood pressure medication, when, really, it's oxies
9   and it's a narcotic or fentanyl, you know, it's a
10  narcotic; it's not allowed in the jail?
11       Is there some way to screen where the Park
12  County jail gets involved to see that -- you know, He
13  says this is blood pressure medication; how do we
14  actually know it's blood pressure medication?
15  A.   Most of the time, we take those
16  medications and store them with the patient's -- or with
17  the inmate's property and substitute medications from our
18  formulary.
19  Q.   Okay.
20  A.   In the case where there's not an
21  equivalent within the formulary, the nurses check with
22  the PDR or call the pharmacy that dispensed the
23  medication and talk with the pharmacist about identifying
24  that particular medication.
25  Q.   Okay. Was any of that done with

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 3 of 12

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 21

1  Mr. Schwark that you know of?
2       MR. MICHALEK: Object to foundation.
3    A.   I have no knowledge about that.
4    Q.   (By Mr. Lane) All right. But you had
5  this conversation with the nurse and you apparently
6  thought he was on some appropriate medications. So it's,
7  Don't change anything, and on we go, right?
8       MR. MICHALEK: Object to form.
9       You can answer.
10   A.   Not exactly.
11   Q.   (By Mr. Lane) What were your thoughts?
12   A.   My thoughts were that, as per our policy,
13  we don't just discontinue benzodiazepines because of the
14  withdrawal syndrome, and that those meds need to be
15  weaned.
16   Q.   Which of his meds were benzodiazepines?
17   A.   His alprazolam.
18   Q.   Okay. And what was that designed to
19  control?
20   A.   I can't tell you that. I didn't prescribe
21  it for him. And at that point, I had no information from
22  the prescribing physician.
23   Q.   Well, you can't cut him back on that, cold
24  turkey, is what I'm hearing you say, right, because
25  there's a withdrawal problem?

Page 22

1    A.   You can't discontinue cold turkey. You
2  can wean off.
3    Q.   Okay. But were you concerned that he
4  should be weaned off of these meds?
5    A.   Absolutely.
6    Q.   And why should he be weaned off a med that
7  another physician decided he needed?
8    A.   There are medications that are not
9  appropriate in an incarceration situation. And we do not
10  provide benzodiazepines as a standing presentation for
11  any inmates because they are frequently abused, traded,
12  and sold within the setting of the jail.
13   Q.   Well, I have been doing this now for 37
14  years and I've been involved in the criminal justice
15  system for 37 years. It is my belief that I've never, in
16  37 years, found a jail that just gives a bottle of pills
17  to an inmate and said, Okay, here's your prescription; go
18  take your meds according to what the bottle says.
19       In every jail in America, they have what
20  is called a med line. Are you familiar with the med
21  line?
22       MR. MICHALEK: Object to form of the
23  question.
24   A.   Yes, I am.
25   Q.   (By Mr. Lane) Okay. And the med line is

Page 23

1  every morning or every afternoon or every evening,
2  there's a medical call. The nurses in the jail have
3  medications for every inmate that's on medication, and
4  it's -- whatever the prescribed dose is, it's in the
5  little paper cup. The inmate gets that dose and no more
6  and no less. The medication is taken in the presence of
7  the nurse.
8       Are you familiar with that concept?
9    A.   Yes, I am.
10   Q.   And I also understand that there is a fear
11  that an inmate could hide the med under his tongue or up
12  in his cheek or wherever and ultimately save them up and
13  abuse them or sell them or do all those things.
14       You're familiar with that concept, right?
15   A.   Yes, I am.
16   Q.   But those things can pretty easily be
17  checked simply by having a nurse with a rubber glove do a
18  thorough inspection of the inmate's mouth, right?
19       MR. MICHALEK: Object to form.
20   A.   That can be done.
21   Q.   (By Mr. Lane) Okay. Do you know who the
22  doctor was that prescribed the benzodiazepine --
23   A.   I believe --
24   Q.   -- for Mr. Schwark?
25   A.   -- it was Dr. Singer.

Page 24

1       MR. MICHALEK: Let him finish his question
2  before you answer. Slow down.
3       THE DEPONENT: Sorry.
4    Q.   (By Mr. Lane) No, you're good.
5       What was your understanding of what was
6  being controlled by the benzodiazepines in Mr. Schwark's
7  case?
8    A.   At the time of the phone call, I had no
9  medical history for him, so I did not know what
10  Dr. Singer prescribed that for.
11   Q.   Do you have -- did you get knowledge from
12  a nurse that a judge had ordered that Mr. Schwark
13  continue his medications?
14   A.   I'm not sure exactly when that was told to
15  me, but it was told to me that Mr. Schwark said that the
16  judge had given -- or written a letter that said he
17  should receive those meds.
18   Q.   Could withdrawal from benzodiazepines
19  cause seizures, based on your training and experience?
20   A.   Yes, it can.
21   Q.   And Mr. Schwark ultimately had some
22  seizures while at the jail, didn't he?
23   A.   Yes, he did.
24   Q.   Do you know what the cause of those
25  seizures was?

