*Kyle Jeffery Schwark vs.*

*Sheriff Fred Wegener, et al.*

*Deposition of Cathlene Pearce, R.N.*

*March 09, 2017*



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Exhibit F

Case 1:15-cv-02507-JLK   Document 65-6   Filed 05/08/17   USDC Colorado   Page 2 of 5

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 17

1  Q.   And do you remember what year?
2  A.   2013, I think.
3  Q.   Okay.
4  A.   And I was called by the nurse who gave me
5  the list of medications and asked if we should -- what
6  his medications should be while being at the Park County
7  jail.
8  Q.   Okay. And what -- I mean, was that an
9  unusual circumstance, where the nurse is calling you and
10 giving you a list of medications and asking you these
11 kinds of questions?
12 A.   No.
13 Q.   Okay. So that's pretty routine?
14 A.   It's routine to check -- for patients who
15 have prescription medications, to call and talk about
16 what will be provided while the inmate is under our
17 custody.
18 Q.   Okay. Now, let me ask you this: A
19 prescription, obviously, is a doctor's order that
20 somebody should be taking whatever the med is, right?
21 A.   That's what a prescription is.
22 Q.   Right. So we have Mr. Schwark going into
23 the jail with doctors saying, You need this medication,
24 Mr. Schwark, right? That's what you understand?
25      MR. MICHALEK: Objection.

Page 18

1  Q.   (By Mr. Lane) He was coming to the jail
2  with other doctors out in the world saying, You need to
3  take this med or that med, or whatever, right?
4       MR. MICHALEK: Object to the form of the
5  question.
6       You can answer.
7  A.   He came to the jail taking medications
8  that were prescribed by other physicians.
9  Q.   (By Mr. Lane) Okay. So my question is:
10 Why is the nurse calling you asking about what he should
11 be taking when he has outside physicians that have
12 already told him what he should be taking?
13 A.   The situation in the jail when someone is
14 incarcerated is a different situation than when that
15 person is out in the community. We have a formulary of
16 medications that we use when someone is in the jail. We
17 don't have --
18 Q.   When you say "a formulary," what does that
19 mean?
20 A.   That's a list of medications that we
21 provide. We may frequently have to substitute
22 medications or change medications.
23 Q.   Why is that?
24 A.   Because we have policies regarding what
25 medications are appropriate and safe to use in the

Page 19

1  setting of an incarceration.
2  Q.   Give me an example of when somebody comes
3  in with a prescription for something and you decide to
4  change it.
5  A.   The patient comes in with a prescription
6  for a blood pressure medication that we don't have on the
7  formulary, and we will substitute a similar medication
8  that will handle the blood pressure issue.
9  Q.   When you say "formulary," it sounds to me
10 like -- obviously, jails are concerned about costs every
11 day. Is formulary another word for a generic substitute
12 for perhaps a higher-priced medicine?
13 A.   Not always.
14      MR. MICHALEK: Object to form.
15 Q.   (By Mr. Lane) Did you get informed that
16 Mr. Schwark had brought all his own meds into the jail?
17 A.   Yes.
18 Q.   Okay. And so he had all his meds.
19      Did you change any of his meds?
20 A.   After the first phone call, no.
21 Q.   Okay. So the nurse read you a list of all
22 the meds that Mr. Schwark was on, and you said, Fine,
23 that's all okay?
24 A.   I said for them to continue that
25 medication.

Page 20

1  Q.   Okay. Is there any fear that somebody
2  brings in narcotics, for example, in a bottle that says
3  it's blood pressure medication or something like that?
4  A.   That's always a possibility. And we don't
5  provide narcotics in the jail setting.
6  Q.   Right. So is there any process for
7  screening, you know, the meds? Somebody claims, Oh, this
8  is blood pressure medication, when, really, it's oxies
9  and it's a narcotic or fentanyl, you know, it's a
10 narcotic; it's not allowed in the jail?
11      Is there some way to screen where the Park
12 County jail gets involved to see that -- you know, He
13 says this is blood pressure medication; how do we
14 actually know it's blood pressure medication?
15 A.   Most of the time, we take those
16 medications and store them with the patient's -- or with
17 the inmate's property and substitute medications from our
18 formulary.
19 Q.   Okay.
20 A.   In the case where there's not an
21 equivalent within the formulary, the nurses check with
22 the PDR or call the pharmacy that dispensed the
23 medication and talk with the pharmacist about identifying
24 that particular medication.
25 Q.   Okay. Was any of that done with

