*Kyle Jeffery Schwark vs.*

*Sheriff Fred Wegener, et al.*

*Deposition of Jeri Swann, R.N.*

*March 13, 2017*



Stevens-Koenig Reporting
700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Exhibit H

Case 1:15-cv-02507-JLK   Document 65-8   Filed 05/08/17   USDC Colorado   Page 2 of 4

Kyle Jeffery Schwark vs.                                                     Deposition of Jeri Swann, R.N.
Sheriff Fred Wegener, et al.                                                              March 13, 2017

Page 13

1  it says, Don't cut the strips, you know, in the
2  literature about the medication.
3     Q.    (By Mr. Lane)  Was it your understanding
4  that Dr. Singer ordered half a strip or Dr. Fitting
5  ordered half a strip?
6     A.    I was under the assumption Dr. Singer had
7  said half a strip.
8     Q.    Okay.  But the box -- the directions the
9  manufacturer gave you were in conflict with that?
10    A.    Were in conflict, yes.
11    Q.    So what did you do about that?
12    A.    We followed the doctor's order.
13    Q.    Okay.  What did you see happen then?
14    A.    Kyle was up and about.  He had a little
15 something to eat.  He was sick to his stomach.
16    Q.    Did you see him vomit?
17    A.    I know he was spitting.  I don't know that
18 I actually saw, you know, emesis in the trash can.  But I
19 know he was -- he was getting up and spitting and just
20 feeling sick to his stomach.
21    Q.    So then what happened?
22    A.    My next recollection is that he was sort
23 of leaning against the table -- kind of half on it, half
24 not -- and had what appeared to be another seizure.  He
25 made a -- I called it a grunt, but it was kind of a

Page 14

1  gurgle, a grunt.  Then he pitched forward onto the floor.
2     Q.    And what happened then?
3     A.    He had hit his head, and he was having
4  muscle contractions and was tight.  I was trying to keep
5  him from hitting his head again on the -- there's a
6  cabinet just a little -- you know, a foot or two over.  I
7  didn't want him to curl and get hurt any further.
8     Q.    So then what happened?
9     A.    Deputy Fenner came in right away.
10 Cathlene had gone to get the other deputy.  And then the
11 corporal checked in right away.
12    Q.    What corporal?
13    A.    At the time, it was probably Robertson.
14    Q.    Okay.
15    A.    And then we immediately tried -- I told
16 him to call the ambulance.  It was bad.
17    Q.    So what happened then?
18    A.    So the ambulance crew got -- well, we were
19 trying to keep him -- because we didn't know if he had
20 any injuries, so we were trying to keep him as still as
21 possible.  You know, he was confused and not sure of
22 where he was.  You know, with all of us standing around,
23 it was probably a little overwhelming.
24          He was angry and didn't want to be
25 restrained or held down.  He wanted to get moving and get

Page 15

1  up and get away from -- it looked like he wanted to get
2  away from us.  And then the ambulance came.  You know, we
3  were trying to get him on a back board and get him ready
4  for transport.  He was just not wanting to have that all
5  happen.
6     Q.    So what happened?
7     A.    So they gave him an injection of some
8  kind.  I just know from the record that it was the
9  Versed.
10    Q.    What's the Versed?  Is that a sedative?
11    A.    That's a sedative to help him calm down a
12 little bit.
13    Q.    Okay.
14    A.    And then he did, fairly quickly.  We tried
15 to explain to him, We don't want you to hurt yourself any
16 further, and we got him onto the board.  Because they
17 have to do a restraint then, and nobody likes that.
18    Q.    Okay.  What happened then?
19    A.    The ambulance took him to the hospital.
20    Q.    Okay.  And what was your next interaction
21 with him?
22    A.    I didn't see him again until March, when
23 he came back.
24    Q.    Was this after his furlough?
25    A.    After his furlough.

