*Kyle Jeffery Schwark vs.*

*Sheriff Fred Wegener, et al.*

*Deposition of Jonathan William Singer, D.O.*

*December 21, 2016*



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Exhibit J

Case 1:15-cv-02507-JLK   Document 65-10   Filed 05/08/17   USDC Colorado   Page 2 of 5

Kyle Jeffery Schwark vs.                                    Deposition of Jonathan William Singer, D.O.
Sheriff Fred Wegener, et al.                                                         December 21, 2016

Page 25

1  Q. Do you know how Mr. Schwark was referred to you?
2  A. I don't recall.
3  Q. Do you know Narconon? Do you know what that is?
4  A. Ah, yes.
5  Q. What is Narconon?
6  A. That's a rehab group out of Fort Collins and,
7  yeah, he might have come through that group.
8  Q. Were you working with that group during that time
9  frame?
10 A. I was.
11 Q. Were you volunteering or how did that work?
12 A. No, they paid me for my services.
13 Q. And would you come weekly and meet with a group
14 and provide counseling or --
15 A. I'd visit the facility but most of the work was
16 done out of my office down there.
17 Q. And would you meet individually or with a group?
18 A. No, it was individually. They would bring their
19 patients in to see me during acute detox treatment, and I
20 would provide assessment and treatment.
21 Q. When you say acute detox, is that another way of
22 saying providing care for somebody going through withdrawal?
23 A. Some were in withdrawal. Some had already gone
24 through withdrawal.
25 Q. Both narcotic withdrawal as well as alcohol

Page 26

1  withdrawal?
2  A. Yes.
3  Q. If Mr. Schwark testified that he began treating
4  with you at Narconon which then led to his ongoing treatment
5  with you, would you have any reason to disagree with that?
6  A. No, I think that's correct.
7  Q. In your private practice, do you provide treatment
8  to patients for withdrawal?
9  A. I do.
10 Q. Both narcotic withdrawal as well as alcohol
11 withdrawal?
12 A. Yes.
13 Q. And are there specific medications that you
14 typically prescribe for withdrawal?
15 A. I have a variety of medications that I use.
16 Q. Such as?
17 A. Suboxone is a common agent I use for withdrawal
18 from opioids. Benzodiazepines are used for withdrawal from
19 alcohol. Antianxiety agents, antidepressants, sleep aids, a
20 variety of different things.
21 Q. Is Librium one of the medications that could be
22 prescribed for alcohol withdrawal?
23 A. It's one that I commonly prescribe.
24 Q. What about Xanax?
25 A. Yeah, I use benzodiazepines, as I said.

Page 27

1  Q. Which Xanax is; correct?
2  A. Yes.
3  Q. And I will probably use Xanax throughout today's
4  deposition because I know that's primarily what you
5  prescribed Mr. Schwark; correct?
6  A. Yes.
7  Q. What type of antianxiety medications do you
8  prescribe for withdrawal, those that we've already
9  referenced?
10 A. Yes.
11 Q. And do you prescribe any other medications besides
12 Suboxone for opioid withdrawal?
13 A. Yes.
14 Q. What do you prescribe?
15 A. I prescribed other types of opioid agents. I have
16 used methadone, a variety of different things.
17 Q. Within the last, let's say, eight years since
18 you've been treating Mr. Schwark, have you prescribed
19 patients anything other than Suboxone for opioid withdrawal?
20 A. As I just stated.
21 Q. So the methadone would have been also within that
22 time period?
23 A. Yes.
24 Q. So you have a choice between those two medications
25 when prescribing them.

Page 28

1  A. Or other opioids.
2  Q. Such as?
3  A. Hydrocodone, oxycodone, oxymorphone, a variety of
4  different things. It depends on what the patient is
5  addicted to and what their level of use is.
6  Q. So if a person was addicted to oxycodone, you
7  wouldn't prescribe them that as part of their withdrawal or
8  would you?
9  A. Part of their withdrawal is tapering the schedule.
10 Q. Okay. So my understanding is that the withdrawal
11 that Mr. Schwark presented to you in October of 2008 was
12 heroin withdrawal; correct?
13 A. I need to find that record.
14 Q. Let me find it for you because I've got it.
15 A. Okay.
16    MR. ZIPORIN: Start with Exhibit 6, please.
17    MR. MICHALEK: I think we have had 6.
18    MR. ZIPORIN: Did we?
19    MR. MICHALEK: Remember that stuff off the phone?
20    MR. ZIPORIN: Okay. I forgot about that. Let's
21 start with 7, please.
22 Q. (By Mr. Ziporin) So, Dr. Singer, you've been
23 handed Exhibit 7, which I will represent to you was
24 presented to my office as being one of your records. Does
25 this look like one of your records?

