**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02507-JLK

KYLE JEFFERY SCHWARK,

      Plaintiff,

v.

SHERIFF FRED WEGENER, in his individual and official capacity,
NURSE SUSAN CANTERBURY, in her individual capacity,
NURSE JERI SWANN, in her individual capacity,
DOCTOR KATHERINE FITTING, in her individual capacity, and
CAPTAIN DANIEL MULDOON, in his individual capacity,

      Defendants.

---

### PARK COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants, **SHERIFF FRED WEGENER**, **NURSE SUSAN CANTERBURY**, **NURSE JERI SWANN**, and **CAPTAIN DANIEL MULDOON**[1], through their attorneys **SENTER GOLDFARB & RICE, LLC,** and pursuant to Fed.R.Civ.P. 56, hereby move for summary judgment on all of Plaintiff's claims.

## I.    <u>INTRODUCTION</u>

This case arises out of Plaintiff Kyle Schwark's allegations that he was deprived of his prescribed medication while incarcerated in the Park County Jail on two separate occasions in November 2013 and February/March 2014.   Schwark claims that immediately upon entering the jail on November 12, 2013, jail staff (including deputies,

---

[1] Plaintiff has agreed to voluntarily dismiss Nurse Cathlene Pearce as a Defendant in this action. *See* Stipulated Voluntary Dismiss of Defendant Cathlene Pearce attached hereto as **Exhibit N**. The stipulation will be filed tomorrow with the Court.

nurses, Captain Daniel Muldoon, and Dr. Katherine Fitting) refused to give him his prescribed Xanax and Suboxone, which caused him to suffer seizures and ultimately, resulted in a fracture to his cervical spine.

**A.     Schwark's Arrival at Park County Jail and Prescribed Medication**

On November 6, 2013, Schwark was sentenced to 60 days of custody and three years of probation for a DUI. The Park County District Court judge granted a stay of execution until November 12, 2013. Schwark entered the Park County Jail on the evening of November 12, 2013. Schwark's BAC was .020. He listed Xanax and Suboxone as his prescription medication.[2]  He arrived with prescription bottles containing Xanax and Suboxone, and two other medications - progesterone/testosterone/DHEA and Elidel cream. In addition to the medication, Schwark arrived with a note from Dr. Jonathan Singer stating that Schwark was under his care for opioid dependency, lead toxicity and anxiety.

Although Schwark alleges that he was not given his medication at all prior to having his first seizure on November 14, 2013, the Jail's medication log indicates that he was given his prescribed doses of Xanax and Suboxone on both November 13 and November 14. On November 14, 2013, Schwark had a seizure while he was in the common area of F-pod. Nurse Cathlene Pearce arrived on scene shortly after being notified of the emergency via radio. Nurse Pearce protected his head while his body was

---

[2]  Suboxone is prescribed to reduce cravings for narcotics.

2

still convulsing. Thereafter, Nurse Pearce transported Schwark to the Medical Unit with the help of a deputy.

Schwark's second seizure occurred several hours after he was brought into Medical for observation. At that point, Schwark was alert and oriented. He has been drinking fluids, eating food, and able to carry on casual conversation with the nurses. There was no indication that he would start convulsing a second time.

**B.      Schwark's Return to Park County Jail**

On February 25, 2014, Schwark was sentenced to complete the remainder of his 60-day sentence. The sentence included his violation of probation for failing to notify the probation officer once he was released from the hospital. Schwark told the court that he was concerned the jail would not administer his medications because, as he alleged, they had not done so in November 2013. Schwark asked the Judge to direct the Jail to give him his medication. In response to Schwark's request, the Judge said that he did not have the power to order the Jail to give him his medication.

Schwark returned to the Park County Jail on the night of February 25, 2014.  He came in with two different prescriptions for Benzodiazepines, Xanax and Librium, as well as Suboxone. On Wednesday, February 26, 2017, Nurse Susan Canterbury called Dr. Fitting to discuss Schwark's current medications and obtain orders on how to manage his medications. At that time, Dr. Fitting wrote an order to discontinue the Suboxone and Librium. She also created a tapering schedule for the Xanax: (1) February 26 – 28, 2014: 1 milligram tablet three times a day; (2) March 1 – 3, 2014: 1 milligram tablet two times

a day; (3) March 4 – 6, 2014: 1 milligram tablet three times a day; (4) March 7, 2014: discontinue Xanax.

Dr. Fitting's orders were immediately put into effect. On the night of Tuesday, March 4, 2014, Schwark did not receive his evening 1 milligram of dose of Xanax for the first time. The morning of Wednesday, March 5, 2014, Schwark began to hallucinate and exhibit paranoia. When Nurse Canterbury went to give Schwark his midday Xanax dose, she noticed that his paranoia had gotten worse. Nurse Canterbury was concerned, so she decided to contact Park County Jail's Mental Health Consultant, Cynthia Parker, Psy.D. Nurse Canterbury exchanged emails with Dr. Parker about Schwark's condition. During those conversations, Dr. Parker approved Nurse Canterbury's request to slow the Xanax tapering schedule until they could stabilize Schwark. Dr. Parker also offered to set up an emergency meeting to assess Schwark, but Nurse Canterbury suggested that they wait to schedule a meeting until he was in a more lucid state.

While Schwark was in a state of psychosis, Nurse Canterbury continually monitored him and gave him his prescribed dose of Xanax hoping to improve his condition. On March 10, 2014, Captain Muldoon personally transported Schwark to Denver Health's secure unit in response to the nurses' request for a medical/psychiatric evaluation. Schwark was only at Denver Health for two days and returned to Park County Jail on March 12, 2014. Upon discharge, Denver Health doctors did not prescribe any medication for Schwark to take once he was out of the hospital. Likewise, Dr. Parker did

not reorder Schwark's scheduled medications after evaluating him when he returned to the Jail. However, she did give the nurses an order to use as needed for 1 milligram of Risperdone in the event that Schwark had another episode.

