IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02507-JLK

KYLE JEFFERY SCHWARK,

    Plaintiff,

v.

SHERIFF FRED WEGENER, in his official and individual capacities;
NURSE SUSAN CANTERBURY, in her individual capacity;
NURSE JERI SWANN, in her individual capacity;
NURSE CATHLENE PEARCE, in her individual capacity;
DOCTOR KATHERINE FITTING, in her individual capacity;
CAPTAIN DANIEL MULDOON, in his individual capacity,

    Defendants.
_____

**AFFIDAVIT OF CATHLENE PEARCE, R.N.**
_____

Affiant, **CATHLENE PEARCE, R.N.**, after first being duly sworn, states as follows:

1. I was employed by Park County as a temporary nurse at the Park County Jail from October 8, 2013 to February 21, 2014. I have personal knowledge of the matter set forth below.

2. Park County Jail contracts out oversight and management of inmate medical treatment to doctors and mental health professionals. While I was working at the Jail, Doctor Katherine Fitting oversaw medical treatment of inmates remotely. Nurses only carry out the specific orders given to them by doctors. Nurses do not have authority to make unilateral treatment decisions, which includes any decision related to administering medication.

3. My only interaction with Kyle Schwark occurred while he was incarcerated at Park County Jail on November 14, 2013.



EXHIBIT E

4.     On the morning of November 14, 2013, I prepared Kyle's various morning medications, including Suboxone, as instructed by his prescribing physician, Dr. Singer. Nurse Susan Canterbury had already packed Kyle's prescribed morning dose of Xanax, which had been given to him at med pass by one of the deputies around 8:00 a.m. I was on my way to distribute medication when I was notified over the radio that one of the inmates in F pod needed immediate medical attention. When I arrived at F pod, I saw Kyle Schwark on the floor, and he appeared to be having a seizure. I placed a blanket under his head to prevent him from injuring himself while his body was convulsing. Kyle was disoriented after he regained consciousness, which is not uncommon in my experience.

5.     Thereafter, I transported Kyle in a wheelchair to the Jail's Medical Unit with the help of one of the deputies. Kyle remained in Medical for a majority of the day for observation and rest. He stayed in the wheelchair for several hours until his vital signs stabilized and he became alert and oriented. While Kyle was in Medical, we gave him some snacks and his lunch was brought to him.

6.     We only allowed Kyle to move from the wheelchair once he was responsive to his environment and "oriented times three"—meaning that Kyle knew who he was, where he was, and the approximate time. Once Kyle was alert and oriented times 3, we moved him to the medical examination table in order to do a more thorough assessment. Kyle was sitting on the edge of the table during the medical exam. Once the assessment was complete, I gave him a blanket and some water while Jeri Swann, R.N. called Dr. Katherine Fitting for further instructions.

7.      Dr. Fitting ordered that Kyle be placed on the Jail's alcohol withdrawal protocol, which includes administering Librium to the inmate. Kyle was given 25 milligrams of Librium as directed by Dr. Fitting.

8.      After Kyle took the Librium, he laid back on the exam table to rest for a few minutes. It was not necessary to restrain Kyle on the exam table because he was alert, oriented times three, and a significant amount of time had passed since his seizure. Moreover, a doctor's order is required before nurses can put physical restraints on an inmate, and no such order had been given. Kyle started feeling nauseous soon after he laid down, so he got up and walked towards the trash can. He stood over the trash can and spit a few times before eventually vomiting.

9.      Kyle seemed to be feeling better after he vomited. He returned to casually conversing with the Medical staff as he leaned against the exam table, and I resumed working. Shortly thereafter, I heard a strange gargling sound coming from his direction. When I turned toward his direction I saw Kyle leaning against the table and then fall to the ground. It appeared as though Kyle was having another seizure.

10.     Nurse Swann stayed with Kyle to prevent further injury while I went to get Deputy Fenner to assist us. An ambulance was called soon after, and we tried to treat the wounds Kyle sustained during the fall while we waited for the paramedics to arrive. At this point, it was difficult to treat him because he became very combative with the Medical staff—biting, kicking, punching, and screaming to let him go.

11.     We were eventually able to secure his neck in a brace and continued to physically prevent him from moving. When the paramedics arrived on scene, they gave Kyle two milligrams

of Versed IM to calm him down. After several minutes, we were able to get Kyle on a stretcher and release him to the paramedics.

12.     When Kyle Schwark left Park County Jail to go to the hospital, I had no further interaction with him. When Kyle returned to jail in February 2014 to serve out his sentence, I no longer worked there.

**FURTHER AFFIANT SAYETH NAUGHT.**

4

_____
Cathlene Pearce, R.N.

STATE OF COLORADO         )
                          ) ss.
COUNTY OF PARK            )

  SUBSCRIBED AND SWORN to me before this _____ day of May, 2017, by Cathlene Pearce, R.N.

  My commission expires: _____

_____
Notary Public