## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02507-JLK

KYLE JEFFERY SCHWARK,

      Plaintiff,

v.

SHERIFF FRED WEGENER, in his official and individual capacities;
NURSE SUSAN CANTERBURY, in her individual capacity;
NURSE JERI SWANN, in her individual capacity;
DOCTOR KATHERINE FITTING, in her individual capacity;
CAPTAIN DANIEL MULDOON, in his individual capacity,

      Defendants.

---

## AFFIDAVIT OF CAPTAIN DANIEL MULDOON

---

Affiant, **CAPTAIN DANIEL MULDOON**, after first being duly sworn, states as follows:

1.      I am a Captain in the Park County Sheriff's Department. I have personal knowledge of the matter set forth below.

2.      I am the Administrator of Park County Jail, and I am responsible for ensuring safety and order at the facility. In this role, I supervise Detention Deputies and oversee their training. Given the Jail's relatively small size, much of our training for new hires is accomplished through a shadowing program where they are paired with more experienced deputies when they first begin working at the facility.

3.      Deputies learn various aspects of their job through shadowing, including their role in providing medical treatment to inmates. A deputy's medical-related duties are generally limited

EXHIBIT

C

to assisting nurses with administering medication to inmates (*i.e.,* "med pass"). During orientation, new hires are taught how the med pass process works in addition to learning techniques to prevent inmates from cheeking medication. Deputies go to every unit to conduct a med pass, whereby inmates line up near the front of the unit to receive their prescribed medications. Typically, the deputies dispense all of the medications to inmates. However, when the prescribed medication is particularly unusual, like Suboxone film, the nurses will administer it to inmates themselves.

4.      Deputies are also trained on how to handle inmate complaints about medication. An inmate always has the option to fill out an Inmate Request Form (*i.e.* kite) about his medical concerns and place it in the request box. Every day, the deputies pick up forms placed in the box and sort them in the Jail's Control Room. The deputies then deliver the forms to the appropriate department. The Jail uses triplicate forms for this process, in which a copy of the request is provided to the inmate, the department, and the inmate's file. Deputies are also instructed to record complaints received about medications into an inmate's Floor Notes for that day. They can also notify Medical personnel in person about an inmate complaint concerning medical treatment.

5.      The Medical Unit operates fairly independently. Park County Jail's Medical Director, Dr. Katherine Fitting, directly supervises nurses working in the Medical Unit. The Jail only trains nurses on how to handle the unique safety and security concerns associated with working in a jail setting. Nurses are also taught how to check an inmate to see if he is cheeking his medication.

6.      I do not interfere with Medical's day-to-day operations, and I defer to Dr. Fitting and the nurses on medical issues that arise within the Jail. Moreover, even if I were to disagree with a specific medical decision, I do not have the authority to override it. Likewise, I do not

question requests made by Medical to transfer an inmate to the hospital. It is my general practice to respond immediately to this type of request and transport an inmate to the hospital as soon as possible. Apart from hospital transport requests, medical issues are not typically brought to my attention. For the most part, the nurses only notify me when they encounter an unusual problem. When the decision is made to transport inmates to the hospital, I am only involved in arranging transportation and ensuring such transport is done securely.

7.     According to Jail policy, the Medical Director has the final say about an inmate's medical treatment while he is serving out a sentence. When a conflict exists between the orders given by the in-house doctor and another doctor, orders from our doctor will govern the situation. Preference for internal orders is necessary because many inmates come into the facility with prescriptions that contraindicate one another and that are unnecessary in a jail setting.

8.     In November 2013, the nurses came to me about odd instructions pertaining to prescribed medication included on Kyle Schwark's mittimus ("mitt"). They were concerned about one of the medications listed on the mitt in particular, Suboxone. The nurses researched the medication because they were unfamiliar with the drug. Apparently, only a few doctors in the state are allowed to prescribe the medication. To this day, Kyle is the only inmate to have entered the facility with medication instructions directed to the Jail included in his mitt. Even though I was unsure about the order's validity at that point, I suggested the nurses follow the instructions as written on the mitt out of caution. In reading the mitt more closely, I believe the instructions are directed at Kyle to continue taking his medications, rather than an order given to the Jail. This interpretation is far more likely given the context in which it was stated as well as the well-

3

established allocation of authority between the courts and the Jail. The judges have repeatedly stated in open courts that they do not have the authority to tell the Jail what to do.

9.      To my knowledge, Dr. Fitting and the nurses decided to follow the orders that Kyle's doctor had given until they were able to obtain more information. I never heard that Kyle was complaining of not receiving his medications, and there is no record of such complaints being made. Kyle's Inmate File does not contain any kites related to medication. I was not contacted again about Kyle until being notified that he had been injured and needed to go to the hospital. I arranged for Kyle's transport and Deputy Robertson accompanied Schwark to the hospital. Thereafter, I requested a medical furlough from Sheriff Fred Wegener for Kyle, which was immediately granted.

10.     On February 25, 2014, Kyle was brought back to the Jail to serve out the remainder of his sentence after violating the terms of his furlough. When he was taken into custody, Kyle resisted arrest. Kyle remained aggressive and belligerent after he arrived at the Jail. Additionally, Kyle appeared to be in an altered mental state, which made him more susceptible to being victimized by other inmates. Accordingly, he was not a good candidate for general population in that state, so he was placed into a segregation cell where he could be watched more closely. The segregation cell is located in the general booking area, a high-traffic area in the Jail.

11.     I recall the general consensus among Jail staff and Medical personnel was that Kyle was going through withdrawal and it was causing his bizarre behavior. From my own experience, his conduct seemed similar to someone who was detoxing. During March 5-7, 2014, it is possible that Nurse Canterbury talked to me about Kyle, but I do not recall having a specific conversation.

4

However, the Jail's documentation regarding Kyle's health demonstrates that Nurse Canterbury believed Kyle was showing signs of improvement on March 6, 2014.

12.     I did not work the weekend of March 8-9, 2014, so I was not present at the Jail during this time. On or about Monday, March 10, 2014, the nurses requested that Kyle be transported to the hospital. I quickly made the arrangements for Kyle to be taken to the secure unit of Denver Health later that day. Sergeant Theobald and I escorted Kyle to Denver Health where he was admitted for treatment.

13.     Just two days later, on March 12, 2014, Kyle returned to Park County Jail. We were not expecting Kyle to be discharged so soon after being admitted into Denver Health. We were also surprised that Kyle was discharged without any prescriptions. From March 12, 2014 to his release date on April 1, 2014, Kyle's condition drastically improved. Kyle was getting along fine and finally acting normal. He did not have another psychotic episode while incarcerated. Also, Kyle physically appeared much healthier than before.

14.     Once he returned from the hospital, he started working in the kitchen. At some point, I approached him while he was working to remark on how much better he looked and congratulate him on getting sober. I also told him that I was happy to see him working and time spent in the kitchen would count towards his good time. Overall, I feel like Kyle's period of incarceration at the Park County Jail was a success because we were able to assist him in getting sober.

**FURTHER AFFIANT SAYETH NAUGHT.**

3513

Captain Daniel Muldoon

STATE OF COLORADO          )
                           ) ss.
COUNTY OF PARK             )

*Rose Avey*
*Notary Public*
*State of Colorado*
*Notary ID 19974008711*
*My Commission Expires September 3, 2017*

SUBSCRIBED AND SWORN to me before this __24th__ day of August, 2017, by Captain Daniel Muldoon.

My commission expires: __9-3-2017__

_____
Notary Public

6