*Kyle Jeffery Schwark vs.*

*Sheriff Fred Wegener, et al.*

---

*Deposition of Katherine Margaret Fitting, MD, FACP*

*January 05, 2017*

---



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Exhibit G

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 18

1      Q.      (By Mr. Lane)  He was coming to the jail

2   with other doctors out in the world saying, You need to

3   take this med or that med, or whatever, right?

4                MR. MICHALEK:  Object to the form of the

5   question.

6                You can answer.

7      A.      He came to the jail taking medications

8   that were prescribed by other physicians.

9      Q.      (By Mr. Lane)  Okay.  So my question is:

10  Why is the nurse calling you asking about what he should

11  be taking when he has outside physicians that have

12  already told him what he should be taking?

13                A.      The situation in the jail when someone is

14  incarcerated is a different situation than when that

15  person is out in the community.  We have a formulary of

16  medications that we use when someone is in the jail.  We

17  don't have --

18      Q.      When you say "a formulary," what does that

19  mean?

20                A.      That's a list of medications that we

21  provide.  We may frequently have to substitute

22  medications or change medications.

23      Q.      Why is that?

24                A.      Because we have policies regarding what

25  medications are appropriate and safe to use in the

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 19

1  setting of an incarceration.

2       Q.    Give me an example of when somebody comes

3  in with a prescription for something and you decide to

4  change it.

5       A.    The patient comes in with a prescription

6  for a blood pressure medication that we don't have on the

7  formulary, and we will substitute a similar medication

8  that will handle the blood pressure issue.

9       Q.    When you say "formulary," it sounds to me

10  like -- obviously, jails are concerned about costs every

11  day.  Is formulary another word for a generic substitute

12  for perhaps a higher-priced medicine?

13       A.    Not always.

14             MR. MICHALEK:  Object to form.

15       Q.    (By Mr. Lane)  Did you get informed that

16  Mr. Schwark had brought all his own meds into the jail?

17       A.    Yes.

18       Q.    Okay.  And so he had all his meds.

19             Did you change any of his meds?

20       A.    After the first phone call, no.

21       Q.    Okay.  So the nurse read you a list of all

22  the meds that Mr. Schwark was on, and you said, Fine,

23  that's all okay?

24       A.    I said for them to continue that

25  medication.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 20

1    Q.    Okay.  Is there any fear that somebody

2    brings in narcotics, for example, in a bottle that says

3    it's blood pressure medication or something like that?

4         A.    That's always a possibility.  And we don't

5    provide narcotics in the jail setting.

6         Q.    Right.  So is there any process for

7    screening, you know, the meds?  Somebody claims, Oh, this

8    is blood pressure medication, when, really, it's oxies

9    and it's a narcotic or fentanyl, you know, it's a

10   narcotic; it's not allowed in the jail?

11             Is there some way to screen where the Park

12   County jail gets involved to see that -- you know, He

13   says this is blood pressure medication; how do we

14   actually know it's blood pressure medication?

15        A.    Most of the time, we take those

16   medications and store them with the patient's -- or with

17   the inmate's property and substitute medications from our

18   formulary.

19        Q.    Okay.

20        A.    In the case where there's not an

21   equivalent within the formulary, the nurses check with

22   the PDR or call the pharmacy that dispensed the

23   medication and talk with the pharmacist about identifying

24   that particular medication.

