# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-02507-JLK

KYLE JEFFERY SCHWARK,

      Plaintiff,

v.

SHERIFF FRED WEGENER, in his official and individual capacities,
NURSE SUSAN CANTERBURY, in her individual capacity,
NURSE JERI SWANN, in her individual capacity,
DOCTOR KATHERINE FITTING, in her individual capacity, and
CAPTAIN DANIEL MULDOON, in his individual capacity,

      Defendants.

---

## PLAINTIFF'S RESPONSE TO PARK COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, by and through his attorneys, David A. Lane and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, hereby brings this Response to the Park County Defendants' Motion for Summary Judgment and alleges as follows:

1. **<u>Introduction</u>**[1]

This is an action by Kyle Schwark, a former inmate at the Park County Jail in Park County, Colorado. Mr. Schwark is seeking redress and damages for the deliberate indifference to his serious medical needs shown by the Park County Defendants'

---

[1] The factual assertions made in this Introduction are supported by the record. Specific citations to the record are made in Sections 2 and 3, below.

1

violation of obvious and basic nursing standards in responding to a seizure that he suffered because he was denied his necessary medications and the utter and complete failure to appropriate treatment for multiple days for a psychotic episode he suffered.

Within days of entering the Park County Jail, Mr. Schwark suffered multiple seizures (due to Defendant Fitting's decision to discontinue a number of his medications). It was Defendant Swann's response to one of these seizures that forms the basis for her liability in this case. Defendant Swann demonstrated deliberate indifference to Mr. Schwark's serious medical needs by having him lay, or sit, on a table in the medical unit of the Park County Jail immediately after he suffered a seizure. It is an obvious violation of nursing protocol, and contrary to basic nursing care taught in nursing care, to place an individual who has just suffered a seizure, unrestrained, on a table and to not closely monitor them. Yet, Defendant Swann did just that. And, as a result of Defendant Swann's conscious disregard of this obvious risk, when Mr. Schwark suffered another seizure he fell from the table, fractured his cervical spine, and suffered a deep laceration on his head. Mr. Schwark was transferred to Denver Health for treatment and required to wear a cervical collar to treat the injuries to his spine which he sustained due to Defendant Swann's deliberate indifference. These serious injuries caused Sheriff Wegener to place Mr. Schwark on medical furlough.

After being re-incarcerated upon revocation of his medical furlough, Mr. Schwark returned to the Park County Jail where he was yet again denied access to the medications that he had been previously prescribed despite having actual knowledge that refusal to provide such medications would pose a substantial risk to his health. As a result, Mr.

Schwark suffered a complete psychological breakdown requiring him to be hospitalized, once again.

Nurse Canterbury, and Captain Muldoon, directly witnessed this complete mental breakdown of Mr. Schwark on Wednesday, March 6, 2013 and Thursday, March 7, 2013. In response, Nurse Canterbury repeatedly told Captain Muldoon that Mr. Schwark required immediate psychiatric hospitalization. Multiple Nurses have testified in this matter that inmates cannot be transferred out of the Park County Jail to receive intensive medical treatment without approval from the Captain of the Jail. Despite Nurse Canterbury's pleas for help for Mr. Schwark, which placed Captain Muldoon on notice that Mr. Schwark required immediate intensive psychiatric treatment, Captain Muldoon did not approve Mr. Schwark's transfer out of the jail for over four days. Despite being on clear notice that Mr. Schwark needed to be transferred out of the Park County Jail on Wednesday, Thursday, and Friday, Captain Muldoon took the weekend off and did not transfer Mr. Schwark to Denver Health until Monday, March 10, 2014. Captain Muldoon admitted that Mr. Schwark was exhibiting serious medical needs requiring immediate hospitalization on Monday, and Nurse Canterbury testified that Mr. Schwark's condition was not any worse on Monday than it was on the previous Thursday. Therefore, Captain Muldoon decided not to transfer Mr. Schwark out of the facility, at least in part, because it was his day off.[2] This is the definition of deliberate indifference.

---

[2] It is clear, also, that in-patient psychiatric hospitalization would have addressed Mr. Schwark's serious medical needs as, once he was transferred to Denver Health, he was only hospitalized for a few days before returning to the Park County Jail without further exacerbation of his psychiatric medical issues or any further incident.

Due to Defendants' deliberately indifferent acts and/or omissions, which are incompatible with the Eighth Amendment's prohibition on cruel and unusual punishment and to be free of deliberate indifference to his serious medical needs, Mr. Schwark continues to suffer serious emotional and physical harm. Mr. Schwark's serious and lasting injuries were wholly preventable and would not have occurred without deliberate indifference on the part of Defendants Wegener, [Canterbury, Swann,] Muldoon and Park County. Accordingly, Plaintiffs ask that this Court deny the Park County Defendants' Motion for Summary Judgment.

2. **Response to Movants' Statement of Material Facts**

1.   Admit, in part. Captain Muldoon, however, runs the day-to-day operation at the Jail and has final decisionmaking authority as to the treatment of individual inmates, as delegated to him by Sheriff Wegener. [Doc. #74], p. 8, ¶ 9; **Exhibit 1**, *Deposition of Fred Wegener*, 34:20-23; **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 10:16-13:5.

2.   Admit.

3.   Admit. However, this fact is immaterial to this dispute.

4.   **Deny.** Park County Jail Policy K-121-N "Decisions Regarding Pharmaceuticals and Medical Marijuana" nowhere addresses what nurses must do when an inmate arrives at the jail with prescription medications that are prohibited. [Doc. #74-2].

5.   Admit. Importantly, Dr. Fitting does not take into account either court orders regarding whether an inmate is to take the medications he has been prescribed by his outside medical provider or the medications that were successfully being used by the inmate outside of the Jail, as prescribed by the inmate's primary care physician.

4

6.  Admit as to facts only. **Deny** as to the significance of Park County Jail Policy K-121-N "Decisions Regarding Pharmaceuticals and Medical Marijuana" to the extent that this policy fails to address whether the Jail Medical Director's decisions and recommendations are final and binding in the face of a conflicting Court Order that an inmate receive particular mediations, in contrast to the Jail Medical Director's authority to supersede medical decisions made by another facility or by the inmate's personal physician. Park County Jail Policy K-121-N "Decisions Regarding Pharmaceuticals and Medical Marijuana," [Doc. #66-2], p. 2. Further, no training was provided to medical staff with respect to the difference between the significance of Court-ordered as opposed to merely doctor-ordered medications. **Exhibit 3,** *Deposition of Nurse Cathlene Pearce*, 51:5-14. Finally, regardless of the existence of any jail policy, in the face of a direct conflict between a Judge's order and the Jail's policy, the Judge's order ultimately trumps Jail policy and must be accommodated by some means; for example, by moving an inmate to another facility the permits administering the Court-ordered medication in question. **Exhibit 1,** *Deposition of Sheriff Fred Wegener*, 40:11-19.

7.  Admit as to facts only. **Deny** as to the significance of this fact, for the reasons articulated in Disputed Material Fact No. 6 above. Moreover, a jail cannot insulate itself from its constitutional duty to provide medical treatment that is not deliberately indifferent to an inmate's serious medical needs simply by promulgating a jail policy that permits its Medical Director to deny or substitute certain medications. There is factual dispute as to whether certain medications may or do exist for which there is no suitable substitute. For example, to the extent that no narcotics, such as opioids, are permitted at

the jail per its policies, there may be no suitable substitutes for any opioid pain medications that could be provided in the jail. Park County Jail Policy K-121-F "Pharmaceuticals." [Doc. 66-4].

8. **Deny.** Although Park County Jail Policy K-121-N "Decisions Regarding Pharmaceuticals and Medical Marijuana" claims that an inmate may appeal the Medical Director's decision, no procedure is actually specified for how an inmate should appeal the Medical Director's decision. Although Park County Jail Policy K-121-N "Decisions Regarding Pharmaceuticals and Medical Marijuana." [Doc. 66-2], p. 2. It is unknown whether such a practice existed as a practical matter. The fact that Plaintiff's continued, adamant verbal pleas on November 13th that he receive his Court-ordered medications as prescribed by his doctor and ordered by the Court were either not conveyed to or not considered by Defendant Dr. Katherine Fitting strongly suggests that in practice, no such procedure actually existed. **Exhibit 4,** *Deposition of Kyle Schwark*, 130:25-131:12, 133:22-25, 134:6-15, 139:9-18, 140:15-21; 143:15-144:5; 147:5-8; 147:13-16; 228:10-23; **Exhibit 5,** *Deposition of Susan Canterbury*, 15:4-5, 15:15-17, 25:24-25.

