EXHIBIT 3

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 15-CV-2507-JLK
 3      _____

 4      KYLE JEFFERY SCHWARK,

 5           Plaintiff,

 6      vs.

 7      SHERIFF FRED WEGENER, in his official and individual
        capacities; NURSE SUSAN CANTERBURY, in her individual
 8      capacity; NURSE JERI SWANN, in her individual capacity;
        NURSE CATHLENE PEARCE, in her individual capacity;
 9      DOCTOR KATHERINE FITTING, in her individual capacity,

10           Defendants.
        _____
11
                 DEPOSITION OF CATHLENE PEARCE, R.N.
12
                          March 9, 2017
13      _____

14

15

16

17

18

19

20

21

22

23

24

25
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 2

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:
               DAVID D. LANE, ESQ.
 3             DUNIA DICKEY, ESQ.
               Killmer, Lane & Newman, LLP
 4             1543 Champa Street, Suite 400
               Denver, Colorado  80202
 5             Phone:  303-571-1000
               Email:  dlane@kln-law.com
 6             Email:  ddickey@kln-law.com

 7    ON BEHALF OF DEFENDANTS SHERIFF FRED WEGENER,
      NURSE SUSAN CANTERBURY, NURSE JERI SWANN, AND
 8    NURSE CATHLENE PEARCE:
               ERIC M. ZIPORIN, ESQ.
 9             Senter Goldfarb & Rice, LLC
               3900 East Mexico Avenue, Suite 700
10             Denver, Colorado  80210
               Phone:  303-320-0509
11             Email:  eziporin@sgrllc.com

12    ON BEHALF OF DEFENDANT KATHERINE FITTING, M.D.:
               STEVEN A. MICHALEK, ESQ.
13             Childs McCune, LLC
               821 17th Street, Suite 500
14             Denver, Colorado  80202
               Phone:  303-296-7300
15             Email:  smichalek@childsmccune.com

16    ALSO PRESENT:
               Kyle Jeffery Schwark
17             Jeri Swann

18

19

20

21

22

23

24

25
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 12

1    to work -- he had come in the night of the 12th.  I

2    wasn't there.  When I came in the next morning, Captain

3    Muldoon said that he's on some Court-ordered medications

4    that he needs to take, that they were over in Holding

5    waiting for us.

6          Q.    Who was over in Holding waiting for who?

7          A.    The medications were waiting in Holding

8    where they put them for us.

9          Q.    Now, had you ever heard of an inmate at

10   the Park County jail being on Court-ordered medications?

11         A.    Lots of people are required to take their

12   medications, and the Court tells them that they have to.

13         Q.    Okay.  So there is a note somewhere in a

14   file that says "Court-ordered medication"?

15         A.    No.

16         Q.    Well, then how do you know what's Court

17   ordered and what's not?

18         A.    I was told by the captain, who runs the

19   jail, that he's on Court-ordered medications.

20         Q.    Understood.  But that was in this

21   particular case.  If there are a lot of inmates that have

22   Court-ordered medications and there's no note in

23   anybody's file saying "Court-ordered medication," how do

24   you, as a nurse, know --

25         A.    I listen to my captain, who tells me what

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 20

```
 1          Q.     Okay.  I'm asking you.  Do you know
 2   whether there was a Court order on the Xanax?
 3          A.     I don't know if there was a Court order on
 4   any of them.
 5          Q.     Well, you just told me that Muldoon told
 6   you that there was a Court order on the Suboxone.
 7          A.     He gave us -- he said there was a Court
 8   order for him to take all of his medications.
 9          Q.     Okay.  Well, all of his medications
10   included Suboxone.  That was one, right?
11          A.     (The deponent nodded.)
12          Q.     Is that a "yes"?
13          A.     Yes, sir.
14          Q.     And Xanax was another one of his
15   medications, right?
16          A.     Yes, sir.
17          Q.     And Muldoon told you there was a Court
18   order that he take all of his medications, right?
19          A.     Yes.
20          Q.     That would include Xanax and Suboxone,
21   right?
22          A.     Yes.
23          Q.     All right.  Here, we have, Dr. Fitting --
24   you wrote in your report, Dr. Fitting, she took him off
25   his Xanax.
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 21

