EXHIBIT 5

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
       Civil Action No:  15-2507-JLK
3     _____

4     KYLE JEFFERY SCHWARK,

5          Plaintiff,

6
       vs.
7
       SHERIFF FRED WEGENER, in his official and individual
8     capacities; NURSE SUSAN CANTERBURY, in her individual
       capacity; NURSE JERI SWANN, in her individual
9     capacity; NURSE CATHLENE PEARCE, in her individual
       capacity; DOCTOR KATHERINE FITTING, in her individual
10    capacity,

11         Defendants.

12    _____

             DEPOSITION OF SUSAN CANTERBURY
13
                 February 7, 2017
14    _____

15

16

17

18

19

20

21

22

23

24

25

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 2

```
 1    APPEARANCES:

 2
      ON BEHALF OF THE PLAINTIFF:
 3            DAVID A. LANE, ESQ.
              ANDREW MCNULTY, ESQ.
 4            Killmer, Lane & Newman, LLP
              1543 Champa Street, Suite 400
 5            Denver, Colorado  80202
              Phone:  303-571-1000
 6            Email:  dlane@kln-law.com
              Email:  amcnulty@kln-law.com
 7
      ON BEHALF OF DEFENDANTS SHERIFF FRED WEGENER,
 8    NURSE SUSAN CANTERBURY, NURSE JERI SWANN, AND
      NURSE CATHLENE PEARCE:
 9            ERIC M. ZIPORIN, ESQ.
              Senter Goldfarb & Rice, LLC
10            3900 East Mexico Avenue, Suite 700
              Denver, Colorado  80210
11            Phone:  303-320-0509
              Email:  eziporin@sgrllc.com
12
      ON BEHALF OF DEFENDANT KATHERINE FITTING, M.D.:
13            STEVEN A. MICHALEK, ESQ.
              Childs McCune, LLC
14            821 17th Street, Suite 500
              Denver, Colorado  80202
15            Phone:  303-296-7300
              Email:  smichalek@childsmccune.com
16
      ALSO PRESENT:  Kyle Jeffery Schwark
17                   Jeri Swann
                     Cathlene Pearce
18

19

20

21

22

23

24

25
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 12

1    to start researching these things.  Before you got

2    online, though, you saw that these were

3    prescriptions, right?

4            A.   Yes.

5            Q.   Okay.  So some doctor had ordered

6    benzodiazepines and Suboxone for Mr. Schwark, right?

7            A.   Right.

8            Q.   What does the jail do to substitute for

9    benzodiazepine?

10           A.   I called Dr. Fitting, and typically if

11   somebody is really regularly taking a benzo, you

12   can't just take them off of it.

13           Q.   Who told you that, or did you just know

14   that?

15           A.   I just know that.

16           Q.   Okay.  Why can't you?

17           A.   Because that can cause some reactions.

18           Q.   The reactions can include seizures?

19                MR. ZIPORIN:  Object to form.

20           A.   I don't know.

21                MR. ZIPORIN:  Foundation.

22                MR. MICHALEK:  Objection, foundation.

23           A.   I don't know.

24           Q.   (By Mr. Lane)  What are the reactions

25   that sudden withdrawal from benzos can cause?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 15

1          A.   That day.

2          Q.   Okay.  So what did he say?

3          A.   I took him one of his own Xanax at that

4    time.  And he was very -- very adamant that he needed

5    his Suboxone and his Xanax.

6          Q.   Okay.  Now, the Xanax is the benzo,

7    right?

8          A.   Yeah.

9          Q.   Okay.  And did you ask him, hey, Kyle,

10   how many of these benzos do you take in a day?

11         A.   I -- possibly.

12         Q.   Do you remember what his answer was?

13         A.   No.

14         Q.   Okay.

15         A.   He -- well, all I know is that he was

16   very adamant that he needed to continue taking his

17   benzo.

18         Q.   Okay.  And what did you tell him?

19         A.   I told him, okay.  I gave him even a

20   Suboxone.  The label on the box said one-half to

21   one -- they are little films in a foil packet.  Well,

22   the instructions on the internet and on -- in any of

23   my research said that you don't cut open a package

24   and take -- you know, you can't store a half a slip.

25         Q.   So it's all or nothing?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 20

1          Q.    And Dr. Fitting said wean him from his

2    Xanax?

3          A.    Correct.

4          Q.    By giving him Librium.

5                And let me ask you about that.  If

6    Librium is also a benzodiazepine, and Xanax is a

7    benzodiazepine, why is Librium a better drug to give

8    him than --

9          A.    I don't know.  You would have to ask

10   Dr. Fitting that question.

11         Q.    Okay.  So you were just following

12   orders?

13         A.    Yes, sir.

14         Q.    Okay.  And what about the Suboxone?

15         A.    Dr. Fitting is not certified to monitor

16   Suboxone.

17         Q.    What kind of a drug is Suboxone?

18         A.    I really -- it's a -- I don't know.

19         Q.    How do you know Dr. --

20         A.    It's some kind of --

21         Q.    Go ahead.

22         A.    It's just supposed to, by some method,

23   reduce cravings for narcotics.

24                MR. ZIPORIN:  David, can I interrupt?

25                MR. LANE:  Sure.

Kyle Jeffery Schwark vs.  
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury  
February 07, 2017

Page 21

