# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-02507-JLK

KYLE JEFFERY SCHWARK,

     Plaintiff,

v.

SHERIFF FRED WEGENER, in his official and individual capacities,
NURSE SUSAN CANTERBURY, in her individual capacity,
NURSE JERI SWANN, in her individual capacity,
DOCTOR KATHERINE FITTING, in her individual capacity, and
CAPTAIN DANIEL MULDOON, in his individual capacity,

     Defendants.

---

## PLAINTIFF'S RESPONSE TO DEFENDANT KATHERINE FITTING, M.D.'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, by and through his attorneys, David A. Lane and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, hereby brings this Response to Defendant Katherine Fitting M.D.'s Motion for Summary Judgment and alleges as follows:

1. **Introduction**[1]

This is an action by Kyle Schwark, a former inmate at the Park County Jail in Park County, Colorado. Mr. Schwark is seeking redress and damages for the deliberate indifference to his serious medical needs shown by Defendant Fitting in her failure to provide him with any medication during his first incarceration at the Park County Jail and

---

[1] The factual assertions made in this Introduction are supported by the record. Specific citations to the record are made in Sections 2 and 3, below.

1

for her decision to wean him off of necessary medication, for no legitimate medical purpose, during his second incarceration at the Park County Jail. Defendant Fitting is a physician that contracts with the Park County Jail to provide all of their physician-level medical services, including medication orders, monitoring, and examinations. Both of these incidents caused Mr. Schwark to suffer immensely: during his first incarceration he suffered multiple seizures and, as a result of the seizures, fractured his neck, during his second incarceration he was driven to insanity and required acute psychiatric treatment and hospitalization.

Mr. Schwark entered the Park County Jail in November 2013 with all of his prescribed medications in hand and a note from his primary care physician emphasizing that Mr. Schwark needed his medications. Instead of receiving those medications, Mr. Schwark was given no medication during his first two days in the Park County Jail. Because Mr. Schwark was deprived of these necessary medications, which included Alprazolam (a benzodiazepine), Mr. Schwark went into benzodiazepine withdrawal and suffered a seizure. After suffering a second seizure, which caused Mr. Schwark to fall from a table in the medical unit of the Park County Jail, and breaking his neck, Mr. Schwark was placed on medical furlough.

In February 2014, Mr. Schwark's medical furlough was revoked and he was sent back to the Park County Jail. Prior to entering the Park County Jail, Mr. Schwark's primary care physician called the jail and left a message for Defendant Fitting, asking her to please ensure Mr. Schwark received his prescribed medications. Instead of providing Mr. Schwark with his prescribed medications, which he had responded positively to and

had been stable while receiving for the past few years, Dr. Fitting immediately

discontinued providing Mr. Schwark with Suboxone and began to aggressively wean Mr.

Schwark off of his prescribed benzodiazepines. Within a week, Mr. Schwark began

suffering a serious psychiatric reaction to being taken abruptly off of his medications.

Ultimately, Mr. Schwark's suffering became so acute that he was hospitalized.

Dr. Fitting, when later asked why she discontinued Mr. Schwark's prescribed

medications, stated that she did so pursuant to Park County's policy that no inmate

should continue to receive benzodiazepines while incarcerated. In other words, there was

no medical reason for her discontinuation of Mr. Schwark's prescribed medications.

Because of Dr. Fitting's deliberate indifference, Mr. Schwark has suffered immensely. To

this day, he has complications from his broken neck and now suffers from PTSD in

connection with his mental breakdown during his second incarceration. Mr. Schwark asks

that this Court not allow Defendant Fitting to skirt liability for her actions.

2. **Response to Statement of Undisputed Material Facts**

*November 2013 Incarceration*

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. **<u>Deny</u>**. Mr. Schwark was not provided any medication, including his prescriptions of Alrpazolam and Suboxone, during his first incarceration at the Park County Jail in November 2013. **Exhibit 1**, *Deposition of Kyle Jeffry Schwark*, 127:16-23, 130:22-131:13.

8. **<u>Deny</u>**. Mr. Schwark was not provided any medication, including his prescriptions of Alrpazolam and Suboxone, during his first incarceration at the Park County Jail in November 2013. **Exhibit 1**, *Deposition of Kyle Jeffry Schwark*, 127:16-23, 130:22-131:13. Mr. Schwark testified that he filed multiple kites asking for his medications. **Exhibit 1**, *Deposition of Kyle Jeffry Schwark*, 16-20.

9. **<u>Deny</u>**. Mr. Schwark was not provided any medication, including his prescriptions of Alrpazolam and Suboxone, during his first incarceration at the Park County Jail in November 2013. **Exhibit 1**, *Deposition of Kyle Jeffry Schwark*, 127:16-23, 130:22-131:13.

10. **<u>Deny</u>**. Mr. Schwark stated that he did not interact with any nurses prior to his seizure on November 14, 2013 because he was not provided medication during the entirety of his first incarceration at the Park County Jail. **Exhibit 1**, *Deposition of Kyle Jeffry Schwark*, 130:22-131:12, 134:4-15, 146:18-147:8.

11. Admit.

12. Admit.

13. Admit.

14. **Deny**. Mr. Schwark did not receive any medication after his seizure on November 14, 2013, let alone medication that was adjusted to account for his seizure. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 151:12-14.

