EXHIBIT 4

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

```
1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 15-CV-2507-JLK
3    _____

4    KYLE JEFFERY SCHWARK,

5         Plaintiff,

6    vs.

7    SHERIFF FRED WEGENER, in his official and individual
     capacities; NURSE SUSAN CANTERBURY, in her individual
8    capacity; NURSE JERI SWANN, in her individual capacity;
     NURSE CATHLENE PEARCE, in her individual capacity;
9    DOCTOR KATHERINE FITTING, in her individual capacity,

10        Defendants.
     _____
11
        DEPOSITION OF KATHERINE MARGARET FITTING, MD, FACP
12
                    January 5, 2017
13   _____

14

15

16

17

18

19

20

21

22

23

24

25
```

Kyle Jeffery Schwark vs.                                    Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                                                January 05, 2017

Page 2

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:
               DAVID D. LANE, ESQ.
 3             DUNIA DICKEY, ESQ.
               Killmer, Lane & Newman, LLP
 4             1543 Champa Street, Suite 400
               Denver, Colorado  80202
 5             Phone:  303-571-1000
               Email:  dlane@kln-law.com
 6             Email:  ddickey@kln-law.com

 7    ON BEHALF OF DEFENDANTS SHERIFF FRED WEGENER,
      NURSE SUSAN CANTERBURY, NURSE JERI SWANN, AND
 8    NURSE CATHLENE PEARCE:
               ERIC M. ZIPORIN, ESQ. (Telephonically)
 9             Senter Goldfarb & Rice, LLC
               3900 East Mexico Avenue, Suite 700
10             Denver, Colorado  80210
               Phone:  303-320-0509
11             Email:  eziporin@sgrllc.com

12    ON BEHALF OF DEFENDANT KATHERINE FITTING, M.D.:
               STEVEN A. MICHALEK, ESQ.
13             Childs McCune, LLC
               821 17th Street, Suite 500
14             Denver, Colorado  80202
               Phone:  303-296-7300
15             Email:  smichalek@childsmccune.com

