## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02507-JLK

KYLE JEFFERY SCHWARK,

      Plaintiff,

v.

SHERIFF FRED WEGENER, in his official and individual
capacities;  NURSE SUSAN CANTERBURY, in her individual
capacity; NURSE JERI SWANN, in her individual capacity;
NURSE CATHLENE PEARCE, in her individual capacity;
DOCTOR KATHERINE FITTING, in her individual capacity,

      Defendants.

_____

## REPLY IN SUPPORT OF DEFENDANT KATHERINE FITTING, M.D.'S MOTION
## FOR SUMMARY JUDGMENT [DOC. #75]

_____

## I.       INTRODUCTION

Plaintiff tries to portray this as a case about an inmate who suffered an injury when he was denied his medications during his first incarceration at Park County Jail and, claims to have been injured when one of his medications was tapered for "no legitimate medical purpose" during his second incarceration.  This portrayal is wholly inaccurate. Dr. Fitting ordered all of Schwark's previously prescribed medications be provided to him during his first incarceration in November 2013.  Evidence, including jail records, the testimony of Dr. Fitting, and the testimony and sworn affidavits of jail nurses confirm that Schwark received all of his medications as they had been prescribed.  Schwark's seizures were caused by alcohol withdrawal and not because he was denied medications.  When Dr. Fitting was informed of Schwark's first seizure, she ordered he be placed on the alcohol withdrawal protocol, which included an even stronger and more long-lasting medication to protect him from further seizures.  In February 2014, Schwark returned to the jail to

complete his sentence.  Dr. Fitting determined there was no legitimate medical reason to continue with a preventative medication for opioids since he would not have access to drugs during his incarceration.  In her medical opinion, it was also contraindicated to be on more than one benzodiazepine.  Dr. Fitting ordered Schwark's Xanax be slowly tapered.  At the end of the tapering schedule upon learning that Schwark had started to exhibit possible signs of hallucinations, Dr. Fitting timely referred his care to a mental health care provider to address his medical needs.  He continued to remain on his benzodiazepine until he was evaluated by mental health professionals at Denver Health, where they not only tapered this medication but discontinued it.

## II.     REPLY TO FACTS

Schwark's deliberate indifference claim focuses on two theories: (1) the alleged failure to receive any medication in November 2013 and (2) Dr. Fitting's decision to wean Schwark off of his medications in the absence of a legitimate medical purpose. Both fail as a matter of law.

### A.  <u>Reply Concerning Undisputed Material Facts</u>

#### *November 2013 Incarceration*

7.      Schwark's claim that Dr. Fitting did not order the nurses to provide him with all his prescribed medications and that he did not receive any medications on November 13 and November 14, 2013 is false and unsupported by all of the credible evidence in this case.  The Park County Jail records kept in the normal course of business, the sworn deposition testimony of Dr. Fitting and the jail nurses, as well as the sworn affidavits by Nurse Canterbury, Nurse Swann and Nurse Pearce all confirm that Schwark received his medications as they had been prescribed.  (Park County Jail Defendants' Motion for Summary Judgment, hereinafter "PCJ's MSJ" at Exs. E at ¶4, F at ¶2; Fitting's MSJ Exs. F, G, H, I, J, N at ¶5).  Schwark can't recall anything about receiving

his medications or who he spoke with on November 13 or 14, 2013, but agreed that if the jail documentation is correct, he received his medication. (**Reply Ex. U**, Schwark Dep, 129-133, 140:1-12, 147:12-16, 151:12-152:8).[1]

8.      Nurse Canterbury personally gave Schwark his medications on November 13, 2013 and had a five-minute conversation with him at that time. (Fitting's MSJ Ex. N, ¶5).  There is no record of Schwark not receiving his medications and no records of any kites from Schwark requesting any additional medications. (Fitting's MSJ at Ex. K, ¶9).  He only submitted one kite and it was to request "new whites." (*Id.*)  Schwark admitted in his testimony that could not recall what happened during that time as he was suffering from alcohol withdrawal. (**Reply Ex. U**).

9.      Schwark received his medications on the morning of November 14, 2013.  (PCJ's MSJ**,** Ex. E, ¶4; Fitting's MSJ Exs. F, G, H, I, and J,).  Schwark again testified that he couldn't recall what happened when he was suffering from withdrawal. (**Reply Ex. U**).

10.      On November 14, 2013, Schwark received his medications at 8:00 a.m. from a deputy during med pass. (PCJ's MSJ, Ex. E, ¶4).  Schwark could not recall who he spoke with or what day it was during this period of time. (**Reply Ex. U**; *see also*, Fitting's MSJ, Ex. F, G, H, I, and J).

14.      Following Schwark's seizure, Dr. Fitting ordered Schwark be placed on the alcohol withdrawal protocol and be given 25 milligrams of Librium, which was administered by Nurse Pearce.  (Fitting's MJS, Exs. F at 10, G at 33:4-16; 40:1-15; PCJ's MSJ, Exs. F, ¶5, E , ¶ 7 and 8; **Reply Ex. V**, Swann Dep., 16:20-24, 36:1-22, 46:11-47:3; **Reply Ex. W**, Pearce Dep. 22:7-18).  Librium is a stronger and longer lasting benzodiazepine than Xanax, and is an appropriate medication to prevent seizures and lessen the symptoms of alcohol withdrawal. (**Reply Ex. X**,

---

[1] Exhibits attached to Dr. Fitting's Reply in Support of Motion for Summary Judgment are in sequential lettering from her Motion for Summary Judgment.

