*Kyle Jeffery Schwark vs.*

*Sheriff Fred Wegener, et al.*

*Deposition of Katherine Margaret Fitting, MD, FACP*

*January 05, 2017*



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Exhibit Y

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 2 of 20

Kyle Jeffery Schwark vs.                                    Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                                              January 05, 2017

Page 8

```
 1   exactly.
 2            Q.    Well, do you consider yourself an
 3   internist or --
 4            A.    I'm an internist and nephrologist.
 5            Q.    Okay.  Have you ever been disciplined by
 6   any medical board?
 7            A.    No.
 8            Q.    Will you tell us how it is that you came
 9   to be involved in -- with the county that we're dealing
10   with here?
11            A.    Park County.
12            Q.    Park County, yeah.
13            A.    I had moved to Fairplay from Denver and
14   opened a practice -- or joined a practice in Fairplay.
15            Q.    And when was that?
16            A.    That was in 2004.
17                  At that point in time, it was associated
18   with a group called High Country Health Care.  And since
19   I was the only practicing physician in Park County, the
20   undersheriff and the jail captain came to me and asked if
21   I would provide medical services for their jail.
22            Q.    Okay.  So you agreed to do that?
23            A.    I did.
24            Q.    And was this on a per-case basis that you
25   were being paid, or was this a flat rate that you were
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 3 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 9

```
 1   being paid, regardless of how many prisoners they had?
 2        A.   It was for a monthly payment.
 3        Q.   Okay.  So it was a flat fee every month,
 4   regardless of how busy or not busy you were?
 5        A.   That's correct.
 6        Q.   And that started in 2004?
 7        A.   The contract was signed in November of
 8   2004.  Services actually started in January of 2005.
 9        Q.   Okay.  And do you recall what that flat
10   rate was?
11             MR. MICHALEK:  Well, objection.  That's
12   confidential.  Any compensation, I don't think, is
13   discoverable.
14        Q.   (By Mr. Lane)  Well, let me explain that.
15   That's the one thing I didn't explain about depositions
16   that you may already know about.
17             Your lawyer is allowed to raise objections
18   to preserve the record.  There is no judge here,
19   obviously, to rule on those objections.  He's preserving
20   the record so that later on down the road, if he wants
21   to, he can go in front of the judge and say, You
22   shouldn't be able to ask that question at trial, and the
23   judge will then make a ruling.  But the rule of
24   depositions is when he makes his objection, you then go
25   ahead and answer the question.  He just raised a
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 4 of 20

Kyle Jeffery Schwark vs.                                Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                                         January 05, 2017

Page 14

```
 1   break and see what else we can get done.
 2              MR. LANE:  Okay.  Well, we can do that.
 3   We're off to a rocky start.
 4              MR. MICHALEK:  Well, I don't think it has
 5   to be that rocky, but...
 6              MR. LANE:  Okay.  I don't take any of this
 7   personally, so it's not a --
 8              MR. MICHALEK:  Neither do I.
 9              MR. LANE:  So it's not a -- I'm not going
10   to lie awake at night over this issue.
11        Q.    (By Mr. Lane)  Okay.  You've been getting
12   paid by the County since 2004; is that right?
13        A.    Since 2005.
14        Q.    And has your contract increased over the
15   years.  Presumably, as time passed, you've charged more
16   every month?
17        A.    There was one raise in the years since I
18   signed that contract.
19              (Ms. Wolak entered the room.)
20              MR. LANE:  Okay.  Sydney, we've decided
21   we're going to talk about this at a break, and -- but you
22   have Judge Kane's number?
23              MS. WOLAK:  Uh-huh.
24              MR. LANE:  Great.  Thank you.
25        Q.    (By Mr. Lane)  What percentage of your
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 5 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 17

```
 1      Q.   And do you remember what year?
 2      A.   2013, I think.
 3      Q.   Okay.
 4      A.   And I was called by the nurse who gave me
 5  the list of medications and asked if we should -- what
 6  his medications should be while being at the Park County
 7  jail.
 8      Q.   Okay.  And what -- I mean, was that an
 9  unusual circumstance, where the nurse is calling you and
10  giving you a list of medications and asking you these
11  kinds of questions?
12      A.   No.
13      Q.   Okay.  So that's pretty routine?
14      A.   It's routine to check -- for patients who
15  have prescription medications, to call and talk about
16  what will be provided while the inmate is under our
17  custody.
18      Q.   Okay.  Now, let me ask you this:  A
19  prescription, obviously, is a doctor's order that
20  somebody should be taking whatever the med is, right?
21      A.   That's what a prescription is.
22      Q.   Right.  So we have Mr. Schwark going into
23  the jail with doctors saying, You need this medication,
24  Mr. Schwark, right?  That's what you understand?
25               MR. MICHALEK:  Objection.
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 6 of 20

