Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO

2

    Civil Action No:   15-2507-JLK
3   _____

4   KYLE JEFFERY SCHWARK,

5         Plaintiff,

6   vs.

7
    SHERIFF FRED WEGENER, in his official and individual
8   capacities; NURSE SUSAN CANTERBURY, in her individual
    capacity; NURSE JERI SWANN, in her individual
9   capacity; NURSE CATHLENE PEARCE, in her individual
    capacity; DOCTOR KATHERINE FITTING, in her individual
10  capacity,

11        Defendants.
    _____

12            DEPOSITION OF SUSAN CANTERBURY

13                 February 7, 2017

14  _____

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT
Q

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 14

1   it and the doctor determines the taper.

2          Q.   Okay.  What was the purpose of the

3   benzo that the doctor had prescribed Kyle Schwark to

4   take?  What was his condition that he needed a benzo?

5          A.   Well, at the time, I didn't know.

6          Q.   Okay.  Did you come to find out?

7          A.   It the -- the whole thing was very

8   confusing, the way things went from what appeared to

9   be psychotic.  I don't know.  I was -- one of the

10  problems when somebody comes in with a benzo or

11  alcohol, you don't know them.  You don't know how

12  much they are really doing, how much they are really

13  taking.  The bottle says 1, 2, 4, or whatever.

14  But -- in a day, but you don't really know.

15          Q.   I guess you have to talk to the person,

16  right?

17          A.   Uh-huh.

18          Q.   And even then they may not be truthful,

19  right?

20          A.   Right.  Very likely.

21          Q.   Uh-huh.  So did you talk to Kyle?

22          A.   I did go talk to him in his cell.

23          Q.   And what did he say?

24          A.   He --

25          Q.   Did you do it that day by the way?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

```
 1              A.   That day.
 2                   Q.   Okay.  So what did he say?
 3              A.   I took him one of his own Xanax at that
 4    time.  And he was very -- very adamant that he needed
 5    his Suboxone and his Xanax.
 6                   Q.   Okay.  Now, the Xanax is the benzo,
 7    right?
 8              A.   Yeah.
 9                   Q.   Okay.  And did you ask him, hey, Kyle,
10    how many of these benzos do you take in a day?
11              A.   I -- possibly.
12                   Q.   Do you remember what his answer was?
13              A.   No.
14                   Q.   Okay.
15              A.   He -- well, all I know is that he was
16    very adamant that he needed to continue taking his
17    benzo.
18                   Q.   Okay.  And what did you tell him?
19              A.   I told him, okay.  I gave him even a
20    Suboxone.  The label on the box said one-half to
21    one -- they are little films in a foil packet.  Well,
22    the instructions on the internet and on -- in any of
23    my research said that you don't cut open a package
24    and take -- you know, you can't store a half a slip.
25                   Q.   So it's all or nothing?
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 21

1           MR. ZIPORIN:  To possibly clean up the

2    record.

3           MR. LANE:  Yeah.

4           MR. ZIPORIN:  You're asking general

5    questions about what is the protocol in terms of

6    weaning off the Xanax with the Librium, but she never

7    testified that's what occurred with Mr. Schwark --

8           MR. LANE:  Right.

9           MR. ZIPORIN:  -- in the November stay.

10          MR. LANE:  Right.  I'm just asking her

11   what her understanding of the overall picture -- the

12   game plan was at this point, and then we are going to

13   get into what actually happened.

14       A.   We didn't really get into the taper.

15   We didn't change the Xanax.  I mean, I took him his

16   own Xanax, and I packed one for in the morning.

17          And then that's when Jeri and Cathlene

18   were there the next day and, you know, we never had

19   time in that visit to -- in that particular -- I

20   mean, we never got very far.

21       Q.   (By Mr. Lane)  Okay.  Well, we'll talk

22   about that in a minute.  I'm just trying to

23   understand what was the -- what the game plan was.

24   And the game plan was get him off the Xanax, put him

25   on Librium, wean him off of Librium, right?

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 25

1          Q.    (By Mr. Lane)  No, I think you and I

2    are on the same -- I don't know what it takes.  I'm

3    not --

4                 THE DEPONENT:  Am I doing okay?

5                 MR. ZIPORIN:  You're doing great.

6          Q.    (By Mr. Lane)  So anyway, so you gave

7    him half a strip of Suboxone, and you gave him some

8    Xanax, but you don't remember how much.

9          A.    One milligram.

10         Q.    One milligram.  Is that one pill?

11         A.    One pill.

12         Q.    Okay.  Did he say he needed more?

13         A.    The instructions on the bottle were one

14   pill, two to four times a day.  I can't remember.

15   It's on the picture.  But one pill is a dose.

16         Q.    Makes it --

17         A.    Is the dose.

18         Q.    Okay.  Anyway.  So do you recall

19   approximately how long your conversation with Kyle

20   lasted?

21         A.    Maybe five minutes.

22         Q.    Okay.  And you said he seemed agitated?

23         A.    No.

24         Q.    Oh, you said he was very adamant?

25         A.    Adamant.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 26

1      Q.   Okay.

2      A.   But not agitated.

3      Q.   Okay.

4      A.   He was very calm.

5      Q.   Okay.

6      A.   He was.

7      Q.   So you gave him his meds, and did you
8   tell him you'll be back with more later, or what did
9   you tell him?

10      A.   I don't remember.

11      Q.   You said see you later, bye?

12      A.   (Nodding head.)

13      Q.   Okay.  So then what happens, then, with
14   Kyle and your interactions with Kyle?

15      A.   I -- there were no further interactions
16   in that particular visit.  I would pack his meds
17   because --

18      Q.   What does that mean?

19      A.   Okay.  Yeah, I know.

20           The deputies pass the meds.  We put med
21   in a labeled little white envelope, and there's a
22   whole tray of these for all of them.  And so I would
23   have packed his med for the next morning because they
24   pass it around 8:00 -- 7:30.

25      Q.   Okay.  Were you giving him more Xanax,

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

1          A.    Yeah.

2                Q.    So it was right around there?

3          A.    And I think he was taking -- the

4    captain and the sergeant at one -- finally he was

5    just so out of hand that the captain and sergeant

6    personally drove him to Denver -- I can't remember --

7    Denver Health.

8                Q.    Okay.  Do you believe that your

9    observations of Kyle Schwark when he was most

10   psychotic, was he a danger to himself?

11         A.    No.  He didn't try to hurt himself.

12               Q.    Was he a danger to others?

13         A.    No.  Well, anybody that's thrashing

14   around can hurt themselves.  It's not that they mean

15   to.

16               Q.    Sure.  I'm not suggesting that -- when

17   I say was he a danger to himself, that could mean

18   either accidentally a danger to himself or

19   intentionally a danger to himself.  Either way, I

20   mean, he was in a psychotic state.  Did you view that

21   as, gee, we've got to do something about this, right?

22         A.    Right.

23               Q.    I mean, that's why you sent the emails

24   that you sent to Ms. Parker, right?

25         A.    Right.

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 73

1    Q.    Okay.   And on March 12th, he's back and

2    he seems to be under control after a trip to Denver

3    Health, right?

4         A.   Right.

5         Q.   So my question to you is, when did he

6    go to Denver Health?

7         A.   On the 10th.

8         Q.   So from the 6th through the 10th, what

9    was happening to him?

10        A.   I don't --

11             MR. ZIPORIN:   From a psychiatric

12   standpoint?   From a behavioral standpoint?

13             MR. LANE:   Just general.   All things.

14        Q.    (By Mr. Lane)   What do you recall was

15   happening to Kyle Schwark from March 6th to

16   March 10th?   Was he still hallucinating?   Was he

17   being given meds?   What was going on?

18        A.   He was getting meds.   That's over the

19   weekend.   I wasn't there.   I don't know that I was

20   even there on Friday -- the Thursday is the 6th, and

21   I don't know that I was there Friday, Saturday, or

22   Sunday.   And I know Monday the 10th was when the

23   captain and the sergeant just took -- he was out of

24   control.

25        Q.   Okay.   So that's when they took him to

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 81

1           I'm just asking, did you tell any of

2   the command staff at the jail --

3           A.   I --

4           Q.   -- get this guy to a hospital?

5           A.   I'm sure I did.

6           Q.   Do you remember who you would have

7   told?  Captain Muldoon?

8           A.   Captain Muldoon.

9           Q.   Do you recall when you told Captain

10  Muldoon?

11          A.   If I remembered when I told him, I

12  would be able to verbatim tell you that I said that,

13  and I have already said I don't remember just when,

14  but it was probably every day.

15          Q.   And Captain Muldoon didn't do anything

16  about it until the 10th?

17               MR. ZIPORIN:  Object to form.

18               You can answer.

19          A.   It's a little hard just to grab

20  somebody and haul them off to a psychiatric ward.

21          Q.   (By Mr. Lane)  What's hard about it?

22          A.   I really would like to answer that

23  question.

24          Q.   Go ahead.

25          A.   I don't know how to answer that

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 132

