**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02507-JLK

KYLE JEFFERY SCHWARK,

     Plaintiff,

v.

SHERIFF FRED WEGENER, in his official capacity;
NURSE JERI SWANN, in her individual capacity;
DOCTOR KATHERINE FITTING, in her individual capacity;
CAPTAIN DANIEL MULDOON, in his individual capacity,

     Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 74 & 75)**

---

Kane, J.

     While serving his sentence for a DUI conviction at the Park County Jail in Fairplay, Colorado, Plaintiff Kyle Jeffery Schwark endured two separate medical emergencies. During his first period of confinement in November 2013, Mr. Schwark suffered two seizures, resulting in a fracture to his cervical spine and a deep laceration to his head. He was granted a medical furlough and returned to the Jail in February 2014. At that time, he experienced a psychotic breakdown for which he had to be hospitalized.

     Mr. Schwark's claims in this case arise out of those custodial experiences, asserting violations of his constitutional rights under 42 U.S.C. § 1983. Specifically, Mr. Schwark alleges Captain Daniel Muldoon, who oversaw the Jail, and Dr. Katherine Fitting and Nurse Jeri Swann, who were involved in his medical treatment there, violated his Eighth Amendment right to be

free from cruel and unusual punishments. He also brings a claim against Sheriff Fred Wegener in his official capacity for failure to properly train the Jail's staff.[1]

Captain Muldoon, Nurse Swann, and Sheriff Wegener (the Park County Defendants) have jointly moved for summary judgment on each of the claims asserted against them (ECF No. 74). Sheriff Wegener argues Mr. Schwark has failed to demonstrate both that a constitutional violation occurred and that a Park County policy caused his alleged injuries. Captain Muldoon and Nurse Swann contend that they are entitled to qualified immunity, as Mr. Schwark has not shown that they violated his clearly established constitutional rights. Independently, Dr. Fitting has filed a Motion for Summary Judgment (ECF No. 75) asserting qualified immunity on the same basis. Finding wheat and chaff in Mr. Schwark's remaining claims, I grant in part and deny in part the Motions.

## I. Summary Judgment Standard

Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* If there are no genuine disputes regarding material facts and the nonmoving party fails to make a sufficient showing on an essential element of his case for which he bears the burden of proof at trial, then the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The judge's function at the summary judgment stage "is not himself to

---

[1]With his Stipulation of Dismissal (ECF No. 81), Mr. Schwark voluntarily dismissed his individual capacity claims against Nurse Susan Canterbury and Sheriff Fred Wegener.

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

For summary judgment purposes, I must view the evidence in the light most favorable to the nonmoving party. *McCoy v. Meyers*, 887 F.3d 1034, 1039, 1044 (10th Cir. 2018). Accordingly, the facts recounted here resolve all genuine dispute of fact in favor of Mr. Schwark.

## II. Facts—Viewed in the Light Most Favorable to Mr. Schwark[2]

The Park County Jail in Fairplay, Colorado, is overseen by the Park County Sheriff's Office, which is led by Defendant Sheriff Wegener. Wegener Aff. ¶ 2, ECF No. 74-1. The day-to-day operations of the Jail have been delegated by Sheriff Wegener to the Jail Administrator, Captain Muldoon. *Id.* ¶ 5. Sheriff Wegener is primarily responsible for creating and maintaining the policies and procedures for the Jail, but Captain Muldoon drafts the content and carries out Jail-related trainings. *Id.* ¶¶ 2, 5; Muldoon Dep. at 19:7-17, ECF No. 82-2.

Deputy Sheriffs who are hired on at the Jail are instructed on how to assist nurses with administering medication to inmates and how to prevent inmates from "cheeking" medication. Muldoon Aff. ¶ 3, ECF No. 74-3. The Jail trains nurses on the safety and security concerns associated with working in a jail setting, but does not provide any medical training. *Id.* at ¶ 5. Nurses are taught how to do a more thorough assessment and to say "no" to inmates who are drug seekers. Muldoon Dep. at 51:2-15, ECF No. 82-2.

The medical unit at the Park County Jail includes the nurses employed by the Jail under the supervision of the Jail's Medical Director. Muldoon Aff. ¶ 5. The Jail's nurses do not have

---

[2]Many of the facts set forth in the parties' briefs became immaterial after Mr. Schwark narrowed his claims with his Stipulation of Dismissal and then further clarified his arguments in his Responses to Defendants' Motions for Summary Judgment.

the authority to prescribe or modify inmates' medications. The Medical Director or Mental Health Consultant for the Jail must provide such orders. *Id.* The Medical Director during both of Mr. Schwark's periods of incarceration at the Jail was Dr. Fitting. She was not a government employee, but instead had a contract with the Jail and was paid directly by it to provide her services.

Pursuant to the Park County Jail Policy and Procedure Manual, "Deputies are not to interfere with medical personnel's examination or treatment of an inmate but are to ensure that facility security is maintained. Staff members are to function as support personnel for medical personnel." Jail Pol. J-121-H at 11, ECF No. 74-14. The Manual also restricts the administration of pharmaceuticals that "present a challenge to the safe, secure and orderly operation of a detention facility." Jail Pol. J-121-N at 19, ECF No. ECF No. 74-2. When an inmate arrives at the Jail with such medications, the Medical Director is contacted for an authorization. Wegener Aff. ¶ 3. The Jail Manual further dictates that "[t]he decisions and recommendations of the Medical Director will be final and supersede medical decisions that were made at other facilities or by the inmate's personal physician." Jail Pol. J-121-N at 20. Inmates can appeal the Medical Director's decision under the Jail's policies, but no procedure for doing so is specified. *Id.* One way in which an inmate at the Jail may convey his medical concerns is through an Inmate Request Form, colloquially known as a "kite." Muldoon Aff. ¶ 4.