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 4 of 12

Kyle Jeffery Schwark vs.  
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP  
January 05, 2017

Page 25

1  A.  I don't know for certain. I have a
2  medical opinion.
3  Q.  What is your medical opinion?
4  A.  My medical opinion is it was an
5  alcohol-withdrawal seizure.
6  Q.  And why do you have that medical opinion?
7  A.  I was informed that we had an alcohol
8  level that indicated the use of alcohol prior to being
9  taken into the Park County jail.
10  Q.  Do you know what his BAC was when he got
11  to the Park County jail?
12  A.  I don't.
13  Q.  Okay. Is there anything that would
14  refresh your recollection on that?
15  A.  I know that we had a level of .02, but I
16  believe that was Breathalyzer as opposed to blood.
17  Q.  Okay. All right. You would agree that
18  those are -- generally, a blood test is a more accurate
19  test, but a Breathalyzer test is usually pretty accurate?
20       MR. MICHALEK:  Object to form.
21  A.  The Breathalyzer is what's generally used
22  by the personnel at the Park County jail.
23  Q.  (By Mr. Lane)  Right. It's acceptable in
24  a court of law for DUI purposes and other purposes,
25  right?

Page 26

1       MR. MICHALEK:  Object to foundation.
2  A.  You would know better than I.
3  Q.  (By Mr. Lane)  Right. I'm just saying --
4  you've distinguished between the Breathalyzer and the
5  blood test, and he had .02 at some point.
6       You're not suggesting that that's an
7  inaccurate reading, are you?
8  A.  No.
9  Q.  Okay. So what was his prescription
10  medication that the benzodiazepine was designed to
11  prevent, or what condition was it being given to him to
12  alleviate?
13  A.  As I said before, I don't know what
14  indication Dr. Singer used for that prescription.
15  Q.  Well, but he was on this med for a reason,
16  presumably, right?
17  A.  I would certainly hope so.
18  Q.  Okay. And did you make any effort to
19  determine what the reason for his being on that med was?
20  A.  I asked the nurse what his medication was,
21  and they gave me the information that they had, which was
22  he was on those meds, but we did not have an indication.
23  Q.  Okay. And you left the status quo after
24  your first conversation with the nurse, right?
25  A.  That is correct.

Page 27

1  Q.  Okay. But at some point, you changed the
2  status quo, right?
3       MR. MICHALEK:  Object to form.
4  Q.  (By Mr. Lane)  You want to wean him off
5  the benzodiazepines, right?
6  A.  We're talking about his first
7  incarceration; is that correct?
8  Q.  Yes.
9  A.  With the first incarceration, I did not
10  start a wean. We had an episode where he had what was
11  felt to be a seizure in the pod. I was called regarding
12  that episode. I asked them to place him on a different
13  protocol that would help protect against
14  alcohol-withdrawal seizures.
15  Q.  Okay. And how much time had passed
16  between his first going to the jail and this next phone
17  call you got that he had had a seizure? Can you just
18  ballpark it, if you don't know?
19  A.  From when he came in or from when I had my
20  first conversation?
21  Q.  What I'm -- well, he came into the jail
22  and he had -- he was on these meds. How long was he in
23  the jail before the nurse called you the very first time
24  and said, Hey, we've got this guy here named Schwark,
25  he's on these meds, and asked for your opinion?

Page 28

1       How much time passed from the time he went
2  into the jail until you got that phone call? Do you
3  know?
4  A.  The first phone call?
5  Q.  Yeah.
6  A.  I don't know precisely, but it would be
7  on -- the time that the call was made is on the
8  medication administration record.
9  Q.  What's the normal course for the jail when
10  they've got somebody on meds?
11       MR. MICHALEK:  Object to form.
12  A.  The nurses have an intake sheet which is
13  provided to each inmate when they come in where they
14  record their current medical conditions and their
15  medications. Those then go to the nurses for review.
16  Once they're reviewed, then if there are questions
17  regarding those medications or what should be provided to
18  the patient, I'm called.
19  Q.  (By Mr. Lane)  Okay. How much -- what's
20  the normal course of the interval? Is it an hour? Is it
21  a day? Is it a week? Is it two weeks between somebody
22  coming in on meds and you getting a call from a nurse
23  saying, The guy's on these meds; what do you want us to
24  do?
25       MR. MICHALEK:  Object to form.

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 5 of 12

Kyle Jeffery Schwark vs.                                                           Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                                                                              January 05, 2017

Page 29

1   You can answer.
2   A.   That can vary depending on what time
3   someone is brought in, what day of the week, if it's a
4   weekend or holiday.  But in general, that would happen
5   within 12 to 24 hours.
6   Q.   (By Mr. Lane)  Okay.  You would agree with
7   me that a seizure is a very serious medical issue, would
8   you not?
9        MR. MICHALEK:  Object to form.
10  A.   Yes, a seizure is a worrisome condition.
11  Q.   (By Mr. Lane)  And it can be fatal.  You
12  would agree with me, right?
13  A.   In rare circumstances, it can be fatal.
14  Q.   And would you agree with me that if
15  someone suffers from a seizure, they should be
16  hospitalized?
17  A.   Not always.
18  Q.   Okay.  Under what circumstances should
19  somebody be hospitalized after a seizure as opposed to
20  not hospitalized after a seizure?
21       MR. MICHALEK:  Object to form.
22  A.   The most direct reason for hospitalizing
23  someone with a seizure is if they have a condition called
24  status epilepticus, which is the seizure continues on --
25  is not self-terminating -- or if repeated seizures occur.