Case 1:15-cv-02507-JLK   Document 65-6   Filed 05/08/17   USDC Colorado   Page 3 of 5

Kyle Jeffery Schwark vs.                                              Deposition of Cathlene Pearce, R.N.
Sheriff Fred Wegener, et al.                                                              March 09, 2017

Page 33

1  offered a job and you took it.
2     A.   Okay.  Well, excuse me.  I was offered the
3  job, I turned in my resignation, and several weeks later,
4  I started over at the nursing home.
5     Q.   Okay.  So you were offered the job while
6  you were still at the jail?
7     A.   Yes.
8     Q.   Okay.  Would you agree that putting
9  someone on a table if they have a seizure problem without
10 strapping them in or putting up guardrails or doing
11 something to protect them is not good medical care?
12         MR. MICHALEK:  Object to form.
13         You can answer.
14         MR. MICHALEK:  Join.
15    A.   I would agree.
16    Q.   (By Mr. Lane)  Did you ever have any
17 interactions with Dr. Singer?
18    A.   No.
19    Q.   Did you ever at any time have anything to
20 say about what medications Kyle Schwark was going to be
21 given?
22    A.   Never.
23    Q.   Look at Exhibit 2.
24    A.   Okay.
25    Q.   Did you fill out Exhibit 2?  Was this a

Page 34

1  combined effort by everybody who was giving the meds?
2     A.   Yeah.  All of the medication sheets are in
3  a notebook.
4     Q.   And how are those filled out?  Is there a
5  specific time when you have to fill those out?
6     A.   We try to fill them out when they come
7  into Holding so we can start figuring out their
8  medications and talking to doctors and seeing if we have
9  doctors' orders to give the medications that they say
10 they're on.
11    Q.   You said that Dr. Fitting was taking him
12 off of Suboxone; is that correct?
13         MR. ZIPORIN:  Object to form.
14    A.   She never told me she was going to take
15 him off of it.  She just said she wasn't certified to
16 give it -- to monitor it.
17    Q.   (By Mr. Lane)  Okay.  Do you know whether
18 they ever reached out to anybody who was certified to
19 monitor it?
20         MR. MICHALEK:  Object to foundation.
21    A.   I don't know.  I can't answer that.
22    Q.   (By Mr. Lane)  Was Dr. Fitting -- did you
23 hear from anyone that Dr. Fitting was tapering him off
24 the Xanax?
25    A.   When Jeri got off the phone, she said she

Page 35

1  was going to taper the Xanax and go with the
2  alcohol-withdrawal protocol.
3     Q.   Did -- have you been trained or taught at
4  the jail that when a Court orders something, that takes
5  priority over just about anything else?
6          MR. MICHALEK:  Objection --
7     Q.   (By Mr. Lane)  If a Court orders
8  medication, you can't change it and the doctor can't
9  change it.  Nobody can change it except the Court.
10    A.   No.
11    Q.   Okay.  Was it of concern to you in any
12 way, shape, or form that cutting somebody off of their
13 customary drugs might have side effects?
14    A.   Always does.
15    Q.   It always concerns you or it always has
16 side effects?
17    A.   There's always going to be side effects
18 from a major medication withdrawal like that.
19    Q.   And one of the side effects from Xanax or
20 Suboxone that you know of is seizures.
21         MR. MICHALEK:  Object to form.
22         MR. ZIPORIN:  Same objection.
23    A.   No, it's not.
24    Q.   (By Mr. Lane)  Do you know what the side
25 effects from withdrawing from Xanax and Suboxone are?

Page 36

1          MR. MICHALEK:  Object to form.
2     A.   Yeah.
3     Q.   (By Mr. Lane)  What?
4     A.   Nausea, vomiting, maybe some sweating.
5     Q.   Did you ask Mr. Schwark whether he had
6  ever had a seizure before?
7     A.   They did when he came in.
8     Q.   And what did he say?
9     A.   No.
10    Q.   So he's now at the jail.  All of a sudden,
11 he has his very first seizure in his entire life.  That's
12 your understanding?
13    A.   That's my understanding.
14    Q.   Approximately how old was he?
15    A.   And he wasn't on any medications for
16 seizures.
17    Q.   Which should lead you to believe, like, I
18 wonder what caused that seizure, right?
19    A.   But I knew he was on alcohol when he came
20 in.
21    Q.   How do you know that?
22    A.   It was on the chart.
23    Q.   Okay.  And are you saying that you
24 believed that the seizure he had was alcohol related?
25    A.   Yes.