Page 16

1     Q.    And what did you see in March?
2     A.    I don't recall, really, any interaction.
3  I know at one point, I gave -- I had charted that I gave
4  a medication to him -- which, according to the med sheet,
5  would have been the Xanax -- one morning, on the 8th of
6  March.
7     Q.    Okay.  Were you tuned into the notion of
8  what Dr. Singer had prescribed for him by way of Xanax
9  and Suboxone, as opposed to what Dr. Fitting was having
10 him take?
11          MR. MICHALEK:  Object to form and
12 foundation.
13          MR. MICHALEK:  Object to form.
14          You can answer.
15    A.    I knew that there's -- I know there's
16 always some question.  You know, you really want to be
17 careful and follow our doctor's orders as clearly as
18 possible.  I don't recall that there was a great
19 discrepancy in which doctor prescribed what amounts of
20 the meds.  Eventually, Dr. Fitting gave us very clear
21 orders that we should continue with the Xanax.  And then
22 when he had the seizures, she said she would feel more
23 comfortable with the Librium, so we switched to the
24 Librium after the first seizure.
25    Q.    (By Mr. Lane)  Okay.  If Dr. Singer gives

Case 1:15-cv-02507-JLK   Document 65-8   Filed 05/08/17   USDC Colorado   Page 3 of 4

Kyle Jeffery Schwark vs.  
Sheriff Fred Wegener, et al.

Deposition of Jeri Swann, R.N.  
March 13, 2017

Page 25

1  foundation.
2     A.   Uh-huh.
3     Q.   (By Mr. Lane) Is that a "yes"?
4     A.   Yes.
5     MR. ZIPORIN: That was a different time
6  frame, though.
7     MR. LANE: Was it?
8     MR. MICHALEK: The note you showed her was
9  from the February 2014 time frame.
10     MR. LANE: Okay. I'm not trying to be
11  misleading here.
12     MR. MICHALEK: He didn't have a seizure in
13  that time frame.
14     Q.   (By Mr. Lane) Okay. Take a look at
15  Exhibit 2, which is Bates stamped page 50.
16     A.   Okay.
17     Q.   Is this the medication sheet from November
18  2013?
19     A.   One of them. I believe there was two.
20     Q.   Okay. And on the second page of that
21  exhibit, page 51, it looks like he's getting alprazolam,
22  2 milligrams -- excuse me -- 1 milligram the evening of
23  November 13th and 2 milligrams the morning of the 14th;
24  is that right?
25     A.   That's what that indicates.

Page 26

1     Q.   So he had his seizure on the 14th, right?
2     A.   He did.
3     Q.   He had been -- his Xanax dosage had been
4  cut. Assuming he had previously been given 4 milligrams
5  self-medicating, this was cutting it in half; is that
6  right?
7     MR. MICHALEK: Object to form.
8     Q.   (By Mr. Lane) Because he was getting two
9  on the 14th, right?
10     MR. MICHALEK: Object to form and
11  foundation.
12     MR. MICHALEK: Object to form.
13     You can answer.
14     A.   He had received two in the morning of the
15  14th.
16     Q.   (By Mr. Lane) Okay. What it's showing
17  me -- look at the 13th. How much Xanax did he receive on
18  the date November 13th, based on this chart?
19     A.   Based on this chart, he got 1 milligram
20  that night.
21     Q.   And you would agree that that is -- if he
22  was taking, on his own, four doses a day of 1 milligram
23  each, only receiving 1 milligram on the 13th would have
24  been a significant reduction?
25     MR. MICHALEK: Object to form --

Page 27

1     A.   That would be --
2     MR. ZIPORIN: -- mischaracterization of
3  the testimony.
4     A.   -- less than he had been taking, yes.
5     Q.   (By Mr. Lane) Okay. Do you know if
6  you -- I mean, you've already said you did not know that
7  withdrawing from Xanax could cause seizures, right?
8     A.   I didn't specifically know that.
9     Q.   Do you know whether any of your fellow
10  nurses had been alerted by anyone or had knowledge from
11  any source that abruptly cutting back your Xanax could
12  lead to seizures?
13     A.   I don't have any knowledge whether they
14  had looked that up or received that information.
15     Q.   But no one talked to you about it?
16     A.   Nobody specifically talked to me.
17     Q.   And when you say in your note, Seizure due
18  to withdrawal, you're telling me, as you sit here right
19  now, you think the withdrawal that you were referring to
20  was alcohol, right?
21     A.   I think so.
22     Q.   Are you trained in observing delirium
23  tremens?
24     A.   I have knowledge of that. I can't say
25  that I've taken a class or am specifically trained.