Case 1:15-cv-02507-JLK   Document 65-10   Filed 05/08/17   USDC Colorado   Page 3 of 5

Kyle Jeffery Schwark vs.                                              Deposition of Jonathan William Singer, D.O.
Sheriff Fred Wegener, et al.                                          December 21, 2016

Page 65

1  Q.  Have you ever seen it in any of your patients?
2  A.  Not that I can recall.
3  Q.  If a patient discontinues the use of Xanax, that
4  doesn't cause seizures, does it?
5  A.  It can.
6  Q.  Is it possible or is it medically probable?
7  A.  I don't know what that means, medically probable.
8  Q.  Have you ever seen any of your patients have a
9  seizure based on the discontinuation of Xanax or a similar
10 form of medication?
11 A.  Benzodiazapines, yes.
12 Q.  Which patients?
13 A.  The names of the patients?
14 Q.  Well, how many patients?
15 A.  Two.
16 Q.  Was Mr. Schwark one of those patients?
17 A.  I think that was what happened in his
18 incarceration, yes.
19 Q.  So you believe that discontinuation of his Xanax
20 is what led to his seizure at the Park County Jail?
21 A.  I don't know what it was attributed to.
22 Q.  All right.  You don't have an opinion along those
23 lines?
24 A.  I believe one or the other or both of the
25 medications, sudden withdrawal created the problem.

Page 66

1  Q.  Okay.  So your opinion -- let me ask you this:
2  Have you been asked to express an opinion?
3  A.  Not yet.
4  Q.  Okay.  But you have an opinion as to what caused
5  his seizure at the Park County Jail?
6  A.  Yes.
7  Q.  And it's your opinion that the discontinuation of
8  the use of either the Suboxone or the Xanax or a combination
9  is what caused his seizures at the Park County Jail?
10 A.  I believe so.
11 Q.  Why do you believe that?
12 A.  It was timely.
13 Q.  So it's a temporal conclusion.
14 A.  Correct.
15 Q.  Are there any other reasons that you believe that?
16 A.  No.  That was -- that's the main reason.
17 Q.  Alcohol withdrawal can result in seizures;
18 correct?
19 A.  Correct.
20 Q.  And do you know whether or not -- well, we will
21 come back to that.
22     And, again, you haven't reviewed the jail records
23 related to Mr. Schwark's incarceration at the Park County
24 Jail, either his inmate records or his medical records?
25 A.  What time frame are we talking about?

Page 67

1  Q.  Well, there's two time frames of note in this
2  case.
3  A.  Right.
4  Q.  There's a November 2013 time frame.  Have you
5  reviewed any of those records?
6  A.  Just my chart records.  So just my chart note.
7  Q.  From when?
8  A.  September 9, 2013.
9  Q.  Okay.  We will come back to that.
10     And he wasn't quite yet incarcerated then.
11 A.  Okay.
12 Q.  So he was incarcerated from November 12 through
13 November 14, 2013.  Have you reviewed any of the jail
14 records?
15 A.  No, I have not.
16 Q.  All right.  He was then incarcerated again on
17 February 25, 2014, through April 1 of 2014.  You've not
18 reviewed any of those jail records during that time period
19 either?
20 A.  The medication records that we talked about
21 before.
22 Q.  Correct.  Or any nursing notes or any --
23 A.  No, no other notes.
24 Q.  Or any records from the jail doctor?  Never read
25 those; correct?

Page 68

1  A.  Possible.
2  Q.  Alcohol withdrawal can also cause a psychotic
3  event as I described earlier; correct?
4  A.  Yes.
5  Q.  Is it -- you said it was possible that either
6  stopping Suboxone or stopping Xanax could cause seizures.
7  From your understanding, is it -- in reading the medical
8  literature or the history of treating patients, is it more
9  likely that seizures and psychotic events are caused by
10 alcohol withdrawal as opposed to the discontinuation of
11 those medications?
12 A.  What's your question again?  Is it more likely?
13 Q.  Yes.
14 A.  It's more common.
15 Q.  Meaning more likely.
16 A.  I don't know if it's more likely but it's more
17 common.
18 Q.  Why do you think there's a distinction between
19 those two phrases?
20 A.  Two different words.
21 Q.  All right.  If something happens more commonly,
22 doesn't that make it more likely to happen?
23 A.  Depends on the circumstances.
24 Q.  Well, we're talking about alcohol withdrawal
25 causing seizures and psychotic events as opposed to

Case 1:15-cv-02507-JLK   Document 65-10   Filed 05/08/17   USDC Colorado   Page 4 of 5