Once Schwark returned from Denver Health, Dr. Parker placed him on a different treatment regimen involving Gabapentin. Schwark did not have another episode while at the Jail. Jail staff even remarked that he looked much healthier. He also started working in the kitchen, which the Jail counted towards his good time. On April 1, 2014, he had completed his sentence and was released from Park County Jail.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

1.     Park County Jail is overseen by the Sheriff's Office, and Sheriff Fred Wegener is primarily responsible for creating and maintaining policies and procedures for the Jail, which are compiled into a manual and disseminated to Jail personnel. [Affidavit of Sheriff Fred Wegener attached hereto as **Exhibit A**, ¶ 2].

2.     The Park County Jail Policy and Procedure Manual provides guidelines on how Jail staff is to address various issues that arise in the jail setting, including inmate access to prescription medication and the authority of Park County Jail's Medical Director within the facility. [**Exhibit A**, Wegener Aff., ¶ 2].

3.     Park County Jail Policy J-121-N, "Decisions Regarding Pharmaceuticals and Medical Marijuana," explains the rationale behind restricting access to some medications in the jail setting: "[i]nmates and detainees arrive at this facility from a

variety of facilities and locations with medications and pills that present a challenge to the safe, secure and orderly operation of a detention facility." [*Id.* at ¶ 3; Park County Jail Policy J-121-N attached hereto as **Exhibit B**, p. 1].

4.     Per Policy J-121-N, when an inmate arrives at the facility with prescription medications that are prohibited, the nurses contact the Medical Director, Dr. Katherine Fitting, to obtain an authorization. [**Ex. A**, Wegener Aff., ¶ 3].

5.     Dr. Fitting assesses various factors when determining whether a certain medication should be provided to the inmate, including the inmate's medical need for the particular medication prescribed, whether the requested medications could be potentially harmful to an inmate when taken together, the particular medication's risk of abuse within the jail setting, and availability of effective substitute medications already included on the Jail's formulary. [*Id.*].

6.     Recognizing that the Medical Director's autonomy and authority is critical to safely and effectively providing treatment to inmates, the Jail has mandated that "[t]he decisions and recommendations of the Medical Director will be final and supersede medical decisions that were made at other facilities or by the inmate's personal physician." [*Id.* at ¶ 4; **Exhibit B**, p. 2].

7.     Accordingly, when a conflict exists between the orders given by Dr. Fitting and the inmate's personal doctor, Dr. Fitting's orders will govern the situation. [Affidavit of Captain Daniel Muldoon attached hereto as **Exhibit C**, Muldoon Aff., ¶ 7].

8.      Additionally, Park County Jail provides a process for inmates to appeal medical decisions: "[s]hould situations arise which are unexpected or unique, the inmate may appeal the Medical Director's decision. The Director will then review each case on an individual basis and make a determination that in the Director's opinion best meets the medical needs of the inmate and the security needs of the facility. The Director's decision will be final." [**Ex. A**, Wegener Aff., ¶ 4; **Ex. B**, p. 2].

9.      Sheriff Wegener has delegated management of the facility's day-to-day operations to the Jail Administrator, Captain Daniel Muldoon. [**Ex. A**, Wegener Aff., ¶ 5; **Exhibit C**, Muldoon Aff., ¶ 2].

10.     Captain Muldoon's overarching responsibility as Jail Administrator is to ensure safety and order at the facility. [**Ex. A**, Wegener Aff., ¶ 5; **Ex. C**, Muldoon Aff., ¶ 2]. Captain Muldoon's specific duties as the Jail Administrator include supervising Detention Deputies and overseeing their training. [**Ex. A**, Wegener Aff., ¶ 5; **Ex. C**, Muldoon Aff., ¶ 2].

11.     Given the relatively small size of Park County Jail, much of the new-hire training is accomplished through a shadowing program where they are paired with more experienced deputies when they first begin working at the facility. [**Ex. C**, Muldoon Aff., ¶ 2].

12.     Pursuant to Policy J-121-F, Detention Deputies are trained on how to "administer medications under the supervision of a health authority"—their primary

medical-related duty at the facility. [**Ex. A**, Wegener Aff., ¶ 5; **Ex. C**, Muldoon Aff., ¶ 3; Park County Jail Policy J-121-F attached hereto as **Exhibit D**, p. 1].

13.     During orientation, new-hires are taught how the med pass process works in addition to learning techniques to prevent inmates from "cheeking" (*i.e.,* storing pill in cheek instead of swallowing it) medication. [**Ex. C**, Muldoon Aff., ¶ 3]. Deputies go to every unit to conduct a med pass, whereby inmates line up near the front of the unit to receive their prescribed medication. [*Id.*]. Typically, the deputies dispense all of the medication to inmates, unless the nurses need to administer the medication themselves because it is particularly unusual. [*Id.*].

14.     Deputies are also trained on how to handle inmate complaints about medication: an inmate always has the option to fill out an Inmate Request Form (i.e., "kite") about his medical concerns and place it in the pod's request box. [*Id.* at ¶ 4]. Every day, the deputies pick up the forms placed in the box and sort them in the Jail's Control Room. [*Id.*]. The deputies then deliver the forms to the appropriate department. [*Id.*]. The Jail uses triplicate forms for this process, in which a copy of the request is provided to the inmate, the department, and the inmate's file. [*Id.*]. Deputies are also instructed to record complaints received about medication into an inmate's Floor Notes for that day. [*Id.*]. Additionally, deputies can notify Medical personnel in person about an inmate complaint concerning medical treatment. [*Id.*].

15.     It is the Jail's policy and general practice to give great deference to the decisions of medical personnel in the facility, so the Medical Unit operates fairly independently. [**Ex. A**, Wegener Aff., ¶ 6; **Ex. C**, Muldoon Aff., ¶¶ 5-6]. The Jail only trains nurses on how to handle the unique safety and security concerns associated with working in a jail setting. [**Ex. C**, Muldoon Aff., ¶ 5].