25        Q.    Okay.  Was any of that done with

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 22

```
 1          A.      You can't discontinue cold turkey.  You
 2   can wean off.
 3          Q.      Okay.  But were you concerned that he
 4   should be weaned off of these meds?
 5          A.      Absolutely.
 6          Q.      And why should he be weaned off a med that
 7   another physician decided he needed?
 8          A.      There are medications that are not
 9   appropriate in an incarceration situation.  And we do not
10   provide benzodiazepines as a standing presentation for
11   any inmates because they are frequently abused, traded,
12   and sold within the setting of the jail.
13          Q.      Well, I have been doing this now for 37
14   years and I've been involved in the criminal justice
15   system for 37 years.  It is my belief that I've never, in
16   37 years, found a jail that just gives a bottle of pills
17   to an inmate and said, Okay, here's your prescription; go
18   take your meds according to what the bottle says.
19                  In every jail in America, they have what
20   is called a med line.  Are you familiar with the med
21   line?
22                  MR. MICHALEK:  Object to form of the
23   question.
24          A.      Yes, I am.
25          Q.      (By Mr. Lane)  Okay.  And the med line is
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 25

1          A.    I don't know for certain.  I have a
2   medical opinion.

3          Q.    What is your medical opinion?

4          A.    My medical opinion is it was an
5   alcohol-withdrawal seizure.

6          Q.    And why do you have that medical opinion?

7          A.    I was informed that we had an alcohol
8   level that indicated the use of alcohol prior to being
9   taken into the Park County jail.

10         Q.    Do you know what his BAC was when he got
11  to the Park County jail?

12         A.    I don't.

13         Q.    Okay.  Is there anything that would
14  refresh your recollection on that?

15         A.    I know that we had a level of .02, but I
16  believe that was Breathalyzer as opposed to blood.

17         Q.    Okay.  All right.  You would agree that
18  those are -- generally, a blood test is a more accurate
19  test, but a Breathalyzer test is usually pretty accurate?

20              MR. MICHALEK:  Object to form.

21         A.    The Breathalyzer is what's generally used
22  by the personnel at the Park County jail.

23         Q.    (By Mr. Lane)  Right.  It's acceptable in
24  a court of law for DUI purposes and other purposes,
25  right?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 26

1            MR. MICHALEK:  Object to foundation.

2       A.    You would know better than I.

3       Q.    (By Mr. Lane)  Right.  I'm just saying --

4   you've distinguished between the Breathalyzer and the

5   blood test, and he had .02 at some point.

6            You're not suggesting that that's an

7   inaccurate reading, are you?

8       A.    No.

9       Q.    Okay.  So what was his prescription

10  medication that the benzodiazepine was designed to

11  prevent, or what condition was it being given to him to

12  alleviate?

13      A.    As I said before, I don't know what

14  indication Dr. Singer used for that prescription.

15      Q.    Well, but he was on this med for a reason,

16  presumably, right?

17      A.    I would certainly hope so.

18      Q.    Okay.  And did you make any effort to

19  determine what the reason for his being on that med was?

20      A.    I asked the nurse what his medication was,

21  and they gave me the information that they had, which was

22  he was on those meds, but we did not have an indication.

23      Q.    Okay.  And you left the status quo after

24  your first conversation with the nurse, right?

25      A.    That is correct.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 27

```
 1              Q.      Okay.  But at some point, you changed the
 2   status quo, right?
 3                      MR. MICHALEK:  Object to form.
 4              Q.      (By Mr. Lane)  You want to wean him off
 5   the benzodiazepines, right?
 6              A.      We're talking about his first
 7   incarceration; is that correct?
 8              Q.      Yes.
 9              A.      With the first incarceration, I did not
10   start a wean.  We had an episode where he had what was
11   felt to be a seizure in the pod.  I was called regarding
12   that episode.  I asked them to place him on a different
13   protocol that would help protect against
14   alcohol-withdrawal seizures.
15              Q.      Okay.  And how much time had passed
16   between his first going to the jail and this next phone
17   call you got that he had had a seizure?  Can you just
18   ballpark it, if you don't know?
19              A.      From when he came in or from when I had my
20   first conversation?
21              Q.      What I'm -- well, he came into the jail
22   and he had -- he was on these meds.  How long was he in
23   the jail before the nurse called you the very first time
24   and said, Hey, we've got this guy here named Schwark,
25   he's on these meds, and asked for your opinion?
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 30

1     Q.     (By Mr. Lane)  All right.  Why did you not

2  change the status quo after the first call from the nurse

3  where you found out he was on benzodiazepines?  Why did

4  you not try to wean him at that point?

5     A.     I had a call early in his incarceration

6  and didn't have a chance to look at the full picture.

7  And so my expectation was we needed to just get something

8  on board at that time, and then we could look at how we

9  would go about weaning him after that.

10     Q.     So he was able to continue to take his

11  benzodiazepines after that first phone call, right?

12     A.     Yes.  He got his regularly prescribed

13  alprazolam after that phone call, until the second phone

14  call.

15     Q.     And how long had passed between the first

16  phone call and the second phone call?