9. Admit.

10. **Deny.** Although it is true that Defendant Muldoon's duties include ensuring safety and order at the Park County Jail, supervising detention deputies and overseeing their training, his duties also encompass ensuring the health and welfare of Jail inmates. It is Captain Muldoon, for example, rather than medical or nursing staff, who has the final decision to take an inmate such as Plaintiff to the hospital. **Exhibit 5**, *Deposition of Susan Canterbury,* 80:4-8 ("Q: Okay. So ultimately security staff decides Kyle is in need

6

of hospitalization, right? Canterbury: Yes."), 95:6-7 (Pearce: "[Medical] [d]oesn't trump the captain. Sorry."). As a legal matter, Park County, Defendant Wegener and Defendant Muldoon cannot absolve themselves of their non-delegable duty to assure that inmates receive appropriate medical care by completely delegating such care to medical staff.

11. Admit. However, this fact is immaterial to this dispute.

12. **<u>Deny</u>**. While it may be true that detention deputies sometimes administer medications to inmates, they also participate in and have responsibility for the medical care of inmates in other ways. For example, in the case of a medical emergency, such as both of the seizures that Plaintiff suffered at the Park County Jail, detention deputies assisted with assuring the medical care of the Plaintiff. **Exhibit 5**, *Deposition of Susan Canterbury,* 33:2-12 (Canterbury: "And so [Kyle Schwark] was on the ground – on the floor in the common room. And he was – appeared to be having a seizure. So Captain Muldoon, and I don't know, some other deputies – of course they all go rushing in when something like that is going on… And then they – when he was done seizing, they put him in the wheelchair and wheeled him into medical."); **Exhibit 3,** *Deposition of Kathleen Pearce,* 26:14-27:22 (When Kyle suffered his second seizure and fell off the medical table, Nurse Cathlene Pearce enlisted Deputy Fenner to assist. "So I went to get a male, Fenner, who has medical experience and way more time in the jail."); **Exhibit 6,** *Deposition of Nurse Jeri Swann*, March 13, 2017 ("Swann Deposition"), 30:25-31:4 (Deputy Fenner filled out the medical report regarding Plaintiff's second seizure, fall and resulting injuries.). As previously noted above, it was not medical staff, but rather jail staff – specifically Captain Muldoon – who finally made the decision to and did transport

Plaintiff to a medical facility on March 10, 2014. **Exhibit 5**, *Deposition of Susan Canterbury,* 73:22-24, 80:4-8, 96:6-13.

13. Admit. However, this fact is immaterial to this dispute.

14. Admit. However, this fact is immaterial to this dispute.

15. Admit in part and **Deny in part**. The Medical Unit, which includes both doctors and nursing staff, does not have the authority to take an inmate to the hospital without Captain Muldoon's final approval. **Exhibit 5**, *Deposition of Susan Canterbury,* 80:4-8 ("Q: Okay. So ultimately security staff decides Kyle is in need of hospitalization, right? Canterbury: Yes."), 95:6-7 (Pearce: "[Medical] [d]oesn't trump the captain. Sorry."). However, it is true that Park County provides *no* medical training to its nursing staff; it only provides security training.

16. Admit.

17. **Deny.** As Captain of the Park County Jail, Captain Muldoon had the final say regarding inmates' medical care, including, critically, the decision as to when an inmate could be transported for outside medical treatment. **Exhibit 5**, *Deposition of Susan Canterbury,* 80:4-8 ("Q: Okay. So ultimately security staff decides Kyle is in need of hospitalization, right? Canterbury: Yes."), 95:6-7 (Pearce: "[Medical] [d]oesn't trump the captain. Sorry."), 80:14-82:10, 83:11-84:21; **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 37:14-38:11.

18. **Deny.** As Captain of the Park County Jail, Captain Muldoon had the final say regarding inmates' medical care, including, critically, the decision as to when an inmate could be transported for outside medical treatment. **Exhibit 5**, *Deposition of Susan*

*Canterbury,* 80:4-8 ("Q: Okay. So ultimately security staff decides Kyle is in need of hospitalization, right? Canterbury: Yes."), 95:6-7 (Pearce: "[Medical] [d]oesn't trump the captain. Sorry."), 80:14-82:10, 83:11-84:21. Captain Muldoon testified that he made the decision to ultimately transfer Mr. Schwark out of the Park County Jail, which contradicts this alleged "undisputed" fact. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 37:14-38:11.

19. **Deny**. The actual practice and custom, as testified to by the nursing staff, is that Captain Muldoon and the security staff must approve the medical decision to transfer an inmate out of the facility for emergent and in-patient care. Absent approval from Captain Muldoon and the security staff, an inmate will not be transferred out of the Park County Jail. **Exhibit 5**, *Deposition of Susan Canterbury*, 80:14-82:10, 83:11-84:21. Also, Captain Muldoon testified that he made the decision to ultimately transfer Mr. Schwark out of the Park County Jail, which contradicts this written policy. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 37:14-38:11.

20. Admit.

21. Admit.

22. Admit as to the first three sentences of Defendants' Material Fact No. 22. **Deny** as to the suggestion that Defendant Canterbury conveyed her concerns about Suboxone to Captain Muldoon and that Defendant Muldoon suggested the orders be followed as written out of caution. When Defendant Canterbury was asked to describe the full sequence of events on November 13, 2013 as they related to Plaintiff's care, Defendant Canterbury made no mention whatsoever of having conveyed any of her concerns

regarding Suboxone to Defendant Muldoon. Rather, Defendant Canterbury testified that she called Dr. Fitting to discuss which medications were appropriate to be administered to Plaintiff. **Exhibit 5,** *Deposition of Susan Canterbury*, 12:10-12.

23. **Deny.** The issue of whether Plaintiff received any medications at all, whether his Xanax prescription was indeed tapered, or whether he received his medications as prescribed by Dr. Singer and ordered by the Court, is hotly in dispute. In contrast to Defendant Canterbury's testimony and the Jail's medical charts, Plaintiff testified that he adamantly, repeatedly and vociferously asked for his medications at every opportunity, but nevertheless did not receive any medication whatsoever on November 13, 2013, or at any time prior to suffering a first seizure on November 14, 2013. **Exhibit 4,** *Deposition of Kyle Schwark*, 127:21-23, 130:25-131:12, 134:6-15, 139:9-18, 140:15-21, 143:15-144:5, 147:5-8, 147:13-16, 228:10-23.

24. **Deny.** Even Defendants' claims that Plaintiff received some of his medications on November 13, 2013 (which Plaintiff vigorously denies), the medical chart (Ex. J to the Park County Defendants' Motion for Summary Judgment) and Defendant Canterbury's testimony contradict each other. While the medical chart indicates that Plaintiff received 2mg of Xanax on the morning of November 13, 2017, Defendant Canterbury herself testified that she only gave Plaintiff 1mg of Xanax on the morning of November 13, 2017. [Doc. #66-10]; **Exhibit 5,** *Deposition of Susan Canterbury*, 15:3-4 ("I took him one of his own Xanax at that time."; 25:6-9 (Q: "So anyway, so you gave him half a strip of Suboxone, and you gave him some Xanax, but you don't remember how much." Defendant Canterbury: "One milligram."). Nurse Pearce testified that Plaintiff's Xanax

was in fact being tapered prior to his first seizure. **Exhibit 3,** *Deposition of Cathleen Pearce,* 47:23-25. In contrast to Defendant Canterbury's testimony and the Jail's medical charts, Plaintiff testified that he adamantly, repeatedly and vociferously asked for his medications at every opportunity, but nevertheless did not receive any medications whatsoever on November 13th or at any time prior to suffering a first seizure on November 14, 2017. **Exhibit 4,** *Deposition of Kyle Schwark,* 127:21-23, 130:25-131:12, 134:6-15, 139:9-18, 140:15-21, 143:15-144:5, 147:5-8, 147:13-16, 228:10-23. With respect to Plaintiff's medical kites, Plaintiff testified that he wrote kites requesting his medications, but they never made it out of his cell. *Id.*, 134:17-20. He believes he made more than one written request. *Id.*, 137:13-14. He believes that such kites should exist. *Id.*, 138:10. Even if Defendants' claims that Plaintiff never filled out any medical kites are to be believed, Plaintiff made numerous verbal requests to receive his medications. *Id.*, 127:21-23, 130:25-131:12, 134:6-15, 139:9-18, 140:15-21, 143:15-144:5, 147:5-8, 147:13-16, 228:10-23; **Exhibit 5,** *Deposition of Susan Canterbury,* 15:4-5.

25. **<u>Deny.</u>** Plaintiff testified that he received no medications whatsoever prior to suffering a first seizure on November 14, 2013, despite his repeated, vociferous requests that he receive his medications as prescribed by his physician Dr. Singer and ordered by the Court. **Exhibit 4,** *Deposition of Kyle Schwark,* 127:21-23, 130:25-131:12, 134:6-15, 139:9-18, 140:15-21, 143:15-144:5, 147:5-8, 147:13-16, 228:10-23. Although Defendant Canterbury now claims in her affidavit that she packed 2mg of Xanax for the jail deputies to be administered to Plaintiff on the morning of November 14, 2013, she testified under oath that she in fact packed a dose of 1mg of Xanax for the jail deputies to administer to

Plaintiff on the morning of November 14, 2013. **Exhibit 5,** *Deposition of Susan Canterbury,* 21:15-16 ("I mean, I took his own Xanax, and I packed one for the morning.") Even if some version of Defendant's claims that she packed some dose of Xanax for Plaintiff to be administered by jail deputies on the morning of November 14, 2013, she has no knowledge of whether the jail deputies actually gave Plaintiff his medications on the morning of November 14, 2013 because she did not work at the jail on November 14, 2013. *See* Material Fact No. 26 below, which is undisputed.