```
 1                        You see that, right?
 2           A.    She tapered him off of his Xanax.
 3           Q.    I'm just asking you.  Did you write the
 4    words:  Dr. Fitting, she --
 5           A.    Yes.
 6           Q.    -- took him off his Xanax?  You wrote
 7    that?
 8           A.    (The deponent nodded.)
 9           Q.    Is that a "yes"?
10           A.    Yes, sir.
11           Q.    You didn't write, Dr. Fitting tapered him
12    off his Xanax, did you?
13           A.    No.
14           Q.    How do you know Dr. Fitting took him off
15    his Xanax or tapered him off his Xanax?
16                 MR. MICHALEK:  Object to form and
17    foundation.
18           A.    Because I work there, and we have a
19    medication sheet with everything that he's supposed to
20    take.
21           Q.    (By Mr. Lane)  Well, how do you know -- in
22    this report, you wrote, When last we figured out where
23    Kyle was, he was up on a table, coming out of the
24    seizure, and then the next thing I know is Dr. Fitting --
25           A.    No.  He's actually in a wheelchair, coming
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 22

```
 1    out of his seizure.  And then when he could talk and walk

 2    and his vital signs were stable, we moved him to the

 3    table.

 4         Q.     I'm trying to figure out --

 5         A.     I understand not all of that is written

 6    here.  But I know what I did.

 7         Q.     Okay.  I'm just trying to figure out --

 8    how do you know Dr. Fitting took him off his Xanax and

 9    put him on the alcohol-withdrawal protocol?

10         A.     Because that's what Jeri told me.

11         Q.     Okay.  And when did that all go down?  Is

12    that while Kyle is sitting on the table?

13         A.     Yes -- no.  He was in the wheelchair

14    still.

15         Q.     Okay.  You gave him 25 milligrams of

16    Librium; is that right?

17         A.     Yes.  That's our jail's alcohol-withdrawal

18    protocol --

19         Q.     Okay.  And then --

20         A.     -- policy and procedure.

21         Q.     -- he vomited, right?

22         A.     Shortly after.

23         Q.     And then at about 5:00, 5:10, he said he

24    was really tired, right?

25         A.     Uh-huh.
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 23

 1            Q.     You told him to lie back and try to sleep,

 2    right?

 3            A.     Uh-huh.

 4            Q.     Is that a "yes"?

 5            A.     Yes, sir.

 6            Q.     All of your answers have to be either

 7    "yes" or "no."  You can't go "uh-huh" or "uh-uh."

 8            A.     I don't mean to.

 9            Q.     You can't shake your head or --

10            A.     It's a habit.  I apologize.

11            Q.     That's okay.

12                   You told him to lie back and try to sleep,

13    right?

14            A.     Yes, sir.

15            Q.     And he started to get comfortable, and you

16    went back to work; is that right?

17            A.     Uh-huh.

18            Q.     Is that a "yes"?

19            A.     Yes, sir.

20            Q.     And did he lie back and look like he was

21    getting ready to go to sleep?

22            A.     He did lie back shortly.  Then he sat up

23    and said he was nauseous again.  He stood up, spit in the

24    trash a few times, and was leaning up against the table.

25            Q.     Okay.  That's nowhere in any of your

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 24

 1   reports, is it?

 2          A.     I understand that.