```
 1            MR. ZIPORIN:  To possibly clean up the
 2    record.
 3            MR. LANE:  Yeah.
 4            MR. ZIPORIN:  You're asking general
 5    questions about what is the protocol in terms of
 6    weaning off the Xanax with the Librium, but she never
 7    testified that's what occurred with Mr. Schwark --
 8            MR. LANE:  Right.
 9            MR. ZIPORIN:  -- in the November stay.
10            MR. LANE:  Right.  I'm just asking her
11    what her understanding of the overall picture -- the
12    game plan was at this point, and then we are going to
13    get into what actually happened.
14            A.   We didn't really get into the taper.
15    We didn't change the Xanax.  I mean, I took him his
16    own Xanax, and I packed one for in the morning.
17            And then that's when Jeri and Cathlene
18    were there the next day and, you know, we never had
19    time in that visit to -- in that particular -- I
20    mean, we never got very far.
21            Q.   (By Mr. Lane)  Okay.  Well, we'll talk
22    about that in a minute.  I'm just trying to
23    understand what was the -- what the game plan was.
24    And the game plan was get him off the Xanax, put him
25    on Librium, wean him off of Librium, right?
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 25

```
 1              Q.    (By Mr. Lane)  No, I think you and I
 2    are on the same -- I don't know what it takes.  I'm
 3    not --
 4                    THE DEPONENT:  Am I doing okay?
 5                    MR. ZIPORIN:  You're doing great.
 6              Q.    (By Mr. Lane)  So anyway, so you gave
 7    him half a strip of Suboxone, and you gave him some
 8    Xanax, but you don't remember how much.
 9              A.    One milligram.
10              Q.    One milligram.  Is that one pill?
11              A.    One pill.
12              Q.    Okay.  Did he say he needed more?
13              A.    The instructions on the bottle were one
14    pill, two to four times a day.  I can't remember.
15    It's on the picture.  But one pill is a dose.
16              Q.    Makes it --
17              A.    Is the dose.
18              Q.    Okay.  Anyway.  So do you recall
19    approximately how long your conversation with Kyle
20    lasted?
21              A.    Maybe five minutes.
22              Q.    Okay.  And you said he seemed agitated?
23              A.    No.
24              Q.    Oh, you said he was very adamant?
25              A.    Adamant.
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 33

 1   had been when she first saw him.

 2              And so he was on the ground -- on the

 3   floor in the common room.  And he was -- appeared to

 4   be having a seizure.  So Captain Muldoon, and I don't

 5   know, some other deputies -- of course they all go

 6   rushing in when something like that is going on.  And

 7   she had grabbed a wheelchair, which it's outside of

 8   our office.  And they waited until he was done

 9   seizing.  She protected his head.

10              And then they -- when he was done

11   seizing, they put him in the wheelchair and wheeled

12   him into medical.

**13          Q.   Okay.**

14          A.   And I guess he was in medical for

15   several hours.  The first hour he was in the

16   wheelchair.  And then he was -- it was lunchtime.  He

17   was hungry.  They got him food.  We keep snacks in

18   the drawer.  So they started out with that.  Then

19   they got his lunch.  And I'm just taking a second

20   here.

**21          Q.   Sure.  Yeah.**

22          A.   So he was chatting.  He eventually was

23   up walking around, and then Jeri was at the desk

24   doing work, which would have put her back to him

25   pretty much, or he would be to the side.  And then he

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 36

1   heard -- when I read -- and talked to Jeri -- because

2   I work with her more days, you know.  And I was

3   really alarmed when I read Cathlene's saying he

4   was -- it's kind of vague.  It really says -- it says

5   she asked -- you know, he said he was tired.  She

6   said, well, lay down and rest, but there is nothing

7   that said that he actually laid down.

8           Q.   (By Mr. Lane)  Okay.  What were you

9   alarmed about?

10          A.   The difference between her story and

11  Jeri's, and I work with Jeri.  I have absolute --

12          Q.   So you would be agreeing with me then,

13  if I said to you it would be dangerous to put a guy

14  who's recently had a seizure up on a table without

15  some sort of mechanism in place if he has another

16  seizure to prevent him from falling off?

17          A.   Correct.

18               MR. ZIPORIN:  Object to form.

19          A.   Correct.

20          Q.   (By Mr. Lane)  That would not be good

21  medical procedure, would it?

22          A.   That would not be good medical

23  procedure.

24          Q.   In fact, are you trained not to do that

25  in nursing school, right?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 37