15. **Deny**. Mr. Schwark did not receive any medication after his seizure on November 14, 2013, let alone medication that was adjusted to account for his seizure. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 151:12-14.

16. Admit that Defendant Fitting testified as much. However, Mr. Schwark's testimony directly contradicts Defendant Fitting's statement that she provided Mr. Schwark with further treatment. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 151:12-14.

17. Admit that according to testimony by the jail staff that Mr. Schwark appeared stable. However, Mr. Schwark's testimony directly contradicts the jail staff's account of Mr. Schwark's state. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 151:3-152:7.

18. Admit.

19. Admit.

*February 2014 Incarceration*

1. Admit.

2. Admit that this is what is stated in the Second Amended Complaint.

3. **Deny**. Mr. Schwark was placed into an isolation cell simply because Captain Muldoon believed that he was experiencing signs of mental health problems and appeared to be "off." **Exhibit 2**, *Deposition of Captain Muldoon*, 33:21-34:18.

4.  Admit.

5.  Admit.

6.  Admit.

7.  Admit that Dr. Fitting testified to this fact; however, whether it was appropriate to wean Mr. Schwark off of his prescribed benzodiazepines is a hotly disputed fact. Dr. Singer spoke to officials at the Park County Jail to ensure that Mr. Schwark received all of his prescribed medications while incarcerated at the Park County Jail prior to his February 2014 incarceration, and Dr. Singer specifically told the officials at the Jail to have Defendant Fitting call him if there was going to be a problem with providing Mr. Schwark his prescribed medications, because he believed it was very necessary that Mr. Schwark continue to receive his medications. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 103:13-106:20. And, Dr. Singer also testified that the medical care provided to inmates should be the same level of treatment provided to individuals in the community. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 109:17-110:1. Further, Summit County does not discontinue inmates' prescribed benzodiazepines, without regard to their medical necessity, as a matter of policy, casting further doubt on the appropriateness of Defendant Fitting's order. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 127:2-7.

8.  Admit that Dr. Fitting ordered the discontinuation of Mr. Schwark's medications despite the fact that Mr. Schwark had been regularly taking these medications with

6

great success outside of the Park County Jail both prior to his initial incarceration and during his medical furlough.

9. Admit.

10. Admit.

11. Admit that Mr. Schwark was hallucinating and exhibiting extreme paranoia.

9. Admit.[2]

10. Admit.

11. Admit.

3. **Statement of Additional Material Facts**

1. Prior to entering the Park County Jail in November 2014, Mr. Schwark was, consistent with his prescription from Dr. Singer, taking four milligrams of Alprazolam per day. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 120:1-6.

2. The Summit County Jail allows inmates to continue their prescriptions for benzodiazepines while incarcerated. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 127:2-7.

3. Mr. Schwark was not provided any medication, including his prescriptions of Alrpazolam and Suboxone, during his first incarceration at the Park County Jail in November 2013. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 127:16-23, 130:22-131:13.

---

[2] Defendant Fitting seemingly mis-numbered her Statement of Material Facts and accidentally began re-numbering her facts after Fact #11 starting at #9. Plaintiff's facts track this error so as to minimize confusion.

4. On the morning of November 14, 2013, Mr. Schwark began experiencing the effects of benzodiazepine withdrawal. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 138:15-140:3.

5. Dr. Fitting provides medical care at the Park County Jail on a contract-basis; she is not a salaried employee of Park County. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 8:8-9:8, 11:9-13.

6. Withdrawing from benzodiazepines can lead to hallucinations. **Exhibit 5**, *Deposition of Jeri Swann*, 33:6-14; **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 98:23-99:4.

7. Dr. Fitting always chose the types of medications, and the doses, that inmates would receive. **Exhibit 5**, *Deposition of Jeri Swann*, 32:25-33:5.

8. Dr. Fitting ordered that the nurses wean Mr. Schwark off of his prescribed benzodiazepines. **Exhibit 5**, *Deposition of Jeri Swann*, 41:21-25.

9. Mr. Schwark brought all of his prescribed medications to the Park County Jail when he was initially incarcerated in November 2013. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 19:15-17.

10. The only reason that Mr. Schwark was weaned off of benzodiazepines was that Dr. Fitting believed that a standing prescription for benzodiazepines was not appropriate in an incarceration setting; there was no medical reason for weaning Mr. Schwark off of benzodiazepines. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 21:23-22:12.

11.      Dr. Fitting put in an order to wean Mr. Schwark off of benzodiazepines despite not knowing what conditions Mr. Schwark was prescribed benzodiazepines to treat. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 21:4-22, 24:4-10, 26:9-14, **Exhibit 6**, *Katherine Fitting Medication Order* (Depo. Ex. 27).

12.      Withdrawal from benzodiazepines can cause seizures. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 24:18-20.

13.      Mr. Schwark suffered multiple seizures during his first incarceration at the Park County Jail. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 24:21-23.

14.      A seizure is a very serious medical issue. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 29:6-13.

15.      It is the policy at the Park County Jail that every person who enters the Jail with a prescription for benzodiazepines is weaned off of that prescription, with the only exception being individuals suffering from seizure disorder. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 30:21-31:11.

16.      Dr. Fitting was called and informed that Mr. Schwark suffered a seizure during his initial incarceration at the Park County Jail in November 2013. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 33:2-8.