16    ALSO PRESENT:
               Kyle Jeffery Schwark
17             Shawn Lindsey
               Sydney Wolak
18

19

20

21

22

23

24

25
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 8

```
 1   exactly.
 2           Q.      Well, do you consider yourself an
 3   internist or --
 4           A.      I'm an internist and nephrologist.
 5           Q.      Okay.  Have you ever been disciplined by
 6   any medical board?
 7           A.      No.
 8           Q.      Will you tell us how it is that you came
 9   to be involved in -- with the county that we're dealing
10   with here?
11           A.      Park County.
12           Q.      Park County, yeah.
13           A.      I had moved to Fairplay from Denver and
14   opened a practice -- or joined a practice in Fairplay.
15           Q.      And when was that?
16           A.      That was in 2004.
17                   At that point in time, it was associated
18   with a group called High Country Health Care.  And since
19   I was the only practicing physician in Park County, the
20   undersheriff and the jail captain came to me and asked if
21   I would provide medical services for their jail.
22           Q.      Okay.  So you agreed to do that?
23           A.      I did.
24           Q.      And was this on a per-case basis that you
25   were being paid, or was this a flat rate that you were
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 9

 1   being paid, regardless of how many prisoners they had?

 2         A.    It was for a monthly payment.

 3         Q.    Okay.  So it was a flat fee every month,

 4   regardless of how busy or not busy you were?

 5         A.    That's correct.

 6         Q.    And that started in 2004?

 7         A.    The contract was signed in November of

 8   2004.  Services actually started in January of 2005.

 9         Q.    Okay.  And do you recall what that flat

10   rate was?

11               MR. MICHALEK:  Well, objection.  That's

12   confidential.  Any compensation, I don't think, is

13   discoverable.

14         Q.    (By Mr. Lane)  Well, let me explain that.

15   That's the one thing I didn't explain about depositions

16   that you may already know about.

17               Your lawyer is allowed to raise objections

18   to preserve the record.  There is no judge here,

19   obviously, to rule on those objections.  He's preserving

20   the record so that later on down the road, if he wants

21   to, he can go in front of the judge and say, You

22   shouldn't be able to ask that question at trial, and the

23   judge will then make a ruling.  But the rule of

24   depositions is when he makes his objection, you then go

25   ahead and answer the question.  He just raised a

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 11

1        MR. MICHALEK:  Just to clarify, my

2    objection -- and I would move for a protective order --

3    is pretty clear.  Anything related to compensation is

4    confidential and privileged and not discoverable.  I

5    don't think that is discoverable, and I would instruct

6    her not to answer about compensation.  Anything else

7    about the terms of the agreement I think you can ask

8    her.

9        Q.    (By Mr. Lane)  Well, let me ask you this:

10   Is Park County paying you?

11       A.    Yes.

12       Q.    Out of County funds?

13       A.    Yes.

14        MR. LANE:  There's nothing at all

15    confidential about that.  That's public record.

16        MR. MICHALEK:  Well, I think -- I don't

17    know from Park County's standpoint.  But the doctor's

18    compensation, from her standpoint, I think, is

19    confidential.

20        MR. LANE:  Well, we can actually go to the

21    magistrate on this one if you want to.  I think it's a

22    looser issue for you because there's absolutely nothing

23    confidential about the expenditure of public funds for

24    any reason.

25        Q.    (By Mr. Lane)  I'm going to ask you to

Page 12

1   answer the question and tell me how much money Park

2   County pays you every month.

3                   MR. MICHALEK:  I'm going to, at this

4   point, instruct her not to answer.

5                   MR. LANE:  Okay.

6                   MR. MICHALEK:  We can talk about it on a

7   break.  And I need to talk to the county attorney, as

8   well, about that because I don't know their position on

9   that issue.

10                  MR. LANE:  Okay.  Well --

11                  MR. MICHALEK:  At least from my client's

12  standpoint, my understanding is her compensation is

13  confidential.

14                  MR. LANE:  Let me ask you this.  Because

15  the only time you can instruct a witness not to answer a

16  question is if there's a privilege -- a legal privilege,

17  like spousal privilege, attorney-client privilege,

18  marital priv- -- you know, physician-patient privilege.

19  You can then instruct your witness not to answer a

20  question.  But unless you can point out a privilege, then

21  you're going to lose this go-around with the magistrate

22  judge.

23                  MR. MICHALEK:  Okay.  Well, I guess we

24  disagree.

25                  MR. LANE:  Is there a privilege you're

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 13

```
 1   citing?
 2                   MR. MICHALEK:  Because I think if there's
 3   something that's privileged or confidential -- if
 4   something is confidential or privileged and it's not
 5   discoverable, then a witness can be instructed not to
 6   answer that question.
 7                   MR. LANE:  Okay.  Well, why don't we stop
 8   and just call the magistrate right now.  Who is the
 9   magistrate on this case?  Do we know?
10                   It should be in the caption in the case --
11   in the file.
12                   MR. ZIPORIN:  We have Judge Kane, but we
13   have no magistrate.
14                   MR. LANE:  Oh, okay.  Now, we've got to
15   find Judge Kane's phone number.
16                   Sydney, could you find Judge Kane's phone
17   number, please?
18                   (Ms. Wolak exited the room.)
19                   MR. MICHALEK:  David, my suggestion is we
20   go on with the questions and talk about this on a break
21   because I would want to talk to the County's attorney
22   about this issue.
23                   MR. LANE:  Okay.
24                   MR. MICHALEK:  And I may well agree that
25   she can answer the question.  Let's talk about it on the
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 19

 1    setting of an incarceration.

 2           Q.     Give me an example of when somebody comes

 3    in with a prescription for something and you decide to

 4    change it.

 5           A.     The patient comes in with a prescription

 6    for a blood pressure medication that we don't have on the

 7    formulary, and we will substitute a similar medication

 8    that will handle the blood pressure issue.

 9           Q.     When you say "formulary," it sounds to me

10    like -- obviously, jails are concerned about costs every

11    day.  Is formulary another word for a generic substitute

12    for perhaps a higher-priced medicine?

13           A.     Not always.

14                  MR. MICHALEK:  Object to form.

15           Q.     (By Mr. Lane)  Did you get informed that

16    Mr. Schwark had brought all his own meds into the jail?

17           A.     Yes.

18           Q.     Okay.  And so he had all his meds.

19                  Did you change any of his meds?

20           A.     After the first phone call, no.

21           Q.     Okay.  So the nurse read you a list of all

22    the meds that Mr. Schwark was on, and you said, Fine,

23    that's all okay?