Fitting Dep. at 60:5-9, 67:16-19, 68:6-9 and Singer Dep. at 26:21-23; *see also*, Fitting's MSJ Exs. P at ¶10, S at ¶4 and 8). The records maintained in the regular course of business by Park County Jail, the deposition testimony of Nurse Swann, Nurse Pearce, Dr. Fitting and Dr. Singer, the affidavits of Nurse Swann, Nurse Pearce, Timothy Moser, M.D., and Jonathan Ritvo, M.D. are consistent with these facts.

15. Following Schwark's seizure, Dr. Fitting ordered Schwark be placed on the alcohol withdrawal protocol and be given 25 milligrams of Librium, which was administered by Nurse Pearce. (Fitting's MSJ Ex. G at 33:4-16, 40:1-15; PCJ's MSJ Exs. F at ¶5, E at ¶ 7 and 8; **Reply Exs. V and W**). Librium is a stronger and longer lasting benzodiazepine than Xanax, and is an appropriate medication to prevent seizures and lessen the symptoms of alcohol withdrawal. (**Reply Ex. X**, Fitting Dep. at 60:5-9, 67:16-19, 68:6-9 and Singer Dep. at 26:21-23; *see also*, Fitting's MSJ Exs. P at ¶10, S at ¶4 and 8). The records maintained in the regular course of business by Park County Jail, the deposition testimony of Nurse Swann, Nurse Pearce, Dr. Fitting and Dr. Singer, the affidavits of Nurse Swann, Nurse Pearce, Timothy Moser, M.D., and Jonathan Ritvo, M.D. are consistent with these facts.

16. The evidence cited by Plaintiff does not contradict Dr. Fitting. Schwark has no recollection of events given he was going through alcohol withdrawal symptoms at the time. (**Reply Exs. U, Y**, Fitting Dep. 25:3-9). Following Schwark's seizure, Dr. Fitting ordered Schwark be placed on the alcohol withdrawal protocol and be given 25 milligrams of Librium, which was administered by Nurse Pearce. (Fitting's MSJ Ex. G; PCJ's MSJ Exs. E, F; **Reply Exs. V and W**). Librium is a stronger and longer lasting benzodiazepine than Xanax, and is an appropriate medication to prevent seizures and lessen the symptoms of alcohol withdrawal. (**Reply Ex. X**, Fitting Dep. at 60:5-9, 67:16-19, 68:6-9 and Singer Dep. at 26:21-23; *see also*, Fitting's MSJ Exs.

P at ¶10, S at ¶4 and 8).  The records maintained in the regular course of business by Park County

Jail, the deposition testimony of Nurse Swann, Nurse Pearce, Dr. Fitting and Dr. Singer, the

affidavits of Nurse Swann, Nurse Pearce, Timothy Moser, M.D., and Jonathan Ritvo, M.D. are

consistent with these facts.

17.    Schwark's subjective testimony that he felt weak does not eliminate the fact that

the Park County Jail nursing staff assessed him and determined he was medically stable. (**Reply**

**Ex. W**; PCJ's MSJ Ex. E).

*February 2014 Incarceration*

3.    Deny.   Plaintiff mischaracterizes Captain Muldoon's deposition testimony.

Captain Muldoon did not testify that he believed Schwark was experiencing mental health

problems.  He testified that Schwark was verbally aggressive and non-compliant, and that he had

a potential for being victimized in the general population.  Captain Muldoon testified that he had

no idea whether Schwark's behavior was attributable to a mental illness. (**Reply Ex. Z**, Muldoon

Dep, 30:1-34:25).

7.    Deny. Plaintiff mischaracterizes Dr. Fitting's clinical judgment to wean Schwark

from his benzodiazepines as "a hotly disputed issue."  Dr. Fitting testified that taking "more than

one benzodiazepines is contraindicated" and the expectation is that patients will be weaned off

benzodiazepines as they can be potentially harmful and are frequently abused, traded and sold

within the jail. (Fitting's MSJ Exs. G at 18:9-25 through 19:1-13, 20:15-24, 85:15-25, 93:2-25,

31:1-21, 22:3-12 and Q).   Accordingly, it was reasonable for Dr. Fitting to permit the Xanax but

not the Librium,[2] and to taper Schwark's Xanax during his second incarceration. (Fitting's MSJ

Ex. P, ¶12 and 15).  Although Dr. Fitting did not personally call Dr. Singer, Nurse Canterbury tried

---

[2] Dr. Singer prescribed Librium on February 21, 2014, only 3 days before the February incarceration (**Reply Ex.
AA**, Singer Dep. 96:6-9, 124:1-17).

to call Dr. Singer at least three times, but was not able to speak with him personally.  (Fitting's MSJ Ex. N, ¶13).  Dr. Singer's letter indicated that Schwark's medications were prescribed for opioid dependency, lead toxicity and anxiety (Doc. 61 at ¶21 and 22; Fitting's MSJ Ex. B). Finally, Schwark testified that when he was incarcerated in Summit County Jail he took benzodiazepines, however, Schwark has produced no evidence to support this statement.  Moreover, even if it were true, Summit County Jail's policies are not relevant.  Park County Jail Policy J-121-N, "Decisions Regarding Pharmaceuticals and Medical Marijuana," sets forth the rationale behind restricting access to some medications in the jail setting: "[i]nmates and detainees arrive at this facility from a variety of facilities and locations with medications and pills that present a challenge to the safe, secure and orderly operation of a detention facility." (Fitting's MSJ Ex. Q).