Kyle Jeffery Schwark vs.                                    Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                                          January 05, 2017

Page 18

```
 1         Q.    (By Mr. Lane)  He was coming to the jail
 2   with other doctors out in the world saying, You need to
 3   take this med or that med, or whatever, right?
 4               MR. MICHALEK:  Object to the form of the
 5   question.
 6               You can answer.
 7         A.    He came to the jail taking medications
 8   that were prescribed by other physicians.
 9         Q.    (By Mr. Lane)  Okay.  So my question is:
10   Why is the nurse calling you asking about what he should
11   be taking when he has outside physicians that have
12   already told him what he should be taking?
13         A.    The situation in the jail when someone is
14   incarcerated is a different situation than when that
15   person is out in the community.  We have a formulary of
16   medications that we use when someone is in the jail.  We
17   don't have --
18         Q.    When you say "a formulary," what does that
19   mean?
20         A.    That's a list of medications that we
21   provide.  We may frequently have to substitute
22   medications or change medications.
23         Q.    Why is that?
24         A.    Because we have policies regarding what
25   medications are appropriate and safe to use in the
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 7 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 19

```
 1   setting of an incarceration.
 2        Q.    Give me an example of when somebody comes
 3   in with a prescription for something and you decide to
 4   change it.
 5        A.    The patient comes in with a prescription
 6   for a blood pressure medication that we don't have on the
 7   formulary, and we will substitute a similar medication
 8   that will handle the blood pressure issue.
 9        Q.    When you say "formulary," it sounds to me
10   like -- obviously, jails are concerned about costs every
11   day.  Is formulary another word for a generic substitute
12   for perhaps a higher-priced medicine?
13        A.    Not always.
14              MR. MICHALEK:  Object to form.
15        Q.    (By Mr. Lane)  Did you get informed that
16   Mr. Schwark had brought all his own meds into the jail?
17        A.    Yes.
18        Q.    Okay.  And so he had all his meds.
19              Did you change any of his meds?
20        A.    After the first phone call, no.
21        Q.    Okay.  So the nurse read you a list of all
22   the meds that Mr. Schwark was on, and you said, Fine,
23   that's all okay?
24        A.    I said for them to continue that
25   medication.
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 8 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 20

 1     Q.    Okay.  Is there any fear that somebody
 2  brings in narcotics, for example, in a bottle that says
 3  it's blood pressure medication or something like that?
 4     A.    That's always a possibility.  And we don't
 5  provide narcotics in the jail setting.
 6     Q.    Right.  So is there any process for
 7  screening, you know, the meds?  Somebody claims, Oh, this
 8  is blood pressure medication, when, really, it's oxies
 9  and it's a narcotic or fentanyl, you know, it's a
10  narcotic; it's not allowed in the jail?
11           Is there some way to screen where the Park
12  County jail gets involved to see that -- you know, He
13  says this is blood pressure medication; how do we
14  actually know it's blood pressure medication?
15     A.    Most of the time, we take those
16  medications and store them with the patient's -- or with
17  the inmate's property and substitute medications from our
18  formulary.
19     Q.    Okay.
20     A.    In the case where there's not an
21  equivalent within the formulary, the nurses check with
22  the PDR or call the pharmacy that dispensed the
23  medication and talk with the pharmacist about identifying
24  that particular medication.
25     Q.    Okay.  Was any of that done with

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 9 of 20

Kyle Jeffery Schwark vs.                                    Deposition of Katherine Margaret Fitting, MD, FACP
Sheriff Fred Wegener, et al.                                                              January 05, 2017