```
 1              A.   Yes.  I never spoke to Dr. Singer, but
 2    I talked -- I could never get him on the phone, but I
 3    talked to his office person.
 4              Q.   All right.  And did you --
 5              A.   And finally after several calls, they
 6    sent me a couple pages of record.
 7              Q.   How many phone calls do you recall
 8    making to Dr. Singer's office during that time frame
 9    of February 25, 2014, to March 11, 2014?
10              A.   Two.  I had made one prior to that
11    earlier in the year, but two, I think, during that
12    period.
13              Q.   And received some medical records in --
14    finally in response to that?
15              A.   Yes.
16              Q.   Did you provide those medical records
17    to either Dr. Parker or Dr. Fitting?
18              A.   Yes.
19              Q.   Do you recall which of the two, or
20    both?
21              A.   Probably was both but definitely
22    Dr. Parker.
23              Q.   All right.  Now, if a decision is made
24    at the jail that somebody needs some inpatient
25    psychiatric care, is it your understanding that the
```

Kyle Jeffery Schwark vs.
Sheriff Fred Wegener, et al.

Deposition of Susan Canterbury
February 07, 2017

Page 133

1    jail first has to make contact with the facility to

2    find out if there's availability for that patient?

3          A.   Yes.   Yes.   We have to make sure

4    there's a bed, that they are able to take the

5    patient.

6          Q.   And are there --

7          A.   If there's no bed --

8          Q.   Have there been circumstances where the

9    jail has been told that there's simply no room for a

10   patient?

11         A.   Yes.   That's a common problem.

12         Q.   And in terms of who would be the

13   individual making contact with the inpatient

14   facility, is that something handled by the nursing

15   staff or the administration at the jail?

16         A.   It would be the administration.

17              MR. ZIPORIN:   Those are all my

18   questions.   Thank you.

19              MR. MICHALEK:   I have a quick

20   follow-up.

21                        EXAMINATION

22   BY MR. MICHALEK:

23         Q.   You were asked questions about the

24   Xanax that the patient was on before he went to

25   Denver Health.