*November 2013*

In November 2013, Mr. Schwark was convicted of driving under the influence and sentenced to serve 60 days in custody. The judge who imposed the sentence ordered that Mr. Schwark "take medication as required on a timely basis even while in custody." *Colorado v. Schwark*, No. 2013-CR-000025, Nov. 6, 2013 Judgment, ECF No. 82-10.

On the evening of November 12, 2013, Mr. Schwark was booked into the Park County Jail to begin serving his sentence. The Jail Notes document that at intake he had a blood alcohol concentration of .020. Floor Notes at 11, ECF No. 75-4. On the Medical History Form he completed for the Jail, Mr. Schwark listed Xanax and Suboxone[3] as his current prescription medications and indicated that he had engaged in past or present alcohol or drug abuse. Medical History at 1-2, ECF No. 75-3. He arrived with the alprazolam[4] and Suboxone, which were prescribed for him by Dr. Jonathan Singer, his primary care physician. Along with the medications, Mr. Schwark had a note from Dr. Singer explaining that he was being treated for opioid dependency, lead toxicity, and anxiety and that he should continue taking his prescriptions. Singer Letter at 1, ECF No. 75-2.

At around 4:30 p.m., the day after Mr. Schwark entered the Jail, Nurse Susan Canterbury—who is no longer a defendant in this case—made contact with Dr. Fitting about his medications. Nov. 2013 Medication Sheet at 1, ECF No. 75-6; *see also* Floor Notes at 11. At that time, Dr. Fitting ordered that Mr. Schwark be administered all of his medications pending future modifications to his prescriptions.

As Nurse Cathlene Pearce—who has also been dismissed from this case—set out to distribute the inmate medications the morning of November 14, she was notified over the radio that Mr. Schwark needed immediate medical attention. She arrived at his cell to observe him having a seizure. After Mr. Schwark regained consciousness, Nurse Pearce took him to the Jail's medical unit in a wheelchair.

Defendant Nurse Swann observed Mr. Schwark in the medical unit along with Nurse Pearce. At some point that afternoon, Nurse Swann called Dr. Fitting to report the seizure. Dr.

---

[3]Suboxone is frequently used to treat opioid dependency.
[4]Alprazolam is a benzodiazepine commonly known as Xanax.

Fitting ordered that Mr. Schwark be placed on the Jail's "alcohol withdrawal protocol" and be given 25 milligrams of Librium, a stronger and longer-acting benzodiazepine than alprazolam. That protocol was to be protective from further seizures, regardless of the underlying diagnosis or cause. Fitting Dep. at 36:11-19, ECF No. 75-7. Mr. Schwark does not remember being given any medication while he was in the medical unit. Schwark Dep. at 151:12-14, ECF No. 83-1. The nurses had him stay seated in the wheelchair until he was more alert. He was then permitted to stand up and move around. Mr. Schwark attempted to eat some food but afterwards went to the trash can and vomited. The nurses encouraged him to recline and rest unrestrained on a hospital table. Pearce Note at 1, ECF No. 82-7. As he was doing so, he began to have another seizure and fell to the ground, causing him to hit his head.[5] *Id.* The paramedics arrived and transported Mr. Schwark to the hospital, where he was treated for the laceration on his head and diagnosed with a fracture to his cervical spine.

The following day, November 15, 2013, Captain Muldoon requested and Sheriff Wegener granted a furlough for Mr. Schwark so that he could recover at home until he was cleared by his doctor. Furlough Order at 1, ECF No. 82-9.

*February to March 2014*

Mr. Schwark was returned to the Jail on February 25, 2014. He was placed in a segregation cell for being verbally noncompliant and out of fear that he would be victimized in the general population. Muldoon Dep. at 32:21-33:1, 33:25-34:18, ECF No. 87-6; Muldoon Aff. ¶ 10. This time, he arrived at the Jail with alprazolam, Librium, and Suboxone. His prescription

---

[5]Park County Defendants dispute that Mr. Schwark was reclining on the medical table when he had his second seizure. *See, e.g.*, Swann Aff. ¶ 7, ECF No. 74-6; Swann Dep. at 30:20-23, ECF No. 82-6; Canterbury Aff. ¶ 7, ECF No. 74-7; Pearce Dep. at 23:20-24, 24:20-25:3, ECF No. 82-3. As I explain below, however, this fact is not material.

for alprazolam was to take one to four one-milligram tablets per day, as needed. Schwark Dep. at 133:6-13, ECF No. 82-4. The day after Mr. Schwark was brought in, Dr. Fitting wrote an order to discontinue his Suboxone and Librium and created a tapering schedule for his alprazolam. Fitting Note at 1, ECF No. 82-15. From February 26 to 28, 2014, Mr. Schwark was to receive a 1 milligram tablet of alprazolam three times per day. From March 1 to 3, he was to receive a 1 milligram tablet twice per day. And, from March 4 to 6, he was to receive a 1 milligram tablet once per day. After that, the alprazolam was to be discontinued.

When she ordered that Mr. Schwark be taken off of Suboxone and Librium and that his alprazolam be tapered, Dr. Fitting had not examined Mr. Schwark and did not know what conditions the medications had been prescribed to treat. Fitting Dep. at 84:13-20, 85:4-9, ECF No. 83-4. Dr. Fitting discontinued the Librium because it is contraindicated to take two benzodiazepines at the same time and discontinued the Suboxone because Mr. Schwark would not have access to alcohol or narcotics in the Jail. Id. at 85:15-86:1, 93:20-94:1. She created the tapering schedule for Mr. Schwark's alprazolam because she believed benzodiazepines were not appropriate in the jail setting and would violate its policies. Id. at 21:23-22:12; 30:21-31:11.