Page 30

1   Q.   (By Mr. Lane)  All right.  Why did you not
2   change the status quo after the first call from the nurse
3   where you found out he was on benzodiazepines?  Why did
4   you not try to wean him at that point?
5   A.   I had a call early in his incarceration
6   and didn't have a chance to look at the full picture.
7   And so my expectation was we needed to just get something
8   on board at that time, and then we could look at how we
9   would go about weaning him after that.
10  Q.   So he was able to continue to take his
11  benzodiazepines after that first phone call, right?
12  A.   Yes.  He got his regularly prescribed
13  alprazolam after that phone call, until the second phone
14  call.
15  Q.   And how long had passed between the first
16  phone call and the second phone call?
17  A.   I don't know exactly --
18  Q.   Just ballpark.
19  A.   -- but I think somewhere around 12 hours.
20  It might have been a little bit longer.  I'm not certain.
21  Q.   Okay.  So it's not a hard-and-fast strict
22  rule that you can't have benzodiazepines at the jail, he
23  had benzodiazepines at the jail, right?
24       MR. MICHALEK:  Object to form.
25  A.   He received his medication, and our

Page 31

1   expectation would be he would be weaned off of
2   benzodiazepines.  That is the policy for all patients who
3   come in on benzodiazepines, with the exception of someone
4   who is on it for a known seizure disorder for which that
5   is the only medication that controls a known seizure
6   disorder.
7   Q.   (By Mr. Lane)  Okay.  So everybody who's
8   getting weaned off of benzodiazepines continues to take
9   benzodiazepines while at the jail; they're just taking
10  smaller doses, right?
11  A.   Until they come off.  That's correct.
12  Q.   So there is no actual rule that says you
13  can't have -- you can't be on benzodiazepines at the
14  jail, because everybody who is getting weaned is on
15  benzodiazepines at the jail, right?
16       MR. MICHALEK:  Object to form.
17  A.   That's one way to look at it.  But if we
18  had a standing rule that you couldn't wean off of
19  benzodiazepines, then the jail couldn't accept anyone who
20  had a prescription for a benzodiazepine.  And that would
21  not be appropriate.
22  Q.   (By Mr. Lane)  And what are the side
23  effects from being weaned off benzodiazepines?
24  A.   Being weaned off?
25  Q.   Yes.

Page 32

1   A.   It may be related -- it will depend from
2   person to person and why the benzodiazepines was
3   prescribed for them.  But if a wean is done over an
4   appropriate period of time, the weaning process itself
5   shouldn't cause a lot of symptoms.  The condition for
6   which they're taking that may become more symptomatic.
7   Q.   But you've testified, if I am correct,
8   that you didn't know what the condition was that was
9   causing Mr. Schwark to take benzodiazepines, right?
10  A.   That's correct.
11  Q.   So you don't have any knowledge whether
12  his symptoms became more severe or were unaffected by his
13  being weaned, right?
14       MR. MICHALEK:  Object to form.
15  A.   Which incarceration are we talking about
16  now?
17  Q.   (By Mr. Lane)  Well, the second call came
18  12 hours after the first call to you from the nurse,
19  right?
20  A.   Correct.
21  Q.   It was at the second call that you told
22  the nurse to start weaning him off of benzodiazepines,
23  right?
24  A.   No.
25  Q.   Oh, I'm sorry.  That's my

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 6 of 12

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 33

1  misunderstanding.
2      Will you clarify, then? What was the
3  second call about?
4      A.  The second call was about having the
5  seizure. I asked that he be put on our
6  alcohol-withdrawal protocol, which substitutes a
7  different benzodiazepine which is stronger and longer
8  acting than the one that he had a prescription for.
9      Q.  Okay. And what was it that led you to
10 believe that he was having alcohol withdrawal and that's
11 what caused the seizure?
12     A.  The fact that he had a history of coming
13 in with an alcohol level and the fact that he had a
14 seizure within the time frame that is typically seen for
15 alcohol-withdrawal seizures, which is while those alcohol
16 levels are falling.
17     Q.  Okay. Did you request that anyone
18 interview Mr. Schwark to find out if he's suffering from
19 alcohol withdrawal?
20         MR. MICHALEK: Object to form.
21     A.  I didn't ask them to ask that specific
22 question.
23     Q.  (By Mr. Lane) All right. I mean,
24 patients are sometimes really unreliable sources of
25 information, and sometimes they're very reliable sources

Page 34

1  of information.
2      Would you agree with that?
3      A.  I would agree with that.
4      Q.  And if Mr. Schwark, for example, said,
5  Yeah, I had one drink this morning, but prior to that, I
6  hadn't had anything to drink in two months, then that
7  might have made you wonder about, Well, I wonder if this
8  actually is alcohol withdrawal, because if he's telling
9  the truth, this does not sound like it should be alcohol
10 withdrawal, right?
11         MR. MICHALEK: Object to form.
12     A.  If you can get a reliable and accurate
13 history, then that may be helpful. However, with the
14 population we work with, we generally don't get a
15 reliable and accurate history.
16     Q.  Understood.
17         Did anyone, to your knowledge, talk to
18 Mr. Schwark about whether he had a history of seizures?
19     A.  I have no knowledge about that.
20     Q.  I mean, do you know whether Mr. Schwark
21 has epilepsy?
22     A.  I know that that wasn't listed as one of
23 his medical conditions.
24     Q.  So a history is taken from the inmate upon
25 intake, right?