Case 1:15-cv-02507-JLK   Document 65-6   Filed 05/08/17   USDC Colorado   Page 4 of 5

Kyle Jeffery Schwark vs.  
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.  
March 09, 2017

Page 37

1  Q. And what do you base that on?
2  A. My experience as a nurse. I have not seen
3  anybody -- there's no evidence-based practice that
4  anybody has had a seizure from withdrawing from opioids
5  or barbiturates.
6  Q. So you don't know of anybody who's ever
7  had a seizure from opioid withdrawal?
8  A. No.
9  Q. Okay. I'm looking at Bates stamp page 11.
10 Whose signature is in the lower right-hand corner?
11 A. I have no idea.
12 Q. Okay. Was the deputy that was brought in
13 from Intake, was that Fenner?
14 A. Uh-huh.
15 Q. And was it Deputy Flores that was standing
16 there?
17 A. I thought it was Deputy Harding.
18 Q. Do you have any knowledge as to why Kyle
19 Schwark was released from jail on furlough?
20 A. No.
21 Q. What is your training about -- you've
22 indicated it would be substandard to put somebody who's
23 had a seizure up on a table that they could fall off of
24 without guardrails, right?
25     MR. ZIPORIN: Object to form.

Page 38

1     MR. MICHALEK: Object to form.
2  A. Yes.
3  Q. (By Mr. Lane) What is your training about
4  what would be the proper thing to do?
5  A. Well, that's why we left him in a
6  wheelchair for several hours until we felt like he was
7  oriented times three, alert, could talk to us, he was
8  eating, and he asked if he could get out of the
9  wheelchair. At that point, I wasn't worried that he was
10 going to have another seizure.
11 Q. Is that based on your training?
12 A. Yes.
13 Q. Okay. Why did you think he was not going
14 to have another seizure?
15 A. Vital signs are stable. He's totally
16 coherent. He knew who he was, where he was, and why he
17 was in jail.
18 Q. Okay. How many times had you interacted
19 with Kyle Schwark, total, at the jail?
20 A. Just on the 14th.
21 Q. Okay.
22 A. Once when I went to F Pod, and then in
23 Medical all day.
24 Q. In writing your report, were you taught in
25 nursing school about the importance of reports?

Page 39

1  A. You are taught to document what you do.
2  Q. Do they teach you how to write reports?
3  A. Of course, they do.
4  Q. And the purpose of these reports is to
5  memorialize the most important features of what you're
6  observing, right?
7  A. Yes.
8  Q. Not every detail can be in every report,
9  right?
10 A. Well, they don't want every detail.
11 Q. That's why you don't put every detail --
12 A. Right.
13 Q. -- in reports, correct?
14 A. Yes, sir.
15 Q. But the summary of the important facts go
16 into the reports, right?
17 A. Yes.
18 Q. And is that what you did here?
19 A. I made a report of what happened, yes.
20 Q. Okay. Was anybody rushing you to make
21 that report?
22 A. No.
23 Q. Were you under any time pressures to get
24 it done?
25 A. No, because nobody told me to write the

Page 40

1  report.
2  Q. So you took your time, thought about what
3  happened, and then wrote the report?
4  A. Uh-huh.
5  Q. Is that a "yes"?
6  A. Yes, sir.
7     MR. LANE: Okay. Let's take a five-minute
8  break. I need to talk to Dunia.
9     (Recess from 1:45 p.m. to 1:57 p.m.)
10 Q. (By Mr. Lane) Okay. Exhibit 2, can you
11 tell me who wrote all of that? Do you know?
12 A. I think it's Susan's handwriting.
13 Q. Susan who?
14 A. Canterbury.
15 Q. Okay. Presumably, there's one medication
16 sheet per inmate who's getting medicated, right? There's
17 not --
18 A. Well, there may be several pages.
19 Q. Right.
20 A. It just depends on --
21 Q. Sure.
22 A. -- how many meds they're on.
23 Q. Okay. But, I mean, it's not like --
24 A. Generally, there's one in the notebook
25 that tells us everything.