Page 28

1  That's something that's kind of come about on the job
2  because you see different scenarios now.
3     Q.   Do you know -- you would agree with me
4  that if Kyle Schwark came into the jail with a low -- a
5  relatively low blood alcohol content of .02, by the time
6  he had a seizure, his BAC should have been about 0?
7     A.   Uh-huh.
8     MR. MICHALEK: Object to form and
9  foundation.
10     Q.   (By Mr. Lane) Is that a "yes"?
11     A.   Yes.
12     Q.   Do you know whether or not delirium
13  tremens occurs when someone's blood alcohol level is at
14  0?
15     A.   Yes. Once you hit 0, then the body starts
16  to develop symptoms of withdrawal.
17     Q.   Okay. Did you ask Mr. Schwark if he had
18  ever had DTs?
19     A.   I don't recall asking Mr. Schwark if he
20  had had them.
21     Q.   Do you know whether anyone ever asked him
22  if he ever experienced DTs, delirium tremens?
23     A.   I don't know if anyone asked him.
24     Q.   Do you know if he had any history of DTs?
25     A.   I don't know.

Case 1:15-cv-02507-JLK  Document 65-8  Filed 05/08/17  USDC Colorado  Page 4 of 4

Kyle Jeffery Schwark vs.  
Sheriff Fred Wegener, et al.

Deposition of Jeri Swann, R.N.  
March 13, 2017

Page 45

1  to the jail, do you?
2     A.   He might have been taking 8 milligrams a
3  day, and he doesn't want to fess up to that because
4  that's not what it says.  I don't know.
5     Q.   Well, if he was taking 8 milligrams a day
6  and he gets cut down to 3 milligrams a day, that's a
7  radical departure, isn't it?
8     A.   That would be a bigger -- certainly, a
9  bigger change than from 4 to 3.
10    Q.   And we could expect some pretty
11 significant side effects to kick in or some effects from
12 withdrawal -- because that's not a gradual taper, is it?
13         MR. MICHALEK:  Object to form and
14 foundation.
15         MR. ZIPORIN:  Same objection.
16    A.   I would have to clarify all of that with
17 the doctor.
18    Q.   (By Mr. Lane)  Okay.
19    A.   I don't know for sure.
20         MR. LANE:  I have no further questions.
21         MR. MICHALEK:  Let me ask some follow-up
22 to clarify the record.
23                EXAMINATION
24 BY MR. MICHALEK:
25    Q.   You were given this medication sheet

Page 46

1  earlier.  It's page A 282, the November 2013 medication
2  administration.
3     A.   Uh-huh.
4     Q.   Is that a "yes"?
5     A.   Yes.
6     Q.   So on the 13th at 1630, there's a note
7  that says, Call Dr. Fitting with report, and orders
8  continue of the Xanax, correct?
9     A.   That says to continue the alprazolam.
10 Yeah.
11    Q.   So on the 13th, Dr. Fitting is continuing
12 the Xanax that was prescribed by Dr. Singer, correct?
13    A.   Correct.
14    Q.   There wasn't any discussion about
15 discontinuing or tapering the Xanax until after the
16 patient had a seizure and fell on the 14th, correct?
17    A.   Correct.  But I don't even recall that we,
18 at that point, discussed the taper.  She said, Switch to
19 Librium for now.
20    Q.   Right.  These questions about, Oh, well,
21 they were tapering him from 4 milligrams to 3 milligrams,
22 isn't consistent with the record, is it?
23    A.   It isn't consistent with that statement
24 there.
25    Q.   Okay.  In fact, the Xanax wasn't

Page 47

1  discontinued or switched to Librium until the 14th, until
2  after the patient had the seizure, right?
3     A.   Correct.
4         MR. MICHALEK:  Okay.  Thanks.
5         MR. LANE:  Nothing further.
6         THE REPORTER:  Mr. Ziporin, same order as
7  before, and you'll handle signature?
8         MR. ZIPORIN:  Yes.
9         THE REPORTER:  Mr. Michalek, same order as
10 before?
11        MR. MICHALEK:  Yes.
12        THE REPORTER:  Mr. Lane, same order?
13        MR. LANE:  Yes.
14        THE REPORTER:  Do you need it expedited?
15        MR. LANE:  No.
16        THE REPORTER:  Okay.  Thank you.
17              * * * * * * * * * * * *
18        (WHEREUPON, the foregoing deposition was
19 concluded at the hour of 2:03 p.m.  Total time on the
20 record was 59 minutes.)

Page 48

         I, JERI SWANN, R.N., the deponent in the
above deposition, do acknowledge that I have read the
foregoing transcript of my testimony, and state under
oath that it, together with any attached Statement of
Change pages, constitutes my sworn statement.


_____  I have made changes to my deposition

_____  I have NOT made any changes to my deposition


                    _____
                         JERI SWANN, R.N.




Subscribed and sworn to before me this _____ day
of _____.

         My commission expires: _____


                    _____
                         Notary Public