Kyle Jeffery Schwark vs.                                                    Deposition of Jonathan William Singer, D.O.
Sheriff Fred Wegener, et al.                                                                          December 21, 2016

Page 69

1  discontinuation of Suboxone and Xanax.
2      A.  I can say I think it's more common.
3      Q.  And just so the record is clear, it's your
4  testimony that it's more common that seizures and psychotic
5  events are caused by alcohol withdrawal than they are caused
6  by the discontinuation of Suboxone or Xanax; correct?
7      A.  It's more common to see withdrawal seizures from
8  alcohol.
9      Q.  As well as more common to see psychotic events
10 from alcohol withdrawal than those medications --
11 discontinuation of those medications.
12     A.  Psychotic events.  I guess it depends on the
13 psychotic event.  I can't make a generalization.
14     Q.  Do you know if the discontinuation of Suboxone
15 and/or Xanax are likely to result in particular types of
16 psychotic events as opposed to other types of psychotic
17 events?
18     A.  Probably.
19     Q.  And what would those be?
20     A.  I think reinstitution of the underlying disorder,
21 not necessarily psychosis but the neurologic disorder that
22 they would be used for.  They are not always used for
23 psychosis.
24     Q.  Are you familiar with what happened to Mr. Schwark
25 when he was in jail in March of 2014?

Page 70

1      A.  I can't say for sure.
2      Q.  So if it had been called a psychotic event by
3  other doctors, you wouldn't know if they were adequately
4  characterizing that since you don't know what happened?
5      A.  Correct.  I would have to review the record.
6      Q.  Exhibit 17 are your notes, Dr. Singer, and these
7  are the packet of records I referred to earlier that I
8  apologize are not in the correct order so we're going to
9  have to kind of bounce our way around.
10         But just for starters here, the first note is
11 September 9, 2013, and this was the first note that I saw
12 that was in this particular format.  Is this when you first
13 started to do data entry as opposed to handwritten SOAP
14 notes?
15         (Exhibit Number 17 was marked.)
16     A.  No.  I have done data entry into electronic
17 medical records since 1987, but I've, at various times,
18 stopped using it and started it again using different
19 programs.
20     Q.  We will come back to Exhibit 17 here shortly, but
21 Exhibit 18 is your ledger, and it's in reverse chronological
22 order.
23         (Exhibit Number 18 was marked.)
24     A.  Correct.
25     Q.  And if you go to the last page of Exhibit 18, we

Page 71

1  see that July 22, 2010, date.  Do you see that?
2      A.  Yes.
3      Q.  And then it looks like there was a gap in
4  treatment until May 31, 2012.  Is that -- did I read that
5  accurately?
6      A.  It looks that way.
7      Q.  Okay.  And then there was fairly consistent
8  treatment in 2012 as well as fairly consistent treatment up
9  until September of 2013; correct?
10     A.  Correct.
11     Q.  Going back to Exhibit 17, which are your notes, on
12 that September 9, 2013, visit, under the CC column, is that
13 chief complaint?
14     A.  Yes.
15     Q.  And here he's saying he's following up with you
16 over stress over his DUI, that he was being sued by a
17 policeman for tearing his rotator cuff.  Do you see that?
18     A.  Yes.
19     Q.  Do you have a recall of that?
20     A.  Some, yes.
21     Q.  So did Mr. Schwark tell you that he was actually
22 being sued by a police officer based on a confrontation that
23 he had with an officer?
24     A.  Yes.
25     Q.  The next category of S, is that subjective

Page 72

1  information from Mr. Schwark?
2      A.  Yes.
3      Q.  And you note no change in drinking habit.  Do you
4  know what his habit was during that time frame?
5      A.  No, I don't during that time frame, just that he
6  was continuing to drink alcohol.
7      Q.  At an abusive level?
8      A.  I believe so.
9      Q.  And that he was using a half Suboxone daily?
10     A.  Yes.
11     Q.  And then A, is that for assessment?
12     A.  Yes.
13     Q.  And you've got opioid dependence, acute alcoholic
14 intoxication, and alcoholism continuous, meaning ongoing at
15 the time.
16     A.  Yes.
17     Q.  You got your toxic effect for lead and then the
18 adjustment disorder; correct?
19     A.  Correct.
20     Q.  Had you -- I know we spoke about the lead toxicity
21 contributing to his anxiety and depression.  You also
22 testified about the allergies that had contributed to his
23 depression and anxiety.  By this point in time, what were
24 other contributors to his depression and anxiety?
25     A.  I think it was stress over this situation, it