16.     Nurses do not have authority to independently prescribe or modify medications for inmates—they must have an order from the Jail's Medical Director or Mental Health Consultant. [Affidavit of Nurse Cathlene Pearce attached hereto as **Exhibit E**, ¶ 2; Affidavit of Nurse Jeri Swann attached hereto as **Exhibit F**, ¶ 10, Affidavit of Nurse Susan Canterbury attached hereto as **Exhibit G**, ¶ 10]. Similarly, a nurse cannot put physical restraints on an inmate without first obtaining a doctor's order to do so. [**Exhibit F**, Swann Aff., ¶ 7].

17.     Even if Captain Muldoon disagreed with a particular medical decision, he does not have the authority to override it. [**Ex. C**, Muldoon Aff., ¶ 6].

18.     Captain Muldoon, Detention Deputies, and other Jail staff serve in a support capacity with respect to medical treatment—particularly in the event of a medical emergency. [**Ex. A**, Wegener Aff., ¶ 6; **Ex. C**, Muldoon Aff., ¶ 6; Park County Policy J-121-H attached hereto as **Exhibit H**, p. 1].

19.     Pursuant to Policy J-121-H, all non-medical personnel "are not to interfere with medical personnel's examination or treatment of an inmate but are to ensure that

facility security is maintained." [**Exhibit H**, p. 1]. As a result, it is Captain Muldoon's general practice to not question requests made by Medical to transfer an inmate to the hospital and respond immediately to such request by transporting an inmate to the hospital as soon as possible. [**Ex. C**, Muldoon Aff., ¶ 6]. Apart from hospital transport requests, the nurses do not usually bring medical issues to Captain Muldoon's attention; for the most part, the nurses only notify the Captain when they encounter an unusual problem. [*Id.*].

20.     On November 12, 2013 at 9:35 p.m., Kyle Schwark was booked into Park County Jail. [Park County Jail In/Out Log for Kyle Schwark attached hereto as **Exhibit I**]. Schwark arrived at the Jail with various medications, including Xanax and Suboxone, which were prescribed by his primary physician, Dr. Singer. [**Exhibit G**, Canterbury Aff., ¶ 2].

21.     The next morning, on November 13, 2013, Nurse Susan Canterbury found Schwark's medications in her inbox. [**Ex. G**, Canterbury Aff., ¶ 2]. Nurse Canterbury was not initially familiar with Suboxone, so she researched the drug online. [*Id.* at ¶ 4]. From her research, she learned that Suboxone is supposed to help reduce cravings for narcotics like morphine. [*Id.*].

22.     Nurse Canterbury also discovered that the manufacturer's instructions contradicted the order by Schwark's doctor, Dr. Singer, on how to administer the Suboxone strips. [*Id.*]. The manufacturer's instructions stated that the strips should not be

cut because the Suboxone film cannot be stored once opened, but Dr. Singer ordered Schwark be given half of a Suboxone strip at a time. [*Id.*]. Nurse Canterbury also learned that Suboxone is contraindicated with alcohol and anxiety medications, so they should not be taken that same time. [*Id.*]. These concerns about Suboxone were relayed to Captain Muldoon. [Ex. C, Muldoon Aff., ¶ 8]. The Captain suggested the orders be followed as written out of caution. [*Id.*].

23.    Nurse Canterbury spoke to Dr. Fitting about Schwark's medications on November 13, 2013, Dr. Fitting said that she was not certified to manage Suboxone and Schwark would need to be taken off it eventually. [**Ex. G**, Canterbury Aff., ¶ 5]. They also discussed a tapering schedule for Schwark's Xanax prescription, but it was not implemented during November 2013. [*Id.*]. At that point, Dr. Fitting gave Nurse Canterbury orders to give Schwark all of his medications as prescribed until she gives further orders on how to modify his medication. [*Id.*].

24.    Schwark's Medication Sheet from November 2013 indicates that he received a 1 milligram Xanax tablet and one-half of a Suboxone strip on November 13, 2013. [Kyle Schwark's Medication Sheet for November 2013 attached hereto as **Exhibit J**]. Additionally, Schwark's inmate file has no record of kites being filed that complain of not receiving his medications. [**Ex. C**, Muldoon Aff., ¶ 9].

25.     At the end of the day on November 13, 2013, Nurse Canterbury packed Scwhark's morning Xanax dose of 2 milligrams for the deputies to dispense the next morning. [**Ex. G**, Canterbury Aff., ¶ 6].

26.     On November 14, 2013, Nurse Jeri Swann and Nurse Cathlene Pearce were the only nurses working in the Medical Unit that day. [*Id.* at ¶ 7].

27.     Kyle Schwark has no recollection of interacting with any of the nurses or other medical professionals prior to being taken to the Medical Unit after his first seizure on Nov. 14, 2013. [Transcript of Kyle Schwark's Deposition attached hereto as **Exhibit K**, p. 147, l. 19-23].

28.     The morning of November 14, 2013, Nurse Pearce prepared Schwark's medication—including Suboxone—as prescribed by Dr. Singer and left Medical to distribute the medications. [**Exhibit E**, Pearce Aff., ¶ 4]. Nurse Swann remained in Medical. [**Ex. F**, Swann Aff., ¶¶ 3-4].

29.     Nurse Pearce was notified over the radio that one of the inmates in F-pod needed immediate medical attention. [*Id.*]. When Nurse Pearce arrived at F-pod she saw Schwark lying on the floor and he appeared to be having a seizure. [*Id.*]. Nurse Pearce placed a blanket under his head to prevent him from injuring himself while his body was convulsing. [*Id.*]. Nurse Pearce and a deputy took Schwark to the medical unit in a wheelchair. [*Id.*].

30.     Nurse Pearce and Nurse Swann required Schwark to stay in the wheelchair for several hours until he became alert and "oriented times three," meaning that he knew who he was, where he was, and the approximate time. [*Id.* at ¶ 5; **Ex. F**, Swann Aff., ¶¶ 6-7].  While Schwark was in the Medical Unit, he was given snack and fluids in addition to lunch. [**Ex. E**, Pearce Aff., ¶¶ 5-6; **Ex. F**, Swann Aff., ¶¶ 6-7].