17     A.     I don't know exactly --

18     Q.     Just ballpark.

19     A.     -- but I think somewhere around 12 hours.

20  It might have been a little bit longer.  I'm not certain.

21     Q.     Okay.  So it's not a hard-and-fast strict

22  rule that you can't have benzodiazepines at the jail, he

23  had benzodiazepines at the jail, right?

24           MR. MICHALEK:  Object to form.

25     A.     He received his medication, and our

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 31

1   expectation would be he would be weaned off of
2   benzodiazepines.  That is the policy for all patients who
3   come in on benzodiazepines, with the exception of someone
4   who is on it for a known seizure disorder for which that
5   is the only medication that controls a known seizure
6   disorder.
7           Q.     (By Mr. Lane)  Okay.  So everybody who's
8   getting weaned off of benzodiazepines continues to take
9   benzodiazepines while at the jail; they're just taking
10  smaller doses, right?
11          A.     Until they come off.  That's correct.
12          Q.     So there is no actual rule that says you
13  can't have -- you can't be on benzodiazepines at the
14  jail, because everybody who is getting weaned is on
15  benzodiazepines at the jail, right?
16                 MR. MICHALEK:  Object to form.
17          A.     That's one way to look at it.  But if we
18  had a standing rule that you couldn't wean off of
19  benzodiazepines, then the jail couldn't accept anyone who
20  had a prescription for a benzodiazepine.  And that would
21  not be appropriate.
22          Q.     (By Mr. Lane)  And what are the side
23  effects from being weaned off benzodiazepines?
24          A.     Being weaned off?
25          Q.     Yes.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 32

```
 1            A.      It may be related -- it will depend from
 2   person to person and why the benzodiazepines was
 3   prescribed for them.  But if a wean is done over an
 4   appropriate period of time, the weaning process itself
 5   shouldn't cause a lot of symptoms.  The condition for
 6   which they're taking that may become more symptomatic.
 7            Q.      But you've testified, if I am correct,
 8   that you didn't know what the condition was that was
 9   causing Mr. Schwark to take benzodiazepines, right?
10            A.      That's correct.
11            Q.      So you don't have any knowledge whether
12   his symptoms became more severe or were unaffected by his
13   being weaned, right?
14                    MR. MICHALEK:  Object to form.
15            A.      Which incarceration are we talking about
16   now?
17            Q.      (By Mr. Lane)  Well, the second call came
18   12 hours after the first call to you from the nurse,
19   right?
20            A.      Correct.
21            Q.      It was at the second call that you told
22   the nurse to start weaning him off of benzodiazepines,
23   right?
24            A.      No.
25            Q.      Oh, I'm sorry.  That's my
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 33

1    misunderstanding.

2                Will you clarify, then?  What was the

3    second call about?

4         A.    The second call was about having the

5    seizure.  I asked that he be put on our

6    alcohol-withdrawal protocol, which substitutes a

7    different benzodiazepine which is stronger and longer

8    acting than the one that he had a prescription for.

9         Q.    Okay.  And what was it that led you to

10   believe that he was having alcohol withdrawal and that's

11   what caused the seizure?

12        A.    The fact that he had a history of coming

13   in with an alcohol level and the fact that he had a

14   seizure within the time frame that is typically seen for

15   alcohol-withdrawal seizures, which is while those alcohol

16   levels are falling.

17        Q.    Okay.  Did you request that anyone

18   interview Mr. Schwark to find out if he's suffering from

19   alcohol withdrawal?

20                MR. MICHALEK:  Object to form.

21        A.    I didn't ask them to ask that specific

22   question.

23        Q.    (By Mr. Lane)  All right.  I mean,

24   patients are sometimes really unreliable sources of

25   information, and sometimes they're very reliable sources

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 36

1          MR. ZIPORIN:  Same objection.

2          MR. LANE:  Okay.

3     A.     When I made the determination that this

4   was, most likely an alcohol-withdrawal situation, I had

5   first gone through a critical-thinking process, which

6   involves constructing a differential diagnosis for the

7   situation.  And in that, I think about the various things

8   that can cause withdrawal.

9          Given the information that I had, it

10  seemed to me, in my medical judgment, that the most

11  likely cause was an alcohol-withdrawal seizure.  I also

12  considered the fact that if it was not, the protocol I

13  put him on was protective from further seizures,

14  regardless of what the underlying diagnosis was or the

15  underlying cause for that seizure.

16     Q.     (By Mr. Lane)  Okay.  So the protocol you

17  put him on was going to prevent seizures, likely,

18  regardless of the cause?

19     A.     That was the intent.

20     Q.     Okay.  So who called you and described the