26. Admit.

27. Admit.

28. **<u>Deny</u>.** The Park County Defendants' Material Fact. No. 28, which states that "On the morning of November 14, 2013, Nurse Pearce prepared Schwark's medication— including Suboxone—as prescribed by Dr. Singer and left Medical to distribute the medications," is inconsistent with her own signed affidavit, in which she states after preparing Plaintiff's medications, "I was on my way to distribute medication when I was notified over the radio that one of the inmates in F pod needed immediate medical attention. When I arrived at F pod, I saw Kyle Schwark on the floor, and he appeared to be having a seizure." *See* [Doc. #66-5]. If Nurse Pearce's affidavit is to be taken at face value, this version of events is consistent with Plaintiff's claims that he did not receive any of his medications prior to suffering his first seizure on the morning of November 14, 2014, as Nurse Pearce herself admits that she had not yet had a chance to give Plaintiff his medications prior to his seizure.

12

29. Admit. It should be noted that along with several deputies, Defendant Muldoon was present when Plaintiff suffered his first seizure on November 13, 2013, and therefore he was on actual notice of Plaintiff's serious medical condition, yet he did not take any action to transport Plaintiff to a hospital for emergency medical care, despite having the authority to do so. **Exhibit 5,** *Deposition of Susan Canterbury,* 33:4-6 ("So Captain Muldoon, and I don't know, some other deputies – of course they all go rushing in when something like that is going on.")*,* 80:4-8 (Q: "Okay. So ultimately security staff decides Kyle is in need of hospitalization, right?" Canterbury: "Yes."), 95:6-7 (Pearce: "[Medical] [d]oesn't trump the captain. Sorry.").

30. Admit.

31. Admit. It should be noted that while Defendant Fitting did not order the use of physical restraints on Plaintiff, Defendant Swann failed to ask her whether physical restraints could or should be used. Regardless, Nurse Pearce, who, along with Defendant Swann, told Kyle to lie on the medical table, knew that placing someone on a table without restraints or guardrails after he had had a seizure was not good medical practice. **Exhibit 3,** *Deposition of Cathlene Pearce,* 33:8-15 (Q: "Okay. Would you agree that putting someone on a table if they have a seizure problem without strapping them in or putting up guardrails or doing something to protect them is not good medical care?" … Pearce: "I would agree."), 37:21-38:2.

32. Admit.

33. **Deny.** Whether Plaintiff was "leaning against" the medical table, as now claimed by Defendants, is a hotly contested issue of material fact. In fact, Plaintiff was lying

down on the medical table, which contained no guardrails or restraints, when he suffered a second seizure, fell off the medical table, hit his head and sustained deep lacerations, a torn earlobe, and cervical fractures on his neck and back. The best evidence that this is what in fact occurred is a contemporaneous nursing note written by Nurse Pearce which described, in part, the following sequence of events: Following Plaintiff's first seizure, "We [Nurse Pearce and Nurse Swann] took him [Mr. Schwark] to medical in a wheel chair. He was very sick to his stomach. *We put him on a medical table and got him a blanket.* We checked him over and hot him some water and called the doctor. Dr. Fitting she took him off his Zanex [sic] and put him on the alcohol withdrawal protocol. We gave him the 25mg Librium. He sat there talking to us and trying to eat for several hours. He vomited about 200ml and remained resting in medical. He kept talking and drinking fluids. About 5:10 pm he said he was really tired. I told him to lay back and try to sleep. He started to get comfortable and I went back to work. I heard a strange gargling sound and turned just in time to see Kyle fall off the table and crack his head open." **Exhibit 7,** *Nurse Cathlene Pearce Note*,. Mr. Schwark also testified that he was on the table when he suffered the seizure, which caused him to fall and fracture his neck. **Exhibit 4,** *Deposition of Kyle Schwark*, 150:12-22. Nurse Pearce, Defendant Swann and Defendant Fitting were each on notice that Plaintiff had recently suffered a seizure, and it was obvious that placing a patient who had suffered a seizure on a medical table without restraints violates the most basic level of nursing care; nevertheless Plaintiff was placed on just such a table, causing him serious injuries, pain and suffering. **Exhibit 8,**

14

*Deposition of Katherine Fitting, MD FACP,* 43:8-9; **Exhibit 3,** *Deposition of Cathlene Pearce,* 33:8-15, 37:21-38:2.

34. Admit. It should be noted that, as discussed more fully in Disputed Material Fact. No. 33, above, Plaintiff suffered a second seizure and *fell off the medical table*, hitting his head on the floor and sustaining deep lacerations, a torn earlobe, and cervical fractures on his neck and back, which required emergency medical attention.

35. Admit.

36. Admit.

37. Admit.

38. **Deny.** Plaintiff's medical furlough clearly stated that Plaintiff could not be returned to the Park County Jail without the approval of his physician and Dr. Singer never approved his return to the Park County Jail. In returning Plaintiff to jail, Defendants knowingly violated the terms of his furlough, which had been signed by Defendant Wegener himself, despite the fact that Plaintiff had taped the furlough on his front door. **Exhibit 9,** *Kyle Schwark Furlough,* ("BY ORDER OF THE SHERIFF Kyle Jeffery Schwark is hereby released from the custody of the Park County Sheriff's Office due to his medical conditions, which are serious and life threatening. I have ordered Kyle Jeffery Schwark to be placed on furlough until such time as he is authorized by his Doctor to complete his sentence."); **Exhibit 4,** *Deposition of Kyle Schwark,* 177:24-178:5 ("I was – I was arrested. There was a furlough taped to my door which clearly states the terms of that furlough. Basically said from their boss [Defendant Wegener] that you are not to put your hands on me, that I'm on a medical furlough. It's very clearly worded. It's

very brief. It says, Until you are cleared by your doctor to come back, then you're under furlough.").

39. **Deny.** Plaintiff's Second Amended Complaint does not allege that on February 25, 2014, the Judge in fact did not have the power to order the Jail to give Plaintiff his medication, it merely states that "*the Judge said* that he did not have the power to order the Jail to give [Plaintiff] his medication." Plaintiff's Second Amended Complaint, [Doc. 61], ¶51. In fact, the question of whether the Court has the authority to order the Jail to provide medications to an inmate is a hotly contested issue of material fact. It is evident that the Court clearly has such authority. First, Judge Groome did order the Jail to provide Plaintiff with his medications as prescribed by his physician, Dr. Singer. **Exhibit 10**, *Kyle Schwark Mittimus* (Plaintiff must "take medication as required on a timely basis even while in custody."). Further, Defendant Wegener understood that in the case of a serious conflict between the Court and the Park County Sheriff's Office, ultimately the Sheriff would be required to accommodate the Court's order, for example by moving an inmate to a different facility that allows a particular medication ordered by the Court. **Exhibit 1,** *Deposition of Fred Wegener,* 40:11-19. Besides Plaintiff, there were many inmates at the jail who were ordered by the Court to take certain medications. **Exhibit 3,** *Deposition of Cathlene Pearce,* 12:9-12. Defendant Muldoon also understood that the Court could order the Jail to provide certain medications to inmates, as it was his practice to tell nurses that certain inmates had been ordered by the Court to be provided certain medications. *Id.,* 12:2-5, 20:5-8, 20:17-19, 42:3-7.

40. Admit.

41. Admit.

42. Admit.

43. Admit.

44. Admit. It should be noted that even if Plaintiff received his Xanax as indicated in his February/ March 2014 Medical Chart, the rapid tapering nevertheless could have caused his withdrawal symptoms, including psychosis. Additionally, it is uncontested that Dr. Fitting ordered that Plaintiff's Suboxone and Librium be completely discontinued, without any taper. **Exhibit 8,** *Deposition of Katherine Fitting, MD FACP,* 93:2-19; **Exhibit 5,** *Deposition of Susan Canterbury,* 54:8-12. This sudden cold-turkey stop to two of his three medications also could have caused his symptoms of withdrawal, including his psychosis.

45. Admit.

46. Admit.

47. Admit.

48. Admit.

49. **<u>Deny.</u>** Defendants mischaracterize the contents of Defendant Canterbury's email correspondence to Dr. Parker. Defendant Canterbury's email to Dr. Parker from March 6, 2014 at 10:44 am does not state that Plaintiff's condition had improved in any way; rather, it describes in harrowing detail the depth of Plaintiff's deepening psychosis. **Exhibit 11,** *Canterbury-Parker Email*, March 6, 2014, 10:44 am ("Canterbury Email, March 6, 2014, 10:44 am"). The fact that in Defendant Canterbury's email to Dr. Parker from March 6, 2014 at 2:04 pm, she indicates that "Returning to BID Xanax 1 mg ER has

17

Kyle Schwark more coherent" constitutes evidence of a causal connection between the rapid tapering and discontinuance of Plaintiff's Xanax (on top of the total and sudden discontinuance of his Suboxone and Librium) and his psychotic symptoms.