 3          Q.     You wrote that you told him to lie back

 4   and try to sleep, he started to get comfortable, and you

 5   went back to work, right?

 6          A.     Yes, sir.

 7          Q.     Now, you're claiming that he vomited

 8   again, aren't you --

 9                 MR. MICHALEK:  Object to form.

10          Q.     (By Mr. Lane)  -- or not, in what you just

11   told me?

12          A.     We gave him the Librium, he sat there, he

13   vomited, and then he felt better.  He was talking to us,

14   communicating.  Everything was fine.

15          Q.     Well, when you say that he started to get

16   comfortable, what does that mean?

17          A.     He started to lie back.  He lied back for

18   a few minutes, sat up, said he was nauseous.  Most people

19   sit up when they're going to throw up.

20          Q.     Well, he fell off the table at some point,

21   didn't he?

22          A.     Well, he had his foot on the table,

23   leaning against the table, and he fell over.

24          Q.     That's not what you wrote, though, is it?

25   You wrote, He fell off the table, right?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 25

1              MR. ZIPORIN:  Object to form.

2              You can answer.

3        A.    Yes.

4        Q.    (By Mr. Lane)  That's different than he

5    was leaning against the table and fell, right?

6              MR. ZIPORIN:  Object to form.

7        A.    Yes.  Meanwhile, all of this -- there's a

8    deputy standing next to him through the entire thing.

9        Q.    (By Mr. Lane)  That would be who?

10       A.    Whoever J14 is.

11       Q.    I don't who J14 is.  Who is J14?

12       A.    Nor do I.

13       Q.    Well, you were there.

14       A.    That's what the paperwork says.

15       Q.    How many deputies are there in the jail?

16       A.    Five, ten.  Who knows?  Then there's

17   everybody on the sheriff's side.

18       Q.    Well, if you're a deputy in the jail,

19   you're a sheriff's employee, right?

20       A.    I'm a nurse, not a deputy.

21       Q.    I didn't ask you if you were a nurse or a

22   deputy.  I'm saying -- you said "on the sheriff's side."

23   Every deputy in the county is on the sheriff's side,

24   right?

25       A.    Well, there's deputies that work on the

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 26

1   jail's side and deputies that work on the sheriff's side.

2        Q.      All right.  So there was a deputy standing

3   right next to Kyle Schwark when all of this happened?

4        A.      There was a deputy there the entire time.

5   They can't be in Medical without somebody watching them.

6        Q.      Well, you don't say that anywhere in your

7   report, do you?

8        A.      This wasn't a report for court.  This was

9   a report that he fell, he hurt his head, and what I did

10  about it.

11       Q.      Ma'am, my question is this:  Did you say

12  that in your report or did you not?

13       A.      No.

14       Q.      Okay.  But in the meantime, you grabbed

15  Deputy Fenner from a holding cell next door -- or from

16  Holding next door, right?

17       A.      Correct.

18       Q.      Why would you need Deputy Fenner next door

19  if there's a deputy standing right next to Kyle when all

20  of this happened?

21       A.      There's -- I'm not going to feel safe with

22  a patient on the floor and me and Jeri and another female

23  deputy in the room.  I'm going to call someone else to

24  come over and help us.

25       Q.      Why did you not feel safe?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 27