```
 1          A.   Right.
 2          Q.   Because somebody could fall off the
 3    table and crack their head?
 4          A.   Yes.
 5          Q.   Okay.
 6          A.   And Jeri was absolutely -- you know,
 7    she said, I don't know why she wrote this, but she
 8    showed me he was perched on the edge of the table.
 9          Q.   Okay.
10          A.   Or -- yeah.
11          Q.   All right.  So anyway, so he falls and
12    cracks his head, right?
13          A.   He hit his head.
14          Q.   Okay.  What happened?  Take me from
15    that point on.  What is the story, the continuation?
16          A.   The story is that Cathlene ran around
17    the corner to the booking room and got a deputy, and
18    Jeri was trying to hold him, but he was a very --
19    thrashing, hitting, spitting, just --
20          Q.   Seemed to be having another seizure?
21          A.   Well, I have never seen that kind of
22    activity with a seizure personally.  Very --
23          Q.   But do you --
24          A.   -- very violent is what I heard, and
25    that is also in the EMS report.  They called the
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 38

 1  ambulance.  The ambulance is close, so it wasn't very

 2  long for -- they are only a block away.

 3          Q.    Well, you don't deny that he was having

 4  a seizure, do you?

 5          A.    I don't know what he was doing.

 6          Q.    Well, you don't think he just threw

 7  himself on the floor and cracked his head, bleeding,

 8  right?

 9          A.    Yes.  Apparently bleeding, but if you

10  hang out around a jail very much, the people do -- I

11  have seen more pseudoseizures and faking --

12  deliberately faked seizures than I have seen real

13  ones.

14          Q.    Well, have you ever seen somebody split

15  their head open and break bones in their body faking

16  a seizure?

17          A.    All I can say is the word seizure is

18  very loosely used.  People -- that's diagnostic.

19          Q.    Well, let me ask you this --

20          A.    And seizure-like activity, it could

21  be -- I don't know.  I don't know what the origin of

22  that activity would have been.

23          Q.    You would agree, though, that it's

24  likely a medical origin.  I mean, you're not

25  suggesting, are you, that Kyle Schwark who had been

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 42

 1          Q.    Okay.

 2          A.    But I'll remind you that he was only

 3   there that one evening and then morning, and then the

 4   rest of the story is --

 5          Q.    Well, you understand that Kyle had

 6   alleged that you guys didn't wean him from Xanax; you

 7   withheld his Xanax?