17.      During Mr. Schwark's second incarceration at the Park County Jail in February and March 2014, Dr. Fitting ordered that Mr. Schwark be weaned off of his prescribed benzodiazepines. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD,*

*FACP*, 84:13-20, 85:15-86:7, **Exhibit 6**, *Katherine Fitting Medication Order* (Depo. Ex. 27).

18.     Dr. Fitting never attempted to contact Mr. Schwark's physician, Dr. Singer, to determine what ailment Mr. Schwark's prescribed benzodiazepines were intended to treat prior to ordering that he be weaned off of the prescribed benzodiazepines. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 86:2-12.

19.     Mr. Schwark began to suffer from major hallucinations during his second incarceration at the Park County Jail. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 87:20-23.

20.     Upon Mr. Schwark's second incarceration at the Park County Jail, Defendant Fitting ordered that the nursing staff discontinue Mr. Schwark's prescription for Suboxone and Chlordiazepoxide, and to wean him off of his prescription of Alprazolam. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 92: 15-93:18, **Exhibit 6**, *Katherine Fitting Medication Order* (Depo. Ex. 27).

21.     An inmate in active hallucinations who is experiencing psychosis is presenting with a serious medical need. **Exhibit 4**, *Deposition of Katherine Margaret Fitting, MD, FACP*, 94:12-22.

22.     An individual who abruptly discontinues the use of suboxone runs the risk of psychosis. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 64:10-12.

23.     An individual who abruptly discontinues the use of suboxone runs the risk of seizures. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 64:7-9.

24.      The discontinuation of benzodiazepines can cause seizures. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 65:3-5.

25.      Park County officials' discontinuation of Mr. Schwark's Suboxone or benzodiazepines (or a combination of the two) while he was incarcerated caused Mr. Schwark to suffer seizures. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 66:4-10.

26.      Dr. Singer, Mr. Schwark's primary care physician, prescribed Mr. Schwark Suboxone in February 2014, prior to his re-incarceration at the Park County Jail. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 80:12-15.

27.      Dr. Singer, Mr. Schwark's primary care physician, prescribed Mr. Schwark Librium in February 2014, prior to his re-incarceration at the Park County Jail. **Exhibit 3**, *Deposition of Jonathan William Singer,* 96:6-12.

28.      Dr. Singer wrote a letter to officials at the Park County Jail on November 11, 2013, so as to ensure that Mr. Schwark received all of his prescribed medications while incarcerated at the Park County Jail. **Exhibit 7**, *Dr. Singer Letter*, (Depo. Ex. 20).

29.      Dr. Singer also spoke to officials at the Park County Jail to ensure that Mr. Schwark received all of his prescribed medications while incarcerated at the Park County Jail prior to his February 2014 incarceration, and Dr. Singer specifically told the officials at the Jail to have Defendant Fitting call him if there was going to be a problem with providing Mr. Schwark his prescribed medications. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 103:13-106:20.

30.     The medical care provided to inmates should be the same level of treatment provided to individuals in the community. **Exhibit 3**, *Deposition of Jonathan William Singer, D.O.*, 109:17-110:1.

31.     After being released from the Park County Jail in April 2014, Mr. Schwark suffered from Post-Traumatic Stress Disorder based on his treatment at the Park County Jail. **Exhibit 1**, *Deposition of Kyle Jeffrey Schwark*, 193:2-194:5.

## 4. **Standard of Review**

Summary judgment is appropriate only if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Woodman v. Runyon*, 132 F.3d 1330, 1337 (10th Cir. 1997). "The party that moves for summary judgment bears the burden of proving that no genuine issue of material fact exists on all claims for which it seeks summary judgment." *Trujillo v. Atmos Energy Corp.*, No. 11-cv-01151-RBJ-MEH, 2012 U.S. Dist. LEXIS 87273, at *4 (D. Colo. June 25, 2012). The Tenth Circuit has emphasized that the nonmovant is given "wide berth to prove a factual controversy exists." *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). In making this determination, the district court must view the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 484 (10th Cir. 1995). "Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifan Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984). Critically:

> The right to confront, cross-examine and impeach adverse witnesses is one
> of the most fundamental rights sought to be preserved by the Seventh
> Amendment provision for jury trials in civil cases. The advantages of trial
> before a live jury with live witnesses, and all the possibilities of considering
> the human factors, should not be eliminated by substituting trial by affidavit
> and the sterile bareness of summary judgment. It is only when the witnesses
> are present and subject to cross-examination that their credibility and the
> weight to be given their testimony can be appraised. Trial by affidavit is no
> substitute for trial by jury which so long has been the hallmark of "even
> handed justice."

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see*

*also Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980).

5. **Argument**

> 5.1 **Defendant Fitting, as a private contractor providing medical care to
> the inmates at the Park County Jail, is not entitled to claim the
> defense of qualified immunity.**

When a person acts "under color" of law, whether that person is a private or public

individual, she is liable under § 1983 if her actions subject, or cause to be subjected,

another individual to a deprivation of constitutional rights. *See Richardson v. McKnight*,

521 U.S. 399, 403 (1997); *see also* 42 U.S.C. § 1983. Although qualified immunity is

generally recognized as a defense to § 1983 liability for public officials, private actors are

not automatically entitled to assert qualified immunity. *Richardson*, 521 U.S. at 512.

Rather, determining if a private defendant may claim qualified immunity requires an

examination of whether (1) at common law, there existed a "firmly rooted" tradition of

immunity applicable to similarly situated defendants; and (2) the purposes behind the

affording immunity to government employees warrant extending immunity to the private defendant. *See id.* at 404, 407.