24           A.     I said for them to continue that

25    medication.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 21

1    Mr. Schwark that you know of?

2                    MR. MICHALEK:  Object to foundation.

3         A.     I have no knowledge about that.

4         Q.     (By Mr. Lane)  All right.  But you had

5    this conversation with the nurse and you apparently

6    thought he was on some appropriate medications.  So it's,

7    Don't change anything, and on we go, right?

8                    MR. MICHALEK:  Object to form.

9                    You can answer.

10        A.     Not exactly.

11        Q.     (By Mr. Lane)  What were your thoughts?

12        A.     My thoughts were that, as per our policy,

13   we don't just discontinue benzodiazepines because of the

14   withdrawal syndrome, and that those meds need to be

15   weaned.

16        Q.     Which of his meds were benzodiazepines?

17        A.     His alprazolam.

18        Q.     Okay.  And what was that designed to

19   control?

20        A.     I can't tell you that.  I didn't prescribe

21   it for him.  And at that point, I had no information from

22   the prescribing physician.

23        Q.     Well, you can't cut him back on that, cold

24   turkey, is what I'm hearing you say, right, because

25   there's a withdrawal problem?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 22

```
 1          A.      You can't discontinue cold turkey.  You
 2   can wean off.
 3          Q.      Okay.  But were you concerned that he
 4   should be weaned off of these meds?
 5          A.      Absolutely.
 6          Q.      And why should he be weaned off a med that
 7   another physician decided he needed?
 8          A.      There are medications that are not
 9   appropriate in an incarceration situation.  And we do not
10   provide benzodiazepines as a standing presentation for
11   any inmates because they are frequently abused, traded,
12   and sold within the setting of the jail.
13          Q.      Well, I have been doing this now for 37
14   years and I've been involved in the criminal justice
15   system for 37 years.  It is my belief that I've never, in
16   37 years, found a jail that just gives a bottle of pills
17   to an inmate and said, Okay, here's your prescription; go
18   take your meds according to what the bottle says.
19                  In every jail in America, they have what
20   is called a med line.  Are you familiar with the med
21   line?
22                  MR. MICHALEK:  Object to form of the
23   question.
24          A.      Yes, I am.
25          Q.      (By Mr. Lane)  Okay.  And the med line is
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 24

```
 1                    MR. MICHALEK:  Let him finish his question
 2      before you answer.  Slow down.
 3                    THE DEPONENT:  Sorry.
 4            Q.     (By Mr. Lane)  No, you're good.
 5                    What was your understanding of what was
 6      being controlled by the benzodiazepines in Mr. Schwark's
 7      case?
 8            A.     At the time of the phone call, I had no
 9      medical history for him, so I did not know what
10      Dr. Singer prescribed that for.
11            Q.     Do you have -- did you get knowledge from
12      a nurse that a judge had ordered that Mr. Schwark
13      continue his medications?
14            A.     I'm not sure exactly when that was told to
15      me, but it was told to me that Mr. Schwark said that the
16      judge had given -- or written a letter that said he
17      should receive those meds.
18            Q.     Could withdrawal from benzodiazepines
19      cause seizures, based on your training and experience?
20            A.     Yes, it can.
21            Q.     And Mr. Schwark ultimately had some
22      seizures while at the jail, didn't he?
23            A.     Yes, he did.
24            Q.     Do you know what the cause of those
25      seizures was?
```

```
 1                    MR. MICHALEK:  Object to foundation.

 2        A.     You would know better than I.

 3        Q.     (By Mr. Lane)  Right.  I'm just saying --

 4  you've distinguished between the Breathalyzer and the

 5  blood test, and he had .02 at some point.

 6               You're not suggesting that that's an

 7  inaccurate reading, are you?

 8        A.     No.

 9        Q.     Okay.  So what was his prescription

10  medication that the benzodiazepine was designed to

11  prevent, or what condition was it being given to him to

12  alleviate?

13        A.     As I said before, I don't know what

14  indication Dr. Singer used for that prescription.

15        Q.     Well, but he was on this med for a reason,

16  presumably, right?

17        A.     I would certainly hope so.

18        Q.     Okay.  And did you make any effort to

19  determine what the reason for his being on that med was?

20        A.     I asked the nurse what his medication was,

21  and they gave me the information that they had, which was

22  he was on those meds, but we did not have an indication.