8.      Deny.  There is no evidence to support Plaintiff's claim that he had been "regularly taking these medications with great success."  After Schwark was evaluated and treated by the specialists at Denver Health, they continued the taper of his Xanax and in fact took him off all of his mediations. He functioned very well off his medications through his release from Jail in April 2014. (Fitting's MSJ Ex. N ¶16).

**B.   Response Concerning Additional Disputed Facts**

1.      Deny. Prior to Schwark's incarceration in November 2013, he was being intermittently prescribed Suboxone and Xanax by Dr. Singer. (Fitting's MSJ Ex. S, ¶5).  Whether Schwark consistently took medication just prior to entering the Park County Jail in November 2013 is unknown.  Schwark's prescription was for two to four tabs per day, which is consistent with what he received during his November 2013 incarceration. (**Reply Ex. AA**, 125:7-16).

2.      This statement is irrelevant even if true.  Schwark testified that when he was previously incarcerated in the Summit County Jail, he was provided his benzodiazepines. Schwark

has produced no evidence to support his statement.  Moreover, even if accurate, it is irrelevant. Park County Jail Policy J-121-N, "Decisions Regarding Pharmaceuticals and Medical Marijuana," sets forth the policy rationale behind restricting access to some medications in the jail setting: "[i]nmates and detainees arrive at this facility from a variety of facilities and locations with medications and pills that present a challenge to the safe, secure and orderly operation of a detention facility." (Fitting's MSJ Ex. Q).

3.      Schwark's claim that Dr. Fitting did not order the nurses to provide him with all his prescribed medications and that he did not receive any medications on November 13 and November 14, 2013 is false and unsupported by all of the credible evidence in this case.  The Park County Jail records kept in the normal course of business, the sworn deposition testimony of Dr. Fitting and the jail nurses, as well as the sworn affidavits by Nurse Canterbury, Nurse Swann and Nurse Pearce all confirm that Schwark received his medications as they had been prescribed. (PCJ's MSJ Exs. E at ¶4, F at ¶2; Fitting's MSJ Exs. F, G at 19:15-25; 26:23-25; 27:9-14; 30:1-20, H at 42:23-25 through 43:1-7, I at 21:15-16, J at 16:20-21, 25:17-25, 26:1-20; N at ¶5,). Schwark can't recall anything about receiving his medications or who he spoke with on November 13 or 14, 2013, but agreed that if the jail documentation is correct, he received his medication. (**Reply Ex. U**).

4.      Deny.  Schwark received his prescribed medications on November 13 and 14, 2013 and was exhibiting signs of alcohol withdrawal. (Fitting MSJ Ex. F, G, H, I, J, N at ¶5, P ¶9, and S ¶6; PCJ's MSJ Exs. E at ¶4, F at ¶2).

5.      Deny. Dr. Fitting had a personal contract with Park County Jail and was paid directly by the Jail for her services as a physician. (**Reply Ex. Y**, Fitting Dep. 14:11-18; 9:1-8).

6.      Deny that a slow tapper from benzodiazepines can lead to hallucinations.  (**Reply Ex. Y**, Fitting Dep., 103:14-18; Fitting's MSJ Ex. S ¶14, P ¶15, "psychosis is not typically a symptom of withdrawal from Suboxone or Xanax.").  At deposition, Dr. Fitting was asked about an email that Nurse Canterbury sent to Cynthia Parker, the Jail's mental health specialist, where she questioned whether Schwark was hallucinating because of the taper from Xanax.  Dr. Fitting testified about the email and stated that Nurse Canterbury was not a prescriber and not qualified to make an accurate assessment about the cause of his hallucinations.  (**Reply Ex. Y,** Fitting Dep., 101:5-9; Fitting's MSJ Ex. N ¶9 and 10, stating, "My training and experience related to mental health issues is very limited, so I did not understand why his condition had suddenly declined.").

7.      Deny.  Pursuant to Policy J-121-N, when an inmate arrives at the facility with prescription medications that are prohibited, the nurses contact Dr. Fitting.  Dr. Fitting then assesses whether certain medication should be provided to the inmate.  She evaluates the inmate's medical need for the particular medication prescribed, whether the requested medications could be potentially harmful to an inmate when taken with other medications, the particular medication's risk of abuse within the jail setting, and availability of effective substitute medications already included on the Jail's formulary. (**Reply Ex. Y**, Fitting Dep., 17:4 through 22:12; PCJ's MSJ Ex. A ¶ 3).