Page 21

```
 1   Mr. Schwark that you know of?
 2                 MR. MICHALEK:  Object to foundation.
 3        A.       I have no knowledge about that.
 4        Q.       (By Mr. Lane)  All right.  But you had
 5   this conversation with the nurse and you apparently
 6   thought he was on some appropriate medications.  So it's,
 7   Don't change anything, and on we go, right?
 8                 MR. MICHALEK:  Object to form.
 9                 You can answer.
10        A.       Not exactly.
11        Q.       (By Mr. Lane)  What were your thoughts?
12        A.       My thoughts were that, as per our policy,
13   we don't just discontinue benzodiazepines because of the
14   withdrawal syndrome, and that those meds need to be
15   weaned.
16        Q.       Which of his meds were benzodiazepines?
17        A.       His alprazolam.
18        Q.       Okay.  And what was that designed to
19   control?
20        A.       I can't tell you that.  I didn't prescribe
21   it for him.  And at that point, I had no information from
22   the prescribing physician.
23        Q.       Well, you can't cut him back on that, cold
24   turkey, is what I'm hearing you say, right, because
25   there's a withdrawal problem?
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 10 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 22

```
 1        A.    You can't discontinue cold turkey.  You
 2   can wean off.
 3        Q.    Okay.  But were you concerned that he
 4   should be weaned off of these meds?
 5        A.    Absolutely.
 6        Q.    And why should he be weaned off a med that
 7   another physician decided he needed?
 8        A.    There are medications that are not
 9   appropriate in an incarceration situation.  And we do not
10   provide benzodiazepines as a standing presentation for
11   any inmates because they are frequently abused, traded,
12   and sold within the setting of the jail.
13        Q.    Well, I have been doing this now for 37
14   years and I've been involved in the criminal justice
15   system for 37 years.  It is my belief that I've never, in
16   37 years, found a jail that just gives a bottle of pills
17   to an inmate and said, Okay, here's your prescription; go
18   take your meds according to what the bottle says.
19              In every jail in America, they have what
20   is called a med line.  Are you familiar with the med
21   line?
22              MR. MICHALEK:  Object to form of the
23   question.
24        A.    Yes, I am.
25        Q.    (By Mr. Lane) Okay.  And the med line is
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 11 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 25

```
 1        A.    I don't know for certain.  I have a
 2   medical opinion.
 3        Q.    What is your medical opinion?
 4        A.    My medical opinion is it was an
 5   alcohol-withdrawal seizure.
 6        Q.    And why do you have that medical opinion?
 7        A.    I was informed that we had an alcohol
 8   level that indicated the use of alcohol prior to being
 9   taken into the Park County jail.
10        Q.    Do you know what his BAC was when he got
11   to the Park County jail?
12        A.    I don't.
13        Q.    Okay.  Is there anything that would
14   refresh your recollection on that?
15        A.    I know that we had a level of .02, but I
16   believe that was Breathalyzer as opposed to blood.
17        Q.    Okay.  All right.  You would agree that
18   those are -- generally, a blood test is a more accurate
19   test, but a Breathalyzer test is usually pretty accurate?
20              MR. MICHALEK:  Object to form.
21        A.    The Breathalyzer is what's generally used
22   by the personnel at the Park County jail.
23        Q.    (By Mr. Lane) Right.  It's acceptable in
24   a court of law for DUI purposes and other purposes,
25   right?
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 12 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 29

```
 1                 You can answer.
 2       A.        That can vary depending on what time
 3  someone is brought in, what day of the week, if it's a
 4  weekend or holiday.  But in general, that would happen
 5  within 12 to 24 hours.
 6       Q.        (By Mr. Lane)  Okay.  You would agree with
 7  me that a seizure is a very serious medical issue, would
 8  you not?
 9                 MR. MICHALEK:  Object to form.
10       A.        Yes, a seizure is a worrisome condition.
11       Q.        (By Mr. Lane)  And it can be fatal.  You
12  would agree with me, right?
13       A.        In rare circumstances, it can be fatal.
14       Q.        And would you agree with me that if
15  someone suffers from a seizure, they should be
16  hospitalized?
17       A.        Not always.
18       Q.        Okay.  Under what circumstances should
19  somebody be hospitalized after a seizure as opposed to
20  not hospitalized after a seizure?
21                 MR. MICHALEK:  Object to form.
22       A.        The most direct reason for hospitalizing
23  someone with a seizure is if they have a condition called
24  status epilepticus, which is the seizure continues on --
25  is not self-terminating -- or if repeated seizures occur.
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 13 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
| --- | --- |
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 31

```
 1   expectation would be he would be weaned off of
 2   benzodiazepines.  That is the policy for all patients who
 3   come in on benzodiazepines, with the exception of someone
 4   who is on it for a known seizure disorder for which that
 5   is the only medication that controls a known seizure
 6   disorder.
 7          Q.     (By Mr. Lane)  Okay.  So everybody who's
 8   getting weaned off of benzodiazepines continues to take
 9   benzodiazepines while at the jail; they're just taking
10   smaller doses, right?
11          A.     Until they come off.  That's correct.
12          Q.     So there is no actual rule that says you
13   can't have -- you can't be on benzodiazepines at the
14   jail, because everybody who is getting weaned is on
15   benzodiazepines at the jail, right?
16                 MR. MICHALEK:  Object to form.
17          A.     That's one way to look at it.  But if we
18   had a standing rule that you couldn't wean off of
19   benzodiazepines, then the jail couldn't accept anyone who
20   had a prescription for a benzodiazepine.  And that would
21   not be appropriate.
22          Q.     (By Mr. Lane)  And what are the side
23   effects from being weaned off benzodiazepines?
24          A.     Being weaned off?
25          Q.     Yes.
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 14 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 32