The Jail's Medication Sheets for Mr. Schwark from February and March 2014 indicate Dr. Fitting's orders were followed up to March 4. Feb. & March 2014 Medication Sheets at 1-2, ECF No. 75-18. On the morning of March 5, Mr. Schwark began hallucinating and exhibiting paranoia. When Nurse Canterbury went to give him his single, midday dose of alprazolam, she noticed his symptoms had worsened and he appeared to have a seizure.[6] Canterbury Emails at 3,

---

[6]Mr. Schwark asserts that this seizure was witnessed by Captain Muldoon. The only evidence he cites in the record is a March 5, 2014 email from Nurse Canterbury to Dr. Parker that states: "[Mr. Schwark's] gaze does not focus on persons in room, appeared to have a seizure, spit all over his face, repetitive speech about the government wanting to kill him, definitely not of this world, gave the captain a reality check." Canterbury Emails at 3, ECF No. 82-11. This statement

ECF No. 82-11. That afternoon, she wrote to the Jail's Mental Health Consultant, Cynthia Parker, Psy.D., concerning Mr. Schwark's state and requested permission to suspend the alprazolam taper ordered by Dr. Fitting. *Id.* Dr. Parker approved slowing the taper schedule and suggested Mr. Schwark might need additional medications for his hallucinations.[7] *Id.* at 2.

Nurse Canterbury contacted Dr. Singer twice from February 25, 2014, to March 11, 2014, to obtain more information about Mr. Schwark's medical history and treatment. Canterbury Dep. at 132:7-12, ECF No. 88-4; Canterbury Aff. ¶ 13. On March 5, she received a fax from him with treatment notes, which she provided to Dr. Parker. *Id.* Nurse Canterbury updated Dr. Parker on Mr. Schwark's status the following morning and again that afternoon. Canterbury Emails at 1, ECF No. 82-11; Canterbury Aff. Att. 6 at 1, ECF No. 74-13. Mr. Schwark was more coherent by the afternoon, but Nurse Canterbury still sought authorization for additional medication to help him function better. *Id.*

Captain Muldoon interacted with Mr. Schwark when he first entered the Jail and noted his altered mental state. Muldoon Dep. at 33:15-34:6, ECF No. 87-6. He was also aware of Mr. Schwark's deteriorating condition beginning on March 5. *See* Muldoon Dep. at 36:23-37:9, ECF No. 82-2; Canterbury Dep. at 80:7-10, 81:1-8, ECF No. 82-5. Neither Nurse Canterbury nor Captain Muldoon was working at the Jail over the weekend, from March 8 to 9, but Nurse Canterbury is sure she told Captain Muldoon before their leave that Mr. Schwark needed to get to the hospital. *Id.*

---

does not establish that Captain Muldoon witnessed a seizure, and none of the persons involved testified to that fact.

[7] Dr. Fitting claims that Nurse Canterbury informed her of Mr. Schwark's condition and that she "ordered Schwark continue receiving Xanax at the current dosage until his symptoms subsided . . . . (Exh. G, Fitting Dep. 87:20-25 through 88:1-11 and 95:2-25 through 96:1-6)." Yet nowhere in that cited material does Dr. Fitting testify that she ordered Mr. Schwark's taper be slowed.

Nurses do not have the authority to start the process of finding a place for inmates in need of mental health treatment. To have an inmate transferred or transported to a treatment facility, medical staff must have approval from law enforcement personnel at the Jail. Muldoon Dep. at 46:2-10, ECF No. 82-2. Consequently, on March 10, when Captain Muldoon returned to the Jail, a collaborative decision was made to take Mr. Schwark to the hospital. *Id.* at 38:5-11. Captain Muldoon escorted Mr. Schwark to Denver Health that day.

In support of the reasonableness of her treatment of Mr. Schwark, Dr. Fitting presents the opinions of Timothy G. Moser, M.D., a physician for inmates at other Colorado jails, and Jonathan I. Ritvo, M.D., a specialist in addiction psychiatry. *See* Moser Aff., ECF No. 75-16; Ritvo Aff., ECF No. 75-19.

### III. Eighth Amendment Claims and Qualified Immunity

Mr. Schwark's claims are brought under 42 U.S.C. § 1983, which creates a private cause of action to vindicate violations of "rights, privileges, or immunities secured by the Constitution and laws" committed by any person acting under color of state law. Mr. Schwark alleges that Defendants violated his Eighth Amendment rights by subjecting him to cruel and unusual punishment. In *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), the Supreme Court recognized that deliberate indifference by prison authorities to a prisoner's serious medical needs violates the Eighth Amendment. The Court explained that it had previously held repugnant to the Eighth Amendment punishments "which are incompatible with the evolving standards of decency that mark the progress of a maturing society" or "which involve the unnecessary and wanton infliction of pain." *Id.* at 102-03 (internal quotation marks and citations omitted). Deliberate indifference to the serious medical needs of prisoners, it concluded, constitutes the unnecessary

and wanton infliction of pain proscribed by the Eighth Amendment. *Id.* at 104 (internal quotation marks and citation omitted).