Page 35

1      A.  Upon intake, the inmate is given a form to
2  fill out. And we have certain conditions that we flag so
3  that a call comes to me immediately if that condition is
4  reported. Epilepsy is one of them, along with things
5  like diabetes, heart disease, certain pulmonary
6  conditions.
7          (Ms. Wolak exited the room.)
8      Q.  (By Mr. Lane) And you're getting these
9  histories from an inherently unreliable population,
10 right?
11     A.  That's correct.
12     Q.  So did anyone, to your knowledge, after
13 Mr. Schwark had his seizure, ask Mr. Schwark,
14 Mr. Schwark, have you ever had a seizure before?
15     A.  I don't know whether that question was
16 asked or not.
17     Q.  You assumed the seizure was alcohol
18 withdrawal. But if he had a history from childhood of
19 having seizures on a regular basis, wouldn't that
20 indicate that it might not be alcohol withdrawal?
21         MR. MICHALEK: Object to form and
22 foundation.
23         MR. ZIPORIN: Same --
24         MR. LANE: Mr. Ziporin, nobody could
25 understand what you just said.

Page 36

1          MR. ZIPORIN: Same objection.
2          MR. LANE: Okay.
3      A.  When I made the determination that this
4  was, most likely an alcohol-withdrawal situation, I had
5  first gone through a critical-thinking process, which
6  involves constructing a differential diagnosis for the
7  situation. And in that, I think about the various things
8  that can cause withdrawal.
9          Given the information that I had, it
10 seemed to me, in my medical judgment, that the most
11 likely cause was an alcohol-withdrawal seizure. I also
12 considered the fact that if it was not, the protocol I
13 put him on was protective from further seizures,
14 regardless of what the underlying diagnosis was or the
15 underlying cause for that seizure.
16     Q.  (By Mr. Lane) Okay. So the protocol you
17 put him on was going to prevent seizures, likely,
18 regardless of the cause?
19     A.  That was the intent.
20     Q.  Okay. So who called you and described the
21 seizure to you?
22     A.  I was called by one of the jail nurses.
23     Q.  Do you know who?
24     A.  I don't remember, specifically, which
25 nurse it was.

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 7 of 12

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 37

1  Q. And what did that nurse tell you?
2  A. That he had had a seizure -- or what
3  appeared to be a seizure -- in the pod, and that they had
4  brought him down to Medical and wanted to know what
5  further orders I wanted to give.
6  Q. And did you get a description of what
7  exactly the seizure looked like?
8  A. I don't recall whether they told me
9  exactly what the seizure looked like.
10 Q. I mean, you would agree that there are
11 different types of seizures, wouldn't you?
12 A. Yes, there are different types of
13 seizures.
14 Q. Are some seizures more indicative of
15 alcohol withdrawal than other seizures?
16    In other words, the physical description
17 of what a seizure is looking like, would that be more
18 indicative of alcohol withdrawal as opposed to epilepsy?
19 A. No.
20 Q. So seizures can look different, but these
21 differences can manifest from all sorts of different
22 causes?
23 A. I would agree with that statement.
24 Q. Okay. Was Mr. Schwark exhibiting any
25 signs of dehydration, to your knowledge?

Page 38

1  A. I know only that his vital signs were
2  stable and he did not have the typical pattern of
3  significant dehydration. He did not have a resting
4  tachycardia and he had a normal blood pressure.
5  Q. And you would agree with me that a typical
6  symptom of alcohol withdrawal would be an inability to
7  hydrate, meaning you're vomiting, you are -- and diarrhea
8  is a frequent side effect from alcohol withdrawal.
9  You're unable to keep fluids in your body.
10    Would you agree that that is a typical
11 symptom of alcohol withdrawal?
12    MR. MICHALEK: Object to form.
13 A. I would not say typical. I would say that
14 those conditions can be associated with alcohol
15 withdrawal, but it's not what I typically see.
16 Q. (By Mr. Lane) And you would also agree
17 with me that alcohol withdrawal itself can be a fatal
18 condition?
19    MR. MICHALEK: Object to form.
20 A. The falling alcohol level can result in
21 alcohol-withdrawal seizures, which, if not properly
22 controlled, could lead to fatality. But that would be,
23 by far, the rare exception.
24 Q. (By Mr. Lane) So you're saying that the
25 only way alcohol withdrawal can be fatal is if you have a

Page 39

1  seizure and the seizure kills you, ultimately?
2     MR. MICHALEK: Object to form.
3  Q. (By Mr. Lane) Is that your understanding?
4  A. I think that's an over-simplification.
5  Q. Well, dehydration can cause electrolyte
6  imbalances, correct?
7  A. That's correct.
8  Q. And electrolyte imbalances can stop the
9  human heart from beating, correct?
10 A. They can.
11 Q. Have you -- are you aware that alcohol
12 withdrawal can, in fact, result in dehydration, which
13 leads to an electrolyte imbalance, which stops the human
14 heart?
15 A. I am aware that that is a remote
16 possibility.
17 Q. Okay. How do you know when an
18 alcohol-withdrawal seizure needs to result in
19 hospitalization?
20 A. Recurrent seizures would result in a
21 hospitalization. The failure of a seizure to terminate
22 in a timely fashion would -- injury because of the
23 seizure would -- if we had -- well, if you had other
24 confounding clinical conditions, you might have a lower
25 threshold for requesting a hospitalization.

Page 40

1  Q. Okay. So the second call comes in. You
2  put him on a different dose of benzodiazepines, right?
3     MR. MICHALEK: Object to form.
4  A. I put him on the medication that's
5  primarily used to treat an alcohol-withdrawal
6  situation.
7  Q. (By Mr. Lane) And that is what again?
8  A. Librium.
9  Q. Librium. All right.
10    Did you discontinue his original
11 medication that Dr. Singer had prescribed?
12 A. I did.
13 Q. And why did you do that?
14 A. Because there is contraindication to being
15 on more than one benzodiazepine at a time.
16 Q. Okay. At any time, did you make an effort
17 to contact Dr. Singer and talk to him about Mr. Schwark's
18 condition?
19 A. Multiple calls were made to Dr. Singer's
20 office.
21 Q. By you?
22 A. By the nursing staff.
23 Q. Okay. And did they talk to Dr. Singer?
24 A. They were unable to talk to Dr. Singer,
25 and they did not receive the requested records.