Case 1:15-cv-02507-JLK   Document 65-6   Filed 05/08/17   USDC Colorado   Page 5 of 5

Kyle Jeffery Schwark vs.                                                Deposition of Cathlene Pearce, R.N.
Sheriff Fred Wegener, et al.                                            March 09, 2017

Page 41

1   Q.   That everybody marks on, right?
2   A.   Yes.
3   Q.   In other words, when you're on duty and
4   you're giving him meds, it goes on the same sheet as when
5   Canterbury's on duty and she's giving him meds. It's all
6   on one sheet, right?
7   A.   Yes.
8   Q.   Okay. So this is a sheet pertaining to
9   Kyle Schwark. And do we know what date this all got
10  started -- or is this the whole month of November?
11  A.   Well, we do it by months, according to the
12  paperwork. But then we just mark when they come in --
13  Q.   With a heavy line?
14  A.   -- so we know that they came in either the
15  night of the 12th or the morning of the 13th --
16  Q.   Okay.
17  A.   -- before we got there.
18  Q.   Okay. You can tell that by the dark
19  line --
20  A.   Yes.
21  Q.   -- that's drawn down the calendar there?
22  A.   Yes.
23  Q.   Suboxone is the first med listed on the
24  med chart, right?
25  A.   Uh-huh.

Page 42

1   Q.   Is that a "yes"?
2   A.   Actually, I think it was the other way
3   around for us. I think this was the first page.
4   Q.   Okay. And you said that the Court -- as
5   far as you knew, he was Court ordered to take all of his
6   meds, right?
7   A.   Yes.
8   Q.   And so that would include Elidel, right?
9   A.   Uh-huh.
10  Q.   Is that a "yes"?
11  A.   Yes, sir.
12  Q.   Inositol?
13  A.   Yes, sir.
14  Q.   Desonide?
15  A.   Yes, sir.
16  Q.   Alprazolam, right?
17  A.   Yes. Alprazolam.
18  Q.   Alprazolam, is that the Xanax?
19  A.   That's Xanax.
20  Q.   Okay. And on the Xanax, there are two
21  little notes -- or two little checks, one for the 13th
22  and one for the 14th.
23  A.   Yes. So that would be the afternoon of
24  the -- let's see. Yeah. On the afternoon of the 13th,
25  the Xanax was given by Susan Canterbury.

Page 43

1   Q.   And you can tell because those are her
2   initials?
3   A.   Yes.
4   Q.   Okay.
5   A.   And then she -- we packed his medication
6   for the next day. She initialed it because she packed
7   it. But the deputies give him his Xanax that morning.
8   Q.   How do we know that the deputies did that?
9   A.   She wasn't working that day. It was me
10  and Jeri.
11  Q.   Okay. But how do you know anybody gave
12  him his meds that day?
13  A.   Well, she packed it and --
14  Q.   Meaning put it into a little pill
15  container --
16  A.   Yes.
17  Q.   -- that then goes out in med pass or
18  something?
19  A.   Yes, sir.
20  Q.   And the inmates, supposedly, take them,
21  right?
22  A.   Yes, sir.
23  Q.   Okay. So it got packed. We don't know if
24  it was delivered, though, right? You weren't there?
25  A.   I don't know.

Page 44

1   Q.   Now, this says alprazolam 3 milligrams a
2   day; is that right? Is that Dr. Singer's order here?
3   A.   Yes.
4   Q.   I understand.
5        Do you know how much -- well, let's look
6   at Exhibit 16, which is a prescription from Dr. Singer
7   dated, it looks like, 2/22/10.
8   A.   Uh-huh.
9   Q.   Suboxone, and start when con scale score
10  is 12 or greater. Is that what that says? And then it
11  says, See taper schedule.
12  A.   Yeah.
13  Q.   Okay. Do you know what any of that refers
14  to?
15  A.   I don't. I don't even know what that
16  scale is referring to.
17  Q.   Okay. Is that sort of your understanding
18  of why you need to be specially trained to administer
19  Suboxone?
20  A.   Yes. I mean, it's a specific medication.
21  You have to have a certification so that they can explain
22  every single thing there is to know about it.
23  Q.   Okay. And did anybody in the Park County
24  jail have such a certification --
25  A.   No.