Case 1:15-cv-02507-JLK   Document 65-10   Filed 05/08/17   USDC Colorado   Page 5 of 5

Kyle Jeffery Schwark vs.                                          Deposition of Jonathan William Singer, D.O.
Sheriff Fred Wegener, et al.                                                              December 21, 2016

Page 93

1  vision.
2  A.  Yes.
3  Q.  And I think you mentioned that your handwritten
4  notes indicate a heroin relapse during this time frame?
5  A.  I don't think so.  The 20th of April?
6  Q.  Maybe it was later in 2015, but you made a
7  reference earlier.
8  A.  Right.  Right.  In 2015.
9  Q.  What was the month on that relapse?
10 A.  That was October 12, 2015.
11 Q.  Okay.  Your ledger would indicate that you've
12 continued to provide treatment fairly regularly for
13 Mr. Schwark through 2015 as well as this year with your last
14 visit just being a few days ago, December 16, 2016.
15 A.  Yes.
16     MR. ZIPORIN:  So we're going to need updated
17 records from --
18     MS. DICKEY:  Okay.
19 A.  That's not an office visit.
20 Q.  (By Mr. Ziporin)  What happened on December 16?
21 A.  He received -- we mailed out supplements to him.
22 Q.  What kind of supplements?
23 A.  Cysteine and dopa, and that's it.
24 Q.  What are those for?
25 A.  Those are neurotransmitter replenishing

Page 94

1  supplements.
2  Q.  Well, we will work with Mr. Schwark's attorneys
3  and get updated records from you guys.
4  A.  I don't believe there's any other updated note
5  concerning those refills.  Those are just mailed out to him.
6  Q.  But the last -- just -- so the last SOAP note that
7  I have is from April of 2015, so we're obviously going to
8  need --
9  A.  Oh, okay.
10 Q.  -- updated records.
11 A.  All right.
12 Q.  Dr. Singer, have you ever worked in a jail?
13 A.  Have I worked in a jail?
14 Q.  Yeah.
15 A.  No.
16 Q.  Have you ever been contracted to provide medical
17 services for inmates at a jail?
18 A.  Not contracted but worked for patients in jail.
19 Q.  They would get a furlough to come see you while
20 they were inmates?
21 A.  Yes.
22 Q.  Okay.  But are you familiar with protocols that
23 exist at -- commonly exist at jails with regard to
24 medications that are authorized and those that are not
25 authorized?

Page 95

1  A.  The jails all seem to have their own particular
2  rules, yes.
3  Q.  Do you know the rules at the Park County Jail?
4  A.  My recollection is that he was not allowed to have
5  controlled substances in the jail.
6  Q.  And do you know if that's something that's common
7  in terms of not being permitted in a jail setting for a
8  whole variety of reasons?
9  A.  I don't know if it's common.  I've only dealt with
10 three jails, the two in Cheyenne and this jail.
11 Q.  Do the jails in Cheyenne permit controlled
12 substances to be prescribed to their inmates?
13 A.  Yes.
14 Q.  And did you say more than one jail?
15 A.  Yes.  The Cheyenne County Jail and the Laramie --
16 no, the Laramie County Jail and the Cheyenne City Jail.
17 Q.  Are those the only -- those three jails, are those
18 the only jails that you have personal knowledge as to
19 whether or not they allow or don't allow controlled
20 substances?
21 A.  That I can recall, yes.
22 Q.  So you're not familiar with any protocol in any
23 other Colorado jail with regard to permission of controlled
24 substances?
25 A.  I am not.

Page 96

1  Q.  Exhibit 19 is a series of documents that appear to
2  be prescriptions that you've made for Mr. Schwark.  Is that
3  accurate?
4     (Exhibit Number 19 was marked.)
5  A.  Yes.
6  Q.  And on page 1 of Exhibit 19, it appears that on
7  February 21, 2014, you prescribed him with a medication;
8  correct?
9  A.  Correct.
10 Q.  And I'm going to let you tell me how that's
11 pronounced.
12 A.  Chlordiazepoxide.  That's Librium.
13 Q.  And you specifically indicate here that you are
14 prescribing it for alcohol withdrawal; correct?
15 A.  Correct.
16 Q.  Why did you prescribe him Librium on February 21,
17 2014?
18 A.  That in my note he was using a half a quart of
19 vodka a day and we were trying to stop his alcohol use.  So
20 I gave him that to prevent alcohol withdrawal.
21 Q.  And did you also know at that time that he was
22 going into jail, back to Park County Jail, four days later?
23 A.  I don't recall.
24 Q.  Would that make sense that you would have
25 prescribed the Librium knowing that he was going to jail