31.     Nurse Swann called the Jail's Medical Director, Dr. Katherine Fitting, for further instructions. [**Ex. E**, Pearce Aff., ¶ 6; **Ex. F**, Swann Aff., ¶ 5]. Dr. Fitting ordered that Schwark be place on the Jail's alcohol withdrawal protocol, which includes administering Librium to the inmate. [**Ex. E**, Pearce Aff., ¶ 7; **Ex. F**, Swann Aff., ¶ 5]. Librium is a longer-acting Benzodiazepine within the same family as Xanax. [**Ex. F**, Swann Aff., ¶ 5]. Schwark was given 25 milligrams of Librium as directed by Dr. Fitting. [**Ex. E**, Pearce Aff., ¶ 7; **Ex. F**, Swann Aff., ¶ 5]. Dr. Fitting did not order the use of physical restraints on Schwark. [**Ex. F**, Swann Aff., ¶ 7].

32.     At one point, Schwark went to the trashcan because he was feeling sick to his stomach. [**Ex. E**, Pearce Aff., ¶ 8; **Ex. F**, Swann Aff., ¶ 6]. However, he appeared to feel better after vomiting because he resumed casually conversing with the nurses. [**Ex. E**, Pearce Aff., ¶ 9; **Ex. F**, Swann Aff., ¶ 7].

33.     When Schwark was calmly leaning against the exam table and casually conversing with the nurses, Nurse Swann and Nurse Pearce resumed working. [**Ex. E**, Pearce Aff., ¶ 9; **Ex. F**, Swann Aff., ¶ 8].

34.     Shortly after the nurses returned to work, they heard a grunting sound coming from Schwark's direction. [*Id.*]. Schwark has fallen to the ground and appeared to be having another seizure. [*Id.*]. When Schwark fell, he hit his head and started to bleed. [**Ex. F**, Swann Aff., ¶ 8].

35.     Nurse Swann called an ambulance and stayed with Schwark to prevent further injury, while Nurse Pearce ran to get assistance from Deputy Fenner. [**Ex. E**, Pearce Aff., ¶ 10; **Ex. F**, Swann Aff., ¶ 9].

36.     Schwark became combative when he started coming to – he was biting, kicking, punching and screaming to let him go. [*Id.*]. When the paramedics arrived, they gave Schwark 2 milligrams of Versed to calm him down and he was transported to the hospital. [**Ex. E**, Pearce Aff., ¶¶ 10-11; **Ex. F**, Swann Aff., ¶ 9].

37.     On November 15, 2013, Sheriff Wegener ordered that Schwark be released from Park County's custody due to his medical condition at the request of the Jail Administrator, Captain Daniel Muldoon. [**Ex. A**, Wegener Aff., ¶ 8; **Ex. C**, Muldoon Aff., ¶ 9]. Schwark was placed on a furlough until such time as he was authorized by his doctor to complete his sentence. [*Id.*]. The Sheriff's only involvement with Schwark was issuing this order. [**Ex. A**, Wegener Aff., ¶ 8].

38.     On February 25, 2014, Schwark was brought back to the Jail to serve out the remainder of his sentence because he violated the terms of his probation. [**Ex. C**, Muldoon Aff., ¶ 10].

39.     The Second Amended Complaint states that the judge said he did not have power to order Park County Jail to give Schwark medication when he requested such an order. [Second Amended Complaint ("SAC"), Doc. 61, ¶ 51].

40.     When Schwark was taken into custody, he resisted arrest. [**Ex. C**, Muldoon Aff., ¶ 10]. Schwark remained aggressive and belligerent after he arrived at the Jail. [*Id.*]. Schwark was placed into an isolation cell where he could be watched more closely. [*Id.*].

41.     Schwark entered the Jail with two different Benzodiazepines, Xanax and Librium, as well as Suboxone. [**Ex. G**, Canterbury Aff., ¶ 8].

42.     On Wednesday, February 26, 2014, Nurse Canterbury reached out to Dr. Fitting to discuss Schwark's current medications to obtain orders on how to manage his medications. [*Id.*]. At that time, Dr. Fitting wrote an order to discontinue the Suboxone and Librium. [*Id.*]. Dr. Fitting also created a tapering schedule for the Xanax: (1) February 26 – 28, 2014: 1 milligram tablet three times a day; (2) March 1-3, 2014: 1 milligram tablet two times a day; (3) March 4-6, 2014: 1 milligram tablet one time a day; (4) March 7, 2014: discontinue Xanax. [*Id.*].

43.     The Second Amended Complaint concedes that Dr. Fitting was responsible for the change in medication during February and March of 2014. [SAC, Doc. 61, ¶¶ 55-57].

44.     Schwark's February/March 2014 Medication Sheet indicates that his Xanax medication was administered in accordance with Dr. Fitting's tapering schedule between

February 26, 2014 to March 3, 2014. [Kyle Schwark's Medication Sheet for February/March 2014 attached hereto as **Exhibit L**].

45.     At 2:30 p.m. on Wednesday, March 5, 2014, Nurse Canterbury wrote an email to the Jail's Mental Health Consultant, Cynthia Parker, Psy.D. [**Ex. G**, Canterbury Aff., ¶¶ 9-10]. In the email, Nurse Canterbury described Schwark's recent conduct to Dr. Parker: Schwark did not receive his evening 1 milligram dose of Xanax for the first time on Tuesday, March 4, 2014 per Dr. Fitting's orders. [*Id.*]. On the morning of March 5, 2014, Nurse Canterbury observed that Schwark began to hallucinate and exhibit paranoia. [*Id.*]. She noticed that these symptoms had worsened when she went to give Schwark his midday dose of Xanax. [*Id.*]. In the email, Nurse Canterbury also requested permission to temporarily suspend the Xanax taper until Schwark's condition improved. [*Id.*].