21  seizure to you?

22     A.     I was called by one of the jail nurses.

23     Q.     Do you know who?

24     A.     I don't remember, specifically, which

25  nurse it was.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 40

1          Q.       Okay.  So the second call comes in.  You

2     put him on a different dose of benzodiazepines, right?

3                   MR. MICHALEK:  Object to form.

4          A.       I put him on the medication that's

5     primarily used to treat an alcohol-withdrawal

6     situation.

7          Q.       (By Mr. Lane)  And that is what again?

8          A.       Librium.

9          Q.       Librium.  All right.

10                  Did you discontinue his original

11    medication that Dr. Singer had prescribed?

12         A.       I did.

13         Q.       And why did you do that?

14         A.       Because there is contraindication to being

15    on more than one benzodiazepine at a time.

16         Q.       Okay.  At any time, did you make an effort

17    to contact Dr. Singer and talk to him about Mr. Schwark's

18    condition?

19         A.       Multiple calls were made to Dr. Singer's

20    office.

21         Q.       By you?

22         A.       By the nursing staff.

23         Q.       Okay.  And did they talk to Dr. Singer?

24         A.       They were unable to talk to Dr. Singer,

25    and they did not receive the requested records.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 41

1          Q.      So you changed his meds 12 hours after you

2    got the first phone call.  What happens then?  What was

3    your next interaction with the Kyle Schwark medical

4    situation?

5          A.      Later that day, I was called and told he

6    had been transported to Denver Health because he had had

7    a seizure -- a subsequent seizure and had fallen and

8    injured himself.

9          Q.      All right.  Let me ask you about that.

10   You understand that when people are having a seizure,

11   they're unconscious?

12         A.      When they have a generalized tonic-clonic

13   seizure, they will be unconscious.

14         Q.      And that's what Mr. Schwark seemed to be

15   having; is that correct?

16         A.      By report, yes.

17         Q.      Okay.  And when someone is having a

18   seizure frequently, they are in convulsions of some sort,

19   correct?

20         A.      That would be a synonym for seizure.

21         Q.      Okay.  Well, I mean, their body is moving

22   without conscious thought by the person having the

23   seizure, frequently?

24         A.      Correct.

25         Q.      And you know how Mr. Schwark ended up

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 60

1        Q.      And is the Park County medical table a

2    normal table?  Is it about the same height, or is it

3    taller or shorter?  Do you know?

4        A.      It's about the same height.

5        Q.      Okay.  He got 25 milligrams of Librium.

6    What would be the effect of 25 milligrams of Librium on

7    Mr. Schwark?

8        A.      The expectation was it would help prevent

9    further alcohol-withdrawal seizures.

10        Q.      Okay.  He started to get comfortable, and

11    she went back to work.

12              Now, I take that to mean that he was lying

13    down on this medical table trying to get comfortable.  Is

14    that how you take that?

15              MR. MICHALEK:  Object to form and

16    foundation.

17        A.      I don't know what position he would have

18    been in when he was feeling comfortable.

19        Q.      (By Mr. Lane)  No.  I'm not saying what

20    position he was in.  I'm simply saying, when I read that

21    note, I'm thinking, Here's a guy lying down on a medical

22    table with a blanket on him trying to get comfortable.

23    Whatever position that is, he's lying town trying to get

24    comfortable.

25              Is that how you read that?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 85

1    everything.  What is the -- we have not talked about the

2    chlordiazepoxide.  What is that?

3            A.     It's chlordiazepoxide, and that's Librium.

4            Q.     Okay.  And why -- we've talked about the

5    Suboxone was for his prior heroin use.  And the

6    alprazolam was given to him for what purpose?

7            A.     That was Dr. Singer's prescription.  I

8    didn't have records from Dr. Singer, so the exact

9    indication, I don't know.

10           Q.     And the chlordiaz- -- what did you say?

11           A.     Chlordiazepoxide?

12           Q.     What is that for?

13           A.     It's also a -- it's a long-acting

14   benzodiazepine.

15           Q.     Okay.  And so as of February 25th, you

16   were ordering him to -- you were ordering your medical

17   staff to wean him off the chlordiazepoxide, as well as

18   the alprazolam?

19           A.     Correct, because there's no reason he

20   should be on two benzodiazepines.  One, necessarily, had

21   to go because there's a contraindication for an increased

22   possibility of adverse side effects from those

23   medications; higher chance of overdosing on the

24   benzodiazepines.  And then we started on the wean that we

25   use when anybody who is on chronic benzodiazepines

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 86