50. Admit.

51. **Deny.** On March 6, 2013, Nurse Canterbury told Captain Muldoon that Mr. Schwark needed to be transported out of the jail to adequately treat his psychosis; Nurse Canterbury continued to tell him every day until Mr. Schwark's transfer out of the Park County Jail that Mr. Schwark needed immediate psychiatric hospitalization. **Exhibit 5**, *Deposition of Susan Canterbury*, 81:1-14, 92:17-25, 94:22-95:7.

52. **Deny.** Defendant Canterbury did not give Plaintiff "his prescribed dose of Xanax" as had been prescribed to Plaintiff by his physician, Dr. Singer, but instead the rapidly tapered dose of Xanax per Dr. Fitting's orders. **Exhibit 5,** *Deposition of Susan Canterbury,* 46:18-19. Defendant Muldoon did not take Plaintiff to Denver Health on March 10, 2014 "at the request of the nursing staff" – it was Captain Muldoon's decision, and his alone, to finally take Plaintiff to Denver Health for emergency medical treatment, despite being on actual notice for at least five days as to the severity of Plaintiff's psychosis and general deterioration. **Exhibit 5**, *Deposition of Susan Canterbury,* 80:4-8 ("Q: Okay. So ultimately security staff decides Kyle is in need of hospitalization, right? Canterbury: Yes."), 95:6-7 (Pearce: "[Medical] [d]oesn't trump the captain. Sorry."). In fact, Defendant Muldoon ignored Nurse Canterbury's repeated requests to him that Plaintiff be transported to a hospital for at least five days. *Id.*, 80:9-18, 81:1-20, 85:23-24, 92:23-25. Also, Nurse Canterbury sincerely believed that Mr. Schwark was a danger to

himself during this time and informed Captain Muldoon as much every day that she saw him. *Id.*, 81:1-14, 92:17-25, 94:22-95:7.

53. Admit. On March 12, 2014, Dr. Parker did, however, prescribe the antipsychotic medication risperidone, also known as Risperdal, for Plaintiff. **Exhibit 5,** *Deposition of Susan Canterbury,* 69:21-22.

54. Admit.

3. **Statement of Additional Material Facts**

1. Kyle Schwark suffered from a serious medical need when he was incarcerated at the Park County Jail for the first time, from November 12, 2013 until November 14, 2013, prior to being furloughed. **Exhibit 1**, *Deposition of Fred Wegener*, 12:12-14.

2. Based on the Court's mittimus, the Park County Jail, and its officials and contracted employees, had the responsibility to ensure that Mr. Schwark was receiving his prescribed medications. **Exhibit 1**, *Deposition of Fred Wegener*, 14:1-19.

3. Sheriff Wegener overrides court orders in operating his jail. **Exhibit 1**, *Deposition of Fred Wegener*, 22:13-23:21.

4. Sheriff Wegener trains his staff at the Park County Jail that if a judge's orders are in contravention of jail policy, the officials are to disregard the judge's order and follow jail policy instead. **Exhibit 1**, *Deposition of Fred Wegener*, 24:18-25; **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 29:9-21.

5. It is the custom, policy, and practice of the Park County Jail to place actively hallucinating inmates into solitary confinement. **Exhibit 1**, *Deposition of Fred Wegener*, 29:24-30:5.

6.   Sheriff Wegener did not know whether a doctor had authorized Mr. Schwark's return to the Park County Jail when he had him arrested and terminated his furlough. **Exhibit 1**, *Deposition of Fred Wegener*, 32:11-19.

7.   Captain Muldoon is the final policymaker in charge of the day-to-day operation of the Park County Jail. **Exhibit 1**, *Deposition of Fred Wegener*, 34:20-23.

8.   Per Park County policy, as implemented by Sheriff Wegener, inmates who have contradicting orders and medications from their outside medical provider and the medical provider on staff at the Jail are only provided medication and treatment in accordance with the orders from the on-staff medical provider; the inmates' outside medical provider's orders are ignored. **Exhibit 1**, *Deposition of Fred Wegener*, 36:1-12; **Exhibit 6**, *Deposition of Jeri Swann*, 17:18-18:6.

9.   Dr. Fitting was the final policymaker at the Park County Jail as to the medications that inmates received and her decisions trumped those of any other doctor that an inmate had prior to being incarcerated. **Exhibit 1**, *Deposition of Fred Wegener*, 42:1-5; **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 28:7-18.

10. On November 14, 2013, Mr. Schwark had a seizure in the Park County Jail, which was reported to Nurse Swann. **Exhibit 6**, *Deposition of Jeri Swann*, 8:21-9:1.

11. Nurse Swann responded to the seizure and brought Mr. Schwark to the medical unit of the Park County Jail. **Exhibit 6**, *Deposition of Jeri Swann*, 8:21-9:1.

12. While Nurse Swann was observing Mr. Schwark in the medical unit of the Park County Jail after his seizure, she had him sit on the table in the medical unit. **Exhibit 6**,

*Deposition of Jeri Swann*, 9:19-23; **Exhibit 7**, *Cathlene Pearce Incident Report* (Depo. Ex. 21).

13. Per Nurse Swann's instructions, Mr. Schwark continued to lie on the table in the medical unit. **Exhibit 6**, *Deposition of Jeri Swann*, 9:19-23; **Exhibit 7**, *Cathlene Pearce Incident Report*.

14. While lying on the table in the medical unit Mr. Schwark suffered another seizure and fell off the medical table, breaking his neck and cracking his head open; Mr. Schwark fell approximately two feet when he fell from the table. **Exhibit 7**, *Cathlene Pearce Incident Report*; **Exhibit 12**, *Denver Health Medical Records* (Depo Ex. 25); **Exhibit 13**, *Medical Request* (Depo. Ex. 24).

15. It is improper medical procedure to place an individual who has recently had a seizure up on a table without some sort of mechanism in place to prevent her/him from falling off should another seizure occur. **Exhibit 5**, *Deposition of Susan Canterbury*, 36:12-23.

16. It is so obvious that it is improper medical procedure to place an individual who has recently had a seizure up on a table without some sort of mechanism in place to prevent her/him from falling off should another seizure occur that nurses are trained as much in nursing school. **Exhibit 5**, *Deposition of Susan Canterbury*, 36:12-37:4.

17. After Mr. Schwark fell off of the table in the medical unit and onto the floor, an ambulance was called and Mr. Schwark was taken to the hospital. **Exhibit 7**, *Cathlene Pearce Incident Report*

18. Mr. Schwark was placed on medical furlough because of the "serious and life threatening" injuries he sustained from the fall from the table in the medical unit on November 14, 2013. **Exhibit 9**, *Medical Furlough*.

19. Mr. Schwark was prescribed suboxone, Alprazolam, and Hydroxyzine by his primary care doctor. *See* **Exhibit 14**, *Singer Letter*.

20. Dr. Fitting wrote an order on February 25, 2014, stating that the nurses at the Park County Jail were to wean Mr. Schwark off of his prescribed benzodiazepine medication, which he had been taking regularly prior to incarceration. **Exhibit 15**, *Katherine Fitting Medication Order*.

21. On March 5, 2014, Mr. Schwark began to experience severe hallucinations, which were documented by Nurse Canterbury, witnessed by Captain Muldoon, and reported to Dr. Fitting. **Exhibit 11**, *March 5, 2014 emails from Canterbury to Parker*.

22. Mr. Schwark also suffered a seizure on March 5, 2014, which was witnessed by Captain Muldoon. **Exhibit 11**, *March 5, 2014 emails from Canterbury to Parker*.

23. Mr. Schwark was exhibiting a serious medical need, through his psychosis, on March 6, 2013, wherein he was a danger to himself. **Exhibit 5**, *Deposition of Susan Canterbury*, 64:16-65:6.

24. On March 6, 2013, Nurse Canterbury told Captain Muldoon that Mr. Schwark needed to be transported out of the jail to adequately treat his psychosis; Nurse Canterbury continued to tell him every day until Mr. Schwark's transfer out of the Park County Jail that Mr. Schwark needed immediate psychiatric hospitalization. **Exhibit 5**, *Deposition of Susan Canterbury*, 81:1-14, 92:17-25, 94:22-95:7.

25. Nursing staff cannot transfer inmates out of the Park County Jail for hospitalization or emergency medical treatment without the approval of Captain Mudloon and the security staff. **Exhibit 5**, *Deposition of Susan Canterbury*, 80:14-82:10, 83:11-84:21.

26. Mr. Schwark was not provided immediate psychiatric hospitalization, in part, because Captain Muldoon left for the weekend on March 7, 2013, and did not authorize Mr. Schwark's transfer before he left. **Exhibit 5**, *Deposition of Susan Canterbury*, 84:4-21.