```
 1          A.      I have an inmate on the floor, bleeding
 2  and flipping out, spitting, kicking, hitting.  I'm
 3  supposed to just stand there?
 4          Q.      I'm not asking -- you can ask me questions
 5  when you're deposing me.  Until then, I'm going to ask
 6  you questions.
 7                  Deputy Fenner was standing right -- you
 8  went and got Deputy Fenner, right?
 9          A.      Yes.
10          Q.      And you --
11          A.      He used to be an EMT, and he's a huge man
12  versus me and Jeri.
13          Q.      Well, there was another deputy, according
14  to you, standing right there.
15          A.      Right.
16          Q.      So it wasn't just you and Jeri.
17          A.      And I'm pretty sure that it was Deputy
18  Harding, who is Jeri's size.
19          Q.      Okay.
20          A.      So I went to get a male, Fenner, who has
21  medical experience and way more time in the jail.
22  Harding was brand new.  So was I.
23          Q.      He received 2 milligrams of Versed IM.
24          A.      Yes.
25          Q.      Intramuscular?
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 33

```
 1   offered a job and you took it.

 2        A.    Okay.  Well, excuse me.  I was offered the

 3   job, I turned in my resignation, and several weeks later,

 4   I started over at the nursing home.

 5        Q.    Okay.  So you were offered the job while

 6   you were still at the jail?

 7        A.    Yes.

 8        Q.    Okay.  Would you agree that putting

 9   someone on a table if they have a seizure problem without

10   strapping them in or putting up guardrails or doing

11   something to protect them is not good medical care?

12              MR. MICHALEK:  Object to form.

13              You can answer.

14              MR. MICHALEK:  Join.

15        A.    I would agree.

16        Q.    (By Mr. Lane)  Did you ever have any

17   interactions with Dr. Singer?

18        A.    No.

19        Q.    Did you ever at any time have anything to

20   say about what medications Kyle Schwark was going to be

21   given?

22        A.    Never.

23        Q.    Look at Exhibit 2.

24        A.    Okay.

25        Q.    Did you fill out Exhibit 2?  Was this a
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 37

1          Q.      And what do you base that on?

2          A.      My experience as a nurse.  I have not seen

3     anybody -- there's no evidence-based practice that

4     anybody has had a seizure from withdrawing from opioids

5     or barbiturates.

6          Q.      So you don't know of anybody who's ever

7     had a seizure from opioid withdrawal?

8          A.      No.

9          Q.      Okay.  I'm looking at Bates stamp page 11.

10    Whose signature is in the lower right-hand corner?

11         A.      I have no idea.

12         Q.      Okay.  Was the deputy that was brought in

13    from Intake, was that Fenner?

14         A.      Uh-huh.

15         Q.      And was it Deputy Flores that was standing

16    there?

17         A.      I thought it was Deputy Harding.

18         Q.      Do you have any knowledge as to why Kyle

19    Schwark was released from jail on furlough?

20         A.      No.

21         Q.      What is your training about -- you've

22    indicated it would be substandard to put somebody who's

23    had a seizure up on a table that they could fall off of

24    without guardrails, right?

25                 MR. ZIPORIN:  Object to form.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 38

1              MR. MICHALEK:   Object to form.

2         A.    Yes.

3         Q.    (By Mr. Lane)   What is your training about

4    what would be the proper thing to do?

5         A.    Well, that's why we left him in a

6    wheelchair for several hours until we felt like he was

7    oriented times three, alert, could talk to us, he was

8    eating, and he asked if he could get out of the

9    wheelchair.   At that point, I wasn't worried that he was

10   going to have another seizure.

11        Q.    Is that based on your training?

12        A.    Yes.

13        Q.    Okay.  Why did you think he was not going

14   to have another seizure?

15        A.    Vital signs are stable.  He's totally

16   coherent.  He knew who he was, where he was, and why he

17   was in jail.

18        Q.    Okay.  How many times had you interacted

19   with Kyle Schwark, total, at the jail?

20        A.    Just on the 14th.

21        Q.    Okay.

22        A.    Once when I went to F Pod, and then in

23   Medical all day.

24        Q.    In writing your report, were you taught in

25   nursing school about the importance of reports?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 42

1      Q.      Is that a "yes"?

2      A.      Actually, I think it was the other way

3    around for us.  I think this was the first page.

4      Q.      Okay.  And you said that the Court -- as

5    far as you knew, he was Court ordered to take all of his

6    meds, right?

7      A.      Yes.

8      Q.      And so that would include Elidel, right?

9      A.      Uh-huh.

10     Q.      Is that a "yes"?

11     A.      Yes, sir.

12     Q.      Inositol?

13     A.      Yes, sir.