 8          A.    But we didn't.

 9          Q.    Okay.

10          A.    That's really what puzzles me.  We

11   didn't.

12          Q.    How long was he gone from the jail

13   after he got shipped off to Summit and then Denver

14   Health, to your knowledge?

15          A.    He was given a furlough by the sheriff,

16   and that was delivered to him on -- I don't know what

17   it was -- a couple of days at the hospital.

18          Q.    Okay.

19          A.    And I -- he didn't come back until, I

20   don't know, February something.

21          Q.    February something, 2014?

22          A.    Yeah.

23          Q.    Okay.

24          A.    Yes.

25          Q.    So he came back.  What happened then?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 46

```
 1              A.    -- at night.  And the next day, I went
 2   to the doctor's office because she doesn't do email
 3   or anything like that.
 4              Q.    Dr. Fitting doesn't do --
 5              A.    Dr. --
 6              Q.    -- doesn't do email?
 7              A.    No.
 8              Q.    Really?
 9              A.    No.  She's like me.  She is my same
10   age.  We don't --
11              Q.    Well, I'm older than both of you
12   probably, and I do email.
13              A.    Well, I'll tell you it took me two
14   years in that job before I got up the nerve to email.
15              Q.    Okay.
16              A.    Because -- anyway, I went to her
17   office, and she wrote out a --
18              Q.    Prescription?
19              A.    -- an order for a taper.
20              Q.    A taper of what?
21              A.    Well, whatever it was.
22              Q.    Well --
23              A.    It's --
24              Q.    Hang on.  Let's go back here.
25              A.    See --
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 54

 1   prescriptions that came in -- that were changed by

 2   Dr. Fitting when he came back on February 25, 2014,

 3   so go ahead.

 4            THE DEPONENT:  Yeah.  I went to her

 5   office on the 26th and I -- she DC'd the Suboxone.

 6        Q.   (By Mr. Lane)  She what?

 7        A.   Dr. Fitting -- oh, I'm sorry.  It's

 8   medical language.  Discontinued the Suboxone.  And he

 9   apparently came in with -- I'm not -- a script for

10   Librium.  At any rate, she discontinued the Librium

11   and put him back on his own -- on Xanax.  Gosh.  I

12   know.  It's written right there.

13        Q.   Okay.  What exhibit are you refreshing

14   your memory with?

15            MR. ZIPORIN:  Exhibit 27.

16        Q.   (By Mr. Lane)  And during the break

17   presumably you looked at Exhibit 27, and that

18   refreshed your recollection about what happened?

19        A.   Yeah.  I have a perfect picture in my

20   mind of that script, but I had the, you know, one

21   benzo flipped for the other --

22        Q.   Okay.

23        A.   -- is all.

24        Q.   So this is on the second time he was in

25   the jail, right?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 64

```
 1            A.    Yeah.

 2            Q.    So it was right around there?

 3            A.    And I think he was taking -- the

 4   captain and the sergeant at one -- finally he was

 5   just so out of hand that the captain and sergeant

 6   personally drove him to Denver -- I can't remember --

 7   Denver Health.

 8            Q.    Okay.  Do you believe that your

 9   observations of Kyle Schwark when he was most

10   psychotic, was he a danger to himself?

11            A.    No.  He didn't try to hurt himself.

12            Q.    Was he a danger to others?

13            A.    No.  Well, anybody that's thrashing

14   around can hurt themselves.  It's not that they mean

15   to.

16            Q.    Sure.  I'm not suggesting that -- when

17   I say was he a danger to himself, that could mean

18   either accidentally a danger to himself or

19   intentionally a danger to himself.  Either way, I

20   mean, he was in a psychotic state.  Did you view that

21   as, gee, we've got to do something about this, right?

22            A.    Right.

23            Q.    I mean, that's why you sent the emails

24   that you sent to Ms. Parker, right?