Any analysis of whether private defendants may claim qualified immunity as a defense to § 1983 liability must begin with *Richardson*, 521 U.S. 399, and *Filarsky v. Delia*, 566 U.S. 377 (2012). In *Richardson*, 521 U.S. at 404-412, the Supreme Court held that employees of a private prison management firm working as guards at a state prison could not claim qualified immunity because history did not reveal a "firmly rooted tradition of immunity applicable to privately employed prison guards," and an examination of the purposes of government employee immunity "reveal[ed] nothing special about the job or [the] organizational structure" of the private firm that would warrant providing qualified immunity to the guards. Conversely, in *Filarsky*, 566 U.S. at 384-91, 394, the Supreme Court held that an attorney retained by a city to assist it in investing potential wrongdoing of an employee could claim qualified immunity even though he was not a full-time government employee because at common law, immunity did not depend on whether an individual was a full-time employee, and the reasons for recognizing immunity under § 1983, namely protecting government's ability to perform its traditional functions, warranted extending qualified immunity to the defendant.

Although the Tenth Circuit has not decided whether qualified immunity is available to employees of a private company providing medical services to inmates, *Kellum v. Mares*, 657 F. App'x 763, 768 n.3 (10th Cir. 2016), at least one District of Colorado court has held that qualified immunity does not extend to private medical professionals who provide care to inmates. *See Carmody v. Ensminger*, Civil Action No.

16-cv-02603-PAB-NYW, 2017 U.S. Dist. LEXIS 151905, at *10 (D. Colo. Sep. 19, 2017). And that decision comports with the weight of authority from other jurisdictions that have held, based on persuasive reasoning, that private healthcare providers working at jails or prisons are much more akin to the private guards in *Richardson* than the retained attorney in *Filasky*, and they cannot claim qualified immunity.[3] When examining Defendant Fitting's claim of qualified immunity in light of this precedent, it is clear that qualified immunity should not be extended to cover her conduct as a private medical provider.

### 5.1(a) History does not reveal a "firmly rooted" tradition of immunity applicable to private healthcare providers at prisons and jails.

In the leading case on private health providers working for jails and prisons on a contract basis, the Sixth Circuit held that a private psychiatrist who worked for a non-profit that provided mental health care to inmates at a county jail could not assert a defense of qualified immunity. *McCullum v. Tepe*, 693 F.3d 696, 697-98 (6th Cir. 2012). The Sixth Circuit first examined whether a private doctor working for a public institution at the time Congress passed § 1983 (late 19th century) would have been immune from a suit at common law. *Id.* at 701. The court thoroughly analyzed English and American history and concluded that "there was no common-law tradition of immunity for a private doctor working" for the government. *Id.* at 701-04. In *Lee v. Willey*, 543 F. App'x 503,

---

[3] At the outset, because Defendant Fitting has not made any argument that these cases are wrongly decided, she has not met her burden to show that she is entitled to claim qualified immunity. *See Richardson*, 521 U.S. at 412 (Defendants "who seek exemption from personal liability have the burden of showing that such an exemption is justified . . . ." (citation omitted)).

506-07 (6th Cir. 2013), the Sixth Circuit reaffirmed its holding in *McCullum* after double checking the accuracy of its historical analysis.

*McCullum*, *Lee*, and other cases that follow strongly weigh against Defendant Fitting being able to establish a "firmly rooted" tradition at common law of extending immunity to private contractors who provide medical care at jails. The Sixth Circuit concluded, after engaging in an extensive historical analysis in *McCullum*, 693 F.3d at 704, that "[d]espite the Supreme court's somewhat cryptic comment in *Richardson*, there does not appear to be any history of immunity for a private doctor working for the government." Accordingly, Defendant Fitting has not established that history supports allowing her qualified immunity defense.

        5.1(b) <u>The policy reasons behind affording governmental officials qualified immunity do not warrant extending qualified immunity to private healthcare providers at jails and prisons.</u>

In *Richardson*, 521 U.S. at 407-08, 411-12, the Supreme Court explained that the purposes of qualified immunity are (1) protecting the public from "unwarranted timidity" on the part of public officials; (2) ensuring that talented candidates are not deterred by the threat of damages suits from entering public service; and (3) protecting public officials from the distraction from their duties that lawsuits would create. *See also McCullum*, 693 F.3d at 704. As discussed by *McCullum* and numerous other cases after *Richardson* and *Filasky*, these policy-based concerns militate against extending qualified immunity to private healthcare providers who provide medical care to inmates at a jail or prison under a government contract.

Regarding the first factor, providing immunity to government officials protects against unwarranted timidity because "the threat of liability can create perverse incentives that operate to *inhibit* officials in the proper performance of their duties":

> When officials are threatened with personal liability for acts taken pursuant to their official duties, they may well be induced to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct. In this way, exposing government officials to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it.

*Forrester v. White*, 484 U.S. 219, 223 (1988) (emphasis in original). The *Richardson* Court held that this concern "is less likely present, or at least is not special, when a private company subject to competitive market pressures operatives a prison." *Richardson*, 521 U.S. at 409. "[A] firm whose guards are too timid will face threats of replacement by other firms with records that demonstrate their ability to do . . . a more effective job." *Id.* at 409. Moreover, a private firm has the "freedom to respond to . . . market pressures through rewards and penalties that operate directly upon its employees," and "[t]o this extent [its] employees . . . resemble those of other private firms and differ from government employees." *Id.* at 410.