23        Q.     Okay.  And you left the status quo after

24  your first conversation with the nurse, right?

25        A.     That is correct.
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 29

```
 1                        You can answer.
 2          A.      That can vary depending on what time
 3   someone is brought in, what day of the week, if it's a
 4   weekend or holiday.  But in general, that would happen
 5   within 12 to 24 hours.
 6          Q.      (By Mr. Lane)  Okay.  You would agree with
 7   me that a seizure is a very serious medical issue, would
 8   you not?
 9                  MR. MICHALEK:  Object to form.
10          A.      Yes, a seizure is a worrisome condition.
11          Q.      (By Mr. Lane)  And it can be fatal.  You
12   would agree with me, right?
13          A.      In rare circumstances, it can be fatal.
14          Q.      And would you agree with me that if
15   someone suffers from a seizure, they should be
16   hospitalized?
17          A.      Not always.
18          Q.      Okay.  Under what circumstances should
19   somebody be hospitalized after a seizure as opposed to
20   not hospitalized after a seizure?
21                  MR. MICHALEK:  Object to form.
22          A.      The most direct reason for hospitalizing
23   someone with a seizure is if they have a condition called
24   status epilepticus, which is the seizure continues on --
25   is not self-terminating -- or if repeated seizures occur.
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 30

1      Q.      (By Mr. Lane)  All right.  Why did you not

2   change the status quo after the first call from the nurse

3   where you found out he was on benzodiazepines?  Why did

4   you not try to wean him at that point?

5      A.      I had a call early in his incarceration

6   and didn't have a chance to look at the full picture.

7   And so my expectation was we needed to just get something

8   on board at that time, and then we could look at how we

9   would go about weaning him after that.

10      Q.      So he was able to continue to take his

11   benzodiazepines after that first phone call, right?

12      A.      Yes.  He got his regularly prescribed

13   alprazolam after that phone call, until the second phone

14   call.

15      Q.      And how long had passed between the first

16   phone call and the second phone call?

17      A.      I don't know exactly --

18      Q.      Just ballpark.

19      A.      -- but I think somewhere around 12 hours.

20   It might have been a little bit longer.  I'm not certain.

21      Q.      Okay.  So it's not a hard-and-fast strict

22   rule that you can't have benzodiazepines at the jail, he

23   had benzodiazepines at the jail, right?

24              MR. MICHALEK:  Object to form.

25      A.      He received his medication, and our

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 31

1   expectation would be he would be weaned off of

2   benzodiazepines.  That is the policy for all patients who

3   come in on benzodiazepines, with the exception of someone

4   who is on it for a known seizure disorder for which that

5   is the only medication that controls a known seizure

6   disorder.

7           Q.    (By Mr. Lane)  Okay.  So everybody who's

8   getting weaned off of benzodiazepines continues to take

9   benzodiazepines while at the jail; they're just taking

10  smaller doses, right?

11          A.    Until they come off.  That's correct.

12          Q.    So there is no actual rule that says you

13  can't have -- you can't be on benzodiazepines at the

14  jail, because everybody who is getting weaned is on

15  benzodiazepines at the jail, right?

16               MR. MICHALEK:  Object to form.

17          A.    That's one way to look at it.  But if we

18  had a standing rule that you couldn't wean off of

19  benzodiazepines, then the jail couldn't accept anyone who

20  had a prescription for a benzodiazepine.  And that would

21  not be appropriate.

22          Q.    (By Mr. Lane)  And what are the side

23  effects from being weaned off benzodiazepines?

24          A.    Being weaned off?

25          Q.    Yes.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 33

1    misunderstanding.

2                   Will you clarify, then?  What was the

3    second call about?

4          A.    The second call was about having the

5    seizure.  I asked that he be put on our

6    alcohol-withdrawal protocol, which substitutes a

7    different benzodiazepine which is stronger and longer

8    acting than the one that he had a prescription for.

9          Q.    Okay.  And what was it that led you to

10   believe that he was having alcohol withdrawal and that's

11   what caused the seizure?

12         A.    The fact that he had a history of coming

13   in with an alcohol level and the fact that he had a

14   seizure within the time frame that is typically seen for

15   alcohol-withdrawal seizures, which is while those alcohol

16   levels are falling.

17         Q.    Okay.  Did you request that anyone

18   interview Mr. Schwark to find out if he's suffering from

19   alcohol withdrawal?

20                   MR. MICHALEK:  Object to form.

21         A.    I didn't ask them to ask that specific

22   question.

23         Q.    (By Mr. Lane)  All right.  I mean,

24   patients are sometimes really unreliable sources of

25   information, and sometimes they're very reliable sources

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 84

1        Q.      Okay.  And what was said during that

2    conversation?

3        A.      The exact conversation I don't recall, but

4    I know that we discussed what medication he was on and

5    how we would manage weaning him from his benzodiazepines.

6        Q.      Okay.  So what -- I mean, were you

7    given -- on the first go-around, they called you with a

8    list of his meds, and you said, Keep the status quo.  Did

9    they do the same thing the second go-around in February?

10       A.      I don't remember whether they went through

11   his entire list of medications, but we did talk about the

12   benzodiazepines and the Suboxone.

13       Q.      Okay.  And what did you say about those

14   things?

15       A.      I asked if we had received records from

16   the hospital, and I asked if we had received records from

17   Dr. Singer.  We had not received any records from either

18   source.  So without access to those records, I evaluated

19   the meds that he was on and gave them orders for his wean

20   from his benzodiazepines.

21       Q.      Okay.  Would it refresh your recollection

22   if I told you that on February 25th, he was on Suboxone,

23   chlordiazepoxide, and alprazolam?

24       A.      Yes.

25       Q.      Okay.  And we've already talked about

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 85

1   everything.  What is the -- we have not talked about the

2   chlordiazepoxide.  What is that?

3           A.    It's chlordiazepoxide, and that's Librium.

4           Q.    Okay.  And why -- we've talked about the

5   Suboxone was for his prior heroin use.  And the

6   alprazolam was given to him for what purpose?

7           A.    That was Dr. Singer's prescription.  I

8   didn't have records from Dr. Singer, so the exact

9   indication, I don't know.

10          Q.    And the chlordiaz- -- what did you say?

11          A.    Chlordiazepoxide?

12          Q.    What is that for?

13          A.    It's also a -- it's a long-acting

14  benzodiazepine.

15          Q.    Okay.  And so as of February 25th, you

16  were ordering him to -- you were ordering your medical

17  staff to wean him off the chlordiazepoxide, as well as

18  the alprazolam?

19          A.    Correct, because there's no reason he

20  should be on two benzodiazepines.  One, necessarily, had

21  to go because there's a contraindication for an increased

22  possibility of adverse side effects from those

23  medications; higher chance of overdosing on the

24  benzodiazepines.  And then we started on the wean that we

25  use when anybody who is on chronic benzodiazepines

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 86

1  therapy undergoes when they are at the jail.

2         Q.    Okay.  Again, Dr. Singer had prescribed

3  these things to Mr. Schwark, based on what your review of

4  the record was, correct?

5         A.    I was told that -- yeah.  We had pictures

6  of his bottles that had Dr. Singer's name on it as the

7  prescribing physician.

8         Q.    Did you --

9         A.    I didn't have records from Dr. Singer.

10         Q.    Did you, personally, ever pick up the

11  phone and try to call Dr. Singer?

12         A.    No.

13         Q.    Did Dr. Singer ever contact anybody at the

14  jail that you know of?

15         A.    I have no knowledge that Dr. Singer,

16  himself, ever contacted the nurses.

17         Q.    Are you aware that Mr. Schwark's mother,

18  on February 28th, contacted the jail and asked if she

19  needed to bring Mr. Schwark's medications to the jail?

20         A.    No.

21         Q.    Are you aware of the fact that Mr. Schwark

22  had a cervical hard collar prescribed to him for the

23  injury that he suffered when he fell off the table?

24         A.    At that time, I had no information

25  regarding what was prescribed for him during his

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 87