8.      Deny in part.  In February 2014, Dr. Fitting wrote an order to discontinue Schwark's Suboxone and Librium. (Fitting's MSJ Ex. O).  In addition, Dr. Fitting ordered a tapering schedule for the Xanax: (1) February 26 – 28, 2014: 1 milligram tablet three times a day; (2) March 1-3, 2014: 1 milligram tablet two times a day; (3) March 4-6, 2014: 1 milligram tablet one time a day; (4) March 7, 2014: discontinue Xanax. (*Id*.).

9.      Admit only that Schwark presented for booking in November 2013 with some medications.

10.     Deny Plaintiff's claim that there was no medical reason to taper Schwark's medications.   Suboxone had been prescribed for opioid dependence. (Fitting's MSJ Ex. B). Suboxone is an opioid which is used to help keep patient's off other opioids.  Since Schwark would not have access to opioids in the jail setting, Dr. Fitting exercised her reasonable medical judgment that there was no medical indication for that medication during his incarceration, particularly given the risks of diversion. (Fitting's MSJ Ex. G, 93:20-25).  The patient had also been prescribed Xanax and Librium.  Both of these medications are benzodiazepines.  It is contraindicated to be on more than one benzodiazepine at the same time. Therefore, she discontinued the Librium and set up a tapering schedule for the Xanax.  Dr. Fitting testified that the expectation is that patients will be weaned off benzodiazepines as they can be potentially harmful and are frequently abused, traded and sold within the jail. (Fitting's MSJ Exs. G, 18:9-25 through 19:1-13, 20:15-24, 85:15-25, 93:2-25, 31:1-21, 22:3-12 and Q, Schwark.Park000167). Dr. Fitting's decisions regarding Schwark's medications were reasonable and appropriate. (Fitting's MSJ Ex. P ¶8 and 12 and 15; C showing Schwark identified no history of mental illness; **Reply Ex. BB,** intake information showing same).

11.     Deny.  Dr. Fitting testified that pursuant to the prescribing physician, Suboxone was for opioid dependence.  Since Schwark would not have access to opioids in the jail setting, it was her medical judgment that there was no indication for the continued use of that medication during his incarceration, particularly given the risks of diversion. (Fitting's MSJ Ex. G at 93:20-25, P ¶8).

12.     Deny. Seizures are not a typical side-effect of abruptly stopping benzodiazepines. (**Reply Ex. Y**, Fitting Dep. 31:22 through 32:6; Fitting's MSJ Ex. P ¶9). Conversely, alcohol

withdrawal may cause seizures. (**Reply Ex. Y,** Fitting Dep. 33:12-16; **Reply Ex. AA**, Singer Dep., 66:17-19, 69:3-8; 98:5-22).

13.     Deny.  Plaintiff mischaracterizes his condition.  Schwark did not have "multiple seizures."  He had two seizures on November 14, 2013 after being given his prescribed medications.

14.     Deny.  Plaintiff misstates Dr. Fitting's testimony.  She testified that a seizure can be a "worrisome condition." (**Reply Ex. Y**, Fitting Dep., 29:6-17).

15.     Admit Dr. Fitting testified as such.

16.     Admit Nurse Swann called Dr. Fitting to inform her of Schwark's first seizure.  Dr. Fitting ordered Schwark be placed on an alcohol withdrawal protocol for his safety. (PCJ's MSJ Exs. F ¶5, E ¶7 and 8).

17.     Admit that in February 2014, Dr. Fitting ordered a tapering schedule for the Xanax: (1) February 26 – 28, 2014: 1 milligram tablet three times a day; (2) March 1-3, 2014: 1 milligram tablet two times a day; (3) March 4-6, 2014: 1 milligram tablet one time a day; (4) March 7, 2014: discontinue Xanax. (Fitting's MSJ Ex, O).

18.     Admit that Dr. Fitting did not personally attempt to call Dr. Singer.  Nurse Canterbury tried to call Dr. Singer at least three times, but did not speak with him personally. (Fitting's  MSJ  Ex.  N  ¶13).   Dr.  Singer's  letter  indicated  that  Schwark's  medications  were prescribed for opioid dependency, lead toxicity and anxiety (Doc. 61 at ¶21 and 22; Fitting's MSJ Ex. B).

19.     Admit that Dr. Fitting was informed by the Jail nursing staff that Schwark was exhibiting signs of potential psychosis. (Fitting's MSJ Ex. G, Fitting Dep. 87:20-25 through 88:1-

11 and 95:2-25 through 96:1-6; PCJ's MSJ Ex. G ¶9-12).  Dr. Fitting referred Schwark's care to Cynthia Parker to address any potential mental health issues.  (*Id. at* Fitting's MSJ at Ex. G).

20.     Admit.

21.     Admit Dr. Fitting testified as much and referred Schwark to the proper health care provider for medical treatment immediately upon learning that he may be exhibiting signs of psychosis. (*Id. at* Fitting's MSJ at Ex. G).