```
 1          A.    It may be related -- it will depend from
 2   person to person and why the benzodiazepines was
 3   prescribed for them.  But if a wean is done over an
 4   appropriate period of time, the weaning process itself
 5   shouldn't cause a lot of symptoms.  The condition for
 6   which they're taking that may become more symptomatic.
 7          Q.    But you've testified, if I am correct,
 8   that you didn't know what the condition was that was
 9   causing Mr. Schwark to take benzodiazepines, right?
10          A.    That's correct.
11          Q.    So you don't have any knowledge whether
12   his symptoms became more severe or were unaffected by his
13   being weaned, right?
14                MR. MICHALEK:  Object to form.
15          A.    Which incarceration are we talking about
16   now?
17          Q.    (By Mr. Lane)  Well, the second call came
18   12 hours after the first call to you from the nurse,
19   right?
20          A.    Correct.
21          Q.    It was at the second call that you told
22   the nurse to start weaning him off of benzodiazepines,
23   right?
24          A.    No.
25          Q.    Oh, I'm sorry.  That's my
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 15 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 33

1   misunderstanding.
2           Will you clarify, then?  What was the
3   second call about?
4       A.   The second call was about having the
5   seizure.  I asked that he be put on our
6   alcohol-withdrawal protocol, which substitutes a
7   different benzodiazepine which is stronger and longer
8   acting than the one that he had a prescription for.
9       Q.   Okay.  And what was it that led you to
10  believe that he was having alcohol withdrawal and that's
11  what caused the seizure?
12      A.   The fact that he had a history of coming
13  in with an alcohol level and the fact that he had a
14  seizure within the time frame that is typically seen for
15  alcohol-withdrawal seizures, which is while those alcohol
16  levels are falling.
17      Q.   Okay.  Did you request that anyone
18  interview Mr. Schwark to find out if he's suffering from
19  alcohol withdrawal?
20           MR. MICHALEK:  Object to form.
21      A.   I didn't ask them to ask that specific
22  question.
23      Q.   (By Mr. Lane)  All right.  I mean,
24  patients are sometimes really unreliable sources of
25  information, and sometimes they're very reliable sources

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 16 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 36

```
 1                 MR. ZIPORIN:  Same objection.
 2                 MR. LANE:  Okay.
 3         A.      When I made the determination that this
 4  was, most likely an alcohol-withdrawal situation, I had
 5  first gone through a critical-thinking process, which
 6  involves constructing a differential diagnosis for the
 7  situation.  And in that, I think about the various things
 8  that can cause withdrawal.
 9                 Given the information that I had, it
10  seemed to me, in my medical judgment, that the most
11  likely cause was an alcohol-withdrawal seizure.  I also
12  considered the fact that if it was not, the protocol I
13  put him on was protective from further seizures,
14  regardless of what the underlying diagnosis was or the
15  underlying cause for that seizure.
16         Q.      (By Mr. Lane) Okay.  So the protocol you
17  put him on was going to prevent seizures, likely,
18  regardless of the cause?
19         A.      That was the intent.
20         Q.      Okay.  So who called you and described the
21  seizure to you?
22         A.      I was called by one of the jail nurses.
23         Q.      Do you know who?
24         A.      I don't remember, specifically, which
25  nurse it was.
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 17 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 96