The Supreme Court set out a two-part test, one part objective and one part subjective, for such violations of the Cruel and Unusual Punishments Clause. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the objective part, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of a constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 834). "[A] medical need is considered 'sufficiently serious' if the condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). Under the subjective part, "the prison official must have a 'sufficiently culpable state of mind.'" *Self*, 439 F.3d at 1230-31 (quoting *Farmer*, 511 U.S. at 834). "That state of mind is one of 'deliberate indifference' to inmate health or safety," which is akin to recklessness as used in the criminal law. *Farmer*, 511 U.S. at 834, 839-40 (citation omitted). Thus, a prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition" is not sufficient. *Estelle*, 429 U.S. at 106.

Defendants assert qualified immunity as a defense to Mr. Schwark's § 1983 claims brought against them in their individual capacities. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. "Put simply, [it] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citing *Pearson*, 555 U.S. at 232). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (internal quotation marks and citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case," *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), and "should not be defined 'at a high level of generality,'" *White*, 137 S.Ct. at 552 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). A prior case need not, however, have "identical" facts. *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (citation omitted). The overarching question is whether the "clearly established right is one that is 'sufficiently clear that every reasonable official would have understood what he is doing violates that right.'" *Mullenix*, 136 S.Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

With those standards set out, I turn to Mr. Schwark's claims against each of the individual Defendants.

A. Nurse Jeri Swann

Nurse Swann initially interacted with Mr. Schwark when she treated him in the medical unit after his first seizure during his incarceration in November 2013. Mr. Schwark claims she was deliberately indifferent to his serious medical needs at that time by directing him to lie on a table without any guard or restraint to prevent him from falling. The record supports his assertion that her doing so was improper medical procedure after an individual has suffered a seizure. *See* Canterbury Dep. at 36:12-23, ECF No. 82-5; Pearce Dep. at 33:8-15, ECF No. 82-3. However, Nurse Swann and Nurse Pearce permitted Mr. Schwark to remain in the medical unit for further evaluation and only let him move from his wheelchair once significant time had passed since his seizure, his vital signs were stable, and he was coherent. *Id.* at 38:5-17; Pearce Aff. ¶ 8, ECF No. 74-5; Swann Aff. ¶ 7. Nurse Swann called Dr. Fitting for orders on how to care for him and followed those orders, having no reason to believe they were improper.

Considering her efforts to treat Mr. Schwark, Nurse Swann was at most negligent in not assuring that he remained in a secured position hours after his first seizure.[8] "'[N]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'" *Self*, 439 F.3d at 1233 (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)). "[A]n official's failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

---

[8]Mr. Schwark argues that the "multitude of factual disputes in the record demonstrates [sic] that the subjective knowledge of Defendant Swann is a proper issue for the jury." Resp. to Park County Mot. at 32, ECF No. 82. Disputes of fact are not sufficient to overcome summary judgment. They must be material. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314-15 (10th Cir. 2002). I find that even the facts as put forward by Mr. Schwark do not demonstrate Nurse Swann acted with deliberate indifference.

Mr. Schwark not only fails to demonstrate a constitutional violation under the first prong of the qualified immunity standard, he points to no case that would have made the law clearly established that Nurse Swann's exercise of judgment in permitting him to recline on the medical table violated his constitutional rights. Therefore, Nurse Swann's qualified immunity defense prevails, and she is entitled to summary judgment on Mr. Schwark's claim against her.

### B.  Captain Daniel Muldoon

The facts presented by Mr. Schwark establish that, as his condition deteriorated in February and March 2014, Captain Muldoon acted as the gatekeeper for him to receive outside medical care. The Captain witnessed Mr. Schwark's altered mental state from the time he was brought into the Jail on February 25 and was aware his condition began deteriorating on March 5. Nurse Canterbury told the Captain that Mr. Schwark needed outside treatment before he left for the weekend, yet he did not follow through until he returned on Monday, March 10.

As Captain Muldoon concedes, *see* Park County Reply at 2, ECF No. 88, Mr. Schwark's mental state meets the objective part of the Cruel and Unusual Punishments standard in that it was "'sufficiently serious' to constitute a deprivation of a constitutional dimension," *Self*, 439 F.3d at 1230 (quoting *Farmer*, 511 U.S. at 834). So, then, to establish his constitutional rights were violated, Mr. Schwark must show the subjective part of the test is also fulfilled—that the Captain was deliberately indifferent to his health or safety in delaying his receipt of outside medical care. "A prisoner may satisfy the subjective component by showing that defendants' delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional." *Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005). That is the case here. Captain Muldoon was responsible for arranging outside

treatment for Mr. Schwark and he did not do so even though he was aware of Mr. Schwark's psychosis and the harm it posed to him. Significantly, the Captain offers no explanation or justification for the delay in transporting Mr. Schwark to the hospital.

Based on the clearly established law at the time, Captain Muldoon should have known delaying or refusing medical care was a violation of Mr. Schwark's constitutional rights. *See Self*, 439 F.3d at 1232 (explaining that a claim is actionable "in cases where the need for additional treatment or referral to a medical specialist is obvious," such as when care is denied even though the inmate presents with recognizable symptoms which potentially create a medical emergency). As an example, in *Sealock v. Colorado*, 218 F.3d 1205, 1211-12 (10th Cir. 2000), a panel of the Tenth Circuit reversed summary judgment in favor of a physician's assistant at a correctional facility, concluding that he may have been deliberately indifferent if he knew about the inmate's unexplained chest pain and failed to summon an ambulance. Captain Muldoon knew about Mr. Schwark's serious medical need and the demand for outside treatment and failed to arrange such care as multiple days passed.

Mr. Schwark has met his burden with respect to his claim against Captain Muldoon, so summary judgment on that claim is not proper.