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 8 of 12

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 41

1  Q. So you changed his meds 12 hours after you
2  got the first phone call. What happens then? What was
3  your next interaction with the Kyle Schwark medical
4  situation?
5  A. Later that day, I was called and told he
6  had been transported to Denver Health because he had had
7  a seizure -- a subsequent seizure and had fallen and
8  injured himself.
9  Q. All right. Let me ask you about that.
10 You understand that when people are having a seizure,
11 they're unconscious?
12 A. When they have a generalized tonic-clonic
13 seizure, they will be unconscious.
14 Q. And that's what Mr. Schwark seemed to be
15 having; is that correct?
16 A. By report, yes.
17 Q. Okay. And when someone is having a
18 seizure frequently, they are in convulsions of some sort,
19 correct?
20 A. That would be a synonym for seizure.
21 Q. Okay. Well, I mean, their body is moving
22 without conscious thought by the person having the
23 seizure, frequently?
24 A. Correct.
25 Q. And you know how Mr. Schwark ended up

Page 42

1  getting injured, correct?
2  A. Yes.
3  Q. How did he get injured?
4  A. I was -- it was reported to me that he was
5  in Medical, under observation, that he was leaning up
6  against the exam table, and that he then fell and hit his
7  head either during a seizure or in that same time frame
8  as a seizure activity was noted.
9  Q. Well, the fact is he was told to lie down
10 on the table. And he was lying down on it, wasn't he?
11     MR. MICHALEK: Object to form and
12 foundation.
13 A. I was not present, so I can't say that I
14 saw what position he was in.
15 Q. (By Mr. Lane) You would agree that
16 someone with a seizure disorder or is having seizures or
17 has just had a seizure has to be watched to determine --
18 you know, to make sure that they're protected if they
19 have another seizure, right?
20     MR. MICHALEK: Object to form of the
21 question.
22 A. Yes, observation would be indicated.
23 Q. (By Mr. Lane) So, for example, if
24 somebody's having seizures at the jail, would you give
25 them a bottom bunk restriction?

Page 43

1  A. It depends on what you mean by having a
2  seizure situation in the jail.
3  Q. Well, if somebody has had a seizure, is it
4  sound policy to put that person on a top bunk, because if
5  they have another seizure, they could very easily fall
6  out of their top bunk and injure themselves?
7      MR. MICHALEK: Object to form.
8  A. For patients that have known seizure
9  disorders, that's generally the way that is handled. For
10 single seizures that we feel may be related to alcohol,
11 since those generally are isolated and don't recur,
12 that's not always the situation.
13 Q. (By Mr. Lane) Well, let's assume for a
14 minute Mr. Schwark was lying down on the examination
15 table.
16    Now, you're familiar with hospital beds,
17 right?
18 A. Yes, I am.
19 Q. Hospital beds have rails that come up to
20 prevent patients from coming out of their beds, correct?
21 A. Many of them do.
22 Q. And Mr. Schwark was in Medical, having
23 just recently had a seizure, correct?
24     MR. MICHALEK: Object to form.
25 A. Yes.

Page 44

1  Q. (By Mr. Lane) Is it sound policy to allow
2  someone to lie down on a table who's just had a seizure
3  when they could fall off the table and injure themselves?
4      MR. MICHALEK: Object to form.
5  A. I don't see a reason not to have him lie
6  down.
7  Q. (By Mr. Lane) Well, there's lying down
8  and there's lying down. There's lying down on a metal
9  table that has no rails, and if you have a seizure, you
10 could fall off and crack your head open, which is what
11 happened to Mr. Schwark, right?
12     MR. MICHALEK: Object to form. It's a
13 mischaracterization of the testimony.
14     MR. ZIPORIN: Same objection.
15 Q. (By Mr. Lane) Right?
16     MR. MICHALEK: Object to form.
17     MR. LANE: You've objected. Your
18 objection is noted.
19 A. Can you restate the question?
20 Q. (By Mr. Lane) Yeah. Mr. Schwark cracked
21 his head open because he had another seizure while in
22 Medical, right?
23 A. Yes.
24 Q. Mr. Schwark claims he was lying down on a
25 table in Medical and he was unprotected at the time.

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 9 of 12

Kyle Jeffery Schwark vs.                                              Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                          January 05, 2017

Page 57

1   vomiting, right?
2       A.   He vomited, yes.
3       Q.   And we don't know why; isn't that right?
4       A.   I don't know why.
5       Q.   Okay. That's when Nurse Pearce says, "We
6   checked him over and got him some water and called the
7   doctor."
8            Do you know who "we" is?
9       A.   I wasn't there, so I don't know for sure.
10      Q.   Okay. Well, Pearce was there.
11      A.   Yes.
12      Q.   But you don't recall talking to Pearce,
13  right?
14           MR. MICHALEK: Object to form.
15      A.   I know I spoke with nurses. I don't know
16  which one of the nurses.
17      Q.   (By Mr. Lane) You talked to multiple
18  nurses or a nurse?
19      A.   I believe, over this time frame, I spoke
20  to more than one nurse.
21      Q.   But you don't remember who?
22      A.   No.
23      Q.   Okay. And there's no note that you took
24  that would help refresh your recollection on that, is
25  there?