46.     According to Jail policy, Dr. Parker is the only in-house provider with authority to prescribe medications for mental health issues. [*Id.* at ¶ 10]. Moreover, nurses do not have authority to give medications absent an order. [*Id.* at ¶ 12]. Nurses also do not have authority to start the process of finding a place for inmates in need of medical treatment at either a hospital or mental health facility. [*Id.* at 14].

47.     At 5:20 p.m. on Wednesday, March 5, 2014, Dr. Parker responded to Nurse Canterbury's email. [*Id.* at ¶ 11]. Dr. Parker replied that it sounded as though Schwark was experiencing some form of psychosis. [*Id.*]. Dr. Parker gave Nurse Canterbury permission to slow the Xanax tapering schedule, but she also suggested that Schwark

may need to be put on medications to address the hallucinations as well. [*Id.*]. Dr. Parker offered to set up an emergency appointment to see him on Thursday afternoon. [*Id.*].

48.     During February/March 2014, Nurse Canterbury tried to contact Dr. Singer twice to get more information about Schwark's medical history and treatment prior to incarceration. [*Id.* at ¶ 12]. On March 5, 2014, Nurse Canterbury received a fax from Dr. Singer's office that included a couple of pages of treatment notes from two visits in 2013. [*Id.*]. She provided these notes to Dr. Parker. [*Id.*].

49.     By Thursday, March 6, 2014, Schwark's Medication Sheet indicates that he was receiving his Xanax medication as originally prescribed by Dr. Singer. [**Exhibit L**, p. 2]. That morning, Nurse Canterbury emailed Dr. Parker to update her on Schwark's status: his condition had somewhat improved Wednesday evening, but he was not yet lucid enough to have a meaningful conversation with her. [**Ex. G**, Canterbury Aff., ¶ 12]. Nurse Canterbury also asked whether there was anything she could give to Schwark that would help with the hallucinations. [*Id.*] Later that day, Nurse Canterbury emailed Dr. Parker to provide another status update on Schwark: he was becoming increasingly coherent and was trying to figure out what happened to him the day before. [*Id.*].

50.     Nurse Swann's only interaction with Schwark during February/March 2014 occurred on March 8, 2014, when she gave him his Xanax medication. [**Ex. F**, Swann Aff., ¶ 11]. Schwark does not recall interacting with Nurse Swann during February 25, 2014 to March 10, 2014. [**Ex. K**, Schwark Deposition, p. 227, l.].

51.     While Schwark was in a state of psychosis, Nurse Canterbury continually monitored him and gave him his prescribed dose of Xanax in an effort to improve his condition. [*Id.* at ¶ 14]. At the request of the nursing staff, Captain Muldoon and Sergeant Theobald personally escorted Schwark to the secure unit at Denver Health on March 10, 2014. [*Id.*; **Ex. C**, Muldoon Aff., ¶ 11].

52.     Just two days later, on March 12, 2014, Schwark returned to Park County Jail. [**Ex. G**, Canterbury Aff., ¶ 15; **Ex. C**, Muldoon Aff., 12]. Upon discharge, the doctors at Denver Health did not prescribe any medications, including Xanax, Suboxone, or Librium, for Schwark to take while in jail. [*Id.*]. Likewise, Dr. Parker did not reorder Schwark's scheduled medications after evaluating him once he returned to the Jail. [**Ex. G**, Canterbury Aff., ¶ 15].

53.     From March 12, 2014 to his release date on April 1, 2014, Schwark's condition improved. [**Ex. C**, Muldoon Aff., ¶ 12]. Schwark did not have another psychotic episode. [*Id.*]. Additionally, Schwark began working in the kitchen. [*Id.*]. Captain Muldoon approached Schwark while he was working and informed him that his work would count towards good time.  [*Id.*].

### III.   <u>STANDARD OF REVIEW</u>

Summary judgment should be granted where the moving party shows the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the burden then

shifts to the non-moving party to demonstrate a genuine issue of material fact to be resolved at trial. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). A fact is "material" if it is essential to the proper disposition of the claim. *Adler v. Wal-mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). An issue of fact is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Id.*

## IV.  ARGUMENT

### A. PLAINTIFF CANNOT OVERCOME QUALIFIED IMMUNITY FOR ANY INDIVIDUAL DEFENDANT BECAUSE NO DISPUTED FACTS SUPPORT A CLAIM OF FAILURE TO PROVIDE MEDICAL CARE AND TREATMENT.

#### 1.  Qualified Immunity Doctrine and Plaintiff's Burden

The qualified immunity doctrine shields governmental officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[Q]ualified immunity not only shields a defendant from liability, but is also intended to protect the defendant from the burdens associated with trial." *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988). "These burdens include distraction of officials from their governmental responsibilities, the inhibition of discretionary decision making, the deterrence of able people from public service, and the disruptive effects of discovery on governmental operations." *Hannula v. City of Lakewood*, 907 F.2d 129, 130 (10th Cir. 1990). Qualified immunity protects "all

but the plainly incompetent or those who knowingly violate the law." *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Where Defendants seek qualified immunity, "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Once Defendants assert qualified immunity, the burden shifts to Plaintiffs to demonstrate (1) Defendants' actions violated a constitutional or statutory right, and (2) the right was clearly established and reasonable persons in the Defendants' positions would have known their conduct violated that right. *See Garrett v. Stratman*, 254 F.3d 946, 951 (10th Cir. 2001) (citing *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir. 2001)); *see also, Migneault v. Peck*, 158 F.3d 1131, 1139 (10th Cir. 1998) (citing *Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997)). "If the plaintiff fails to carry either part of his two-part burden, the defendant is entitled to qualified immunity." *Migneault*, 158 F.3d at 1139 (citing *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

In order to overcome the defense of qualified immunity, Plaintiffs must make a particularized showing that the law is sufficiently clear that Defendants would have known that their conduct was unconstitutional. *See Patrick v. Miller,* 953 F.2d 1240, 1243 (10th Cir. 1992). Although the standard does not require an exact or precise factual correlation between existing law and the circumstances of the case at bar, it does require that the law be reasonably well-developed to inform the state official that his conduct

would violate the law. *See Hilliard v. City and County of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991). In order for the law to be sufficiently clear, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). In order to be clearly established, the unlawfulness of the complained of conduct must be apparent. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