```
 1   therapy undergoes when they are at the jail.
 2         Q.     Okay.  Again, Dr. Singer had prescribed
 3   these things to Mr. Schwark, based on what your review of
 4   the record was, correct?
 5         A.     I was told that -- yeah.  We had pictures
 6   of his bottles that had Dr. Singer's name on it as the
 7   prescribing physician.
 8         Q.     Did you --
 9         A.     I didn't have records from Dr. Singer.
10         Q.     Did you, personally, ever pick up the
11   phone and try to call Dr. Singer?
12         A.     No.
13         Q.     Did Dr. Singer ever contact anybody at the
14   jail that you know of?
15         A.     I have no knowledge that Dr. Singer,
16   himself, ever contacted the nurses.
17         Q.     Are you aware that Mr. Schwark's mother,
18   on February 28th, contacted the jail and asked if she
19   needed to bring Mr. Schwark's medications to the jail?
20         A.     No.
21         Q.     Are you aware of the fact that Mr. Schwark
22   had a cervical hard collar prescribed to him for the
23   injury that he suffered when he fell off the table?
24         A.     At that time, I had no information
25   regarding what was prescribed for him during his
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 87

1   hospitalization at Denver Health.

2          Q.      Do you believe that -- what is the

3   function of a protective cervical hard collar?

4          A.      To stabilize the neck.

5          Q.      Is that done by prescription?

6          A.      It can be.  You can also purchase a hard

7   collar at a pharmacy.

8          Q.      All right.  If it is -- if a hard

9   collar -- if a cervical hard collar was prescribed by

10  somebody at Denver Health, would you have ordered that it

11  be taken from Mr. Schwark?

12         A.      No.

13         Q.      All right.  Would you agree that taking

14  away a hard collar from somebody who has a prescription

15  for a hard collar could exacerbate cervical issues?

16                 MR. MICHALEK:  Object to form.

17         A.      If they had an acute fracture and they

18  were still within the time frame for which they needed

19  that protection, then the answer would be yes.

20         Q.      (By Mr. Lane)  Are you aware that on his

21  second incarceration, Mr. Schwark began to suffer major

22  hallucinations?

23         A.      I was informed of that.

24         Q.      Do you know what the cause of those

25  hallucinations was?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 88

1            A.      No.

2            Q.      Are there psychotropic medications that
3    people can be given to mitigate or stop hallucinations?

4            A.      Yes, there are.

5            Q.      What are those kinds of meds?

6            A.      Antipsychotics.

7            Q.      Okay.  Did you prescribe antipsychotics
8    for Mr. Schwark?

9            A.      I don't do any of the mental health
10   prescribing at the jail.  We have a mental health
11   provider that does that, so I referred him to her.

12           Q.      On March 6th, did you have an email
13   correspondence with Nurse Canterbury?

14           A.      I have no idea.

15           Q.      Okay.  Well, did you ever look at the
16   records from Denver Health or Summit County stemming from
17   Mr. Schwark's fall?

18           A.      And when you say "ever," do you mean ever
19   in my lifetime?

20           Q.      Ever in your lifetime.  We'll start there.

21           A.      I have subsequently seen some of those
22   records.

23           Q.      Okay.  While Mr. Schwark was in your care,
24   did you ever see those reports?

25           A.      No.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 93

1        A.      Yes.

2        Q.      It's for Kyle Schwark.  Number 1 says, "DC

3    Suboxone."  What is -- is that to discontinue Suboxone?

4        A.      Correct.

5        Q.      Number 2, "DC" --

6        A.      Chlordiazepoxide.

7        Q.      Right.  Discontinue that?

8        A.      Yes.

9        Q.      And then to wean off the --

10       A.      Alprazolam.

11       Q.      Alprazolam.

12               Okay.  What does the rest of that note

13    mean?