27. On the day that Mr. Schwark was transported, by Captain Muldoon himself, to Denver Health for emergency psychiatric care, March 10, 2013, he was suffering the same severity of psychosis as March 6, 2013, the day that Nurse Canterbury informed Captain Muldoon that Mr. Schwark required emergency psychiatric hospitalization. **Exhibit 5**, *Deposition of Susan Canterbury*, 84:22-85:3.

28. When Mr. Schwark was sent to the Park County Jail on November 6, 2013, Judge Stephen Groome entered in the mittimus that the Jail was required to ensure that Mr. Schwark "take medication as required on a timely basis even while in custody." **Exhibit 10**, *Kyle Schwark Mittimus*.

29. Captain Muldoon testified that, based on his observations, Nurse Canterbury is an honest person and has accurate medical judgment. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 14:10-19.

30. Captain Muldoon testified that he had no specific memory of conversations with Nurse Canterbury from March 5, 2014 until March 10, 2014, but he would have no

reason to dispute Nurse Canterbury's testimony that she spoke with him from March 5, 2014 until March 10, 2014 about Mr. Schwark's medical needs. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 36:23-37:9.

31. Captain Muldoon is the final policymaker as to the day-to-day operations of the Park County Jail. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 10:16-13:5.

32. Captain Muldoon is the direct supervisor of the nurses at the Park County Jail. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 18:19-19:6.

33. Captain Muldoon made the decision that Mr. Schwark was to be transferred out of the Park County Jail on March 10, 2014. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 37:14-38:11.

34. In order to transfer an inmate out of the Park County Jail for medical treatment, the transfer has to be approved by law enforcement personnel at the Jail. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 45:20-46:10.

35. According to Captain Muldoon, it was apparent from Mr. Schwark's speech and actions that on March 10, 2014 Mr. Schwark was suffering from a serious medical problem that required acute care outside of the Jail. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 47:3-14.

36. Captain Muldoon testified that his actions towards Mr. Schwark, and the actions of the other Park County officials including Nurse Swann, were in compliance with the practices, customs, and policies of the Park County Jail. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 48:15-49:8.

37. No one was disciplined in connection with Mr. Schwark's treatment at the Park County Jail. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 49:9-15.

38. The only medical training that the Park County Jail provides to its nurses is "to say no." In other words, the only medical training that the Park County Jail provides to its nurses is that they should not treat inmate complaints as credible because inmates spend all day coming up with imagined ailments. There is no other medical training provided to nurses at the Park County Jail. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 50:20-51:2.

39. It is the custom and practice of the Park County Jail to place inmates who are suffering from mental health problems on lockdown and confine them to their cells for twenty-three hours a day. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 59:8-60:5.

40. It is the policy at the Park County Jail that every person who enters the Jail with a prescription for benzodiazepines is weaned off of that prescription, with the only exception being individuals suffering from seizure disorder. **Exhibit 8**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 30:21-31:11.

## 4. **Standard of Review**

Summary judgment is appropriate only if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). "The party that moves for summary judgment bears the burden of proving that no genuine issue of material fact exists on all claims for which it seeks summary judgment."

*Trujillo v. Atmos Energy Corp.*, No. 11-cv-01151-RBJ-MEH, 2012 U.S. Dist. LEXIS

87273, at *4 (D. Colo. June 25, 2012). The Tenth Circuit has emphasized that the

nonmovant is given "wide berth to prove a factual controversy exists." *Ulissey v.*

*Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). In making this determination, the district

court must view the record and all reasonable inferences drawn therefrom in the light

most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 484

(10th Cir. 1995). "Where different ultimate inferences may be drawn from the evidence

presented by the parties, the case is not one for summary judgment." *Brown v. Parker-*

*Hannifan Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984). Critically:

> The right to confront, cross-examine and impeach adverse witnesses is one
> of the most fundamental rights sought to be preserved by the Seventh
> Amendment provision for jury trials in civil cases. The advantages of trial
> before a live jury with live witnesses, and all the possibilities of considering
> the human factors, should not be eliminated by substituting trial by affidavit
> and the sterile bareness of summary judgment. It is only when the witnesses
> are present and subject to cross-examination that their credibility and the
> weight to be given their testimony can be appraised. Trial by affidavit is no
> substitute for trial by jury which so long has been the hallmark of "even
> handed justice."

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see*

*also Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980).

## 5. **Argument**

### 5.1 **The abundance of disputed material facts precludes summarily judging this matter.**

Numerous disputed issues of material fact preclude granting Defendants summary

judgment based on qualified immunity. "A qualified immunity defense will not succeed

in inducing a court to grant summary judgment when 'the facts . . ., considered collectively, present an incomplete picture of the [relevant] circumstances.'" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1137 (10th Cir. 1991)) (alterations in original). The Tenth Circuit has explained that, when plaintiffs and defendants allege completely different factual circumstances surrounding a constitutional violation, summary judgment (via qualified immunity or otherwise) is not appropriate:

> On the issue of excessive force, neither party's asserted material facts jibe with those of the other. Officer King says that Appellant behaved belligerently before he attempted to handcuff him. Appellant and his children say that Appellant did nothing but cooperate passively. Officer King contends that Appellant tried to resist the arrest by "turning in to me, which just made me hold on to the control hold." App. at 216. Appellant maintains that he complied physically at all times. App. at 215. Appellant says that Officer King pushed Appellant at least 10 feet into a store window to effectuate the arrest. Officer King tells a far more subdued tale of "maneuvering [Appellant] against a storefront window [to] gain[] the necessary leverage to handcuff him." Supp. App. at 2. Officer King mentions nothing about manhandling Appellant during the arrest process. Appellant asserts that Officer King "cocked [his arm] at an angle, . . . clear up the middle of [his] back." App. at 172-173. Although the district court erred in granting summary judgment via qualified immunity, the overwhelming number of factual divergences scream the obvious -- that material disputed facts obviously remain as to the excessive force claim. The court erred in granting summary judgment on the excessive force issue.

*Olsen*, 312 F.3d at 1315.

Defendants' allegedly "undisputed" mateiral facts are, in fact, disputed by voluminous evidence in the record, rendering summary judgment inappropriate. *See*

*Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989) ("This rather one-sided factual summary provided by [the officer], however, is only part of the picture presented by the evidentiary record which is before us. Other testimony and evidence contained in the summary judgment record casts doubt on the objective reasonableness of [the officer's] use of deadly force."). The only undisputed facts that Defendant outlines above are immaterial to this case. For example, Plaintiff and Defendants disagree about what happened during Mr. Schwark's initial incarceration, including whether or not he was provided with his prescription medication and whether or not he was lying on the table in the medical unit (unwatched and without any form of restraint preventing him from falling off) after suffering a seizure. In addition, the circumstances surrounding Mr. Schwark's second incarceration are hotly disputed; particularly, there is a material dispute as to when Nurse Canterbury informed Captain Muldoon as to Mr. Schwark's condition, whether Nurse Canterbury had the ability to transfer Mr. Schwark from the Park County Jail, and whether Captain Muldoon told Nurse Canterbury that Mr. Schwark could not be transferred out of the Jail. As outlined above, Defendants' version of the facts in this case is contradicted by their own testimony.

This multitude of genuine issues of disputed material fact precludes summary judgment. *See Zuchel*, 890 F.2d at 275 (denying summary judgment based on qualified immunity because of "genuine issues of material fact precluding a judicial determination of whether [the officer's] conduct was objectively reasonable"). And these factual disputes must be resolved by a jury. *See Despain v. Uphoff*, 264 F.3d 965, 977 (10th Cir.

2001) ("While defendants challenge [the plaintiff's] allegations of the severity of the situation and of [a defendant's] knowledge, those factual disputes must be left to the province of an appropriate factfinder. This claim should not have been dismissed on summary judgment.").

### 5.2 Defendants Swann and Muldoon violated Mr. Schwark's Eighth Amendment rights.

Under the Eighth Amendment standard outlined in *Farmer v. Brennan*, there is a two-part test for proving deliberate indifference to medical needs. 511 U.S. 825 (1994). Under the objective component of the test, it is necessary to demonstrate that: (1) Mr. Schwark's medical needs were "sufficiently serious" to constitute a deprivation of constitutional dimension, *Id.* at 834, and, under the subjective component of the test, that: (2) each Defendant knew of and disregarded an excessive risk to Mr. Schwark's health and safety. *Id.* at 837. The evidence in the record contains facts sufficient to support both elements of Mr. Schwark's claim against Defendant Swann for deliberate indifference to Mr. Schwark's obvious, serious medical needs.