14     Q.      Desonide?

15     A.      Yes, sir.

16     Q.      Alprazolam, right?

17     A.      Yes.  Alprazolam.

18     Q.      Alprazolam, is that the Xanax?

19     A.      That's Xanax.

20     Q.      Okay.  And on the Xanax, there are two

21   little notes -- or two little checks, one for the 13th

22   and one for the 14th.

23     A.      Yes.  So that would be the afternoon of

24   the -- let's see.  Yeah.  On the afternoon of the 13th,

25   the Xanax was given by Susan Canterbury.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 47

1          Q.      The bottles -- so it says, 1 tablet, on

2     the Xanax, which is also called alprazolam.

3          A.      Right.  It doesn't -- it's not complete.

4          Q.      Right.  One --

5          A.      It doesn't show me how many times a day.

6          Q.      Exactly.  That's what I was going to get

7     at.

8                  Okay.  Did you ever see Exhibit 20?

9          A.      I don't remember ever seeing this.

10         Q.      Okay.  That would indicate -- and this was

11    dated November 11th, 2013.  We're talking about Exhibit

12    Number 20, which is Bates Stamp 87 -- Schwark 87.  It's a

13    note from Dr. Singer to "To Whom It May Concern," and it

14    looks like he needs 1 milligram four times a day of

15    alprazolam, right?

16         A.      Uh-huh.

17         Q.      Is that right?

18         A.      Yes, sir.

19         Q.      Now, in looking at the med chart that we

20    were just looking at before, which is Exhibit 20, for the

21    alprazolam, it looks like 2 milligrams in the morning.

22    And what does this all mean?  3 milligrams what?

23         A.      Q-day.  By us tapering, we went from 4 to

24    3.  He can have up to 3 milligrams a day, preferably two

25    in the morning and one at night.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 51

1   wouldn't you?

2                MR. MICHALEK:  Object to form and

3   foundation.

4        A.    Yes.

5        Q.    (By Mr. Lane)  Okay.  And you would also

6   agree with me that nobody at the jail ever taught you of

7   the significance of Court-ordered meds versus

8   doctor-ordered meds or the difference between the two or

9   anything like that?  Would you agree that you've never

10  been trained in that area?

11       A.    No.  Never.

12       Q.    Okay.  So you would agree with me that you

13  have never been trained in that?

14       A.    Yes, sir.

15                MR. LANE:  Okay.  I don't have any further

16  questions.

17                MR. MICHALEK:  No questions.

18                MR. ZIPORIN:  I don't have any questions.

19  I will handle review and signature.

20                THE REPORTER:  Same order you've gotten in

21  the past?

22                MR. ZIPORIN:  Yes.

23                THE REPORTER:  Mr. Lane, same order you've

24  received previously?

25                MR. LANE:  Yes.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 52

 1              THE REPORTER:  Mr. Michalek, same order

 2   you've gotten in the past?

 3              MR. MICHALEK:  Yes.

 4              THE REPORTER:  Thank you.

 5              *  *  *  *  *  *  *  *  *  *  *

 6              (WHEREUPON, the foregoing deposition was

 7   concluded at the hour of 2:10 p.m.  Total time on the

 8   record was 58 minutes.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

**Page 53**

1        I, CATHLENE PEARCE, R.N., the deponent in

2    the above deposition, do acknowledge that I have read the

3    foregoing transcript of my testimony, and state under

4    oath that it, together with any attached Statement of

5    Change pages, constitutes my sworn statement.

6

7

_____    I have made changes to my deposition

8

_____    I have NOT made any changes to my deposition

9

10

11    _____

CATHLENE PEARCE, R.N.

12

13

14

15    Subscribed and sworn to before me this  _____ day

16    of  _____.

17

18        My commission expires: _____

19

20    _____

Notary Public

21

22

23

24

25

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Cathlene Pearce, R.N.
March 09, 2017

Page 54

 1                    REPORTER'S CERTIFICATE

 2              I, Wendy Evangelista, a Registered

 3    Professional Reporter and Notary Public within and for

 4    the State of Colorado, commissioned to administer oaths,

 5    do hereby certify that previous to the commencement of

 6    the examination, the witness was duly sworn by me to

 7    testify to the truth in relation to matters in

 8    controversy between the said parties; that the said

 9    deposition was taken in stenotype by me at the time and

10    place aforesaid and was thereafter reduced to typewritten

11    form by me; and that the foregoing is a true and correct

12    transcript of my stenotype notes thereof; that I am not

13    an attorney nor counsel nor in any way connected with any

14    attorney or counsel for any of the parties to said action

15    nor otherwise interested in the outcome of this action.

16              My commission expires:  August 30, 2020.

17

18

19    _____

20    Wendy Evangelista
      Registered Professional Reporter
      Notary Public, State of Colorado

21

22

23

24

25