25            A.    Right.
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 65

1     Q.   Because you said we have to do

2   something about this, right?

3          A.   Right.

4          Q.   Because you recognized the severity of

5   what he was going through; is that right?

6          A.   Right.

7          Q.   Did you consult with Dr. Fitting about

8   any of this?

9          A.   I don't remember specific

10  conversations.  But I know that my normal practice

11  would be to keep her informed.

12         Q.   Now, you know, we were talking about

13  slipping drugs in at one point.  If -- you are

14  trained to know that in an emergency situation you

15  can administer medications to save someone's life,

16  can't you?

17              MR. MICHALEK:   Object to form and

18  foundation.

19         A.   Well, if they are having a heart

20  attack, I could give them an aspirin.  I could work

21  under a protocol for cardiac.

22         Q.   (By Mr. Lane)  Right.  Which also

23  includes medications that require prescriptions,

24  right?

25         A.   Yes.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 69

1             Q.   Yeah.   Absolutely.

2                MR. ZIPORIN:   You're not going to find

3   it.   Is there a document that you could look that you

4   think would refresh your memory?

5                THE DEPONENT:   That black notebook.

6                MR. ZIPORIN:   Why don't we take five

7   minutes.   She's got her own notebook --

8                MR. LANE:   Great.   No problem.

9                MR. ZIPORIN:   -- and we can refresh her

10   memory on that.

11                MR. LANE:   Perfect.

12           (Recess taken from 10:24 a.m. to 10:38 a.m.)

13                THE DEPONENT:   Just for the record I'm

14   not trying to be deceptive or lie or anything.   It's

15   very hard to keep dates and sequences sorted out.

16         Q.   (By Mr. Lane)   I totally get that.   I'm

17   not thinking bad thoughts about you.

18         (Court reporter interrupted, and brief

19   discussion off the record.)

20         Q.   So now -- go ahead.

21         A.   Risperidone wasn't ordered until

22   March -- March 12th.

23         Q.   Okay.   And that --

24         A.   When he returned.

25                MR. LANE:   Do you have those exhibits?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 73

1        Q.   Okay.  And on March 12th, he's back and

2   he seems to be under control after a trip to Denver

3   Health, right?

4        A.   Right.

5        Q.   So my question to you is, when did he

6   go to Denver Health?

7        A.   On the 10th.

8        Q.   So from the 6th through the 10th, what

9   was happening to him?

10       A.   I don't --

11            MR. ZIPORIN:  From a psychiatric

12   standpoint?  From a behavioral standpoint?

13            MR. LANE:  Just general.  All things.

14       Q.   (By Mr. Lane)  What do you recall was

15   happening to Kyle Schwark from March 6th to

16   March 10th?  Was he still hallucinating?  Was he

17   being given meds?  What was going on?

18       A.   He was getting meds.  That's over the

19   weekend.  I wasn't there.  I don't know that I was

20   even there on Friday -- the Thursday is the 6th, and

21   I don't know that I was there Friday, Saturday, or

22   Sunday.  And I know Monday the 10th was when the

23   captain and the sergeant just took -- he was out of

24   control.

25       Q.   Okay.  So that's when they took him to

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 80

1   those.  All right.

2             A.   I won't even tell you what that stands

3   for.

4             Q.   Okay.  So ultimately security staff

5   decides Kyle is in need of hospitalization, right?

6             A.   Yes.

7             Q.   Okay.  Medical staff didn't make that

8   determination, did they?

9             A.   Me being the medical staff, I wanted

10  him to go to a hospital long before that.

11            Q.   Okay.  Did you tell --

12            A.   But getting things to happen, I'm just

13  one cog in the whole wheel.

14            Q.   Sure.  Did you tell anybody that, hey,

15  we need to get this guy to a hospital?

16            A.   I can't specifically remember, but I

17  know that that is what I would have done or likely

18  did do.

19            Q.   Okay.

20            A.   Because that is what I do when somebody

21  is like that.  They don't belong in jail.