Defendant Fitting, as a private contractor who provides healthcare to Park County Jail inmates, is similarly situated to the privately employed prison guards in *Richardson*. In an analogous case, the Sixth Circuit held that nurses employed by a private health company contracted to provide medical services to inmates at a county jail could not claim qualified immunity in large part because "market forces will operate to insure that

the [company] and its employees [would] effectively execute their contractual duties."

*Harrison v. Ash*, 539 F.3d 510, 524 (6th Cir. 2008). The company and its employees had

an incentive to perform their duties in a manner that was not overly cautious and that

comported with the expectations of the county because, otherwise, the company would

likely face pressure from potentially competing firms at the end of its contractual term.

*Id.*

Harrison also determined that the other two policy purposes discussed in

*Richardson* as reasons for qualified immunity did not support affording immunity to the

nurse employees of the private healthcare company:

> [E]ven in the absence of qualified immunity, [the company] may attract
> [talented] candidates for nursing and other positions by increasing pay,
> benefit packages, and obtaining adequate insurance coverage. Although
> such measures will not entirely eliminate the distraction caused by the treat
> of damages from a suit, any distraction caused by the treat of suit is
> certainly no greater than the threat of malpractice suits faced by other
> medical professionals.

*Id.* at 524-25.  The court concluded that "as in *Richardson*, there [were] no special

concerns to distinguish [the company] from other private firms and thus, there [was] no

need to extend qualified immunity to [the defendant] nurses." *Id.* it 525.

Multiple other cases have similarly concluded that under *Richardson* and *Filasky*,

private healthcare providers working at jails or prisons to provide medical care to inmates

are not entitled to claim qualified immunity. *See id.* (collecting cases); *see also Currie v.

Chhabra*, 728 F.3d 626, 631-33 (7th Cir. 2013); *Garner v. Mohave Cty.*, No. CV-15-

08147-PCT-PGR, 2016 U.S. Dist. LEXIS 21045, at *2-9 (D. Ariz. Feb. 22, 2016);

*Thompson v. Ackal*, No. 15-02288, 2016 U.S. Dist. LEXIS 47154, at *36-42 (W.D. Mar. 9, 2016); *Cady v. Cumberland Cty. Jail*, No. 2:10-cv-00512-NT, 2013 U.S. Dist. LEXIS 109195, at *96-101 (D. Me. Mar. 22, 2013); *Zikianda v. Cty. of Albany*, No. 1:12-CV-1194, 2015 U.S. Dist. LEXIS 122363, at *46-49 n.6 (N.D.N.Y. Sep. 15, 2015); *Hendricks v. Pickaway Corr. Inst.*, No. 2:08-cv-00580, 2015 U.S. Dist. LEXIS 159261, at *8-11 (S.D. Ohio Nov. 25, 2015); *Cheek v. Nueces Cty. Tex.*, No. 2:13-cv-26, 2013 U.S. Dist. LEXIS 110039, at *68-69 (S.D. Tex. Aug. 5, 2013).

Therefore, policy reasons do not support extending qualified immunity to cover healthcare providers who contract with jails and prisons to provide medical services. Defendant Fitting is not entitled to assert a qualified immunity defense.

### 5.2 The abundance of disputed material facts preclude summarily judging this matter.

Numerous disputed issues of material fact preclude granting Defendants summary judgment based on qualified immunity. "A qualified immunity defense will not succeed in inducing a court to grant summary judgment when 'the facts . . ., considered collectively, present an incomplete picture of the [relevant] circumstances.'" *Olsen*, 312 F.3d at 1314 (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1137 (10th Cir. 1991)) (alterations in original).  The Tenth Circuit has explained that, when plaintiffs and defendants allege completely different factual circumstances surrounding a constitutional violation, summary judgment (via qualified immunity or otherwise) is not appropriate:

> On the issue of excessive force, neither party's asserted material facts jibe with those of the other. Officer King says that Appellant behaved belligerently before he attempted to handcuff him. Appellant and his children

> say that Appellant did nothing but cooperate passively. Officer King contends that Appellant tried to resist the arrest by "turning in to me, which just made me hold on to the control hold." App. at 216. Appellant maintains that he complied physically at all times. App. at 215. Appellant says that Officer King pushed Appellant at least 10 feet into a store window to effectuate the arrest. Officer King tells a far more subdued tale of "maneuvering [Appellant] against a storefront window [to] gain[] the necessary leverage to handcuff him." Supp. App. at 2. Officer King mentions nothing about manhandling Appellant during the arrest process. Appellant asserts that Officer King "cocked [his arm] at an angle, . . . clear up the middle of [his] back." App. at 172-173. Although the district court erred in granting summary judgment via qualified immunity, the overwhelming number of factual divergences scream the obvious -- that material disputed facts obviously remain as to the excessive force claim. The court erred in granting summary judgment on the excessive force issue.