```
 1   hospitalization at Denver Health.
 2        Q.    Do you believe that -- what is the
 3   function of a protective cervical hard collar?
 4        A.    To stabilize the neck.
 5        Q.    Is that done by prescription?
 6        A.    It can be.  You can also purchase a hard
 7   collar at a pharmacy.
 8        Q.    All right.  If it is -- if a hard
 9   collar -- if a cervical hard collar was prescribed by
10   somebody at Denver Health, would you have ordered that it
11   be taken from Mr. Schwark?
12        A.    No.
13        Q.    All right.  Would you agree that taking
14   away a hard collar from somebody who has a prescription
15   for a hard collar could exacerbate cervical issues?
16             MR. MICHALEK:  Object to form.
17        A.    If they had an acute fracture and they
18   were still within the time frame for which they needed
19   that protection, then the answer would be yes.
20        Q.    (By Mr. Lane)  Are you aware that on his
21   second incarceration, Mr. Schwark began to suffer major
22   hallucinations?
23        A.    I was informed of that.
24        Q.    Do you know what the cause of those
25   hallucinations was?
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 92

```
 1              A.    I don't know the date that he came back.

 2              Q.    But it was February in 2014, to the best

 3    of your recollection?

 4              A.    Yes.

 5              Q.    All right.  At the bottom of this UA

 6    Dipstick Results, it says, "+THC."  Does that mean that

 7    he had smoked some marijuana, probably?

 8              A.    It was positive for the metabolites for

 9    marijuana, so...

10              Q.    Okay.  And whoever wrote this note or --

11    presumably wrote, "Called Dr. Fitting with results - she

12    stated that this likely means his dietary status is poor

13    and dehydration."

14              A.    Correct.

15              Q.    Okay.  Here's the next exhibit, which is

16    Exhibit Number 27.

17                    (Deposition Exhibit 27 marked.)

18              Q.    Do you recognize this?

19              A.    Yes.

20              Q.    This is a -- on your letterhead.  It's a

21    prescription pad, right?

22              A.    It's actually a notepad, but it --

23              Q.    Okay.

24              A.    -- served as a prescription.

25              Q.    It's dated 2/25/14 -- or 2/26/14.
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 93

1      A.      Yes.

2      Q.      It's for Kyle Schwark.  Number 1 says, "DC

3   Suboxone."  What is -- is that to discontinue Suboxone?

4      A.      Correct.

5      Q.      Number 2, "DC" --

6      A.      Chlordiazepoxide.

7      Q.      Right.  Discontinue that?

8      A.      Yes.

9      Q.      And then to wean off the --

10     A.      Alprazolam.

11     Q.      Alprazolam.

12             Okay.  What does the rest of that note

13   mean?

14     A.      That's the dosing schedule for the

15   alprazolam.

16     Q.      Okay.  You were just going to cut him off

17   completely on the Suboxone and chlordiazepoxide?

18     A.      Chlordiazepoxide.

19     Q.      Right.

20     A.      As I stated earlier, it's contraindicated

21   to be on two benzodiazepines at the same time, so the

22   chlordiazepoxide was discontinued.  The Suboxone, which

23   is indicated to help people with urges to use alcohol or

24   narcotics, was discontinued because there's no access to

25   alcohol or narcotics in the jail, so it wasn't needed for

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 94