22.     Deny.  Dr. Singer testified that he's never seen anyone who abruptly discontinued the use of Suboxone develop psychosis.  (**Reply Ex. AA**, Singer Dep., 64:7-25; Fitting's MSJ Exs. S at ¶14, P at ¶15, "psychosis is not typically a symptom of withdrawal from Suboxone or Xanax.").  Dr. Fitting testified hallucinations are not caused by withdrawal from Suboxone or Xanax. (**Reply Ex. Y**, Fitting Dep. 103:14-18).  Schwark abused alcohol and was intoxicated when he entered the jail in November 2013.  (**Reply Ex. AA**, Singer Dep. 98:5-16). Alcohol withdrawal can cause seizures and psychosis. (*Id*. **Reply Ex. AA**, 68:2 to 69:23, 98:2-22).

23.     Deny.  Dr. Moser averred in his sworn affidavit that seizures are not typically a side effect of withdrawal from Suboxone or Xanax. (Fitting's MSJ Ex P ¶9). Dr. Singer testified there may be a very small risk for seizures to patients who abruptly discontinue the use of Suboxone. (**Reply Ex. AA**, Singer Dep., 68:2 to 69:23).  Schwark was given Suboxone in November 2013 and still experienced a seizure.  Schwark was not given Suboxone in February 2014 and did not suffer a seizure.

24.     Deny.  It is unlikely that a sudden discontinuation of Xanax would cause seizures. (**Reply Ex. Y**, Fitting Dep. 21:12-15; Fitting's MSJ Ex. P ¶9).  It is more common to suffer seizures from alcohol withdrawal than from Xanax. (**Reply Ex. AA**, Singer Dep., 68:24 to 69:8). Schwark

was given Xanax in November 2013 and suffered a seizure from alcohol withdrawal.  Schwark

was given his Xanax and weaned from it in February 2014 and did not suffer a seizure.

25.     Deny. Schwark's seizures were caused by alcohol withdrawal.  (**Reply Ex. Y**,

Fitting Dep., 25:9; 33:4-16; 36:3-19; **Reply Ex. AA**, Singer Dep., 68:2 to 69:23, 98:2-22; Fitting's

MSJ Ex. P ¶9, S ¶10).  Notably, Dr. Singer never reviewed any records from Park County Jail

regarding what medications were given Schwark. (**Reply Ex. AA**, Singer Dep., 67:12-23).

26.     Admit.

27.     Admit that Dr. Singer testified that he had prescribed Librium to Schwark in mid-

February 2014, but deny evidence that Schwark was taking Librium. (**Reply Ex. AA**, 96:6-9,

124:1-17).  In fact, Schwark testified in his deposition that he did not typically take that medication.

28.     Deny any foundation or information relating to Dr. Singer's intent.

29.     Deny.  Nurse Canterbury testified that although she tried to call Dr. Singer, she

never personally spoke with him. (Fitting's MSJ Ex. N ¶13).

30.     Deny. (Fitting's MSJ Ex. P ¶¶ 1, 2, 4, 5).

31.     Admit only that this is part of Schwark's allegations.

## III.     AFFIRMATIVE DEFENSE - QUALIFIED IMMUNITY

### A.     Dr. Fitting is Entitled to Qualified Immunity.

Schwark asserts Dr. Fitting is not entitled to qualified immunity because she is a private

physician who contracted with Park County Jail to provide medical services and, therefore, is not

a true government employee to whom qualified immunity should apply.  Schwark cites to a number

of cases almost exclusively from other jurisdictions which are all factually distinguishable from

the case at issue.  Specifically, all of the cases referenced by Plaintiff to support his position involve

private individuals employed by private companies to perform tasks by a municipality or state

entity.  In this case, there is no private intermediary and thus no reason why qualified immunity should not apply. See e.g., *Arabbo v. City of Burton*, No. 13-cv-11331, 2016 U.S. Dist. LEXIS 99950, at *8 (E.D. Mich. Aug. 1, 2016).

Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).  All of the cases relied on by Schwark, including *McCullum v. Tepe*, 693 F.3d 696, 697-98 (6th Cir. 2012) (psychiatrist employed by private non-profit entity who contracted with county jail not entitled to qualified immunity), *Richardson v. McKnight*, 521 U.S. 399, 403 (1997) (privately employed prison guards of private corporation who contracted with correctional center not entitled to qualified immunity), and *Carmody v. Ensminger*, Civil Action No. 16-cv-02603-PAB-NYW, 2017 U.S. Dist. LEXIS 151905 (D. Colo. Sept. 19, 2017) (private employees of private management corporation who contracted with county no entitled to qualified immunity), each involve a third-party contract between a jail and a corporation for services by one of the corporation's employees.[3]  The Courts in those cases determined that private employees of a private company who provide services for a governmental entity are not entitled to qualified immunity because (1) "unwarranted timidity" is less likely present when a private company is subject to competitive market pressures, (2) privatization helps ensure talented candidates are not deterred from entering public service by the threat of damage suites, and (3) the