```
 1        Q.    Okay.  And how long did the apparent
 2   psychosis last with Mr. Schwark?
 3        A.    I was informed of his symptoms, I referred
 4   him, and that was the last I heard of the situation.  So
 5   it was the nurses that then would get him in contact with
 6   the prescribing nurse practitioner.
 7        Q.    And you don't know if that ever happened?
 8        A.    I don't know if they ever had a
 9   face-to-face interaction.
10        Q.    Did he get some sort of a prescription for
11   these hallucinations?
12        A.    I don't know if she prescribed that.
13        Q.    Do you have a written record of referring
14   Mr. Schwark to -- what's this person's name?
15        A.    Dr. Parker.
16        Q.    -- Dr. Parker?
17        A.    Do I have a written record?  No.
18        Q.    Does the jail?  I mean, is there a written
19   record somewhere?
20        A.    I would guess that there is, since it was
21   a verbal order from me.
22              MR. LANE:  Okay.  You know what?  I think
23   maybe what we should do -- it's now 20 minutes until
24   noon.  Why don't we break for lunch.  I'm going to wait
25   for Dunia to come back because I need to ask her a
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 18 of 20

| Kyle Jeffery Schwark vs.<br>Sheriff Fred Wegener, et al. | Deposition of Katherine Margaret Fitting, MD, FACP<br>January 05, 2017 |
|---|---|

Page 101

```
 1   if this gets him to a point where he can even talk to
 2   you.  Is there something we can start for hallucinations?
 3   Susan.  He is so paranoid that getting him to take
 4   something else may or may not happen.  Susan"
 5                Susan Canterbury again seems to be
 6   relating all this to a lack of Xanax, isn't she?
 7        A.   I don't know exactly what she was
 8   thinking.  But she's not a prescriber, so her assessment
 9   of that may not be accurate.
10        Q.   Okay.  Now, did there come a time that
11   you're aware of that Mr. Schwark was taken from the Park
12   County jail because of his hallucinations?
13        A.   I was informed of that.
14        Q.   When were you informed of it?
15        A.   I don't recall.
16        Q.   And where was he taken?
17        A.   I was believe he was taken to Denver
18   Health.
19        Q.   Okay.  And do you know what happened to
20   him at Denver Health?
21        A.   No.
22        Q.   Was he then, at some point, returned to
23   the Park County jail?
24        A.   I have subsequently found out that that
25   was the case.  But I wasn't notified when he was
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 19 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 103

```
 1   believe that not giving him his Xanax was causing him to
 2   hallucinate.  You say you disagree with that.
 3             Do you know whether -- I mean, do you know
 4   what did cause his hallucinations?
 5       A.    I don't know what caused his
 6   hallucinations.
 7       Q.    Is Xanax ever prescribed to stop
 8   hallucinations?
 9       A.    Not that I'm aware of.
10       Q.    Do you know what Mr. Schwark's behavior
11   was at the jail that caused them to have to transport him
12   to Denver Health for the second time?
13       A.    No.
14       Q.    Okay.  Would withdrawal from Xanax or
15   Suboxone, if it's done too quickly, cause one to
16   hallucinate?
17             MR. MICHALEK:  Object to form.
18       A.    Would not cause hallucinations, no.
19       Q.    (By Mr. Lane)  How long was Mr. Schwark,
20   if you know -- just approximately, how long was he in the
21   jail after he went to Denver Health for the second
22   go-around with Denver Health?
23       A.    I don't know anything about that part of
24   his incarceration.
25       Q.    Okay.  Fair enough.
```

Case 1:15-cv-02507-JLK   Document 87-5   Filed 11/13/17   USDC Colorado   Page 20 of 20

| Kyle Jeffery Schwark vs. | Deposition of Katherine Margaret Fitting, MD, FACP |
|---|---|
| Sheriff Fred Wegener, et al. | January 05, 2017 |

Page 109

```
 1                  REPORTER'S CERTIFICATE

 2              I, Wendy Evangelista, a Registered

 3   Professional Reporter and Notary Public within and for

 4   the State of Colorado, commissioned to administer oaths,

 5   do hereby certify that previous to the commencement of

 6   the examination, the witness was duly sworn by me to

 7   testify to the truth in relation to matters in

 8   controversy between the said parties; that the said

 9   deposition was taken in stenotype by me at the time and

10   place aforesaid and was thereafter reduced to typewritten

11   form by me; and that the foregoing is a true and correct

12   transcript of my stenotype notes thereof; that I am not

13   an attorney nor counsel nor in any way connected with any

14   attorney or counsel for any of the parties to said action

15   nor otherwise interested in the outcome of this action.

16              My commission expires:  August 30, 2020.

17

18

19                         _____
                           Wendy Evangelista
20                         Registered Professional Reporter
                           Notary Public, State of Colorado
21

22                  .

23

24

25
```