C.  Dr. Catherine Fitting

*Assertion of Qualified Immunity*

Like Nurse Swann and Captain Muldoon, Dr. Fitting raises qualified immunity as a defense to Mr. Schwark's claim against her. Unlike the other Defendants, however, she was a private contractor and not an employee of the Jail. She contends that she is nevertheless entitled

to assert the defense of qualified immunity because she contracted directly with the Jail to fulfill the state's constitutional obligation to provide medical services to inmates.

The Tenth Circuit has not spoken to these specific circumstances, nor has it weighed in on whether qualified immunity is available when an intermediary is involved, i.e. when employees of private companies provide medical services to inmates, *see Kellum v.* Mares, 657 F. App'x 763, 768 n.3 (10th Cir. 2016). But other circuits and at least one judge in this District have found qualified immunity does not cover medical professionals who are employees of private entities. *See Rasho v. Elyea*, 856 F.3d 469, 479 (7th Cir. 2017); *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012); *Jensen v. Lane County*, 222 F.3d 570, 580 (9th Cir. 2000); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999); *Carmody v. Ensminger*, No. 16-cv-02603-PAB-NYW, 2017 WL 4150601, *4 (D. Colo. Sept. 19, 2017). Extending the reasoning of those cases, Magistrate Judge Kristen Mix of this District has found that the defense of qualified immunity was not available to a nurse who privately contracted with a jail. *Estate of Stieb v. Johnson*, No. 16-cv-02548-KLM, 2018 WL 4111018, *13 (D. Colo. Aug. 29, 2018).

The Supreme Court, in *Richardson v. McKnight*, 521 U.S. 399, 404 (1997), set forth two principle inquiries for evaluating whether an individual is able to assert qualified immunity:  (1) whether there was a firmly rooted history of immunity for similarly situated parties at common law and (2) whether granting immunity would be consistent with the doctrine's purposes. The Court identified three relevant purposes of the doctrine:  (1) avoiding "unwarranted timidity" on the part of those engaged in the public's business, (2) ensuring that talented candidates are not deterred from entering public service by the threat of damages from lawsuits, and (3) preventing individuals from being distracted from their duties by such suits. *Id.* at 409-12 (citations omitted).

As explained in detail in *McCullum v. Tepe*, 693 F.3d at 702-04, there was no "firmly rooted history" of immunity at common law for a private doctor working for a public institution. And I find the purposes of the qualified immunity doctrine do not obtain when costs of litigation and personal liability protection are readily available and includable in the contract for services. Dr. Fitting's attempt to distinguish her circumstances based on the lack of an intermediary between her and the Jail are unpersuasive. Indeed, direct, role-specific negotiations like those engaged in here are just as, or even more likely, to result in favorable provisions for physicians as those executed with an intermediary.

With respect to physicians performing their duties with unwarranted timidity, there is no indication private competition, which the Supreme Court has found to ward off timidity, *see Richardson*, 521 U.S. at 409-10, would be any less likely to exist between physicians vying for government contracts than between private healthcare companies. Moreover, medical professionals, perhaps uniquely so, work under the constant threat of litigation,[9] and thus, claims brought under § 1983 are unlikely to distract them or cause them to be timid to any additional degree.

Dr. Fitting cites *Filarsky v. Delia*, 566 U.S. 377 (2012), and *Estate of Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016), in support of her contention that qualified immunity should extend to her circumstances. In *Filarsky*, the city contracted an independent attorney to assist with an official investigation into potential wrongdoing by one of its firefighters. 566 U.S. at 380-81. The attorney was not hired as a full-time government employee but worked in close

---

[9] A 2017 American Medical Association research paper found that over one-third of physicians had had medical liability claims filed against them at some point in their careers. José R. Guardado, *Policy Research Perspectives:  Medical Liability Claim Frequency Among U.S. Physicians*, American Medical Association, 6 (Dec. 2017) *available at* https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/government/advocacy/policy-research-perspective-medical-liability-claim-frequency.pdf.

coordination with public employees. *Id.* at 384, 391. The firefighter brought claims against him under § 1983 for his handling of the investigation, and he asserted the defense of qualified immunity. *Id.* at 382. The Supreme Court observed that, at common law, immunity was provided to government actors involved in adjudicative activities, criminal prosecutions, and law enforcement and no line was drawn between those working full-time as employees and those engaged in public service on a temporary or occasional basis. *Id.* at 387-89. It also concluded that the reasons for recognizing immunity under § 1983 do not support distinguishing between full-time government employees and others acting similarly on behalf of the government. *Id.* at 389-91. Thus, the Court held the attorney was entitled to seek the protection of qualified immunity. *Id.* at 394.

In likening her position to that of the attorney in *Filarsky*, Dr. Fitting ignores the first half of the Court's analysis and its determination that the common law supported affording qualified immunity to a private attorney hired to conduct investigations on behalf of the government. Such is not the case for her. *See McCullum*, 693 F.3d at 704. Dr. Fitting also disregards the distinguishing circumstances that she was not just briefly associated with a government body and was not operating in the same close coordination with government actors. *See Filarsky*, 566 U.S. at 381 (obtaining permission to proceed from and the signature of the Fire Chief). In fact, Captain Muldoon emphasized that Dr. Fitting was in charge of the medical unit and he did not interfere or have the authority to override her decisions. Muldoon Aff. ¶¶ 5-6. The Supreme Court has never "held that the mere performance of a governmental function could make the difference between unlimited § 1983 liability and qualified immunity, especially for a private person who performs a job without government supervision or direction." *Richardson*, 521 U.S. at 408-09 (citations omitted).