Page 58

1       A.   That I wrote, personally?
2       Q.   Yes.
3       A.   No.
4       Q.   Okay. "He kept talking and drinking
5   fluids. About 5:10 pm he said he was really tired. I
6   told him to lay back and try to sleep. He started to get
7   comfortable. I went back to work."
8            All right. Let me backtrack on this. Do
9   you see, up near -- about a third of the way down, it
10  says, "We took him to medical in a wheel chair [sic]. He
11  was very sick to his stomach." And then the very next
12  sentence says, "We put him on the medical table and got
13  him a blanket."
14           Do you see that sentence right there?
15      A.   I see that sentence.
16      Q.   That would indicate to me that he was
17  lying down on the medical table and they were going to
18  cover him with a blanket. That doesn't indicate to me
19  that he was leaning against the medical table; that means
20  he was lying down on the medical table. That's how I
21  read that.
22           Let me ask you. How do you read that?
23           MR. MICHALEK: Object to the form of the
24  question and foundation.
25      A.   That statement would indicate that when he

Page 59

1   was first brought down to Medical, they had him lie down
2   on the medical table.
3       Q.   (By Mr. Lane) Okay. And I presume the
4   medical table is sort of a standard height for a table;
5   isn't it?
6            MR. MICHALEK: Object to form.
7       Q.   (By Mr. Lane) I mean, let me -- you've
8   seen the medical table at the Park County jail, right?
9       A.   Yes.
10      Q.   Okay. I'm going to stand up. We're
11  seated at a conference room table. Is the medical table
12  about as high off the ground as this conference room
13  table or is it a little higher or is it a little lower?
14  Do you know?
15           Would it help to be standing up so you can
16  compare and contrast?
17      A.   It's similar in height.
18      Q.   Okay. And I'm guessing this table is
19  about -- I don't know -- 3 feet high. I don't know.
20           Is that a fair estimate?
21      A.   I don't really have calibrated eyeballs.
22      Q.   Right. I'm just guessing.
23           This is a normal table; you would agree
24  with me?
25      A.   It's a normal table.

Page 60

1       Q.   And is the Park County medical table a
2   normal table? Is it about the same height, or is it
3   taller or shorter? Do you know?
4       A.   It's about the same height.
5       Q.   Okay. He got 25 milligrams of Librium.
6   What would be the effect of 25 milligrams of Librium on
7   Mr. Schwark?
8       A.   The expectation was it would help prevent
9   further alcohol-withdrawal seizures.
10      Q.   Okay. He started to get comfortable, and
11  she went back to work.
12           Now, I take that to mean that he was lying
13  down on this medical table trying to get comfortable. Is
14  that how you take that?
15           MR. MICHALEK: Object to form and
16  foundation.
17      A.   I don't know what position he would have
18  been in when he was feeling comfortable.
19      Q.   (By Mr. Lane) No. I'm not saying what
20  position he was in. I'm simply saying, when I read that
21  note, I'm thinking, Here's a guy lying down on a medical
22  table with a blanket on him trying to get comfortable.
23  Whatever position that is, he's lying town trying to get
24  comfortable.
25           Is that how you read that?

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 10 of 12

Kyle Jeffery Schwark vs.  
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP  
January 05, 2017

Page 81

1  A.  Protect patient something. I don't know
2  what that word is.
3  Q.  Something seizure?
4  A.  Right.
5  Q.  And then what does Note Number 2 mean?
6      MR. MICHALEK: Object to foundation.
7  A.  I think it says, Attempted with something
8  precautions.
9  Q.  (By Mr. Lane) Spinal precautions of some
10 sort?
11     MR. MICHALEK: Object to foundation.
12 A.  I can't tell.
13 Q.  (By Mr. Lane) Okay. Number 3, Notify EMS
14 for transport and, Number 4, Consulted a nurse.
15     MR. MICHALEK: Object to foundation.
16 Q.  (By Mr. Lane) Is that what that says?
17 A.  That's what I think it says.
18 Q.  This is a typical medical note that you
19 would see at the jail, isn't it, meaning it's on a
20 medical form from the jail?
21 A.  It's on a medical form from the jail, yes.
22 Q.  Okay. And you're familiar with these
23 kinds of notes; is that correct?
24 A.  What kind of notes?
25 Q.  Well, you -- this is a typical thing in a

Page 82

1  medical file for an inmate with a medical issue, isn't
2  it?
3      MR. MICHALEK: Object to form.
4  Q.  (By Mr. Lane) And this form is
5  commonly --
6  A.  This form is used for reporting medical
7  situations.
8  Q.  Would it be possible that the person who
9  filled it out and signed on the right -- 3701, could that
10 be a badge number for a deputy?
11 A.  It could be.
12 Q.  Would a deputy typically fill something
13 like this out?
14 A.  I don't know the jail policy on what the
15 deputies are supposed to document, but it could be.
16 Q.  Okay. On November 15th -- well, do you
17 know how Mr. Schwark got from Summit County to Denver
18 Health?
19 A.  I don't -- I don't know for certain, but I
20 suspect he was ground transported.
21 Q.  Let's talk about his second stay at the
22 jail.
23 A.  Okay.
24 Q.  When was the next time that Kyle Schwark's
25 name became known to you?