With respect to the second part of the two-part qualified immunity burden, reasonableness is judged against the backdrop of the law at the time of the conduct, because the focus is on whether the officer had fair notice that his conduct was unlawful. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The inquiry must be in the specific context of the case rather than a broad general proposition. *Id.* Plaintiffs do not meet their burden by identifying "in the abstract" a right and claiming Defendants violated this right. *See Losavio*, 847 F.2d at 645. Rather, Plaintiffs must articulate the clearly established constitutional right and the Defendants' conduct which violated the right with specificity, and demonstrate a substantial correspondence between the conduct in question and prior law establishing that the Defendants' actions were clearly prohibited. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995) (alterations, quotation marks and citations omitted). The U.S. Supreme Court recently reemphasized the need for a particularized showing:

Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." … As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case… Otherwise, "plaintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

*White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted). "Unless such a showing is made, the Defendant prevails," *Losavio*, 847 F.2d at 646, and "we need not address the other elements of the qualified immunity inquiry," *Davis v. Gracey*, 111 F.3d 1472, 1478 (10th Cir. 1997).

In the face of a summary judgment motion, Plaintiff must produce evidence that would allow a trier of fact to find that no reasonable person in the Defendants' positions would have thought the facts justified the Defendants' acts. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [officer] conduct." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.*; *see also*, *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1196 (10th Cir. 2001).

### 2.  Elements of an Eighth Amendment Claim

The test for an Eighth Amendment violation is two-pronged. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first prong requires that the plaintiff show that the treatment he received was, objectively, a sufficiently serious deprivation of his rights. *Id.* The second prong is subjective, requiring that the plaintiff show the defendant had a "sufficiently culpable state of mind," which in the prison context is one of "deliberate indifference" to inmate health and safety. *Id.* "Prison officials violate the Eighth Amendment when they are deliberately indifferent to the serious medical needs of prisoners in their custody." *Perkins v. Kansas Dept. of Corrections*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976)). "A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Id.* "Moreover, a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Id.* "A medical need is sufficiently serious if it has been diagnosed by a doctor or is one that has been diagnosed by a physician as mandating treatment or one that is so obvious even a lay person would easily recognize the necessity for a doctor's attention." *Ajaj v. U.S.*, 293 F. App'x 575, 579 (2008) (unpublished) (citation omitted).

### a. Sheriff Fred Wegener

#### i.    No Constitutional Violation

Sheriff Fred Wegener did not violate Schwark's constitutional rights. It is undisputed that Sheriff Wegener had no interaction with Plaintiff while he was incarcerated at Park County Jail in either November 2013 or February-April of 2014. [SUMF, ¶ 1]. The Sheriff was aware of Schwark's injuries in November 2013 because he signed a medical furlough for him at the request of Captain Muldoon. [SUMF ¶ 37]. However, that is the extent of his knowledge and personal involvement in this matter. It is also undisputed that the Sheriff has delegated all day-to-day management of the Jail, including training, to Captain Muldoon. [SUMF, ¶¶ 9-10]. As such, Plaintiff cannot establish personal participation or even that Sheriff Wegener had a supervisory role within the facility.

#### ii.    No Clearly Established Law

Under clearly established law, "[a] supervisor is not liable under § 1983 unless an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993). Here, the Sheriff did not personally participate in the alleged constitutional violation. [SUMF, ¶ 1]. Likewise, he did not exercise control or fail to supervise because he had delegated all supervisory

responsibility to Captain Muldoon. [SUMF, ¶ 9]. Thus, the Sheriff retains his qualified immunity from suit and should be dismissed from this action.

### b.  Nurse Jeri Swann

#### i.    No Constitutional Violation

Nurse Jeri Swann did not violate Schwark's constitutional rights because she did not act with deliberate indifference to Schwark's serious medical needs during the limited interactions she had with him. Although Plaintiff alleges that he made several complaints about not receiving his medication during November of 2013, he has no recollection of interacting with any of the nursing staff prior to his seizure on November 14, 2013. [SUMF, ¶ 27]. By Plaintiff's own account, Schwark was not complaining to Nurse Swann. Without knowledge, Nurse Swann could not be deliberately indifferent to the risk of the alleged withholding of medication.

On November 14, 2013, Nurse Swann's conduct was a reasonable response to the risk. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). It is undisputed that her first interaction with Schwark occurred when she treated him in the Medical Unit after he had his first seizure. [SUMF, ¶ 28]. The undisputed facts demonstrate that Nurse Swann attentively cared for Schwark while he was in Medical. The nurses required him to remain in the wheelchair for several hours. [SUMF, ¶ 30]. They gave Schwark a snack

and some fluids before his lunch was brought to him in Medical. [*Id.*]. The nurses only allowed him to get up from the wheelchair once he was responsive to his environment and "oriented times three"—meaning Schwark knew who he was, where he was, and the approximate time. [*Id.*]. Moreover, instead of making him return back to his pod, the nurses allowed him to stay in Medical for further observation. At that point, there was no need to restrain Schwark because he had remained in a stable condition for several hours. Furthermore, a doctor's order is required before a nurse can put physical restraints on an inmate, and no such order had been given. [SUMF, ¶¶ 16, 31]. Accordingly, Nurse Swann was not deliberately indifferent to Schwark's serious medical needs in November 2013.

Nurse Swann had even more limited involvement with Schwark during his second period of incarceration. In order to establish a lack of knowledge, which would foreclose a finding of deliberate indifference, "[p]rison officials … might show … that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was unsubstantial or nonexistent." *Farmer*, 511 U.S. at 844. It is undisputed that Nurse Swann only interacted with Schwark on March 8, 2014, when she gave him his Xanax medication. [SUMF, ¶ 51]. Schwark also does not recall interacting with Nurse Swann at all during this time period. [*Id.*]. Nurse Swann's personal knowledge of the progression of Schwark's

condition was very limited, which means she could have been unaware of the danger. Even if she was fully informed as to Schwark's deteriorating mental state, it was reasonable for her to believe that complying with Dr. Fitting's order was the correct course of action at the time.