14       A.      That's the dosing schedule for the

15    alprazolam.

16       Q.      Okay.  You were just going to cut him off

17    completely on the Suboxone and chlordiazepoxide?

18       A.      Chlordiazepoxide.

19       Q.      Right.

20       A.      As I stated earlier, it's contraindicated

21    to be on two benzodiazepines at the same time, so the

22    chlordiazepoxide was discontinued.  The Suboxone, which

23    is indicated to help people with urges to use alcohol or

24    narcotics, was discontinued because there's no access to

25    alcohol or narcotics in the jail, so it wasn't needed for

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 95

```
 1          A.      I am.
 2          Q.      So he was hallucinating.  Can withdrawal
 3   from Suboxone cause hallucinations?
 4          A.      That is not one of the symptoms of
 5   withdrawal from Suboxone.
 6          Q.      How about the other one, chlordiazepoxide?
 7          A.      It's not a symptom of that either.
 8          Q.      All right.  Yet, you have a person
 9   presenting with apparent psychosis, and you -- you did
10   not know what the cause of this was, right?
11                  MR. MICHALEK:  Object to form.
12          A.      That's correct.
13          Q.      (By Mr. Lane)  So you referred him to the
14   psychiatric nurse?
15          A.      That's correct.
16          Q.      Who is the psychiatric nurse?
17          A.      Dr. Parker.
18          Q.      So the psychiatric nurse is actually a
19   doctor?
20          A.      Yes, she is.
21          Q.      Okay.  Is she a psychiatrist?
22          A.      No, she is not.
23          Q.      What kind of doctor is she?
24          A.      She's a psychiatric prescribing nurse
25   practitioner who has a Ph.D.
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 96

1          Q.      Okay.   And how long did the apparent

2    psychosis last with Mr. Schwark?

3          A.      I was informed of his symptoms, I referred

4    him, and that was the last I heard of the situation.   So

5    it was the nurses that then would get him in contact with

6    the prescribing nurse practitioner.

7          Q.      And you don't know if that ever happened?

8          A.      I don't know if they ever had a

9    face-to-face interaction.

10         Q.      Did he get some sort of a prescription for

11   these hallucinations?

12         A.      I don't know if she prescribed that.

13         Q.      Do you have a written record of referring

14   Mr. Schwark to -- what's this person's name?

15         A.      Dr. Parker.

16         Q.      -- Dr. Parker?

17         A.      Do I have a written record?  No.

18         Q.      Does the jail?  I mean, is there a written

19   record somewhere?

20         A.      I would guess that there is, since it was

21   a verbal order from me.

22               MR. LANE:  Okay.  You know what?  I think

23   maybe what we should do -- it's now 20 minutes until

24   noon.  Why don't we break for lunch.  I'm going to wait

25   for Dunia to come back because I need to ask her a

Kyle Jeffery Schwark vs.                                    Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                                            January 05, 2017

```
 1                    REPORTER'S CERTIFICATE

 2                 I, Wendy Evangelista, a Registered

 3    Professional Reporter and Notary Public within and for

 4    the State of Colorado, commissioned to administer oaths,

 5    do hereby certify that previous to the commencement of

 6    the examination, the witness was duly sworn by me to

 7    testify to the truth in relation to matters in

 8    controversy between the said parties; that the said

 9    deposition was taken in stenotype by me at the time and

10    place aforesaid and was thereafter reduced to typewritten

11    form by me; and that the foregoing is a true and correct

12    transcript of my stenotype notes thereof; that I am not

13    an attorney nor counsel nor in any way connected with any

14    attorney or counsel for any of the parties to said action

15    nor otherwise interested in the outcome of this action.

16                 My commission expires:  August 30, 2020.

17

18

19                      _____
                        Wendy Evangelista
20                      Registered Professional Reporter
                        Notary Public, State of Colorado
21

22                 .

23

24

25
```