### 5.2(a) Mr. Schwark suffered a serious medical need.

The objective component of the test is satisfied if the official causes an injury that, objectively, is "sufficiently serious," i.e., an injury that equates to the "denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). A medical need is sufficiently serious to implicate the Eighth and Fourteenth Amendments "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Hunt*, 199 F.3d at 1224 (internal citation omitted). Serious mental health issues like those that Mr. Schwark experienced, including anxiety, psychosis, and hallucinations, constitute a serious medical need. *See Smith v. Carver*, No. 07-575, 2008 U.S. Dist. LEXIS 11434, at *13 (E.D. Pa. Feb. 15, 2008) ("Plaintiff has established a sufficiently 'serious medical need' through his undisputed testimony that his ADHD, anxiety, depression, and RLS were diagnosed by a physician as requiring treatment."); *Luna v. Butler*, No. 16-cv-00579-MJR, 2016 U.S. Dist. LEXIS 88668, at *5 (S.D. Ill. Jul. 8, 2016) (finding that allegations of bipolar, anxiety, and post-traumatic stress disorders satisfy the objective component of a deliberate indifference claim for screening purposes); *Graham v. Warden*, No. 07-cv-295-PB, 2007 U.S. Dist. LEXIS 98964, at *7 (D.C. N.H. Dec. 13, 2007) (finding that mental health conditions including ADHD, bipolar disorder, personality disorder, and anxiety constitute a serious medical need); *see also Goodrich v. Clinton County Prison*, 214 F. App'x 105, 111 (3d Cir. 2007) (holding that a mental illness diagnosed by a psychiatrist as requiring treatment constitutes a serious medical need); *United States ex rel. Schuster v. Vincent*, 524 F.2d 153, 160 (2d Cir. 1975) ("[A]cts causing mental suffering can even absent attendant bodily pain violate the Eighth Amendment."); *Inmates of the Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979) ("Although most challenges to prison medical treatment have focused on the alleged deficiencies of medical treatment for physical ills, we perceive no reason why psychological or psychiatric care should not be held to the same standard."); *Atkins v. Cnty. of Orange*, 372 F. Supp. 2d 377, 377 (S.D.N.Y. 2005) (implying that a psychotic episode is a "serious medical need"); *Viero v.*

*Bufano*, 901 F. Supp. 1387, 1393 (N.D. Ill. 1995) ("Although *Estelle* originally used the phrase ['serious medical needs'] in the context of physical health needs, it has since been applied to mental health needs as well."); *Coleman v. Wilson*, 912 F. Supp. 1282, 1319 (E.D. Cal. 1995) (describing mental illness as a "serious medical [need]"); *Carl v. Cty. of Muskegon*, No. 1:11-cv-94, 2012 U.S. Dist. LEXIS 187348, at *53 (W.D. Mich. Dec. 26, 2012) ("Plaintiff has met the objective prong of a deliberate indifference claim by demonstrating that his mental illness was a serious medical need.")

Further, seizures are objectively serious because a layperson would realize the need for a doctor's attention. *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); *see, e.g., King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (recognizing that "medical conditions much less serious than seizures have satisfied" the objective seriousness standard); *Maguire v. Patterson*, No. 2:10-cv-00626-CW, 2015 U.S. Dist. LEXIS 168040, at *24-27 (D. Utah Dec. 14, 2015); *Hilyer v. Dunn*, No. 15-00356-WS-N, 2016 U.S. Dist. LEXIS 150508, 2016 WL 7093437, at *2 (Oct. 28, 2016), *adopted by the District Court*, 2016 U.S. Dist. LEXIS 166323, 2016 WL 7045731 (S.D. Ala. Dec. 2, 2016) ("There can be no doubt that controlling seizures constitutes a serious medical need" (citing *Johnson v. Hay*, 931 F.2d 456, 461 (8th Cir. 1991); *Miranda v. Munoz*, 770 F.2d 255, 259 (1st Cir. 1985)). And, particularly, seizures caused by benzodiazepine withdrawal are serious medical needs. *Stoner v. Fye*, No. 5:15-CV-102 (CAR), 2017 U.S. Dist. LEXIS 48322, at *15 (M.D. Ga. Mar. 31, 2017) (finding that "[m]ost telling Plaintiff suffered from an objectively serious medical need is the fact that he was found unresponsive in his cell due to a benzodiazepine-withdrawal seizure"). Mr. Schwark's

suffering from symptoms of benzodiazepine withdrawal, seizures, and significant mental health problems constituted objectively serious medical needs. Moreover, the furlough order signed by Defendant Wegener makes clear, that the seizures, and injuries Mr. Schwark suffered as a result of those seizures, were "serious and life threatening." **Exhibit 9**, *Medical Furlough*. Mr. Schwark's injuries were certainly "sufficiently serious."

### 5.2(b) Defendant Swann responded with deliberate indifference to Mr. Schwark's serious and obvious medical needs.

With regard to the second component of the *Farmer* inquiry, whether a jail official knew about and disregarded a substantial risk to a detainee's health and safety is a question of fact that may be proven from circumstantial evidence. *See Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 430 (10th Cir. 2014). As such, the subjective knowledge of Defendant Swann is best tested at a later stage. *See McGill v. Corr. Healthcare Cos.*, No. 13-cv-01080, 2014 WL 2922635, at *8 (D. Colo. June 27, 2014). In fact, the multitude of factual disputes in the record demonstrates that the subjective knowledge of Defendant Swann is a proper issue for the jury. *See* Sections 2 and 3, above. Nevertheless, even if this Court finds the facts regarding deliberate indifference are not in dispute, the undisputed evidence in the record demonstrates that Defendant Swann knew about and disregarded an obvious and substantial risk to Plaintiff's health and safety.

In order to act with subjective deliberate indifference, a prison official must (1) "be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists," (2) actually "draw the inference," and (3) "fail[] to take reasonable steps to alleviate that risk." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (internal quotations omitted). "Although deliberate indifference is a subjective inquiry, a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Id*. The facts demonstrate that Mr. Schwark was directed by Defendant Swann to lie on a table in the medical unit immediately after suffering from a seizure. **Exhibit 6**, *Deposition of Jeri Swann*, 9:19-23; **Exhibit 3**, *Cathlene Pearce Incident Report* (Depo. Ex. 21). And there is unrebutted testimony in the record that it is so obvious that it is improper medical procedure to place an individual who has recently had a seizure up on a table without some sort of mechanism in place to prevent her/him from falling off should another seizure occur that nurses are trained as much in nursing school. **Exhibit 5**, *Deposition of Susan Canterbury*, 36:12-37:4. Mr. Schwark's fall was caused by this blatant, and deliberately indifferent, violation of nursing protocol. The facts demonstrate that Nurse Swann was deliberately indifferent to Mr. Schwark's obvious and serious medical needs.

    5.2(c) <u>Defendant Muldoon responded with deliberate indifference to Mr. Schwark's serious and obvious medical needs.</u>

    Again, with regard to the second component of the *Farmer* inquiry, whether a jail official knew about and disregarded a substantial risk to a detainee's health and safety is a question of fact that may be proven from circumstantial evidence. *See Walton*, 745 F.3d at 430. As such, the subjective knowledge of Defendant Muldoon is best tested at a later

stage. *See McGill*, 2014 WL 2922635, at *8. In fact, the multitude of factual disputes in the record demonstrates that the subjective knowledge of Defendant Muldoon is a proper issue for the jury. *See* Sections 2 and 3, above. Nevertheless, even if this Court finds the facts regarding deliberate indifference are not in dispute, the undisputed evidence in the record demonstrates that Defendant Muldoon knew about and disregarded an obvious and substantial risk to Plaintiff's health and safety.

Defendant Muldoon's deliberate indifference to Plaintiff's serious medical needs invokes his failure as a gatekeeper to provide him access to further medical care. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (recognizing deliberate indifference claims where the health official provides inadequate medical care or, if a prison health official serves as a gatekeeper for other medical personnel capable of treating the condition, delays or refuses to provide access to adequate medical care).

The evidence shows that Defendant Muldoon failed to act as a gatekeeper by failing to ensure that Mr. Schwark received emergent or specialized medical attention for his obvious, serious medical condition even though it was obvious that he needed such medical treatment. *See Self*, 439 F.3d at 1232 (holding that a claim for gatekeeper liability is actionable "where the need for additional treatment or referral to a medical specialist is obvious"); *see also Mata*, 427 F.3d 745, 751 (10th Cir. 2005). The evidence shows that Captain Muldoon caused, through his inaction and failure to approve the transfer of Mr. Schwark to psychiatric hospitalization, a delay in treatment that resulted in unnecessary pain and the worsening of Mr. Schwark's condition. Not only did Captain Muldoon fail to transfer Mr. Schwark out of the Jail and to an emergent medical provider,

but he had direct knowledge that Mr. Schwark needed to be transferred to an emergent

medical provider. Nurse Canterbury stated that she told Captain Muldoon every day that

Mr. Schwark needed immediate medical attention and asked that he be transferred out of

the Park County Jail for immediate psychiatric hospitalization.

Further, Nurse Canterbury's email to Dr. Fitting state explicitly that *over four days*

before Mr. Schwark was eventually transferred out of the Jail, and provided the

psychiatric hospitalization he required, Captain Muldoon witnessed the obvious state of

psychosis that Mr. Schwark was experiencing. Nurse Canterbury testified that Mr.