22            Q.   Okay.

23            A.   But that's -- there's a whole system

24  around me.  I'm --

25            Q.   Understood.  Got it.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 81

```
 1                    I'm just asking, did you tell any of
 2    the command staff at the jail --
 3            A.   I --
 4            Q.   -- get this guy to a hospital?
 5            A.   I'm sure I did.
 6            Q.   Do you remember who you would have
 7    told?  Captain Muldoon?
 8            A.   Captain Muldoon.
 9            Q.   Do you recall when you told Captain
10    Muldoon?
11            A.   If I remembered when I told him, I
12    would be able to verbatim tell you that I said that,
13    and I have already said I don't remember just when,
14    but it was probably every day.
15            Q.   And Captain Muldoon didn't do anything
16    about it until the 10th?
17                 MR. ZIPORIN:  Object to form.
18                 You can answer.
19            A.   It's a little hard just to grab
20    somebody and haul them off to a psychiatric ward.
21            Q.   (By Mr. Lane)  What's hard about it?
22            A.   I really would like to answer that
23    question.
24            Q.   Go ahead.
25            A.   I don't know how to answer that
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 82

 1   question.

 2            Q.   Give it a shot.

 3            A.   That is a battle I have fought for

 4   years.

 5            Q.   Why is it hard?  You go in with big

 6   guys; they cuff them; they put him in a car; and they

 7   drive him.  What's the problem?

 8            A.   I don't know.  I wish it was that easy.

 9            Q.   Why isn't it?

10            A.   I don't know.

11            Q.   That's what they did to Kyle -- to get

12   him to the hospital?

13            A.   They -- I don't know what they went

14   through prior to do that.

15            Q.   There's no note, there's no indication

16   anywhere that Kyle struggled, that he put up a

17   massive battle, that he was spitting and kicking and

18   biting and, you know, just took him to the hospital,

19   right?

20                 MR. ZIPORIN:  Object to form.

21                 You can answer.

22            A.   What am I answering?

23            Q.   (By Mr. Lane)  You have no indication

24   that this was anything other than Muldoon -- and who

25   else went?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 83

 1          A.    The sergeant.

 2          Q.    What is his name?

 3          A.    Theobald.

 4          Q.    Theobald and Muldoon go into his cell;

 5    they cuff him; they put him in the car; they drive

 6    him to Denver Health.

 7                You have no knowledge that anything

 8    beyond that was required to get him to Denver Health,

 9    right?

10          A.    Right.  I'm not part of that.

11          Q.    So what is the hassle?  What is the

12    problem?  Where is this a big deal?  Why is it

13    difficult to do?

14                MR. ZIPORIN:  Object to foundation.

15                You can answer.

16          A.    I don't have an answer.

17          Q.    (By Mr. Lane)  Well, you said, "I wish

18    it was that easy."  And I'm asking you why isn't it?

19    Seems like it is.

20          A.    It's not.

21          Q.    Why?  Give me a "for instance."  I

22    understand there are big people who are psychotic,

23    who are violent, who want to fight.  They think they

24    are being killed.  They are hallucinating.  It's

25    dangerous.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 84

 1                 But running a jail is a dangerous

 2    business, right?

 3         A.   Yes.

 4         Q.   Okay.  And assuming Kyle Schwark wasn't

 5    that guy, and when they went into his cell and cuffed

 6    him, he didn't resist and they took him out to the

 7    car.  They put him in the backseat and they drove

 8    him.

 9                 What's the hassle?

10                 MR. MICHALEK:  Object to form and

11    foundation.

12                 MR. ZIPORIN:  Same objection.

13         A.   It's like you say, why don't you just

14    slip him this pill?  Well, you have to go to -- you

15    know, there is processes.  The captain isn't -- I

16    don't know.  Maybe they didn't go any sooner because

17    the captain was not in the office Saturday -- Friday,

18    Saturday, and Sunday.

19         Q.   (By Mr. Lane)  Okay.  So --

20         A.   I had to wait for them to make the

21    decision to finally do this.

22         Q.   So was Kyle Schwark any worse on the

23    10th based on your observations in terms of his

24    psychiatric condition than he was on the 6th or the

25    5th?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 85

```
 1           A.    I don't know that he was any worse.