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

Defendant Fitting's allegedly "undisputed" material facts are, in fact, disputed by evidence in the record, rendering summary judgment inappropriate. *See Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989) ("This rather one-sided factual summary provided by [the officer], however, is only part of the picture presented by the evidentiary record which is before us. Other testimony and evidence contained in the summary judgment record casts doubt on the objective reasonableness of [the officer's] use of deadly force."). For example, it is hotly disputed whether Mr. Schwark was ordered to receive, or actually provided, his prescribed benzodiazepines and Suboxone by Defendant Fitting upon his initial incarceration at the Park County Jail.[4] It is also in dispute as to

---

[4] The ultimate determination as to whether Mr. Schwark received these medications comes down to weighing the credibility of the witnesses, a well-established province of the jury that makes this case inappropriate for summary judgment. *See Newmaker v. City of Fortuna*, 2016 U.S. App. LEXIS 20932, at *20 (9th Cir. Nov. 22, 2016) ("Because this

whether Mr. Schwark's psychosis during his second incarceration was caused by Dr.

Fitting intentionally weaning him off of his prescribed benzodiazepines and Suboxone,

despite there being no medical reason to do so. This multitude of genuine issues of

disputed material fact precludes summary judgment. *See Zuchel v. Spinharney*, 890 F.2d

273, 275 (10th Cir. 1989) (denying summary judgment based on qualified immunity

because of "genuine issues of material fact precluding a judicial determination of whether

[the officer's] conduct was objectively reasonable"). And these factual disputes must be

resolved by a jury. *See Despain v. Uphoff*, 264 F.3d 965, 977 (10th Cir. 2001) ("While

defendants challenge [the plaintiff's] allegations of the severity of the situation and of [a

defendant's] knowledge, those factual disputes must be left to the province of an

appropriate factfinder. This claim should not have been dismissed on summary

judgment.").

### 5.3 **Assuming that Defendant Fitting may claim the defense of qualified immunity, the evidence demonstrates that she is not entitled to qualified immunity.**

To avoid dismissal on the basis of qualified immunity, the plaintiff must establish

that (1) "the facts, as pled by the plaintiff, set forth a constitutional violation, and (2) the

---

case 'requires a jury to sift through disputed factual contentions' — including whether
the officers were telling the truth about when, why, and how Soeth shot Newmaker —
summary judgment was inappropriate.") (internal citations omitted); *see also Jones v.
Barnhart*, 349 F.3d 1260, 1265-66 (10th Cir. 2003) ("We recognize that at the summary
judgment stage credibility determinations, the weighing of the evidence, and the drawing
of legitimate inferences from the facts are jury functions, not those of a judge. In this
procedural posture, therefore, our role is simply to determine whether the evidence
proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain
her claim.") (quotations and citations omitted).

constitutional right the defendant violated was clearly established at the time of the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1284 (10th Cir. 2004). Even assuming Defendant Fitting may claim qualified immunity, the evidence demonstrates Defendant Fitting violated, or there is disputed evidence demonstrating that Defendant Fitting violated. Mr. Schwark's clearly established right to adequate medical care.

### 5.4 Defendant Fitting violated Mr. Schwark's Eighth Amendment rights.

With regard to the second component of the *Farmer* inquiry, whether a jail official knew about and disregarded a substantial risk to a detainee's health and safety is a question of fact that may be proven from circumstantial evidence. *See Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 430 (10th Cir. 2014). As such, the subjective knowledge of Defendant Fitting is best tested at a later stage. *See McGill v. Corr. Healthcare Cos.*, No. 13-cv-01080, 2014 WL 2922635, at *8 (D. Colo. June 27, 2014). In fact, the multitude of factual disputes in the record demonstrates that the subjective knowledge of Defendant Fitting is a proper issue for the jury. *See* Sections 2 and 3, above. Nevertheless, even if this Court finds the facts regarding deliberate indifference are not in dispute, the undisputed evidence in the record demonstrates that Defendant Fitting knew about and disregarded an obvious and substantial risk to Plaintiff's health and safety.

"A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005). Deliberate indifference involves both an objective and a subjective component. *Id.* Under the objective prong,

22

"the prisoner must produce objective evidence that the deprivation at issue was in fact sufficiently serious." *Id*. It is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely "the symptoms presented at the time the prison employee has contact with the prisoner." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citation omitted). A medical need will be sufficiently serious "if is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751. In addition, a delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm, which may be evidenced by "lifelong handicap, permanent loss, or considerable pain." *Id*.

The subjective component of the deliberate indifference test is satisfied if the official knows of and disregards a substantial risk to inmate health or safety. *See Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006). That is, the defendant must have had actual knowledge of the plaintiff's serious medical needs and have disregarded that "risk by failing to take reasonable measures to abate it." *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999). An inmate, however, need not "show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Whether "a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in

unusual ways, including inference from circumstantial evidence." *Id*. Thus, actual

knowledge may be inferred from circumstantial evidence, including but not limited to the

fact that the risk of harm was obvious. *Id*. A harm will be obvious in circumstances

including, but not limited to where "(1) a medical professional recognizes the need for

further medical treatment and declines or refuses to provide a referral; (2) a medical

professional fails to treat a condition that would have been obvious even to a layperson;

or (3) where a medical professional denies care though presented with recognizable

symptoms." *Walker v. Hickenlooper*, 2015 U.S. App. LEXIS 17727, at *16-17 (10th Cir.

2015) (citing *Self*, 439 F.3d at 1232).

A court will find deliberate indifference where "a medical professional" fails to

"treat a serious medical condition properly." *Self*, 439 F.3d at 1231. While a defendant

cannot be liable for mere negligence, a jury may infer conscious disregard where the

defendant responds to an obvious risk with treatment that is patently unreasonable. *Id*. at

1232.