```
 1   his medical therapy.
 2         Q.      What is your best understanding of why
 3   Kyle Schwark was hallucinating in the jail in February?
 4         A.      I don't know why he was hallucinating,
 5   which is why I referred him to the psychiatric nurse.
 6         Q.      Did he see the psychiatric nurse?
 7         A.      I don't know.
 8         Q.      Would you agree that hallucinations are a
 9   symptom of a psychotic state?
10              MR. MICHALEK:  Object to form.
11         A.      They can be.
12         Q.      (By Mr. Lane)  If someone is actively
13   hearing voices or seeing things, assuming that it is not
14   caused by hallucinogenic drugs, isn't that sort of the
15   quintessential benchmark of psychosis?
16         A.      Those are symptoms of psychosis, yes.
17         Q.      And you would agree with me that psychosis
18   is a serious medical need, right?
19              If an inmate is psychotic, that inmate has
20   a serious medical need?
21              MR. MICHALEK:  Object to form.
22         A.      Correct.
23         Q.      (By Mr. Lane)  And do you understand that
24   the jail is obligated to attend to these serious medical
25   needs of an inmate?
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 98

1    time to not get it at night, so just one yesterday.  This

2    8 am he was starting to activate.  Hallucinations have

3    accelerate [sic], highly activated, everyone has a gun to

4    his head.  Took forever to get him to take his 1 mg ER at

5    1:00 ish.  His gaze does not focus on persons in room,

6    appeared to have a seizure, spit all over his face,

7    repetitive speech about the government wanting to kill

8    him, definitely not of this world, gave the captain a

9    reality check.  I feel we need a new much slower taper

10   program, thanks - asap.  He acted scared and

11   hallucinating but does not offer to be aggressive, but

12   very activated.  Susan."