---

[3] *Currie v. Chhabra*, 728 F.3d 626 (7th Cir. 2013) (County contracts with Health Professionals, Ltd to provide employees to provide medical care to inmates); *Garner v. Mohave Cty*., No. CV-15-08147-PCT-PGR, 2016 U.S. Dist. LEXIS 21045 (D. Ariz. Feb. 22, 2016) (defendants all employed by private medical company who contracted with County detention facility); *Thompson v. Ackal*, No. 15-02288, 2016 U.S. Dist. LEXIS 47154, at *36-42 (W.D. Mar. 9, 2016) (private employees of private company who contracted with county); *Cady v. Cumberland Cty. Jail*, No. 2:10-cv-00512-NT, 2013 U.S. Dist. LEXIS 109195, at *96-101 (D. Me. Mar. 22, 2013) (private health services provider contracted with county to provide its employees to the jail); *Hendricks v. Pickaway Corr. Inst.*, No. 2:08-cv-00580, 2015 U.S. Dist. LEXIS 159261, at *8-11 (S.D. Ohio Nov. 25, 2015) (defendant physician employed by a medical practice hired by the Ohio Department of Rehabilitation); *Cheek v. Nueces Cty. Tex.*, No. 2:13-cv-26, 2013 U.S. Dist. LEXIS 110039, at *68-69 (S.D. Tex. Aug. 5, 2013) (private medical personnel employed by private corporation that contracts with county to provide services to inmates).

risk of a private employee being distracted from their duties by potential lawsuits is minimal.[4] None of these considerations apply when, as is the case here, a private physician and not a corporation contracts directly with the correctional facility to provide medical services.

The present case is more akin to *Estate of Lockett v. Fallin*, No. 15-6134, 841 F.3d 1098, 2016 U.S. App. LEXIS 20499 (Nov. 15, 2016) and *Filarsky v. Delia,* 566 U.S. 377, 132 S. Ct. 1657 (2012).   In *Estate of Lockett*, Lockett's Estate sued Dr. Doe, a private healthcare provider who contracted with a government agency to perform executions on inmates, alleging violation of Eighth and Fourteenth Amendments.   Dr. Doe moved to dismiss asserting the defense of qualified immunity.   The Estate argued that Dr. Doe was not entitled to qualified immunity because he was a private party and not a government employee.   The Court held that Dr. Doe was entitled to qualified immunity because carrying out criminal penalties is a traditional function of government and had a state employee performed the same duties as Dr. Doe did, qualified immunity would apply.   The Court stated: "We see no sense in depriving a private doctor the same protection…he was a private party hired to do a job for which a permanent employee would have received qualified immunity." *Id*. at 1109.

Similarly, in *Filarsky v. Delia,* 566 U.S. 377, 132 S. Ct. 1657 (2012), a private attorney was hired by the city to conduct an investigation.   The appellee firefighter sued the city and the private attorney alleging they violated his constitutional rights.   With respect to whether the private attorney was entitled to qualified immunity, the Supreme Court unanimously held that a private attorney who directly contracted with the jail on a part-time basis was entitled to qualified

---

[4] One case cited in Plaintiff's Response, *Zikianda v. Cty. of Albany*, No. 1:12-cv-1194, 2015 U.S. Dist. LEXIS 122363 (N.D.N.Y. Sep. 15, 2015), involved a correctional facility's medical director who moved for summary judgment arguing he was a private independent physician. The court held that his actions were attributable to the State and he was in fact a "State actor."  Although the physician defendant did not argue qualified immunity, the court said assuming he had and that he was entitled to it, summary judgment was denied.

immunity. "Though not a public employee, Filarsky was retained by the City to assist in conducting an official investigation into potential wrongdoing. There is no dispute that government employees performing such work are entitled to seek the protection of qualified immunity. The Court of Appeals rejected Filarsky's claim to the protection accorded Wells, Bekker, and Peel solely because he was not a permanent, full-time employee of the City. The common law, however, did not draw such distinctions, and we see no justification for doing so under § 1983." *Id.* at 1667-68.  The *Filarsky* Court distinguished *Richardson*, in which the Court determined prison guards employed by a private firm to work in a correctional facility were not entitled to qualified immunity, stating, "*Richardson* was a self-consciously "narrow[ ]" decision. *Id.*, at 413, 117, S. Ct. 2100, 138 L. Ed. 2d 540 ("[W]e have answered the immunity question narrowly, in the context in which it arose"). The Court made clear that its holding was not meant to foreclose all claims of immunity by private individuals." *Id.* at 1667.

Schwark alleged in his Second Amended Complaint that Dr. Fitting was acting under the color of law, is an employee of Park County Jail, is a supervising physician responsible for overseeing the medical needs of the inmates at the Park County Jail and ensuring inmates receive appropriate medical care. (Doc. 85).  Dr. Fitting, in her Answer, admitted she was a physician providing medical care for Park County Jail inmates. (Doc. 89).  She contracts directly with Park County Jail. (**Reply Ex. Y**, Fitting Dep., 9:1-8).  The Jail pays Dr. Fitting for her services as Medical Director. (**Reply Ex. Y**, Fitting Dep., 14:11-18).  Dr. Fitting is employed by Park County Jail to fulfill the State's constitutional obligation to provide medical services to inmates.  Carrying out medical care and treatment of inmates in a state prison in unquestionably a traditional function of government and the sort of role qualified immunity is meant to protect. *Filarsky v. Delia*, 566 U.S. 377, 393-94, 132 S. Ct. 1657; *Estate of Lockett v. Fallin*, No. 15-6134, 841 F.3d 1098, 2016