On their face, the facts of *Estate of Lockett*—involving a private-party doctor—appear to more closely resemble the present ones, but the comparison still misses the mark. In that case, the estate of a man who was executed brought suit under § 1983 against the doctor responsible for overseeing the administration of the execution drugs. *Estate of Lockett*, 841 F.3d at 1104-07. Affirming the grant of qualified immunity to the doctor, a panel of the Tenth Circuit held that "carrying out criminal penalties is unquestionably a traditional function of government, exactly the sort of activities that *Richardson* reasoned qualified immunity was meant to protect." *Id.* at 1108. Dr. Fitting was not carrying out the criminal penalty of death, though. She was tasked with presumably the opposite:  providing medical treatment to inmates. The holding in *Estate of Lockett* is, therefore, inapplicable.

Because the firmly rooted history of the common law and the purposes of the doctrine do not support extending qualified immunity to Dr. Fitting, I decline to do so. However, as confirmed below, even if Dr. Fitting could assert the defense of qualified immunity, summary judgment on that basis would be inappropriate for her conduct in February and March 2014.

*November 2013*

Mr. Schwark has not shown Dr. Fitting violated his constitutional rights in November 2013. Upon his incarceration, Dr. Fitting initially ordered that he receive his medications as prescribed by Dr. Singer.[10] She modified those medications in response to his first seizure, placing him on Librium to prevent future seizures, alcohol-related or otherwise. Dr. Fitting did

---

[10]Mr. Schwark contends that "it is hotly disputed whether Mr. Schwark was ordered to receive, or actually provided, his prescribed benzodiazepines and Suboxone by Defendant Fitting upon his initial incarceration at the Park County Jail." Resp. to Fitting Mot. at 20, ECF No. 83. While Mr. Schwark may not remember receiving any of his medications before his first seizure, there is no genuine dispute with respect to whether Dr. Fitting ordered that he was to receive them.

not order that the nurses restrain Mr. Schwark, but the record also does not reveal she was aware he was reclining on a medical table. This conduct simply does not establish that Dr. Fitting had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation marks and citation omitted). There is no support for the conclusion that she knew Mr. Schwark "faced a substantial risk of harm and disregarded that risk, 'by failing to take reasonable measures to abate it.'" *Hunt*, 199 F.3d at 1224 (*Farmer*, 511 U.S. at 847). The contrary is true. The record shows she was presented with the risk of him having a subsequent seizure and, in response, took the reasonable measure of modifying his medication based on his symptoms and his history.

*February and March 2014*

In contrast, Dr. Fitting's conduct in February and March 2014, viewed in the light most favorable to Mr. Schwark, amounts to a constitutional violation. As I found above, Mr. Schwark's medical needs and psychosis at that time were sufficiently serious, and Dr. Fitting admits as much, Fitting Dep. at 94:17-22, ECF No. 83-4. As a result, I again focus on the subjective part of the Eighth Amendment standard—whether Dr. Fitting was deliberately indifferent to Mr. Schwark's health or safety during this period. *See Farmer*, 511 U.S. at 834.[11]

According to Mr. Schwark's presentation of the facts, Dr. Fitting modified his medications without (a) examining or having a nurse observe him, (b) evaluating or seeking more information on why the medications had been prescribed, (c) prescribing any alternative medications, (d) taking into account his history of seizures, (e) considering his substance abuse

---

[11]Dr. Fitting complicates this analysis by conflating the two requirements of the standard. *See* Fitting Mot. at 12, ECF No. 75 (discussing the subjective component of the standard and deliberate indifference as a part of "Element 1," which the Motion defines as the objective part requiring the deprivation to be sufficiently serious). Incorrect citations, *see* Fitting Reply at 20, ECF No. 87 (citing to *Oxendine v. Kaplan* instead of *Self v. Crum*), have also made review of her arguments more difficult.

as a diagnosable illness, or (f) referring him to the Mental Health Consultant responsible for mental health prescribing. Dr. Fitting generally characterizes these complaints by Mr. Schwark as an unactionable difference of opinion regarding the treatment he received. Fitting Mot. at 17 (quoting *Johnson v. Stephan*, 6 F.3d 1227, 1232-33 (10th Cir. 1993); Fitting Reply at 20 (quoting *Toler v. Troutt*, 631 F. App'x 545, 547–48 (10th Cir. 2015)). Relying on the opinions of her experts and the fact that Mr. Schwark did not note any history of mental illness on the forms he completed for the Jail, she argues the evidence does not support the inference that she knew or should have known Mr. Schwark faced a substantial risk of harm and that she disregarded that risk. *See Hunt*, 199 F.3d at 1224.

While it is true that "where a doctor merely exercises his considered medical judgment" the subjective component usually cannot be met, *Self*, 439 F.3d at 1232, what is at issue here is not an exercise of medical judgment by Dr. Fitting. Her contention that she ordered treatment consistent with the symptoms presented by Mr. Schwark is baseless. *See* Fitting Mot. at 17 ("Where a doctor orders treatment consistent with the symptoms presented, an inference of deliberate indifference is unwarranted." (citing *Self*, 439 F.3d at 1232-33)). When she modified his medications, she was unaware of his symptoms or the reasons the medications had been prescribed. Her Motion for Summary Judgment even admits that her orders for Mr. Schwark were not tailored to him or his presentation. *See* Fitting Mot. at 14 ("Dr. Fitting ordered a Xanax tapering schedule similar to any inmate that is on chronic benzodiazepines therapy.").

Dr. Fitting should have had sufficient information about Mr. Schwark, including that he had a history of substance abuse, was prescribed Suboxone and benzodiazepines, and had previously suffered seizures while incarcerated, to know that modifying his medications without further investigation or considered medical judgment could put Mr. Schwark at substantial risk

of harm. Consequently, a jury could find her doing so was in violation of his constitutional rights.