Page 83

1  A.  I was called sometime after he came back
2  to the Park County jail.
3  Q.  Do you recall approximately when that was?
4  A.  I think it was in February.
5      MR. LANE: Okay. You know what? There is
6  a document I need to get. Let me take 30 seconds and go
7  get it. I'll be right back.
8      (Recess from 11:15 a.m. to 11:17 a.m.)
9  Q.  (By Mr. Lane) Okay. When is your best
10 estimate as to when he got back for the second stay?
11 A.  I'm guessing February.
12 Q.  Okay. And how did he come to your
13 attention on the second go-around?
14 A.  I received a call from one of the nurses.
15 Q.  Do you recall which nurse?
16 A.  I do not.
17 Q.  And what did that nurse tell you?
18 A.  As I recall, that he was back -- that he
19 was brought in by the deputies to complete the sentence.
20 Q.  Why were you called about that?
21 A.  To notify me that he was in and to get an
22 idea on how we were going to manage his medication.
23 Q.  Okay. So you discussed his medication
24 with whoever called you?
25 A.  Yes.

Page 84

1  Q.  Okay. And what was said during that
2  conversation?
3  A.  The exact conversation I don't recall, but
4  I know that we discussed what medication he was on and
5  how we would manage weaning him from his benzodiazepines.
6  Q.  Okay. So what -- I mean, were you
7  given -- on the first go-around, they called you with a
8  list of his meds, and you said, Keep the status quo. Did
9  they do the same thing the second go-around in February?
10 A.  I don't remember whether they went through
11 his entire list of medications, but we did talk about the
12 benzodiazepines and the Suboxone.
13 Q.  Okay. And what did you say about those
14 things?
15 A.  I asked if we had received records from
16 the hospital, and I asked if we had received records from
17 Dr. Singer. We had not received any records from either
18 source. So without access to those records, I evaluated
19 the meds that he was on and gave them orders for his wean
20 from his benzodiazepines.
21 Q.  Okay. Would it refresh your recollection
22 if I told you that on February 25th, he was on Suboxone,
23 chlordiazepoxide, and alprazolam?
24 A.  Yes.
25 Q.  Okay. And we've already talked about

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 11 of 12

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 85

1  everything.  What is the -- we have not talked about the
2  chlordiazepoxide.  What is that?
3      A.   It's chlordiazepoxide, and that's Librium.
4      Q.   Okay.  And why -- we've talked about the
5  Suboxone was for his prior heroin use.  And the
6  alprazolam was given to him for what purpose?
7      A.   That was Dr. Singer's prescription.  I
8  didn't have records from Dr. Singer, so the exact
9  indication, I don't know.
10     Q.   And the chlordiaz- -- what did you say?
11     A.   Chlordiazepoxide?
12     Q.   What is that for?
13     A.   It's also a -- it's a long-acting
14  benzodiazepine.
15     Q.   Okay.  And so as of February 25th, you
16  were ordering him to -- you were ordering your medical
17  staff to wean him off the chlordiazepoxide, as well as
18  the alprazolam?
19     A.   Correct, because there's no reason he
20  should be on two benzodiazepines.  One, necessarily, had
21  to go because there's a contraindication for an increased
22  possibility of adverse side effects from those
23  medications; higher chance of overdosing on the
24  benzodiazepines.  And then we started on the wean that we
25  use when anybody who is on chronic benzodiazepines

Page 86

1  therapy undergoes when they are at the jail.
2      Q.   Okay.  Again, Dr. Singer had prescribed
3  these things to Mr. Schwark, based on what your review of
4  the record was, correct?
5      A.   I was told that -- yeah.  We had pictures
6  of his bottles that had Dr. Singer's name on it as the
7  prescribing physician.
8      Q.   Did you --
9      A.   I didn't have records from Dr. Singer.
10     Q.   Did you, personally, ever pick up the
11  phone and try to call Dr. Singer?
12     A.   No.
13     Q.   Did Dr. Singer ever contact anybody at the
14  jail that you know of?
15     A.   I have no knowledge that Dr. Singer,
16  himself, ever contacted the nurses.
17     Q.   Are you aware that Mr. Schwark's mother,
18  on February 28th, contacted the jail and asked if she
19  needed to bring Mr. Schwark's medications to the jail?
20     A.   No.
21     Q.   Are you aware of the fact that Mr. Schwark
22  had a cervical hard collar prescribed to him for the
23  injury that he suffered when he fell off the table?
24     A.   At that time, I had no information
25  regarding what was prescribed for him during his

Page 87

1  hospitalization at Denver Health.
2      Q.   Do you believe that -- what is the
3  function of a protective cervical hard collar?
4      A.   To stabilize the neck.
5      Q.   Is that done by prescription?
6      A.   It can be.  You can also purchase a hard
7  collar at a pharmacy.
8      Q.   All right.  If it is -- if a hard
9  collar -- if a cervical hard collar was prescribed by
10  somebody at Denver Health, would you have ordered that it
11  be taken from Mr. Schwark?
12     A.   No.
13     Q.   All right.  Would you agree that taking
14  away a hard collar from somebody who has a prescription
15  for a hard collar could exacerbate cervical issues?
16          MR. MICHALEK:  Object to form.
17     A.   If they had an acute fracture and they
18  were still within the time frame for which they needed
19  that protection, then the answer would be yes.
20     Q.   (By Mr. Lane)  Are you aware that on his
21  second incarceration, Mr. Schwark began to suffer major
22  hallucinations?
23     A.   I was informed of that.
24     Q.   Do you know what the cause of those
25  hallucinations was?