### ii.   No Clearly Established Law

Under these set of facts, Plaintiff will be unable to make a showing that the law was clearly established such that Nurse Swann should have known she was violating Plaintiff's constitutional rights.

First, even assuming Schwark was not provided his medication in November of 2013, Nurse Swann would not be liable considering the November 2013 Medication Sheet indicated that he received all of his prescribed medications. [SUMF, ¶ 24]. Nurse Swann reasonable relied on her co-workers documentation. Second, Nurse Swann's conduct in not foreseeing Schwark's second seizure amounts to negligence at most given his relatively stable condition for several hours prior to the seizure. [SUMF, ¶ 30]. Moreover, Dr. Fitting had not ordered that physical restraints could be used on Schwark, so Nurse Swann did not have authority to do so. [SUMF, ¶ 31]. Third, Nurse Swann was following Dr. Fitting's order on March 8, 2014. [SUMF, ¶¶ 42, 50]. Nurse Swann had no knowledge that Dr. Fitting's order was somehow improper, and she does not have the authority to modify an inmate's scheduled medications. [SUMF, ¶ 16]. As such, no clearly established law indicates that Nurse Swann's conduct does not rise to the level of

an Eighth Amendment violation. *See Perkins*, 165 F.3d 811 ("A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.").

### c.  Captain Daniel Muldoon

#### i.    No Constitutional Violation

Plaintiff's Second Amended Complaint does not allege Captain Muldoon personally participated in the alleged constitutional violation in November of 2013 and no facts would support such an allegation. In November 2013, the nurses initially approached Captain Muldoon about Schwark's Suboxone prescription when Schwark was first admitted into the Jail. [SUMF, ¶ 22]. At that point, Captain Muldoon suggested that the nurses follow the prescription as written out of caution. [*Id.*]. Schwark's November 2013 Medication Sheet indicates that he received his medications as prescribed. [SUMF, ¶ 24]. Additionally, Kyle's inmate file has does not contain any kites related to medication. [*Id.*]. Captain Muldoon had no reason to believe that Schwark's medications were not being provided to him as prescribed by Dr. Singer, so he could not have been deliberately indifferent to the risk.

Plaintiff alleges that Captain Muldoon violated Schwark's constitutional rights by refusing the nurses request to take Schwark to the hospital until March 10, 2014. Plaintiff asserts that Nurse Canterbury's deposition testimony demonstrates that she repeatedly made requests to Captain Muldoon for Schwark to be taken to the hospital. [SAC, Doc.

61 at ¶ 66]. However, Nurse Canterbury actually testified that she "[couldn't] specifically remember" whether or not she told anyone that Schwark needed to go to the hospital, but "that is what I would have done or likely did do." [Nurse Susan Canterbury's Deposition attached hereto as **Exhibit M**, p. 80, l. 16-18]. With respect to whether Nurse Canterbury notified Captain Muldoon, she stated, "[i]f I remembered when I told him, I would be able to verbatim tell you that I said that, and I have already said I don't remember just when, but it was probably every day." [**Exhibit M**, p. 81, l. 11-14]. The transcript reveals that Nurse Canterbury did not say that she was certain she made a request to the Captain for a hospital transfer sooner than March 10, 2014. Instead, it is clear that she meant that it was her general practice to do so in those situations. Additionally, refusing a transfer request from the Medical personnel would go against Jail policy as well as Captain Muldoon's general practice of responding immediately to such requests. [SUMF ¶¶ 15-19]. These facts do not establish that Captain Muldoon refused any request to transfer Schwark to the hospital. Moreover, the undisputed facts show that Captain Muldoon reasonably responded to a request to transfer Schwark to the hospital on March 10, 2014, and Schwark was personally escorted by the Captain from Park County all the way to Denver Health. [SUMF, ¶ 51]. As a result, Plaintiff cannot show that Captain Muldoon was deliberately indifferent to the risk.

Moreover, "[d]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifferent which results in substantial harm." *Boyett*

*v. Cnty. of Washington*, 282 F. App'x 667, 674 (10th Cir. 2008) (unpublished) (citing *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993)). The undisputed facts demonstrate that Schwark returned to the Jail after only two days in the hospital. [SUMF, ¶ 52]. Moreover, the doctors prescribed him no medications upon discharge. [*Id.*]. Even assuming there was a delay, it did not result in substantial harm as evidenced by Schwark's limited amount of time in the hospital and lack of prescription medications.

### ii.    No Clearly Established Law

Captain Muldoon did not violate clearly established law. "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety.'" *Farmer*, 511 U.S. at 844. During November 2013 and February/March 2014, the Captain acted reasonably considering the facts available to him at the time. In November 2013, all Jail documentation indicated that Schwark received his medication as prescribed. Similarly, he relied on the medical professionals to determine when it was necessary to transfer Schwark to the hospital for more extensive treatment. When the request was finally made, Captain Muldoon reacted promptly and took Schwark to the hospital himself.

No clearly established law would have put Captain Muldoon on notice of a possible constitutional violation.

### d.  Nurse Susan Canterbury

### i.    No Constitutional Violation

Plaintiff alleges that Nurse Susan Canterbury violated Schwark's constitutional rights by refusing to give him his medication in November of 2013 and by modifying his medications in February/March of 2014. Plaintiff further alleges that both incidents were in violation of a court order directing him to receive his medication as prescribed by Dr. Singer.

As to the November 2013 incident, it is undisputed that Schwark's Medication Sheets for that month indicate that he received his Xanax and Suboxone medications as prescribed by Dr. Singer. [SUMF, ¶ 24]. It is also undisputed that Schwark's inmate file contains no kites regarding medications at all. [*Id.*]. Even accepting Plaintiff's facts—that Schwark did not receive his medications during the two days he was incarnated— deliberate indifference on the part of the nurses could still not be established. It is undisputed that Schwark does not recall having any interactions with Medical personnel until after he had his first seizure on November 14, 2013. [SUMF, ¶ 27]. By Plaintiff's own account, none of the nurses were aware of his medical needs.