Schwark was in no worse shape on Monday March 10, 2014 than he was on March 6,

2014, the first day that she notified Captain Muldoon that Mr. Schwark needed

immediate psychiatric hospitalization. And Captain Muldoon admitted in his deposition

both that Nurse Canterbury is a trustworthy reporter of the facts (and she can be taken at

her word with regards to Mr. Schwark's condition and treatment at the Park County Jail)

and it was obvious when he saw Mr. Schwark on March 10, 2014 that he had serious and

emergent medical needs that necessitated inpatient psychiatric treatment. The evidence

demonstrates that Captain Muldoon had knowledge that Mr. Schwark was suffering from

a serious medical need that required immediate psychiatric hospitalization. *See Farmer*,

511 U.S at 842 (noting that "a factfinder may conclude that a prison official knew of a

substantial risk from the very fact that the risk was obvious."). [3]

---

[3] It is also clear that psychiatric hospitalization would have addressed Mr. Schwark's
serious medical needs because, once he was sent to Denver Health, he returned only a
few days later in a dramatically improved condition and did not suffer from any further
serious mental health needs over the remainder of his incarceration.

And yet, Captain Muldoon blocked Mr. Schwark's transfer out of the Park County Jail and prevented him from getting necessary treatment. Captain Muldoon's delay of Mr. Schwark's treatment was deliberately indifferent to Mr. Schwark's obvious and serious medical needs. *Mata*, 427 F.3d at 755; *Sealock*, 218 F.3d at 1210 (finding that a delay of only "several hours" in taking inmate with chest pains to the hospital violated the Eighth Amendment); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991) ("prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering"); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (few hours delay in treating inmate's broken foot could render defendants liable); *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (fifteen minute delay in treating inmate in cardiac arrest may violate Eighth Amendment).

### 5.3 Defendants violated Mr. Schwark's clearly established rights.

As fully demonstrated above, the evidence demonstrates that Mr. Schwark's constitutional right to be free from deliberate indifference to his serious medical needs was violated by Defendants. The only remaining question is whether that right was clearly established at the time of the events at issue. "[T]here is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata*, 427 F.3d at 749. As stated by the Supreme Court in *Estelle*:

> Elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not

> be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency. . . .

429 U.S. 97, 103 (1976) (citations omitted). Defendants were therefore on notice that their failure to provide meaningful medical care to Mr. Schwark (or obtain medical care for him), despite obvious signs of serious medical needs, violated his clearly established rights.

Additionally, it was clearly established that when Defendant Muldoon – with the actual knowledge that Mr. Schwark was suffering from psychosis and presented a threat of harm to himself – was confronted with actual signs of Mr. Schwark's psychosis, and statements from Nurse Canterbury that Mr. Schwark was in desperate need of immediate psychiatric hospitalization, Captain Muldoon had the obligation to provide Mr. Schwark with access to necessary medical care, including inpatient psychiatric care. Defendant Muldoon was thus on fair notice that failing to provide such access would be sufficient to show a constitutional violation. *See, e.g., Estelle*, 429 U.S. at 104-05 (deliberate indifference may be found when prison guards intentionally deny or delay an inmate access to medical care); *Sealock*, 218 F.3d at 1210 (holding prison guard could be liable for deliberate indifference when he was told that plaintiff might be having a heart attack and refused to transport him to a doctor). His denial of treatment for Mr. Schwark for five days, while he was on notice that Mr. Schwark needed immediate and emergent medical care, is truly shocking.

> Liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998). It is clear that Captain Muldoon's failure to act as a gatekeeper and ensure that Mr. Schwark received apparently necessary medical care for his serious medical needs violated clearly established law.

Defendants deliberately failed to provide Mr. Schwark with adequate care to address his basic, obvious, and emergent medical needs; and failed to ensure that his care met basic and obvious standards of nursing care. *See Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980) (stating that in order to comply with constitutional guarantees, a state must make "available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates... [and t]his includes medical treatment for inmates' physical ills, dental care, and psychological or psychiatric care."). Further, Captain Muldoon's failure to provide Mr. Schwark with *access to* further medical treatment, including physician assistance and emergent medical care, after witnessing his obvious medical needs, implicates a clearly established right to receive adequate "gatekeeping" treatment in order to obtain basic medical care. *See Sealock*, 218 F.3d at 1211 (holding prison officials are deliberately indifferent when they fail to perform "gatekeeping" roles, thereby preventing serious medical needs from being met). Defendants violated clearly established law in their treatment of Mr. Schwark

### 5.4 Park County, through Sheriff Wegener in his official capacity, is municipally liable for the violation of Plaintiff's Eighth Amendment Rights.

Municipalities are considered "persons" subject to suit under 42 U.S.C. § 1983 for civil rights violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality or other local government unit is liable for constitutional torts if the alleged unconstitutional acts implicate a policy, ordinance, or custom of the local government. *Id.* at 690-94; *Garcia*, 768 F.2d at 308 n.4. An institutional defendant is responsible under § 1983 when the execution of a policy or custom actually caused an injury of constitutional dimensions. *Monell*, 436 U.S. at 694; *D.T. v. Indep. Sch. Dist.*, 894 F.2d 1176, 1187 (10th Cir. 1990). To ultimately prevail on his claim against Defendant Park County, Plaintiff must establish "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). A policy or custom can be established in many ways, including demonstrating the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted).

Here, the actions of Defendant Muldoon and Defendant Swann, who were employed by Park County, <u>singlehandedly</u> states a claim against Park County because these individuals had an extended opportunity to do better but consistently responded in a constitutionally deficient manner to Plaintiff's serious and obvious medical needs. Particularly, Defendant Muldoon's repeated pattern of unconstitutional conduct, through his refusal to allow Mr. Schwark to be transferred out of the Park County Jail to receive medical treatment despite the knowledge that Mr. Schwark needed psychiatric hospitalization, shows that Park County's customs and practices are illegal as well. *See, e.g.*, *Rykard v. City of Dothan*, 2011 U.S. Dist. LEXIS 101135, *9-10 (M.D. Ala. Aug. 9, 2011); *Jacoby v. DuPage County Ill.*, 2013 U.S. Dist. LEXIS 89934, *8-10 (N.D. Ill. June 26, 2013), *Smith v. Corrections Corp. of America, Inc.,* 674 F.Supp.2d 201, 206-07 (D.D.C. 2009).

> 5.4(a) <u>Mr. Schwark's injuries were caused by the decisions of Captain Muldoon, a final policymaker.</u>

"[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). For example, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.*; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("[T]he isolated decision of an executive municipal

policymaker… could… give rise to municipal liability under § 1983."); *see also Lusby v.*

*T.G. & Y. Stores, Inc.*, 796 F.2d 1307, 1312 n.5 (10th Cir.), *cert. denied*, 479 U.S. 884

(1986); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736-38 (1989); *Ware v. Unified*

*Sch. Dist. No. 492*, 902 F.2d 815, 817 (10th Cir. 1990). The Supreme Court explained,

> it [is] fair to hold municipalities liable for the isolated, unconstitutional acts
> of their legislative bodies, regardless of whether those acts were meant to
> establish generally applicable "policies," so too in *Pembaur* four of us
> concluded that it is equally appropriate to hold municipalities accountable
> for the isolated constitutional injury inflicted by an executive final
> municipal policymaker, even though the decision giving rise to the injury is
> not intended to govern future situations. In either case, as long as the
> contested decision is made in an area over which the official or legislative
> body could establish a final policy capable of governing future municipal
> conduct, it is both fair and consistent with the purposes of § 1983 to treat
> the decision as that of the municipality itself, and to hold it liable for the
> resulting constitutional deprivation.

*Praprotnik*, 485 U.S. at 140; *Monell,* 436 U.S. at 691 (noting that the policy need not be

formal or written to trigger municipal liability). The evidence establishes that such a

situation occurred in this case.

The key inquiry is whether an official has "final, unreviewable discretion to make

a decision or take an action." *Dempsey v. City of Baldwin*, *143* F. App'x 976, 986 (10th

Cir. 2005). Captain Muldoon is the final policymaker as to the day-to-day operations of

the Park County Jail and has final, unreviewable discretion to make a decision or take an

action with regards to the individual treatment of inmates. **Exhibit 2**, *Deposition of*

*Captain Daniel Muldoon*, 10:16-13:5. He has been delegated this final policymaking

authority by Sheriff Wegener. *See* [Doc. #74], p. 8, ¶ 9; **Exhibit 1**, *Deposition of Fred*

*Wegener*, 34:20-23. By operation of state law, Sheriff Wegener is a final policymaker for

the Park County Jail. *See Cortese v. Black*, 838 F. Supp. 485, 496 (D. Colo. 1993) ("In Colorado a sheriff is an elected county officer, § 30-10-501, 12A C.R.S. (1986), and is responsible for the official acts of his deputies. § 30-10-506. In the context of this case I conclude that the sheriff is properly defined as a final 'policymaker' of the county. Colorado law provides that both the sheriff and the county are suable entities. § 30-11-101(a) and § 30-10-522. I will treat Cortese'[s] suit against the Sheriff's Department as a suit against the sheriff in his official capacity."); *see also Starrett v. Wadley*, 876 F.2d 808, 819 n.14 (10th Cir. 1989). Defendant Muldoon's refusal to transfer Mr. Schwark out of the Park County Jail with the knowledge that Mr. Schwark needed immediate psychiatric hospitalization was an action undertaken in his role as an official policymaker for Park County and, therefore, Park County is municipally liable for Captain Muldoon's actions.