 2           Q.    Okay.

 3           A.    But he was plenty bad.

 4           Q.    Right.  So for at least five days, he

 5      was plenty bad, and nobody at that jail did anything

 6      to make him any better; is that right?

 7                 MR. ZIPORIN:  Object to form.

 8                 MR. MICHALEK:  Object to form.

 9           Q.    (By Mr. Lane)  To your knowledge?

10           A.    I don't know.  I tried.

11                 MR. MICHALEK:  Foundation.

12           Q.    (By Mr. Lane)  By giving him more Xanax,

13      right?

14           A.    I did what I could do.

15           Q.    Is that what you could do, give him

16      more Xanax?

17           A.    And communicate.

18                 MR. ZIPORIN:  Object to form.

19           Q.    (By Mr. Lane)  And talk to him?

20                 MR. ZIPORIN:  Go ahead.

21           A.    Communicate to --

22           Q.    (By Mr. Lane)  Communicate with who?

23           A.    I'm sure I would have been talking to

24      Muldoon daily.

25           Q.    Okay.  Do you recall asking Muldoon
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 92

 1   five days apparently?

 2                   MR. MICHALEK:  Object to form.

 3                   MR. ZIPORIN:  Object to form;

 4   foundation.

 5                   You can answer.

 6           Q.   (By Mr. Lane)  So let me break that

 7   down.

 8                   You would agree with me that the only

 9   thing that was being done for Kyle Schwark in that

10   five-day window was you trying to up his dose of

11   Xanax?

12                   MR. ZIPORIN:  Object to form.

13           Q.   (By Mr. Lane)  Is that right?

14                   MR. ZIPORIN:  You can answer the

15   question again, all the things you did between

16   March 5th and March 10th.

17           Q.   (By Mr. Lane)  Well, that was sort of

18   the question.  What I'm saying is you have no

19   knowledge that anything else was being done to help

20   Kyle Schwark between March 5th and March 10th other

21   than you trying to up his dose of Xanax, correct?

22                   MR. ZIPORIN:  Object to form.

23           A.   There was more to it than that.  I was

24   trying to communicate to different people like

25   Muldoon, let's do something about this.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 94

1        A.    No.

2        Q.    Okay.  And is it also a fair statement

3    that you can't give me any reason that you know of as

4    to why he was being ignored from March 5th through

5    March 10th when he was in a severely psychotic

6    condition?

7              MR. ZIPORIN:  Object to form;

8    foundation.

9        Q.    (By Mr. Lane)  Can you give me any

10   reasons why that was happening?

11       A.    I don't know.  It was a weekend.  I

12   don't know.  I don't know.  I really don't.

13       Q.    Okay.  Fair enough.

14       A.    I'm only one piece.

15       Q.    Got it.  Understood.

16             But we started this deposition where

17   you are the medical unit, and now you're one piece of

18   the big puzzle, right?