### 5.4(a) Mr. Schwark suffered a serious medical need.

A medical need is sufficiently serious to implicate the Eighth and Fourteenth

Amendments "if it is one that has been diagnosed by a physician as mandating treatment

or one that is so obvious that even a lay person would easily recognize the necessity for a

doctor's attention." *Hunt*, 199 F.3d at 1224 (internal citation omitted). Serious mental

health issues, including anxiety, constitute a serious medical need. *Smith v. Carver*, No.

07-575, 2008 U.S. Dist. LEXIS 11434, at *13 (E.D. Pa. Feb. 15, 2008) ("Plaintiff has

established a sufficiently 'serious medical need' through his undisputed testimony that

his ADHD, anxiety, depression, and RLS were diagnosed by a physician as requiring treatment."); *Luna v. Butler*, No. 16-cv-00579-MJR, 2016 U.S. Dist. LEXIS 88668, at *5 (S.D. Ill. Jul. 8, 2016) (finding that allegations of bipolar, anxiety, and post-traumatic stress disorders satisfy the objective component of a deliberate indifference claim for screening purposes); *Graham v. Warden*, No. 07-cv-295-PB, 2007 U.S. Dist. LEXIS 98964, at *7 (D.C. N.H. Dec. 13, 2007) (finding that mental health conditions including ADHD, bipolar disorder, personality disorder, and anxiety constitute a serious medical need); *see also Goodrich v. Clinton County Prison*, 214 F. App'x 105, 111 (3d Cir. 2007) (holding that a mental illness diagnosed by a psychiatrist as requiring treatment constitutes a serious medical need); *United States ex rel. Schuster v. Vincent*, 524 F.2d 153, 160 (2d Cir. 1975) ("[A]cts causing mental suffering can even absent attendant bodily pain violate the Eighth Amendment.").

Further, seizures are objectively serious because a layperson would realize the need for a doctor's attention. *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); *see, e.g., King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (recognizing that "medical conditions much less serious than seizures have satisfied" the objective seriousness standard); *Maguire v. Patterson*, No. 2:10-cv-00626-CW, 2015 U.S. Dist. LEXIS 168040, at *24-27 (D. Utah Dec. 14, 2015); *Hilyer v. Dunn*, No. 15-00356-WS-N, 2016 U.S. Dist. LEXIS 150508, 2016 WL 7093437, at *2 (Oct. 28, 2016), *adopted by the District Court*, 2016 U.S. Dist. LEXIS 166323, 2016 WL 7045731 (S.D. Ala. Dec. 2, 2016) ("There can be no doubt that controlling seizures constitutes a serious medical need" (citing *Johnson v. Hay*, 931 F.2d 456, 461 (8th Cir. 1991); *Miranda v. Munoz*, 770

F.2d 255, 259 (1st Cir. 1985)). And, particularly, seizures caused by benzodiazepine

withdrawal constitute a serious medical need. *Stoner v. Fye*, No. 5:15-CV-102 (CAR),

2017 U.S. Dist. LEXIS 48322, at *15 (M.D. Ga. Mar. 31, 2017) (finding that "[m]ost

telling Plaintiff suffered from an objectively serious medical need is the fact that he was

found unresponsive in his cell due to a benzodiazepine-withdrawal seizure"). Mr.

Schwark's suffering from symptoms of benzodiazepine withdrawal, seizures, and

significant mental health problems constituted objectively serious medical needs.

### 5.4(b) Defendant Fitting responded with deliberate indifference to Mr. Schwark's serious and obvious medical needs.

"To prevail on the subjective component, [a plaintiff] must show that the

defendants knew he faced a substantial risk of harm and disregarded that risk, by failing

to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th

Cir. 2006) (internal quotation marks omitted). A plaintiff need not plead a defendant's

acts or omissions were taken "for the very purpose of causing harm or with knowledge

that harm will result." *Farmer*, 511 U.S. at 835. Instead, a plaintiff need only allege that a

defendant was made aware of the risk of harm and failed to treat it. *Id*. Plaintiff has done

so here.

"Unlike the objective component, the symptoms displayed by the prisoner are

relevant to the subjective component of deliberate indifference. The question is: were the

symptoms such that a prison employee knew the risk to the prisoner and chose

(recklessly) to disregard it?" *Martinez*, 563 F.3d at 1089 (internal quotation marks and

citation omitted). Conduct that is more than mere negligence includes: "(1) knowledge of

a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all." *Magwood v. Sec'y, Fla. Dep't of Corr.*, 652 F. App'x 841, 844 (11th Cir. 2016) (per curiam) (citing *McElligott*, 182 F.3d at 1255).

In this case, Defendant Fitting's conduct was deliberately indifferent in a number of ways (and the evidentiary basis for her deliberate indifference is outlined above in Sections 2 and 3). First, her complete and utter failure to provide Mr. Schwark with *any* medication during his first incarceration, despite the knowledge that Mr. Schwark was prescribed medications to treat his severe mental health issues constitutes deliberate indifferent. Not only did this cause Mr. Schwark to suffer from serious mental helath problems, but it caused Mr. Schwark to go into benzodiazepine withdrawal and suffer multiple seizures. *See Steele v. Shah*, 87 F.3d 1266, (11th Cir. 1996) (reversing a district court's grant of summary judgment where the doctor detined medication, even though the defendant-doctor knew about the potential risk without the medicine); *Smith v. Sheahan*, No. 05 C 1264, 2008 U.S. Dist. LEXIS 112288, 2008 WL 4276221, at * 8 (N.D. Ill. Sept. 16, 2008) (a reasonable jury could conclude that prison nurses were deliberately indifferent to risk from inmate not receiving anti-rejection medication for three days).