13                   Is that right?

14        A.    Yes.

15        Q.    Now, Xanax is another word for which drug?

16        A.    The alprazolam.

17        Q.    Now, you said the alprazolam is designed

18   to stop what?

19                   You didn't know, did you?

20        A.    I don't know what Dr. Singer's indication

21   for alprazolam was for.  There are several things it can

22   be prescribed for.

23        Q.    But according to this note, Susan

24   Canterbury apparently believes that stopping the

25   alprazolam or tapering it off is what is causing these

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 99

1    hallucinations.  Isn't that what you understand this note

2    to mean?

3          A.     That is her opinion, which, in my opinion,

4    is incorrect.

5          Q.     Okay.  Did you ever see this email?

6          A.     I don't think I've seen this one.

7          Q.     Okay.  Now let's turn to the next

8    Bates-stamped page.  We're looking at the back-and-forth

9    between Susan Canterbury and Cynthia Parker.  Let's read

10   this.  The way emails are read is from the bottom up, so

11   let's turn to Bates-stamped page 99.  The bottom email on

12   page 99 is the one I just read.

13               Cynthia Parker then responds on March 5th

14   at 5:20 p.m. and says, "That sounds more like psychosis

15   than seizure activity.  Slowing the taper is fine, but

16   perhaps needs to have medications for hallucinations.  If

17   you want me to see him tomorrow as an emergency patient,

18   I can try to see him at 3PM on Thursday.  Let me know if

19   that works."

20               That was Cynthia Parker's conclusion.

21         A.     Yes.

22         Q.     Do you agree with Cynthia Parker?

23         A.     Do I agree with what?

24         Q.     That this sounds more like a psychosis

25   than some sort of seizure activity.

Page 107

```
 1                 MR. ZIPORIN:  Yes, please.

 2                 THE REPORTER:  Mr. Lane, do you need it

 3    expedited?

 4                 MR. LANE:  No.

 5                 THE REPORTER:  Okay.  Thank you.

 6                 (Deposition Exhibit 29 marked.)

 7                  *  *  *  *  *  *  *  *  *  *  *

 8                 (WHEREUPON, the foregoing deposition was

 9    concluded at the hour of 11:58 a.m.  Total time on the

10    record was 2 hours and 29 minutes.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kyle Jeffery Schwark vs.                                    Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                                              January 05, 2017

Page 108

```
 1                    I, KATHERINE MARGARET FITTING, MD, FACP,

 2    the deponent in the above deposition, do acknowledge that

 3    I have read the foregoing transcript of my testimony, and

 4    state under oath that it, together with any attached

 5    Statement of Change pages, constitutes my sworn

 6    statement.

 7


 8
      _____  I have made changes to my deposition
 9
      _____  I have NOT made any changes to my deposition
10

11

12                        _____

13                        KATHERINE MARGARET FITTING, MD, FACP

14

15

16    Subscribed and sworn to before me this  _____ day

17    of  _____.

18

19                    My commission expires: _____

20

21                        _____

22                        Notary Public

23

24

25
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Katherine Margaret Fitting, MD, FACP
January 05, 2017

Page 109

```
1                    REPORTER'S CERTIFICATE

2              I, Wendy Evangelista, a Registered

3   Professional Reporter and Notary Public within and for

4   the State of Colorado, commissioned to administer oaths,

5   do hereby certify that previous to the commencement of

6   the examination, the witness was duly sworn by me to

7   testify to the truth in relation to matters in

8   controversy between the said parties; that the said

9   deposition was taken in stenotype by me at the time and

10  place aforesaid and was thereafter reduced to typewritten

11  form by me; and that the foregoing is a true and correct

12  transcript of my stenotype notes thereof; that I am not

13  an attorney nor counsel nor in any way connected with any

14  attorney or counsel for any of the parties to said action

15  nor otherwise interested in the outcome of this action.

16              My commission expires:  August 30, 2020.

17

18

19              _____
                Wendy Evangelista
20              Registered Professional Reporter
                Notary Public, State of Colorado
21

22                      .

23

24

25
```