U.S. App. LEXIS 20499 (Nov. 15, 2016); *West v. Atkins*, 487 U.S. 42, 53-54 (1988); *Lopez v. Dep't of Health Servs*., 939 F.2d 881, 883 (9th Cir. 1991) (hospital and ambulance service under contract with the state); *Evans v. Brouwer*, No. 9:13-CV-302, 2017 U.S. Dist. LEXIS 155711, at *2 (E.D. Tex. Sep. 22, 2017) (an independent contractor who performs a government function is entitled to qualified immunity); *Brewer v. Hayne*, 860 F.3d 819, 824 (5th Cir. 2017) (consulting forensic experts engaged in the criminal investigative functions entitled to assert qualified immunity).  The facts of this case, namely a private physician who contracts directly with a government entity and is paid directly by the government facility, distinguish it from *Richardson*, *McCullum* and *Carmody*.  There is no private company to lessen "unwarranted timidity" or to ensure talented candidates are not deterred from entering public service because of the threat of damage suits.  As set forth below, denying Dr. Fitting the right to plead the affirmative defense of qualified immunity would create far-reaching and devastating results for independent professionals who contract directly with government entities to assist in carrying out government functions.  Accordingly, under these circumstances, Dr. Fitting should be entitled to qualified immunity.

> ## B.    Public Policy Strongly Supports the Application of Qualified Immunity.

 "Affording immunity not only to public employees but also to others acting on behalf of the government similarly serves to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service." *Filarsky v. Delia*, 566 U.S. 377, 390, 132 S. Ct. 1657, 1665 (internal citations omitted).

"Qualified immunity's purpose lies in protecting government's ability to perform its traditional functions by providing immunity where necessary to preserve the ability of government officials to serve the public good or to ensure that talented candidates were not deterred by the

threat of damages suits from entering public service." *Estate of Lockett v. Fallin*, No. 15-6134, 841 F.3d 1098, 2016 U.S. App. LEXIS 20499 (Nov. 15, 2016) (internal citations omitted).

"To the extent such private individuals do not depend on the government for their livelihood, they have freedom to select other work--work that will not expose them to liability for government actions. This makes it more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts." *Filarsky v. Delia*, 566 U.S. 377, 390, 132 S. Ct. 1657, 1666.

Denying Dr. Fitting the ability to defend this Section 1983 deliberate indifference case based on qualified immunity would have a chilling effect on private physicians who contract directly with government correctional facilities to provide medical care and treatment to inmates. A physician acting under color of state law for a governmental entity must be assured the freedom to provide medical services without fear of being sued if a patient should disagree with their treatment plan. Contrary to Plaintiff's Response brief, this case is not similar to *McCullum v. Tepe*, *Richardson v. McKnight*, *Carmody, Currie, Garner, Thompson, Cady, Hendricks, or Cheek,* where a private corporation employed the defendant and contracted with the correctional facility to place her in the jail. Rather, Dr. Fitting is a private physician in the community that contracted directly with and was paid by Park County Jail. In fact, Dr. Fitting was the only practicing physician in Park County and the undersheriff and jail captain asked her to provide medical services for the jail. (**Reply Ex. Y**, Fitting Dep., 8:19-23).

Dr. Fitting served the role as the Park County Medical Director fulfilling the Jail's constitutional duty to provide inmates with medical care and treatment. A physician's autonomy and authority is critical to safely and effectively providing treatment to inmates. Extending qualified immunity to Dr. Fitting is reasonable as the threat of liability would significantly dampen

a private physician's willingness to serve in such capacity.  As such, the public policy behind qualified immunity strongly supports its application to Dr. Fitting.

        **C.**      **Dr. Fitting is entitled to Summary Judgment based on qualified immunity.**

"Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry. *Id. See also Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003) (once a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional or statutory right and (2) the constitutional or statutory right was clearly established when the alleged violation occurred). A reviewing court may exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Herrera*, 589 F.3d at 1070. See *King v. Patt*, 525 F. App'x 713, 718 (10th Cir. 2013).

A clearly established law "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[T]here must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Whitington v. Lawson*, 424 F. App'x 777, 780 (10th Cir. 2011) (quoting *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir.2010)).

Schwark fails to point to any case, let alone a Supreme Court or Tenth Circuit case, establishing liability under a deliberate indifference theory based on an alleged negligent tapper of benzodiazepines.  The treatment provided by Dr. Fitting during the November 2013 and February 2014 incarcerations were reasonable and appropriate and supported by legitimate medical purposes and policies.  At all times, Dr. Fitting's care and treatment contemplated the safety of Schwark and

his fellow inmates.  There is no question that Dr. Fitting is entitled to qualified immunity and summary judgment is appropriate.