The expert opinions provided by Dr. Fitting cannot—on summary judgment—convince otherwise. Both of Dr. Fitting's experts reference events that are not clear from the record, i.e., that when Dr. Fitting was notified of Mr. Schwark's hallucinations, she ordered his Xanax be continued and referred him to the mental health specialist. Moser Aff. ¶ 14; Ritvo Aff. ¶ 13. Dr. Ritvo seems to confuse the facts further, stating: "It is also not consistent for a discontinuation of Suboxone to be expected to cause a psychosis, and Mr. Schwark was not discontinued from Librium. Instead, it was most likely the result of alcohol withdraw [sic] and the benzodiazepine he was on would have assisted him with that condition." Ritvo Aff. ¶ 14. In addition, both doctors' opinions lack justification. Dr. Moser, for example, provides no explanation for his conclusion that, "[w]ith respect to the February 2014 incarceration, Dr. Fitting's *medical* decision to stop the Suboxone and slowly taper Mr. Schwark's Xanax was reasonable and appropriate." Moser Aff. ¶ 12 (emphasis added).[12]

The law defining Dr. Fitting's actions in February and March 2014 as a constitutional violation was clearly established at the time. *See Hunt*, 199 F.3d at 1223-24 (reversing dismissal of the plaintiff's Eighth Amendment claim alleging, among other wrongs, that prison officials confiscated his prescribed medication and refused to treat him for his ailments); *Mata v. Saiz*, 427 F.3d at 758-59 (concluding a jury could reasonably find that a Department of Corrections nurse demonstrated deliberate indifference to an inmate's chest pain by "refus[ing] to assess or diagnose [her] medical condition at all by, for instance, taking her blood pressure, listening to her

---

[12]The cause of Mr. Schwark's psychosis and hallucinations is disputed, and for the reasons stated here, the opinions of Dr. Fitting's experts are not conclusive on that matter. Moser Aff. ¶ 15; Ritvo Aff. ¶ 14; Singer Dep. at 64:10-23, ECF No. 83-3.

heart with a stethoscope, and performing a cardiac work-up."). *Boyett v. County of Washington*, 282 F. App'x 667 (10th Cir. 2008) (unpublished), which Dr. Fitting misperceives as supporting her position, illustrates the takeaway:  there is a critical distinction between providing an inmate with medical treatment and writing rote orders. In *Boyett*, the physician's assistant at the correctional facility examined the inmate and took his medical history before ordering that his prescribed Methadone be substituted with Clonidine. *Id.* at 670. Not only did the medical professional gather relevant information, she prescribed a proper replacement that was to alleviate withdrawal symptoms.[13] *Id.* at 674. Predictably, the Court of Appeals found her exercise of medical judgment did not demonstrate deliberate indifference. *Id.*

If Dr. Fitting were entitled to raise the defense of qualified immunity, Mr. Schwark's showing would overcome it. In any case, he may proceed with his claim against Dr. Fitting based on her deliberate indifference to his serious medical needs during his second period of incarceration.


IV. Claim against Sheriff Wegener in His Official Capacity

Mr. Schwark's final claim is against Sheriff Fred Wegener in his official capacity. When a plaintiff brings a claim against an officer in his official capacity, it is "another way of pleading an action against the entity of which the officer is an agent." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978).  Mr. Schwark's Second Amended Complaint asserts a claim titled "Supervisory Liability for Failure to Train and Supervise" against Sheriff Wegener in his official capacity. Compl. at 17, ECF No. 61. In his Response to the Park County

---

[13] *See* Kevin Fiscella et al., *Benign Neglect or Neglected Abuse:  Drug and Alcohol Withdrawal in U.S. Jails*, 32 J. L. Med. & Ethics 129, 130, 134 (2004) (discussing the use of Clonidine as an alternative to Methadone for treating opiate withdrawal).

Defendants' Motion for Summary Judgment, though, Mr. Schwark also argues the County is liable because (1) Captain Muldoon was a final policymaker, (2) the County ratified its employees unconstitutional conduct, and (3) the County's illegal medication policy caused his injuries.

While a municipal entity cannot be held liable under the doctrine of *respondeat superior* for the constitutional torts of its employees, it is responsible under § 1983 "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" on which a plaintiff's claim is based. *Monell* 436 U.S. at 691, 694. "[T]o establish a claim for damages under § 1983 against municipal entities or local government bodies, the plaintiff must prove (1) the entity executed a policy or custom, (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009) (citing *Whitesel v. Sengenberger*, 222 F.3d 861, 870 (10th Cir. 2000)). The plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997).

"[A] municipality can be liable under § 1983 if the 'final policymaker' takes the unconstitutional action." *Moss*, 559 F.3d at 1168–69 (citation omitted). The Tenth Circuit has acknowledged that municipal liability may also be found when a plaintiff establishes: (1) "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," or (2) that "a subordinate's position is subject to review by the municipality's authorized policymakers and the authorized policymakers approve a subordinate's decision and the basis for it." *Id.* at 1169 (internal quotation marks and citations omitted).

*Failure to Train*

A failure to provide proper training may constitute the requisite policy or custom executed by the municipal entity if that failure reflects "deliberate indifference to the constitutional rights of its inhabitants." *City of Canton v. Harris,* 489 U.S. 378, 92 (1989). Such deliberate indifference is apparent when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." *Id.* at 390.