Page 88

1      A.   No.
2      Q.   Are there psychotropic medications that
3  people can be given to mitigate or stop hallucinations?
4      A.   Yes, there are.
5      Q.   What are those kinds of meds?
6      A.   Antipsychotics.
7      Q.   Okay.  Did you prescribe antipsychotics
8  for Mr. Schwark?
9      A.   I don't do any of the mental health
10  prescribing at the jail.  We have a mental health
11  provider that does that, so I referred him to her.
12     Q.   On March 6th, did you have an email
13  correspondence with Nurse Canterbury?
14     A.   I have no idea.
15     Q.   Okay.  Well, did you ever look at the
16  records from Denver Health or Summit County stemming from
17  Mr. Schwark's fall?
18     A.   And when you say "ever," do you mean ever
19  in my lifetime?
20     Q.   Ever in your lifetime.  We'll start there.
21     A.   I have subsequently seen some of those
22  records.
23     Q.   Okay.  While Mr. Schwark was in your care,
24  did you ever see those reports?
25     A.   No.

Case 1:15-cv-02507-JLK   Document 65-5   Filed 05/08/17   USDC Colorado   Page 12 of 12

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 93

1   A.   Yes.
2   Q.   It's for Kyle Schwark.  Number 1 says, "DC
3   Suboxone."  What is -- is that to discontinue Suboxone?
4   A.   Correct.
5   Q.   Number 2, "DC" --
6   A.   Chlordiazepoxide.
7   Q.   Right.  Discontinue that?
8   A.   Yes.
9   Q.   And then to wean off the --
10  A.   Alprazolam.
11  Q.   Alprazolam.
12       Okay.  What does the rest of that note
13  mean?
14  A.   That's the dosing schedule for the
15  alprazolam.
16  Q.   Okay.  You were just going to cut him off
17  completely on the Suboxone and chlordiazepoxide?
18  A.   Chlordiazepoxide.
19  Q.   Right.
20  A.   As I stated earlier, it's contraindicated
21  to be on two benzodiazepines at the same time, so the
22  chlordiazepoxide was discontinued.  The Suboxone, which
23  is indicated to help people with urges to use alcohol or
24  narcotics, was discontinued because there's no access to
25  alcohol or narcotics in the jail, so it wasn't needed for

Page 94

1   his medical therapy.
2   Q.   What is your best understanding of why
3   Kyle Schwark was hallucinating in the jail in February?
4   A.   I don't know why he was hallucinating,
5   which is why I referred him to the psychiatric nurse.
6   Q.   Did he see the psychiatric nurse?
7   A.   I don't know.
8   Q.   Would you agree that hallucinations are a
9   symptom of a psychotic state?
10       MR. MICHALEK:  Object to form.
11  A.   They can be.
12  Q.   (By Mr. Lane)  If someone is actively
13  hearing voices or seeing things, assuming that it is not
14  caused by hallucinogenic drugs, isn't that sort of the
15  quintessential benchmark of psychosis?
16  A.   Those are symptoms of psychosis, yes.
17  Q.   And you would agree with me that psychosis
18  is a serious medical need, right?
19       If an inmate is psychotic, that inmate has
20  a serious medical need?
21       MR. MICHALEK:  Object to form.
22  A.   Correct.
23  Q.   (By Mr. Lane)  And do you understand that
24  the jail is obligated to attend to these serious medical
25  needs of an inmate?

Page 95

1   A.   I am.
2   Q.   So he was hallucinating.  Can withdrawal
3   from Suboxone cause hallucinations?
4   A.   That is not one of the symptoms of
5   withdrawal from Suboxone.
6   Q.   How about the other one, chlordiazepoxide?
7   A.   It's not a symptom of that either.
8   Q.   All right.  Yet, you have a person
9   presenting with apparent psychosis, and you -- you did
10  not know what the cause of this was, right?
11       MR. MICHALEK:  Object to form.
12  A.   That's correct.
13  Q.   (By Mr. Lane)  So you referred him to the
14  psychiatric nurse?
15  A.   That's correct.
16  Q.   Who is the psychiatric nurse?
17  A.   Dr. Parker.
18  Q.   So the psychiatric nurse is actually a
19  doctor?
20  A.   Yes, she is.
21  Q.   Okay.  Is she a psychiatrist?
22  A.   No, she is not.
23  Q.   What kind of doctor is she?
24  A.   She's a psychiatric prescribing nurse
25  practitioner who has a Ph.D.

Page 96

1   Q.   Okay.  And how long did the apparent
2   psychosis last with Mr. Schwark?
3   A.   I was informed of his symptoms, I referred
4   him, and that was the last I heard of the situation.  So
5   it was the nurses that then would get him in contact with
6   the prescribing nurse practitioner.
7   Q.   And you don't know if that ever happened?
8   A.   I don't know if they ever had a
9   face-to-face interaction.
10  Q.   Did he get some sort of a prescription for
11  these hallucinations?
12  A.   I don't know if she prescribed that.
13  Q.   Do you have a written record of referring
14  Mr. Schwark to -- what's this person's name?
15  A.   Dr. Parker.
16  Q.   -- Dr. Parker?
17  A.   Do I have a written record?  No.
18  Q.   Does the jail?  I mean, is there a written
19  record somewhere?
20  A.   I would guess that there is, since it was
21  a verbal order from me.
22       MR. LANE:  Okay.  You know what?  I think
23  maybe what we should do -- it's now 20 minutes until
24  noon.  Why don't we break for lunch.  I'm going to wait
25  for Dunia to come back because I need to ask her a