With respect to the February/March 2014 incident, Plaintiff concedes that Dr. Fitting was responsible for the changes to his medication during this time. [SUMF, ¶ 43]. It is undisputed that Dr. Fitting ordered Schwark's Suboxone and Librium medications to be discontinued and she created a tapering schedule to eventually ween Schwark off

Xanax. [SUMF, ¶ 42].  It is also undisputed that Nurse Canterbury complied with Dr. Fitting's orders. [SUMF, ¶ 44]. Nurse Canterbury was required to follow Dr. Fitting's orders, and it was reasonable for her to do so.

Furthermore, rather than demonstrating deliberate indifference, Nurse Canterbury's conduct shows that she was proactive in trying to help Schwark. She reached out to Dr. Parker about Schwark's declining mental state on several occasions in March 2014. [SUMF, ¶¶ 45-47]. Additionally, she contacted Schwark's primary physician, Dr. Singer, in an effort to obtain more information about his medical history to give to Dr. Parker. [SUMF, ¶ 48]. Simply put, she was not deliberately indifferent to the risk.

### ii.    No Clearly Established Law

Nurse Canterbury did not violate clearly established law because a change in Schwark's treatment via medication does not violate his constitutional rights. *See Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) ("A prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment." (quoting *Dulaney v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997))); *see also Boyett*, 282 F. App'x at 274 ("[P]rescription of substitute medication [by the Jail's Physician's Assistant] for [inmate] does not demonstrate deliberate indifference.").

Moreover, construing the Park County District Court order as requiring the Jail to provide a specific medication as opposed to requiring the facility provide treatment generally would contravene the well-established judicial preference to avoid interfering in matters related to administration of a jail or prison. *See Anderson v. Colorado*, 887 F. Supp. 2d 1133, 1144 (D. Colo. 2012) ("An even more fundamental problem with [Plaintff's] quest for a stimulant is that courts do not prescribe medication. Courts are not in a position to second guess the medical judgment of a physician.").

Under these set of facts, Plaintiff will be unable to make a showing that the law was clearly established such that Nurse Canterbury should have known she was violating Plaintiff's constitutional rights.

## B. PLAINTIFF CANNOT ESTABLISH A § 1983 CLAIM AGAINST SHERIFF WEGENER FOR FAILURE TO TRAIN AND SUPERVISE.

Plaintiff's claim against Sheriff Wegener in his official capacity is essentially a claim against Park County. *See Watson v. City of Kansas City*, 857 F.2d 690, 695 (10th Cir. 1988). To the extent that Plaintiff alleges a claim for liability against the County, Plaintiff has the burden of proving (1) an underlying constitutional violation by the Jail and (2) a municipal policy or custom that caused Plaintiff's alleged injuries. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (citing *Monell*, 436 U.S. at 694). It is not enough for a plaintiff to identify conduct attributable to the county; the plaintiff must demonstrate that, "through its *deliberate* conduct, the [county] was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404 (emphasis in original).

Likewise, Plaintiff must be able to prove that the failure to train, supervise, discipline, or properly hire reflects a *deliberate or conscious choice* by a county, in other words, a policy. *See Canton v. Harris*, 489 U.S. 378, 389 (1989) (emphasis added).

As set forth above, Plaintiff cannot establish any underlying violation of his constitutional rights by Sheriff Wegener, Captain Muldoon, Nurse Canterbury, or Nurse Swann. Without an underlying constitutional violation, a § 1983 claim cannot survive. Moreover, even if Plaintiff could establish an underlying constitutional violation, there is no evidence that Park County Jail's conduct was the moving force behind the alleged violation. First, there is no evidence to suggest that Park County Jail provided inadequate training to its Detention Deputies. Rather, deputies are specifically trained on how to distribute medication to inmates as well as how to handle inmate complaints regarding medication. [SUMF. ¶¶ 11-14].

Second, there is no evidence to suggest that Park County Jail is responsible for training nurses on how to perform their medical duties. The Medical Unit, including the nursing staff, operates fairly independently. [SUMF, ¶ 15]. It is the Jail's policy and general practice to give great deference to the decisions of medical personnel in the facility. [*Id.*]. The Jail only trains the nurses on how to handle the unique security concerns associated with working in a jail setting. [*Id.*].

Consequently, Plaintiff cannot show any deliberate conduct on the part of the Park County Jail that resulted in the alleged constitutional violation. Therefore, Plaintiff's

§ 1983 claim for failure to train and supervise should also be dismissed as a matter of law.

**WHEREFORE**, the Park County Defendants respectfully request that the Court enter orders as follows:

A.      Granting summary judgment in favor of the Park County Defendants on Plaintiff's claims;

B.      Granting judgment in favor of the Park County Defendants and against Plaintiff for costs and attorney fees; and

C.      Such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/ Eric M. Ziporin
*Eric M. Ziporin*

s/ Susan E. McNulty
*Susan E. McNulty*
SENTER GOLDFARB & RICE, L.L.C.
3900 E. Mexico Ave., Suite 700
Denver, Colorado 80210
Telephone:  (303) 320-0509
Facsimile:   (303) 320-0210
E-mail: eziporin@sgrllc.com
            smcnulty@sgrllc.com

*Attorneys for Park County Defendants*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 8th day of May, 2017, I emailed a true and exact copy of the above and foregoing **PARK COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

David A. Lane
Andy McNulty
Dunia Dickey
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com
amcnulty@kln-law.com
ddickey@kln-law.com

*Attorneys for Plaintiff*

Steven Michalek
Gina Glockner
Childs McCune LLC
821 17th Street, Suite 500
Denver, Colorado 80202
(303) 296-7300
smichalek@childsmccune.com
gglockner@childsmccune.com

*Attorneys for Defendant Katherine Fitting, M.D.*

*s/ Carol J. Kelly*
Carol Kelly, Legal Secretary