### 5.4(b) Park County ratified Defendants' violations of Plaintiff's Constitutional Rights.

A municipality may also be liable under § 1983 if it ratifies an employee's unconstitutional conduct. Ratification occurs where "a subordinate's position is subject to review by the municipality's authorized policymakers," and those policymakers "approve a subordinate's decision and the basis for it." *Moss v. Kemp,* 559 F.3d 1155, 1169 (10th Cir. 2009) (internal citation omitted). Ratification differs fundamentally from other areas of municipal liability in that "a single decision by a municipal policymaker may be sufficient to trigger § 1983 liability under *Monell,* even though the decision is not intended to govern future situations." *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir.

1992). So long as a final delegated decision maker made a "conscious, affirmative choice" to follow a particular course of action, liability can attach. *Id.*

Here, Park County, never disciplined or reprimanded any of the Defendants for any aspect of their treatment, or lack thereof, of Plaintiff. *See* **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 49:9-15. Had the Defendants been reprimanded for their treatment of Mr. Schwark upon his first incarceration at the Park County Jail, wherein he was placed on a table after a seizure with no restraints or other device to prevent him from falling off the table in blatant disregard of basic nursing standards and the risk of injury to Mr. Schwark, it is possible that Defendants would have provided a constitutionally adequate level of care upon Mr. Schwark's return to the Jail. Instead, Mr. Schwark's obvious and serious medical needs were again ignored, causing another violation of his constitutional rights and him to suffer immensely. Park County's ratification of its officials' unconstitutional conduct caused the violation of Mr. Schwark's constitutional rights.

> 5.4(c) Park County's failure to adequately train and supervise its officials caused the violation of Mr. Schwark's constitutional rights.

*Monell* liability may attach where a superior officer, governing body, or municipality has failed to train subordinates to avoid encroaching on the constitutional rights of others such that the failure to train amounts to "deliberate indifference." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To establish deliberate indifference in a failure-to-train case against a municipality, a plaintiff must show: (1) the municipality's training program is inadequate; and (2) the municipality deliberately or recklessly made

the choice to ignore its deficiencies. *Zuchel v. City & County of Denver*, 997 F.2d 730, 740 n.5 (10th Cir. 1993) (citing *City of Canton*, 489 U.S. at 389-90). To impose liability upon the City under this theory, the City's policies and customs need not be unconstitutional. *City of Canton*, 489 U.S. at 387. "A municipality can be liable where 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 773 (10th Cir. 2013) (quoting *City of Canton*, 489 U.S. at 390).

The training that Park County provided to its nursing staff was woefully deficient and caused the violation of Mr. Schwark's constitutional rights. The only medical training that the Park County Jail provides to its nurses is "to say no." In other words, the only medical training that the Park County Jail provides to its nurses is that they should not treat inmate complaints as credible because inmates spend all day coming up with imagined ailments. There is no other medical training provided to nurses at the Park County Jail. **Exhibit 2**, *Deposition of Captain Daniel Muldoon*, 50:20-51:2. The Captain of the Jail stated that they provide this training because "most nurses are caregivers" and they need to be trained to disregard their training as a caregiver in the Jail setting and instead "be trained to say no." *Id.* By actively training their nursing staff to provide a lower standard of care and to ignore inmate complaints about serious medical needs, the Park County Jail is deliberately indifferent.

44

The unconstitutionality of Park County's training, which actively tells its nursing staff to provide substandard care and to disregard inmate complaints of serious medical needs, was "so likely to result in the violation of constitutional rights, that the policymakers of [Park County] can reasonably be said to have been deliberately indifferent to the need" for remedial change. *See City of Canton*, 489 U.S. at 390.

> 5.4(d) <u>Park County's illegal customs and practices caused Plaintiff's injuries.</u>

Finally, the evidence demonstrates a direct causal link between Park County's policies with respect to prohibition of certain medications at the jail, refusal to comply with Court orders in relation to the provision of Court-ordered medications to inmates, and failure to adequately monitor, train, supervise, and discipline their jail employees, including Defendant Muldoon, regarding the mandates imposed by the United States Constitution – including the provision of appropriate care to inmates confronting emergency medical situations– and the individual Defendants' violations of Plaintiff's federally-protected rights.

Specifically, the evidence demonstrates that Park County has a policy that every person who enters the Jail with a prescription for benzodiazepines is weaned off of that prescription, with the only exception being individuals suffering from seizure disorder. **Exhibit 8**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 30:21-31:11. The Seventh Circuit found that the existence of a similar policy provided evidence that defeated a motion for summary judgment. In *King v. Kramer*, the plaintiff prescribed alprazolam, but that medication was not permitted in the La Crosse County Jail by

policy. 680 F.3d 1013, 1015 (7th Cir. 2012). So, although he was given a tapered dose over two days, he was ultimately denied that medication and instead the jail's medical vendor put him on a beta blocker, which was permitted by policy but ultimately not successful in treating the plaintiff's underlying condition. *Id.* at 1015-16. Thereafter the plaintiff died, with the benzodiazepine withdrawal being a likely contributing factor. *Id.* at 1017. Based on this set of facts, the Court reversed the district court's grant of summary judgment on the plaintiff's *Monell* claim against the county. The Court stated that it had "previously said that a municipality would violate the Eighth Amendment under *Monell* if it had a policy requiring jail staff to throw away all prescription medications without implementing an appropriate mechanism for providing alternative treatment. " *Id.* at 1021 (citation omitted). Here, Park County did just that: it denied Mr. Schwark his validly prescribed medication based solely on its policy of denying certain prescribed medications to newly admitted inmates and, thereby, led to painful withdrawal symptoms. Indeed, even more problematically than in *King*, Park County did not provide an alternate treatment for Mr. Schwark's anxiety. As in *King*, a reasonable jury could conclude that Mr. Schwark suffered a painful and unnecessary withdrawal based on a blanket policy, rather than independent medical judgment, and therefore Park County was deliberately indifferent to his serious medical needs by way of its express policy.

Further, the Defendants Swann and Muldoon testified that they acted precisely as Park County trained them to act, and conducted themselves in accordance with and pursuant to the customs and practices of Park County at all relevant times. **Exhibit 2**,

*Deposition of Captain Daniel Muldoon*, 48:15-49:8. Such binding admissions create a jury question as to Park County's liability. *See Moore*, 2014 U.S. Dist. LEXIS 72452, at *27 ("[I]f Defendant Police Officers testify that they acted in accordance with their training and it is found that they committed constitutional violations, the reasonable inference is that, had the City implemented a different training policy on the use of force, Mr. Moore would not have been subjected to the amount force used in this case."); *Ortega v. City & Cnty. of Denver,* 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) (Martinez, J.) (reaching the same result). As such, Park County is municipally liable for the violation of Plaintiff's constitutional rights and his injuries, pain and suffering.

### 5.5 **Plaintiff voluntarily dismisses Defendants Canterbury and Wegener, in his official capacity.**

Plaintiff has conferred with Defendants and agreed to dismiss with prejudice Defendants Canterbury and Wegener, in his individual capacity, with each side to bear their own fees and costs.

### 6. <u>Conclusion</u>

Plaintiff respectfully requests that the Court deny the Park County Defendants' Motion for Summary Judgment as to Nurse Swann, Captain Muldoon, and Park County, through Sheriff Wegener in his official capacity, and dismiss with prejudice Defendant Canterbury and Defendant Wegener in his individual capacity.

DATED this 19th day of October, 2017.

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*_____

47

David A. Lane
Andy McNulty
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com
amcnulty@kln-law.com

ATTORNEYS FOR PLAINTIFF

<u>CERTIFICATE OF SERVICE</u>

I certify that on this 19th day of October, 2017, I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO PARK COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Steve Michalek
Gina Glockner
Childs McCune
821 17th Street, Suite 500
Denver, CO 80202
smichalek@childsmccune.com
gglockner@childsmccune.com
*Attorneys for Dr. Katherine Fitting*

Eric Ziporin
Susan McNulty
Senter Goldfarb & Rice
3900 E. Mexico Ave., Suite 700
Denver, CO 80210
eziporin@sgrllc.com
smcnulty@sgrllc.com
*Attorneys for Sheriff Fred Wegener,*
*Susan Canterbury and Jeri Swan*


s/ *Charlotte Bocquin Scull*
Paralegal