19       A.    Right.

20       Q.    Okay.

21       A.    What was your point there?

22       Q.    Well, you're saying you are the medical

23   unit.  On the one hand, that sort of encompasses

24   you're the boss; you're in charge of medical at the

25   jail.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 95

```
 1              A.   Yeah.  Woo, woo.
 2              Q.   And --
 3              A.   Medical at that time -- you know, we
 4     aren't that important.
 5              Q.   Okay.
 6              MS. PEARCE:  Doesn't trump the captain.
 7     Sorry.
 8              Q.   (By Mr. Lane)  So let me just see
 9     something here.
10              So what was Wegener's involvement at
11     the jail?  Did he have any?
12              A.   Sheriff Wegener?
13              Q.   Yeah.
14              A.   He is the sheriff.
15              Q.   I know.  But what was his involvement
16     in the jail?  Would he come to the jail every day?
17              A.   It's all one building.  He's just
18     through a different door.
19              Q.   So it sounds like Muldoon is the guy in
20     charge of the jail, and the sheriff has delegated all
21     decision-making authority to Muldoon?
22              A.   Yeah, I guess.
23              MR. ZIPORIN:  Object to foundation and
24     form.
25              Q.   (By Mr. Lane)  Well, is that your
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 96

 1   observation of how the jail works?  The sheriff is

 2   the overboss and he can overrule Muldoon, but he

 3   basically gives Muldoon the freedom to run his jail

 4   any way he wants?

 5            A.   Right.

 6            Q.   Okay.  Do you know if Muldoon or

 7   anybody went and got a court order to take Kyle

 8   Schwark to the hospital, or they just went into hid

 9   cell and snatched him?

10            A.   They just took him.  They just took

11   him --

12            Q.   Okay.

13            A.   -- to my knowledge.

14            Q.   Okay.  When you were observing Kyle

15   Schwark in his psychosis between March 5th and

16   March 10th, your email to Parker indicates that he

17   believed people were going to try to kill him or

18   trying to kill him, right?

19            A.   I'm not sure I can answer that.

20            Q.   It's Exhibit 28.

21            A.   Well, in the note Parker wrote, she

22   actually does a pretty good summary.

23            Q.   What are you looking at?

24            A.   Cynthia Parker's --

25            Q.   What exhibit?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 138

```
 1   before March 10th?

 2            A.   I don't have personal knowledge.  I do

 3   know that when I go to Captain Muldoon, he does the

 4   best he can to do what needs to be done.

 5            MR. LANE:  Okay.  Nothing further.

 6   Thank you.

 7            MR. ZIPORIN:  Steve, are you done?

 8            MR. MICHALEK:  All done.

 9            MR. ZIPORIN:  I am all done as well.

10            THE REPORTER:  Mr. Ziporin, same copy

11   as before?

12            MR. ZIPORIN:  Please.

13            THE REPORTER:  And you'll handle

14   signature?

15            MR. ZIPORIN:  I will.

16            THE REPORTER:  Mr. Michalek, same copy

17   as before?

18            MR. MICHALEK:  Yes, please.

19            MR. LANE:  Just an e-copy for us.

20                 *   *   *   *   *   *   *

21            WHEREUPON, the foregoing deposition was

22   concluded at the hour of 12:02 p.m.  Total time on the

23   record was 2 hours and 29 minutes.

24

25
```

Kyle Jeffery Schwark vs.                                    Deposition of Susan Canterbury
Sheriff Fred Wegener, et al.                                              February 07, 2017

Page 139

1          I, SUSAN CANTERBURY, the deponent in the

2     above deposition, do hereby acknowledge that I have

3     read the foregoing transcript of my testimony, and

4     state under oath that it, together with any attached

5     Amendment to Deposition pages, constitutes my sworn

6     testimony.

7

8     _____ I have made changes to my deposition

9     _____ I have NOT made any changes to my deposition

10

11

12                          _____
                                    SUSAN CANTERBURY

13

14

15          Subscribed and sworn to before me this____

      day of _____, 20_____.
16

17

18          My Commission expires: _____

19

20                          _____
                            Notary Public
21

22                          _____
                            Address
23

24

25

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 140

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4            I, Carmen Murphy, a Registered Professional

 5    Reporter and Notary Public within and for the State of

 6    Colorado, commissioned to administer oaths, do hereby

 7    certify that previous to the commencement of the

 8    examination, the deponent was duly sworn/affirmed by me

 9    to testify the truth in relation to matters in

10    controversy between the said parties.

11            I further certify that this deposition was

12    taken in stenotype by me at the time and place herein

13    set forth and thereafter reduced to a typewritten form;

14    that the foregoing constitutes a true and correct

15    transcript to the best of my ability.

16            I further certify that I am not related to,

17    employed by, nor of counsel for any of the parties or

18    attorneys herein, nor otherwise interested in the

19    result of the within action.

20

21            My commission expires April 22, 2017.

22

23                        _____

                          CARMEN MURPHY
24                        Registered Professional Reporter
                          and Notary Public.
25
```