Second, when Mr. Schwark returned to the Park County Jail after his medical furlough, Defendant Fitting's decision to wean Mr. Schwark off of benzodiazepines, despite the fact that he had been responding positively to treatment from benzodiazepines for years, without any other form of treatment, constitutes deliberate indifference.

Compoudning the deliberate indifference of this decision is that it was not made for medical reasons. Rather, Mr. Schwark was weaned off of his prescribed benzodiazepines simply because it was against policy to administer benzodiazepines at the Park County Jail. *See Grawcock v. Hodges*, No. 10-CV-345-RLM, 2012 U.S. Dist. LEXIS 109890, 2012 WL 3245977, at *4 (N.D. Ind. Aug. 6, 2012) ("Mr. Grawcock can show (and there is no disagreement on this) that Ms. Caldwell made her decision to deny the narcotic pain medication based on a policy rather than on her medical assessment of whether he required it. This deflates Ms. Caldwell's argument that she couldn't have been deliberately indifferent because she provided some pain medication, even if not the proper kind. Instead, it tends to show that Ms. Caldwell didn't base the decision to give over-the-counter medication in lieu of OxyContin and Soma on a medical decision at all, but made the decision to adhere to a policy. Since the decision wasn't based on her (or a doctor's) assessment that Mr. Grawcock didn't medically require the prescription medication, a jury may find that the decision was deliberately indifferent to Mr. Grawcock's pain."); *see also French v. Daviess Cnty., Ky.*, 376 F. App'x 519, 523 (6th Cir. 2010); *Wethington v. Tippecanoe Cnty. Sheriff*, No. 4:10 CV 84, 2011 U.S. Dist. LEXIS 11814, 2011 WL 488652, at *4 (N.D. Ind. Feb. 7, 2011*); Estate of Clutters v. Sexton*, No. 1:05cv223, 2007 U.S. Dist. LEXIS 84025, 2007 WL 3244437, at *8 (S.D. Ohio Nov. 2, 2007); *King v. Kramer*, 680 F.3d 1013, 1015 (7th Cir. 2012).

Finally, it is hardly surprising that the Defendant now falsely denies having perceived Mr. Schwark's serious medical needs in an attempt to avoid liability. That is why a jury "may infer existence of this subjective state of mind from the fact that the risk

of harm is obvious." *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002); *see also Durkee v. Minor*, 841 F.3d 872, 876 (10th Cir. 2016) ("The question whether Defendant Hochmuth was aware of facts from which he drew the inference that a risk of harm to Plaintiff existed while in the visitation room is for the factfinder."). A jury could reasonably find that the risk of harm was obvious to Defendant Fitting. *See Mata*, 427 F.3d at 752 (finding that a defendant cannot "escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist[]").

### 5.5 **Mr. Schwark's right to be free from deliberate indifference to his serious medical needs was clearly established in November 2013.**

As fully demonstrated above, the evidence demonstrates that Mr. Schwark's constitutional right to be free from deliberate indifference to his serious medical needs was violated by Defendant Fitting. The only remaining question is whether that right was clearly established at the time of the events at issue. "[T]here is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata*, 427 F.3d at 749. As stated by the Supreme Court in *Estelle*:

> Elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency. . . .

429 U.S. at 103 (citations omitted). Defendants were therefore on notice that their failure to provide meaningful medical care to Mr. Schwark (or obtain medical care for him), despite obvious signs of serious medical needs, violated his clearly established rights. Defendants deliberately failed to provide Mr. Schwark with adequate care to address his basic, obvious, and emergent medical needs; and failed to ensure that his care met basic and obvious standards of nursing care. *See Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980) (stating that in order to comply with constitutional guarantees, a state must make "available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates... [and t]his includes medical treatment for inmates' physical ills, dental care, and psychological or psychiatric care."). Mr. Schwark had a clearly established right to be free from deliberate indifference to his medical needs and Defendant Fitting violated that right.

6. **Conclusion**

Plaintiff respectfully requests that the Court deny Defendant Katherine Fitting M.D.'s Motion for Summary Judgment in its entirety.

DATED this 19th day of October, 2017.

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*
David A. Lane
Andy McNulty
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com

30

amcnulty@kln-law.com

ATTORNEYS FOR PLAINTIFF

<u>CERTIFICATE OF SERVICE</u>

I certify that on this 19th day of October, 2017, I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT KATHERINE FITTING, M.D.'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Steve Michalek
Gina Glockner
Childs McCune
821 17th Street, Suite 500
Denver, CO 80202
smichalek@childsmccune.com
gglockner@childsmccune.com
*Attorneys for Dr. Katherine Fitting*

Eric Ziporin
Susan McNulty
Senter Goldfarb & Rice
3900 E. Mexico Ave., Suite 700
Denver, CO 80210
eziporin@sgrllc.com
smcnulty@sgrllc.com
*Attorneys for Sheriff Fred Wegener,*
*Susan Canterbury and Jeri Swan*


s/ *Charlotte Bocquin Scull*
Paralegal