## IV.    SCHWARK CANNOT PROVE DR. FITTING HAD A SUFFICIENTLY CULPABLE STATE OF MIND.

Schwark points to no evidence that Dr. Fitting's order and decision to continue his medications as prescribed in November 2013 and medication modification made after his seizure to help protect against another seizure demonstrate a deliberate indifference.  Schwark's only evidence, presumably to try and create the illusion of an issue of fact, is his own self-serving testimony that he believes he did not receive his medications.  However, Schwark's own testimony undermines his position as he admits he can't clearly remember when or who he spoke with during that period of time.  Most importantly, Schwark admitted that if the Park County Jail's documentation is correct then he received his medications.  All evidence, including business records from the Jail and the testimony of Dr. Fitting and the jail nurses indicate Schwark was given his mediations. Indeed, even if Schwark were not actually provided with his medications, which is factually not the case, Dr. Fitting ordered he receive his medications as prescribed by his outside physician until she had a chance to more thoroughly review them. (**Reply Ex. Y**; Fitting's MSJ Ex. G). After being alerted about his seizure, which Dr. Fitting reasonably attributed to alcohol withdrawal, she ordered a protective medication to prevent against further seizures.  Dr. Fitting's actions can hardly be called deliberate indifference.

Schwark also offers no evidence that Dr. Fitting's medical decision to not provide him with his Suboxone and to slowly wean him off Xanax during his February 2014 incarceration demonstrate deliberate indifference.  The subjective element of the deliberate indifference test requires that the plaintiff demonstrate facts "supporting an inference that Defendants *knew about and disregarded* a substantial risk of harm . . . ." *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 (10th

Cir. 2001) (emphasis added).  Liability under the subjective component only arises "where the need for additional treatment or referral to a medical specialist is obvious." *Id.* at 1232.  In the field of professional medical care, the Tenth Circuit recognizes an obvious need in three circumstances: (1) a medical professional recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral; (2) when a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition; or (3) a medical professional completely denies care although presented with recognizable symptoms that potentially create a medical emergency. *Id.*

Here, Schwark has produced no evidence that Dr. Fitting's care and treatment falls under any of the above categories.  Dr. Fitting's decision-making during both incarcerations were medically based as well as reasonable and appropriate under the circumstances. (Fitting's MSJ Ex. G, Fitting Dep. 18:9-25 through 19:1-13, 20:15-24, 85:15-25, 93:2-25, 31:1-21, 22:3-12).  Further, there is no evidence that Schwark had a "serious mental illness" that required Suboxone and Xanax. (Fitting's MSJ Ex. C showing Schwark identified no history of mental illness; s*ee also*, **Reply Ex. BB,** intake information showing same).  Indeed, neither Schwark himself nor his prescribing provider indicated Schwark's medication was for a "serious mental illness." (Fitting's MSJ Ex. B).  Schwark's evidence that another doctor may have chosen a different course of treatment is not evidence that the need was obvious.  "A difference of opinion with medical staff about treatment is not actionable under the Eighth Amendment, nor is a disagreement among medical experts." *Toler v. Troutt*, 631 F. App'x 545, 547–48 (10th Cir. 2015).  Plaintiff has offered no evidence that Dr. Fitting knew or should have known that Schwark would suffer from psychosis during his second incarceration. Nothing about his history or his prior incarceration suggests she knew her orders would cause psychosis and she chose to disregard the risk.

Accordingly, since Schwark has offered no evidence that the course of treatment Dr. Fitting chose in February 2014 was medically unacceptable under the circumstances and that she chose such course in conscious disregard of an excessive risk to his health, Dr. Fitting is entitled to summary judgment on Schwark's deliberate indifference claim. See e.g., *McKenzie v. Jorizzo*, No. 1:13-cv-1302-AA, 2015 U.S. Dist. LEXIS 2009, at *18-19 (D. Or. Jan. 6, 2015) (citing, Snow v. McDaniel, 681 F. 3d 1076 (9th Cir. 2014), overruled in part on other grounds by *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc)).

## V.      CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court grant summary judgment for Dr. Fitting on all claims against her.

Respectfully submitted this 13th day of November, 2017.

/s/ Steven A. Michalek
Steven A. Michalek, #29491
Gina L. Glockner, #44359
Childs McCune LLC
821 17th Street, Suite 500
Denver, CO 80202
Telephone: (303) 296-7300
FAX: (720) 625-3637
Email: smichalek@childsmccune.com
Email: gglockner@childsmccune.com
Attorneys for Defendant Dr. Fitting

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November 13, 2017, a true and correct copy of the foregoing **REPLY IN SUPPORT OF DEFENDANT KATHERINE FITTING, M.D.'S MOTION FOR SUMMARY JUDGMENT [DOC. #75]** was filed with the Court and served electronically via ECF upon the following:

David A. Lane
Andy McNulty
Killmer, Lane & Newman, LLP
1543 Champa St., Ste. 400
Denver, CO  80202
Email: dlane@kln-law.com
Email: amcnulty@kln-law.com

Eric Michael Ziporin
Susan E. McNulty
Senter Goldfarb & Rice, LLC
3900 East Mexico Avenue, Suite 700
Denver, CO 80210
Email: eziporin@sgrllc.com
Email: smcnulty@sgrllc.com

*s/ Mary Baltz*