Mr. Schwark's failure to train claim, as stated in his Complaint, broadly included correctional officers, medical staff, and mental health staff. Compl. at 17. His Summary Judgment Response, however, only discusses the alleged insufficient training provided to nursing staff. Resp. to Park County Mot. at 43-45. Since I have found Mr. Schwark has failed to show the single nurse remaining in this case violated his rights, no liability for the County can lie for failure to train the Jail's nurses. *See Moss*, 559 F.3d at 1168. Besides, under Mr. Schwark's theory that Nurse Swann violated his rights in neglecting to secure him in the medical unit, he would have to establish that the County's failure to train her in that regard caused the violation and that the need for related training was so obvious and the inadequacy so likely to result in the violation that the County's deliberate indifference was apparent. Instead, Mr. Schwark claims that, "[b]y actively training their nursing staff to provide a lower standard of care and to ignore inmate complaints about serious medical needs, the Park County Jail is deliberately indifferent." Resp. to Park County Mot. at 44. Such nonspecific and unrelated assertions do not come close to meeting the standard.

With respect to the failure to train correctional officers, which must relate to Captain Muldoon's violation of Mr. Schwark's rights, nothing in the record pertains to that training or how its inadequacy was the cause of the violation. So there, too, Mr. Schwark falls short.

*New Bases for County Liability*

I find it is not proper to entertain the other grounds Mr. Schwark now advances for holding the County liable. A complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Mr. Schwark's claim against Sheriff Wegener in his official capacity specified that it was for failure to train the Jail employees and did not put the County on notice of the other bases for which he might assert the claim. *See Simantob v. Mullican Flooring, L.P.*, 527 Fed. Appx. 799, 807 (10th Cir. 2013) (unpublished) ("[R]eading complaints too broadly to include any possible theory of recovery 'could create injustice' by requiring defendants to infer every potential argument a plaintiff could later make." (quoting *Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009)).

Regardless, even if I were to consider the alternative bases, each would fail. First, Captain Muldoon was not a final policymaker. Sheriff Wegener was the Jail's final policymaker. Wegener Aff. ¶¶ 2, 5; Muldoon Dep. at 19:7-17, ECF No. 82-2. Thus, Captain Muldoon's unconstitutional actions cannot be attributed to the County. Under Mr. Schwark's broad reading of what constitutes a final policymaker, a municipality could be held liable for the constitutional violations of any individual assigned a duty. That is not the law. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 126 (1988) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat*

*superior* liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.").

Second, Sheriff Wegener, as the final policymaker, did not ratify Captain Muldoon or Dr. Fitting's conduct and cannot subject the County to liability merely for not disciplining or reprimanding them for their conduct in February and March 2014. *Butler v. City of Norman*, 992 F.2d 1053, 1056 (10th Cir. 1993) (refusing to hold that failure "to discipline in a specific instance is an adequate basis for municipal liability under *Monell*." (internal quotation marks and citation omitted)).

And, third, assuming and not finding that the County's medication policy did cause his injuries, establishing that single connection is insufficient for the County to be held liable.[14] "[P]roof of a single incident of unconstitutional activity is ordinarily not sufficient to impose municipal liability . . . ." *Moss*, 559 F.3d at 1168–69 (citing *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996)). Mr. Schwark alludes to other possible constitutional violations by stating that "every person who enters the Jail with a prescription for benzodiazepines is weaned off of that prescription, with the only exception being individuals suffering from seizure disorder." Resp. to

---

[14]Mr. Schwark vaguely asserts:

> [T]he evidence demonstrates a direct causal link between Park County's policies with respect to prohibition of certain medications at the jail, refusal to comply with Court orders in relation to the provision of Court-ordered medications to inmates, and failure to adequately monitor, train, supervise, and discipline their jail employees, including Defendant Muldoon, regarding the mandates imposed by the United States Constitution – including the provision of appropriate care to inmates confronting emergency medical situations– and the individual Defendants' violations of Plaintiff's federally-protected rights.

Resp. to Park County Mot. at 45. The arguments I do not address here are not fully developed and lack any support in the record.

Park County Mot. at 45. But, even supposing that every person entering the Jail on benzodiazepines is weaned off of them, that is not proof of other incidents of unconstitutional activity. Here, the act of weaning Mr. Schwark off of benzodiazepines alone is not the basis for finding a constitutional violation on the part of Dr. Fitting. Mr. Schwark cites *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012), to carry his argument. Importantly, however, in *King*, the Seventh Circuit noted that at least seven articles had been published by the local paper "expressing alarm" over the medication policy and the Sheriff testified he was aware of the jail's problems with distribution of medication to inmates. *Id.* at 1021. Mr. Schwark has presented no such evidence.

Therefore, Mr. Schwark has not shown—through any of his various theories—that Park County executed a policy or custom that caused him to suffer a deprivation of his constitutional rights. And Sheriff Wegener is entitled to summary judgment on Mr. Schwark's claim against him in his official capacity.

## V. Conclusion

Accordingly, the Motion for Summary Judgment filed by Defendants Nurse Swann, Captain Muldoon, and Sheriff Wegener (ECF No. 74) is GRANTED IN PART in that summary judgment shall enter in favor of Nurse Swann and Sheriff Wegener and DENIED IN PART in that Mr. Schwark may proceed with his claim against Captain Muldoon for his conduct in February and March 2014. Dr. Fitting's Motion (ECF No. 75) is likewise GRANTED IN PART and DENIED IN PART such that Mr. Schwark may proceed with his claims against her for her actions in February and March 2014. The parties are DIRECTED to call chambers jointly at (303) 844-6118 on or before April 4, 2019, to set a date and time for the pretrial conference.

DATED this 29th day of March, 2019.

_____

JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE